**UNITED STATES v. GENERAL ELECTRIC
CO. et al.**

**Civ. A. No. 1364.**

United States District Court
D. New Jersey.

Jan. 19, 1949.

As Corrected April 4, 1949.

762

Leonard J. Emmerglick, and Bartholomew A. Diggins, Sp. Assts. to Atty. Gen., John S. James, of New York City, Robert

B. Hummel, of Alexandria, Va., Horace H. Robbins, of New York City, and Burton R. Thorman, of Washington, D. C., Sp. Attys., Wendell Berge, Asst. Atty. Gen., Alfred E. Modarelli, U. S. Atty., of Newark, N. J., for plaintiff.

Katzenbach, Gildea & Rudner and George Gildea, all of Trenton, N. J. (Simpson, Thacher & Bartlett, Whitney North Seymour, Albert C. Bickford, Stephen P. Duggan, Jr., R. E. Anderson, Charles J. Colgan, Irving Parker, George G. Gallantz, James H. Sheils, Fish, Richardson & Neave, Alexander C. Neave, H. R. Ashton, Charles H. Walker and Harry Pugh, Jr., all of New York City, and Quincy D. Baldwin, of Cleveland, Ohio, of counsel), for General Electric Co. and International General Electric Co., Inc.

Lindabury, Depue & Faulks and Josiah Stryker, all of Newark, N. J. (Cravath, DeGersdorff, Swaine & Wood and Robert T. Swaine, all of New York City, Roy Weidman, of Newark, N. J., and Harold Smith, Donald C. Swatland and Edwin H. Todd, all of New York City, of counsel), for Westinghouse Electric & Manufacturing Co.*

Hobart, Minard & Cooper and Ralph E. Cooper, all of Newark, N. J., and Donald O. Hobart, of Montclair, N. J. (John Lord O'Brian, of Washington, D. C., Halsey Sayles, of Elmira, N. Y., and William P. Stewart, of Buffalo, N. Y., of counsel), for Corning Glass Works, American Blank Co., and Empire Machine Co.†

Edgar W. Hunt, of Lambertville, N. J. (George C. Sharp and Emery H. Sykes, both of New York City, of counsel), for N. V. Philips' Gloeilampenfabrieken.

Wall, Haight, Carey & Hartpence and Edward J. O'Mara, all of Jersey City, N. J. (Edwin Foster Blair, and Gregory H. Doherty, both of New York City, of counsel), for Consolidated Electric Lamp Co.

Pitney, Hardin, Ward & Brennan, John R. Hardin, and Arthur J. Martin, Jr., all of Newark, N. J., and William R. Lockridge, of Salem, Mass. (Ropes, Gray, Best, Coolidge & Rugg, John B. Hopkins, Charles B. Rugg and Warren F. Farr, all of Boston, Mass., of counsel), for Sylvania Electrical Products, Inc.

Wicoff & Lanning and Kenneth H. Lanning, all of Trenton, N. J. (Leonard & Leonard, Gordon M. Leonard, and Ernest Freeman, Jr., all of Chicago, Ill., of counsel), for Chicago Miniature Lamp Works.

Martin & Reiley and Blair Reiley, all of Newark, N. J. (Bartlett, Eyre, Keel & Weymouth, by Richard Eyre, all of New York City, of counsel), for Tung-Sol Lamp Works, Inc.

## CONTENTS

| Subject | Page |
|---|---|
| Pleadings | 764 |
| Introduction | 771 |
| Adjuvant Monopolies | 777 |
| Lamp Making Machinery | 777 |
| Glass Machinery and Products | 779 |
| Lamp Base Machinery and Bases | 799 |
| Filament and Leading-in Wire | 803 |
| Expansion and Distribution of Outlets | 805 |
| Patents | 805 |
| Agency | 817 |
| Foreign Agreements | 827 |
| Mazda | 848 |
| Public Business | 850 |
| Electrical Testing Laboratories | 852 |
| Public Utilities | 854 |
| Suppression of Research and Development | 856 |
| Fluorescent License | 858 |
| Argon Gas | 859 |
| Suppression of Trade by Domestic Licenses | 860 |
| Competition Eliminated Between General Electric and Westinghouse | 860 |
| "B" Licensees | 873 |

---

* The attorneys and counsel for Westinghouse Electric & Manufacturing Company withdrew from the case and did not participate in the trial after the entry of the consent decree against it on April 10, 1942.

† The attorneys and counsel for Corning Glass Works withdrew from the case and did not participate in the trial after the entry of the consent decree against it on March 7, 1946. American Blank Company and Empire Machine Company were dissolved prior to the institution of this suit.

| Subject | Page |
|---|---|
| Clayton Act | 884 |
| Philips | 884 |
| Monopoly of Incandescent Electric Lamps | 892 |
| Dominant Position | 892 |
| Profits | 894 |
| General Monopoly Powers | 895 |
| Intimidation of Business | 895 |
| Deterioration of Product | 896 |
| Power to Exclude | 899 |
| Industrial Surveillance | 901 |
| Conclusion | 901 |
| Objections and Motions | 902 |
| General Conclusion | 905 |

FORMAN, District Judge.

### The Pleadings

Pursuant to § 4 [1] of the Sherman Act, § 15 [2] of the Clayton Act and § 74 [3] of the Wilson Tariff Act, the plaintiff, the United States of America, filed a complaint to prevent and restrain alleged continuing violations of §§ 1 [4] and 2 [5] of the Sherman Act, § 3 [6] of the Clayton Act and § 73 [7] of the Wilson Tariff Act respectively. It named the following defendants:

1. General Electric Company, described as a New York corporation, having lamp plants in Ohio, New Jersey, Missouri, Massachusetts, New York and California, which together with its subsidiaries is engaged principally in production and distribution of incandescent electric lamps, electrical appliances and other electrical products, and is the largest producer of glass bulbs, lamp bases, and incandescent electric lamps in the United States and in the world.

2. International General Electric Company, Inc., a New York corporation whose outstanding capital stock is entirely owned by General Electric Company. It is described as a large distributor in and to foreign countries of American produced incandescent electric lamps, electrical appliances and other forms of electrical products.

3. Westinghouse Electric & Manufacturing Company, [8] a Pennsylvania corporation with its principal office in New York City and its lamp plants in New Jersey and Pennsylvania. It is described as the second largest manufacturer and distributor of incandescent electric lamps in the United States. Together with its subsidiaries it manufactures and distributes a full line of electrical appliances and other electrical products, some of which are competitive with similar products produced by defendant General Electric and its subsidiaries.

4. Corning Glass Works, [9] a New York corporation which together with its subsidiaries is described as the largest manufacturer and distributor of specialty glass products in the United States. It is principally engaged in the production and distribution of glass bulbs, tubing and cane, signal and optical ware, heat resisting ware, and other forms of specialty ware.

5. American Blank Company, [10] a corporation of the State of Maine, described as a patent holding company for defendants, General Electric and Corning. It is said to be wholly owned by defendant Corning, or Corning subsidiary, Empire Machine Company.

6. Empire Machine Company, [10] a corporation of the State of Maine, described as a patent holding company for the defendant Corning, 90% of the stock of which is owned by the stockholders of Corning.

7. N. V. Philips' Gloeilampenfabrieken, a limited company of Holland. It is described as having been engaged for many years in the business of manufacturing, among other things, glass bulbs, tubing and cane at several of its plants including those

---

[1] 15 U.S.C.A. § 4.
[2] 15 U.S.C.A. § 25.
[3] 15 U.S.C.A. § 9.
[4] 15 U.S.C.A. § 1.
[5] 15 U.S.C.A. § 2.
[6] 15 U.S.C.A. § 14.
[7] 15 U.S.C.A. § 8.
[8] Consent decrees were entered against the defendants, Westinghouse Electric & Manufacturing Company and Corning Glass Works, before the taking of any testimony and without trial or adjudication of any issue of fact or law. The said defendants did not participate in the trial and all statements contained in this opinion should be understood in the light of that fact.
[9] See note 8.
[10] These companies were dissolved prior to the institution of this suit.

in Holland and distributing and selling such products throughout the world, including importations into the United States. (Jurisdiction over Philips was obtained by service on its officers who had taken refuge in this country to escape Nazi domination.)

8. Consolidated Electric Lamp Company, a Massachusetts corporation licensed by defendant General Electric to produce and distribute large type incandescent electric lamps in the United States.

9. Hygrade Sylvania Corporation, a Massachusetts corporation described as being licensed by General Electric to produce and distribute large type incandescent electric lamps in the United States.

10. Ken-Rad Tube and Lamp Corporation,[11] a corporation of Delaware described as licensed by General Electric to produce and distribute large type incandescent electric lamps in the United States.

11. Chicago Miniature Lamp Works, a corporation of Illinois licensed by General Electric to produce and distribute miniature incandescent electric lamps in the United States.

12. Tung–Sol Lamp Works Incorporated, a corporation of Delaware described as being licensed by General Electric to produce and distribute miniature type incandescent electric lamps in the United States.

For brevity the plaintiff will be usually referred to herein as the Government and the defendants' corporate titles will generally be shortened to the following:

General Electric Company—General Electric or GE

International General Electric Company, Incorporated—International General Electric or IGE

Westinghouse Electric & Mfg. Co.—Westinghouse

Corning Glass Works—Corning

American Blank Company—American Blank

Empire Machine Company—Empire

N. V. Philips' Gloeilampenfabrieken—Philips

Consolidated Electric Lamp Company—Consolidated

Hygrade Sylvania Corporation—Sylvania

Ken-Rad Tube and Lamp Corporation—Kenrad

Chicago Miniature Lamp Works—Chicago Miniature

Tung-Sol Lamp Works Incorporated—Tungsol

In paragraphs 17 to 83, inclusive, of the complaint, the Government described the history of the incandescent electric light lamp industry and its technical development. It outlined the business organization of the industry during the periods from 1879 to 1896; 1896 to 1911; and 1911 to 1926. In the earliest period General Electric succeeded to the interests of practically all of the companies engaged in the manufacture of incandescent electric light lamps with the exception of Westinghouse. General Electric had acquired the "Edison" patents controlling the carbon filament lamp. These, however, were about to expire in 1896.

During the period from 1896 to 1911 a patent agreement was executed between General Electric and Westinghouse and an association of lamp manufacturers was organized. In 1911 a suit was instituted charging General Electric, Westinghouse and a number of other companies with violating the Sherman Anti-Trust Act and a consent decree was entered in the suit.

The period from 1911 to 1926 was characterized by the acquisition by General Electric of the controlling patents on the tungsten filament incandescent electric light lamps and the licensing of Westinghouse and other lamp manufacturers under these patents. In 1924 the Government filed a petition against General Electric, Westinghouse and Westinghouse Lamp Company charging that the agency system of lamp marketing employed by the companies and the license agreement between General Electric and Westinghouse were il-

---

[11] The lamp business of Ken-Rad Tube and Lamp Corporation was acquired by Westinghouse Electric and Manufacturing Company since the institution of this suit and was subsequently dissolved.

legal and in violation of the Sherman Anti-Trust Act. The case was tried in 1925 in the United States District Court for the Northern District of Ohio, Eastern Division, and the petition was dismissed, 15 F.2d 715. The decision was appealed to the United States Supreme Court which, in 1926, affirmed the District Court, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362.

In paragraph 84 of the complaint the Government charged that since 1927 each of the defendants unlawfully conspired to monopolize, attempted to monopolize, and unlawfully contracted, combined and conspired to restrain trade or commerce among the several states, or with foreign nations, in the incandescent electric light lamp industry and more particularly by unlawfully and in violation of § 1 and § 2 of the Sherman Anti-Trust Act

"(a) acquiring and maintaining monopolies of (1) patents relating to incandescent electric lamps, (2) patents relating to glass bulbs, tubing and cane, (3) the manufacture and distribution of machinery for the production of glass bulbs, tubing and cane, (4) the manufacture, distribution and sale of glass bulbs, tubing and cane, (5) the manufacture, distribution, and sale of incandescent electric lamp bases, (6) the manufacture, distribution, and sale of incandescent electric lamps;

"(b) agreeing to restrain and by restraining interstate and foreign trade and commerce in incandescent electric lamps and machinery for the production of incandescent electric lamps;

"(c) agreeing to restrain and by restraining interstate and foreign trade and commerce in glass bulbs, tubing and cane and in machinery for the production of glass bulbs, tubing and cane;

"(c) [sic] agreeing to restrain and by restraining interstate and foreign trade and commerce in incandescent electric lamp bases and in machinery for the production of incandescent electric lamp bases;

"(e) agreeing to restrain and by restraining interstate trade and commerce in argon gas; and

"(f) agreeing to maintain and by maintaining uniform prices in the distribution and sale of incandescent electric lamps in the United States."

In paragraph 85 the Government charged that since 1927 General Electric and Westinghouse violated § 3 of the Clayton Act by making sales, contract for sales, or contracts for the distribution of incandescent electric lamps manufactured by them for use, consumption or re-sale within the United States and fixing the prices charged therefor or discounts from, or rebates upon such prices on the condition, agreement or understanding that the purchasers thereof or agents therefor shall not use or deal in other incandescent electric lamps, all with the purpose and effect of substantially lessening competition and tending to create a monopoly in interstate trade or commerce in incandescent electric lamps.

In paragraph 86 the Government charged that since 1927 General Electric, Corning and Philips have violated and are now violating § 73 of the Wilson Tariff Act by unlawfully combining and conspiring with and entering into and maintaining unlawful contracts or agreements relating to the importation from foreign countries into the United States of glass bulbs, tubing and cane and machinery for the production of such articles, whereby Philips has been and is prevented from importing such articles into the United States, all with the purpose and effect of restraining lawful trade and competition in the United States.

In paragraphs 87 to 102 the Government set forth in summary and in detail its charges that General Electric since 1927 has dominated and monopolized and continues to dominate and monopolize the incandescent electric lamp industry in the United States in which domination and monopoly Westinghouse has shared.

In paragraphs 103 to 117, inclusive, the Government charged that since 1927 General Electric has through its subsidiary, IGE, entered into and maintained unlawful patent licensing agreements, and is unlawfully maintaining other agreements earlier made with potential and actual foreign competitors; that General Electric and Corning have acquired and maintained and are maintaining foreign patents and have entered into licensing agreements with foreign companies in order to keep out of the United States glass parts and glass mak-

ing machinery and that General Electric and Westinghouse have since 1927 entered and have maintained and are maintaining unlawful patent pooling and licensing agreements and other agreements with potential domestic competitors.

In paragraphs 118 to 129, inclusive, the Government charged that General Electric and Westinghouse recognizing that General Electric's controlling lamp patents were about to expire entered into negotiations with each other in 1927, with a view toward continuing their control over the manufacture, distribution and sale of lamps in the foreign market. On or about June 15, 1928, General Electric and Westinghouse executed a license agreement, dated as of January 1st, 1927, which superseded the license and agreement executed in 1912 providing as follows:

"(a) Westinghouse is licensed nonexclusively by General Electric to manufacture and sell all types of incandescent electric lamps under certain United States patents listed in a schedule annexed to the license and agreement, and under any United States patents and patent applications which General Electric might during the term of the license own or control, or under which General Electric might have the right to grant such licenses, for improvements in electric lamps and improvements in the machines, appliances, or processes for the manufacture of incandescent electric lamps;

"(b) Westinghouse's quota for domestic production was for the year 1927 to be increased from 17.25% to 22.4421% of the aggregate net sales (expressed in dollars) of electric lamps by General Electric and Westinghouse in and for use in the United States, and thereafter the quota was raised by 1% for each succeeding year after 1927 and until 1930, when it reached a maximum of 25.4421%, at which percentage the quota is to remain constant for the duration of the license;

"(c) Westinghouse has agreed to pay as a royalty or license fee an amount equal to 1% of its net sales of lamps for use in or outside the United States and made under the patents covered by the license, and in the event that such sales by Westinghouse exceed its quota, the royalty rate is to be stepped up from 1% to an amount equal to 30% of such excess sales:

"(d) Westinghouse has agreed to maintain prices, terms, and conditions of sales as fixed and followed by General Electric in making its own lamp sales:

"(e) Westinghouse has agreed not to interfere with General Electric's 'consignment' plan of lamp distribution by (1) offering Westinghouse's 'agents' greater compensation than that allowed by General Electric to its own 'agents'; (2) offering Westinghouse's 'agents' more favorable terms than those allowed by General Electric to its own 'agents', and (3) appointing as Westinghouse's 'agents' persons or companies of whom General Electric affirmatively disapproved;

"(f) Westinghouse is expressly not licensed under the foreign patents owned by General Electric, nor permitted to export lamps nor to sell lamps for export, except to those countries to which General Electric itself has a right to export lamps;

"(g) Westinghouse is expressly not licensed to sell filaments or other parts of lamps, nor to manufacture glass bulbs, tubing, or cane;

"(h) General Electric and Westinghouse have admitted the validity of the patents under which each is licensed, but such admission is to be limited to the life of, and to the fields of use covered by, the licenses;

"(i) The agreement is to continue in force until the date of expiration of the patents and patent applications, as listed in the schedule annexed to the license and agreement, but it has been agreed that Westinghouse can surrender the license by giving two years' notice after 1935, and General Electric can terminate the license and agreement on sixty days' notice after arbitrators, appointed as provided in the license and agreement, have determined that Westinghouse has willfully breached the agreement; and

"(j) If in any year Westinghouse sells an amount 5% or more in excess of its quota, such sale is to be deemed a breach of the agreement."

In paragraphs 130 to 139, inclusive, the Government charged that in 1927 about

eleven domestic companies, other than Westinghouse, were operating under patent licensing arrangements with General Electric to manufacture and sell lamps in the United States. By 1936 they had been reduced to five companies known as the "B" licensees of General Electric, and consisted of defendants Sylvania, Consolidated, Kenrad, Tungsol and Chicago Miniature. Except for the differences in the amount and type of lamps which General Electric permits each licensee to manufacture and sell in the United States the licenses and agreements are substantially identical and provide as follows:

"(a) Each licensee is licensed nonexclusively by General Electric under its patents then owned or thereafter to be acquired which relate to incandescent electric lamps or to the manufacture thereof;

"(b) Each licensee is limited in its sales in any one year to a certain fixed quota or percentage which is based on General Electric's total net dollar sales for that year;

"(c) If in any one year a licensee should sell less than its quota, it could, in the next succeeding year, sell an additional amount equal to the amount of the shortage, but not more than 10% of the quota for the year in which the shortage occurred;

"(d) If in any year a licensee should sell an amount 10% or more in excess of its quota, such act would constitute a breach of the agreement;

"(e) Each licensee is required to pay upon its lamp sales a royalty of 3⅓% with a discount of 10% for prompt payment and proper reporting, and such royalty is computed on the basis of the prices charged by General Electric for such types of lamps;

"(f) Each licensee is required to pay an additional royalty of 20% of its net sales in any year in excess of 5% over its quota for that year;

"(g) Each licensee is expressly precluded under General Electric's patents covered by the license from (1) manufacturing lamp bulbs, glass tubing, cane glass or lamp bases, (2) exporting lamps or selling lamps for export, and (3) selling any part of an incandescent lamp or any machine, appliance, or material, or any part thereof;

"(h) Each licensee is licensed to manufacture, solely for its own use as a licensed lamp manufacturer, any lamp-making machinery, appliance or materials covered by any patent or patents listed in the license and agreement, or to purchase the same in each case, solely for such use, but only from such others licensed by General Electric to manufacture them for sale;

"(i) Each licensee has granted to General Electric a non-exclusive license with the right to grant sub-licenses, to make, use and sell incandescent lamps of all kinds and machines, appliances and materials for the manufacture of such lamps, under all patents and patent rights which the licensee or its officers and directors then, or thereafter during the term of the agreement might own or control for the life of the patents respectively;

"(j) Each licensee has agreed to grant to General Electric upon demand, non-exclusive licenses under any foreign patents such licensee might own, to enable General Electric to abide by its contracts with others;

"(k) Each licensee has agreed to keep its books, warehouses, and factories open to the inspection of General Electric;

"(l) Each agreement is to continue in force until December 31, 1944, unless sooner terminated by General Electric for breach of conditions thereof by the licensee;

"(m) Each licensee can cancel the agreement upon six months' notice in writing to General Electric;

"(n) Each licensee has agreed not to advertise or sell lamps bearing the mark 'G. E.,' 'Mazda,' 'Edison,' 'National' or any other mark or brand used by General Electric; and

"(o) General Electric and each licensee have admitted the validity of the patents under which each is licensed, but such admission is to be limited to the life of, and the fields of use covered by, the licenses."

In paragraphs 140 to 217, inclusive, the Government charged that General Electric and Westinghouse have conspired and combined to control and dominate the manufacture, use and sale of lamp bases and lamp

base making machinery in the United States; that General Electric, Corning, Empire and American Blank have conspired and combined to control and dominate the manufacture, use and sale of glass bulbs, tubing and cane, and glass making machinery in the United States; that General Electric has conspired and combined with others to restrain the production, use and distribution of argon gas for use in lamps in the United States and General Electric has conspired and combined with others to restrain the manufacture, use and sale of lamp making machinery in the United States.

In paragraphs 218 to 253, inclusive, the Government charged that in order to carry out the conspiracies, monopolies and combinations in restraint of trade, as alleged in the complaint, and particularly insofar as they relate to the distribution and sale of large lamps, General Electric and Westinghouse have adopted and maintained a system of lamp distribution involving a so-called agency arrangement by which General Electric has acquired a monopoly in the distribution and sale of lamps in the United States, and Westinghouse has acquired a share of such monopoly. By means of this system and by means of the license and agreement between General Electric and Westinghouse, General Electric fixed and controlled re-sale prices of all lamps sold by General Electric and Westinghouse.

In paragraphs 254 to 266, inclusive, the Government alleged that in order to carry out the conspiracies, monopolies and combinations insofar as they related to the manufacture and sale of miniature lamps General Electric and Westinghouse have since 1927 distributed such miniature lamps with the exception of mine type lamps by means of so-called agency contracts and have fixed and maintained re-sale prices of miniature lamps.

In paragraphs 267 to 293, inclusive, the Government charged that the distribution arrangement of General Electric and Westinghouse for all types of lamps whereby contracts of so-called agency have been and are executed by them with their respective distributors has not created and does not create or represent a relationship of true agency between General Electric or West-

inghouse and their respective distributors. Plaintiff alleged that General Electric and Westinghouse have employed this device to defeat the provisions of the anti-trust laws.

In paragraphs 294 to 314, inclusive, the Government alleged that in order to maintain and extend General Electric's control and domination of the domestic lamp industry General Electric and Westinghouse from time to time since 1927 have engaged in other unlawful acts and practices which are thereinafter set forth.

In paragraphs 315 to 322, inclusive, the Government alleged that continuously from the dates of their original agreements, licenses and understandings, as thereinbefore set forth, General Electric and Westinghouse have unlawfully maintained such agreements and understandings with other large and powerful companies which are potential lamp manufacturing competitors whereby such companies have been disabled and have refrained from engaging in competition.

In paragraph 333 the Government concludes that:

"By establishing and maintaining the conspiracies, monopolies, and combinations in restraint of trade, and by the various acts hereinbefore alleged, the defendants herein (a) have obtained and now hold a monopoly of patents relating to glass bulbs, tubing and cane and the manufacture thereof in the United States; (b) have obtained and now hold a monopoly of patents relating to incandescent electric lamps and the manufacture thereof in the United States; (c) have established and now hold a monopoly in the manufacture, distribution, and sale of such lamps in the United States; (d) have unreasonably restricted and now restrict the production of such lamps in the United States; (e) have unreasonably restricted and now restrict the distribution and sale of such lamps in the United States; (f) have fixed and now maintain non-competitive prices on approximately 80% of such lamps manufactured and sold in the United States; (g) have obtained and now maintain monopolies on glass bulbs, tubing and cane on lamp bases; (h) have restrained and now restrain trade in other essential parts and materials for incandescent lamps; (i) have eliminated the importation into the

United States of glass bulbs, tubing and cane, machinery relating to the manufacture of such glass parts; lamps, lamp parts and lamp-making machinery; (j) have discouraged and impeded the progress of science and the useful arts, and have used the patent laws of the United States for purposes inconsistent with the constitutional basis of these laws; and (k) have monopolized interstate and foreign trade and commerce and have unreasonably restrained such trade and commerce in violation of the laws of the United States."

Finally, among the sixteen prayers of the Government are the following:

"(1) That the aforesaid monopolies, attempts to monopolize, combinations and conspiracies to monopolize, and contracts, combinations, and conspiracies to restrain trade and commerce among the several States and with foreign nations be adjudged and decreed to be unlawful, and that the agreements, understandings, acquisitions, purchases, and practices alleged in this complaint be adjudged and decreed to be in violation of the Sherman Anti-Trust Act, the Clayton Act and the Wilson Tariff Act.

"(2) That the Court adjudge and decree that the defendants have monopolized, attempted to monopolize, combined and conspired to monopolize, and contracted, combined, and conspired to restrain trade in violation of Sections 1 and 2 of the Sherman Antitrust Act, Section 3 of the Clayton Act, and Section 73 of the Wilson Tariff Act.

"(3) That the Court adjudge and decree that the defendants, General Electric, International, Corning, Philips, American Blank, and Empire have monopolized, attempted to monopolize, combined and conspired to monopolize, and contracted, combined, and conspired to restrain trade in violation of Sections 1 and 2 of the Sherman Antitrust Act with respect to patents relating to the manufacture of machinery for the production of glass bulbs, tubing and cane and with respect to the manufacture and sale of glass bulbs, tubing and cane.

"(4) That the Court adjudge and decree that the defendants, General Electric and Westinghouse have monopolized, attempted to monopolize, combined and conspired to restrain trade in violation of Sections 1 and 2 of the Sherman Antitrust Act with respect to the manufacture and sale of bases for incandescent electric lamps.

"(5) That the Court adjudge and decree that the defendants, General Electric and Westinghouse have monopolized, attempted to monopolize, combined and conspired to monopolize, and contracted, combined, and conspired to restrain trade in violation of Sections 1 and 2 of the Sherman Antitrust Act with respect to patents relating to lamps and to the manufacture of lamps.

"(6) That the Court adjudge and decree that the defendants, General Electric and Westinghouse have monopolized, attempted to monopolize, combined and conspired to restrain trade in violation of Sections 1 and 2 of the Sherman Antitrust Act and Section 3 of the Clayton Act with respect to the manufacture and sale of incandescent electric lamps.

"(7) That the Court adjudge and decree that the defendants, General Electric, Corning and Philips have combined and conspired to restrain trade in violation of Section 73 of the Wilson Tariff Act with respect to the importation into the United States of glass bulbs, tubing and cane and machinery for the production thereof.

"(8) That each of the agreements, licenses and understandings between defendants General Electric and Westinghouse, between defendants General Electric and Consolidated, between defendants General Electric and Hygrade, between defendants General Electric and Ken-Rad, between defendants General Electric and Chicago Miniature, between defendants General Electric and Tung-Sol, between defendants Corning and Philips, between defendants General Electric and each or all of the following defendants: Philips, Corning, American Blank, and Empire Machine, and between any of such defendants, and any other agreements, licenses and understandings between and among the corporate defendants, or any of them, be each adjudged to represent an illegal combination and conspiracy to restrain and monopolize interstate and foreign trade and commerce, and that the observance of each of such agreements, licenses and understandings in any respect, and the execution of similar agree-

ments, licenses and arrangements be perpetually enjoined.

"(9) That the agreements between defendants General Electric and International, and between defendant International and the various foreign lamp companies described hereinafter, be each adjudged to represent an illegal combination and conspiracy to restrain and monopolize interstate and foreign trade and commerce, and that the observance of each of such agreements in any respect and the execution of similar agreements be perpetually enjoined.

"(10) That defendants General Electric and Westinghouse and their respective subsidiaries be enjoined from making a contract or other arrangements with any dealer engaged in handling lamps which will have the effect of fixing a sales price thereof after such lamps shall physically pass out of the hands of defendants General Electric and Westinghouse or their respective subsidiaries.

"(11) That the defendants, and each of them, and their officers, directors, agents, representatives, and all persons and corporations acting and claiming to act on behalf of them, be perpetually enjoined from monopolizing, attempting to monopolize, combining and conspiring to monopolize or agreeing, combining, or conspiring to restrain trade, and be perpetually enjoined from engaging in or participating in practices, agreements, licenses, contracts, relationships, or understandings, or claiming any rights thereunder, having a tendency to continue or revive any of the aforesaid violations of the Sherman Anti-Trust Act, the Clayton Act and the Wilson Tariff Act.

"(12) That plaintiff have such other and further relief with respect to the organization, functions and operations of defendants as the Court may deem appropriate and necessary to establish effective competition in lamp parts, lamp machinery and lamps in the United States.

"(13) That the plaintiff have such injunctive relief as the Court may deem appropriate and necessary to prevent General Electric, Corning and Westinghouse by the abuse of their patent rights from restricting and eliminating competition between each other and between and among the other defendants from depriving others of a fair opportunity to compete freely and unrestrictively with General Electric, Corning and Westinghouse and the other defendants and from engaging in any other activities which are designed to or have the effect of impairing the ability of such competitors to compete with defendants."

Answers were filed by all defendants, Corning filing for American Blank and Empire. Since these latter two defendants were dissolved by judicial decree of the State of Maine on November 7, 1940 and January 8, 1941, an order was signed dismissing the complaint as against them. For the purpose of totality of determination, however, it has been necessary to give consideration in detail to their activities prior to such dissolution. Sylvania also filed a cross-claim against Corning and General Electric alleging restraints of trade in the glass bulb, tubing and cane industry as it affected Sylvania but these parties later stipulated to its dismissal without prejudice. Jewell Incandescent Lamp Company sought to intervene as a representative of a class of incandescent lamp manufacturers but its motion was denied.

The complaint was filed January 27, 1941 and trial commenced in 1942, but was suspended at the request of the Secretaries of War and Navy and not resumed until March 1946.

### Introduction

The incandescent lamp industry has its foundations in the invention of the carbon filament vacuum electric lamp by Thomas A. Edison in 1879. A number of companies were organized to exploit this invention, patented in 1880. In 1891, a consolidation of the Edison General Electric Company, Thomson-Houston Company and the Thomson-Houston International Electric Company resulted in the organization of the General Electric Company. By this consolidation General Electric obtained control of the basic Edison patents and until expiration of the patents had a virtual monopoly of the domestic supply in electric lamps. Upon expiration of the basic patents in 1894, General Electric entered into a cross-licensing patent agreement with Westinghouse and organized the Incandes-

cent Lamp Manufacturers an unincorporated association consisting of several independents who entered the field upon expiration of the Edison patents. In 1901, General Electric acquired a majority stock interest in the National Electric Lamp Company which in turn obtained control of the Lamp Manufacturers Association. By 1911 National Electric controlled eighteen subsidiaries engaged in the incandescent lamp industry. Although National Electric was an alter ego of General Electric, National Electric and its subsidiaries held themselves out to the public as competing establishments.

As a result of the cross-license agreement with Westinghouse and stock interest in National Electric, General Electric controlled approximately 80% of the incandescent lamp business by 1911, although the basic Edison patents had expired. The Government, in 1911, charged General Electric, Westinghouse, National Electric and its affiliates with violations of the Sherman Act. By a consent decree National Electric was ordered dissolved and General Electric directed to acquire the assets of its subsidiaries to prevent the public from being misled as to the real nature of General Electric control (Ex. G 1). General Electric continued its 80% control of the industry so that the decree had no effect upon its dominance of it, but lamp manufacturers were enjoined by the decree from engaging in certain price fixing practices.

Meanwhile, General Electric, through General Electric Research Laboratory, conducted experiments in the use of metallized carbon filaments. The incandescent lamp of the period 1900 to 1912 was relatively fragile, short lived and not an efficient source of light. Between 1907 and 1909, General Electric brought out the filament lamps. Two Austrians, Just and Hanaman, had developed practical commercial models of the tungsten filament lamps and had applied in the United States for patents. These patent rights were acquired by General Electric and in 1912, the Just and Hanaman patent was issued.

In 1912 aside from General Electric's control of approximately 80% of the incandescent lamp business as a result of the previously mentioned consolidations resulting from the 1911 decree, the remaining 20% was done by a number of companies which were infringing the Just and Hanaman patent on the tungsten filament. A new license with Westinghouse was executed so as to permit it to manufacture lamps under this and other patents. The Just and Hanaman patent was sustained in 1916, General Electric Co. v. Laco-Philips Co., 2 Cir., 233 F. 96, and as a result, General Electric, as the owner of this patent was in a position to prevent any other persons from making lamps of the then commercially successful types.

The predecessors of General Electric had established several foreign contacts. Upon organization of General Electric, these contacts were extended until General Electric had some form of representation in England, France, Germany, Holland, Italy, Austria and Japan (R. 1422–1455). Eventually wholly owned General Electric foreign subsidiaries were established as follows: Anderson, Meyer and Company, Ltd. (China); Australian General Electric Company, Ltd.; General Electric, S.A. (Brazil); General Electric Company of Cuba; General Electric, S.A. (Mexico); and South African General Electric Company (Ex. 20-G, R. 1425–1426).

In 1919, International General Electric was organized by General Electric for the purpose of exploiting the foreign markets. It was an autonomous organization and its prime responsibility was to operate successfully in the foreign field. It took over General Electric's foreign assets, its foreign business, and the functions of its foreign department in all areas of the world except Canada.

While General Electric, through the monopoly granted by the Just and Hanaman patents, as well as other patents to be mentioned hereinafter, continued to maintain dominance over the incandescent lamp industry in the United States, her overseas markets were expanded through her foreign subsidiaries. General Electric maintained a close contact with this market and negotiated several agreements with foreign companies other than its subsidiaries (R 1434-1455).

Philips, the Dutch Company, offered the potentiality of being a menacing competitor to General Electric in Europe. Exhibit 2112-G points to the seriousness with which International General Electric felt the Philips' competition. J. W. Woodward, in charge of IGE's European incandescent lamp business warned A. W. Burchard, President of IGE in 1924 that there was serious danger of competition in the American market from Philips for Anton Philips' leadership was greatly expanding the scope of Philips' operations.

Several European lamp manufacturers had organized in 1921 a price regulating cartel. This proved inadequate and it broke down in 1924 (Ex. 2111-G). Mr. Woodward of IGE, representatives of Philips and the German interest (Osram) conducted extensive negotiations (Ex. 2112-G) which eventually led to an agreement for the stabilization of the lamp industry throughout the world (Ex. 2117-G). This agreement was the Phoebus contract [12] (Ex. 2278-G) and Anderson, Meyer & Co., Ltd., Australian General Electric Co., Ltd., General Electric Company of Cuba, General Electric, S.A. (Brazil and Mexico), South African General Electric, and defendant Philips, were among the signators.

Meanwhile in 1922, General Electric invited the Attorney General of the United States to investigate it for the purpose of ascertaining whether it was acting in violation of the anti-trust laws and such an investigation was initiated. (Ex. GE 3 to 9). It led to an action by the Government in the Northern District of Ohio in 1924 which charged General Electric and Westinghouse with engaging in a combination and conspiracy in violation of the Sherman Anti-Trust Act. There the suit was dismissed and unanimously affirmed by the Supreme Court in United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. (Hereinafter referred to as the 1926 case or the General Electric Co. case. See Ex. G-1.)

The case in the trial court was submitted upon a stipulated set of facts United States v. General Electric Co. et al., Northern District of Ohio, Eastern Division, Second Government Lamp Suit, Record, Vol. 1, page 85 et seq., Ex. G-1. In 272 U.S. at page 478, 47 S.Ct. at page 192, 71 L.Ed. 362, the basis of the action is detailed:

"This is a bill in equity, brought by the United States in the District Court for the Northern District of Ohio to enjoin the General Electric Company, the Westinghouse Electric & Manufacturing Company, and the Westinghouse Lamp Company from further violation of the Anti-Trust Act of July 2, 1890, 26 Stat. 209, c. 647. The bill made two charges, one that the General Electric Company, in its business of making and selling incandescent electric lights, had devised and was carrying out a plan for their distribution throughout the United States by a number of so-called agents, exceeding 21,000, to restrain interstate trade in such lamps and to exercise a monopoly of the sale thereof; and, second, that it was achieving the same illegal purpose through a contract of license with the defendants, the Westinghouse Electric & Manufacturing Company and the Westinghouse Lamp Company."

The court first considered the agency relation in detail and observed that the delivery of stock to the agent was no more than a consignment and that the agency contracts were genuine.

On the second issue presented, the court made the following remarks concerning the patent position of General Electric:

"The General Electric Company is the owner of three patents—one of 1912 to Just & Hanaman, the basic patent for the use of tungsten filaments in the manufacture of electric lamps; the Coolidge patent of 1913, covering a process of manufacturing tungsten filaments by which their tensile strength and endurance is greatly increased; and, third, the Langmuir patent of 1916, which is for the use of gas in the bulb, by which the intensity of the light is substantially heightened. These three patents cover completely the making

[12] Signators to the Phoebus agreement and its structure are detailed in the discussion headed "Foreign Agreements".

of the modern electric lights with the tungsten filaments, and secure to the General Electric Company the monopoly of their making, using and vending." 272 U.S. at pages 480, 481, 47 S.Ct. at page 193, 71 L. Ed. 362.

The court then directed the following inquiry to itself:

"Had the Electric Company as the owner of the patents, entirely controlling the manufacture, use and sale of the tungsten incandescent lamps, in its license to the Westinghouse Company, the right to impose the condition that its sales should be at prices fixed by the licensor and subject to change according to its discretion? * * *" 272 U.S. at page 488, 47 S.Ct. at page 196, 71 L.Ed. 362.

The Court relying upon Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, concluded that the restrictions in the license to Westinghouse were not illegal.

This decision in the General Electric case has engendered considerable analysis in the courts, and on several occasions the Government has asked that it be expressly overruled. The history of its recurrences in litigation is comprehensively set forth and reconsidered in two recent cases, United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, and United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525.

At the opening of its case, General Electric attacked the complaint of the Government with the assertion that the matters offered in proof in this action would be shown to be in all substantial respects the same as those of which the complaint was made or could have been made in the former action against it in 1926. At the end of its case, General Electric argued that this was established and that the doctrine of res adjudicata applied to the principal issues in this case. General Electric pointed out that its operations under its agency system of distribution and under its license agreements with Westinghouse and its "B" licensees were substantially indentical in all material respects to its operations prior to 1926; that its position in legal effect remained the same and that its position in the lamp industry, if it has changed, has become less prominent than it was prior to the 1926 suit. It cited the case of Straus v. American Publishers' Ass'n, 2 Cir., 201 F. 306, as authority for the proposition that successive suits may not be maintained when they are based upon a continuing conspiracy where the defendants' course of conduct remained substantially similar although the basic agreements had been modified in some respects. The fact that additional parties were added and that different statutes were invoked in the second suit, it is pointed out, were held to be immaterial. It cited a number of other cases to support this view and claims that the present suit violates the rule against splitting a cause of action. It contended that even if the two causes of action are somewhat different that those matters actually litigated in 1926 are res adjudicata here.

The Government, on the other hand, insisted that the causes of action are not the same. First, it claimed that a new conspiracy arose in or about 1927 in anticipation of the approaching expiration of the alleged patent monopoly of General Electric, that a design was created whereby Westinghouse and General Electric's "B" licensees would guarantee its dominance in production and sale of lamps although there was no longer completely covering article patents upon which to base controls; that the resale price device was expanded to include a monopolization of market outlets; that action was taken to secure complete control over lamp machinery and that control over each part of the lamp was utilized to replace in part the power given by patents that were expiring or that had expired; that patents themselves were made conspiratorial devices to function by weight of number and that General Electric's dominating position was further sustained by its efforts to suppress research by others. The Government further contended that the charge of monopoly was of necessity a charge of a new cause of action and that the prevailing facts and circumstances surrounding such a charge are determinative and that the most cogent ones in the instant case among others were the expiration of

patents, the use of adjuvant monopolies, expansion of distributive controls and the exercise of opportunity to abuse powers.

Secondly, the Government charged that even without a new conspiracy, when the General Electric's patent monopoly allegedly expired in 1933 it thereupon became illegal for it to continue to pursue its previous course of conduct.

Thirdly, the course of conduct followed by General Electric after 1927 was significantly different from that followed prior to that date. The Government insisted that the documents submitted by General Electric in 1922 to the Attorney General could not give knowledge of what would be the continuation of that "course of conduct" over the years from 1924 to 1941 and that other activities had been shown by the Government to be in some instances independently illegal or essential to the complete picture of the alleged growing monopoly and were not barred from consideration by the decision of the 1926 case.

Fourthly, the Government contended that during the period 1927 to 1941 the transactions if assumed to be similar were not the same as those occurring before the 1926 action and for the purpose of res adjudicata they must be identical not merely similar; that the alleged conspiracy required constant adherence to its purposes and was a constantly self renewing offense.

Fifthly, that the present action is brought under different statutes—the 1926 case charged only violations of the Sherman Act; the present suit charges violations of the Sherman, Clayton and Wilson Tariff Acts; that different parties, subject matter and relationships are involved; in the former case only General Electric and Westinghouse and one of its subsidiaries are named as defendants, while here Corning, Philips, the "B" licensees, two patent holding companies, and Westinghouse are named in addition to General Electric and one of its subsidiaries. The former case dealt only with the 1912 General Electric-Westinghouse license and a comparatively small number of General Electric agency agreements, whereas the present one deals with domestic agreements, international agreements, the operation of a vast "agency" system largely comprised of a new form of "agency" and numerous activities in restraint of trade and in furtherance of monopolistic objectives. It further claimed that the relief sought in this case is different from that sought in 1924. The former case was brought to cancel the Westinghouse-General Electric Agreement of 1912 and the "agency" agreements of Westinghouse and General Electric. The present case sought a complete reorganization of the structure of the industry, including the cancellation of, and injunctive relief against, foreign and domestic contracts between General Electric and various alleged co-conspirators, compulsory licensing of patents and dissolution of the monopoly achieved and maintained by General Electric.

The Government contended that it could distinguish the case of Straus v. American Publishers' Ass'n, supra, and the others cited by General Electric. In connection with the Straus case it argued that the "agreements and conduct" complained of in both actions were "exactly the same" except that instead of covering both copyrighted and uncopyrighted books the later agreements applied to copyrighted books. The earlier case also involved copyrighted books and therefore the issue in the second suit had already been litigated. Both suits covered the same period of time except that the second action asked for damages for a longer period. Additional parties were privy to the judgment in the first suit. It asserted that there is no comparison between the two cases because both actions involved in the Straus litigation concerned the same statutes, parties, subject matter and identical issues.

It is true that the complaint in the 1926 case and the present one were filed for violation of the anti-trust laws. It is equally true that new matters are brought forward in the present controversy which make it different. Also a different period of time is involved. That very passage of time has evolved new activities upon the part of the defendants and is essentially a factor bearing upon the continuing validity of patents and their efficacy as a basis for contractual relationships. It is sufficient to say that there are such differences in the time element, the parties, and their activi-

ties and relationships and the prayers for relief that the doctrine of res judicata cannot be applied as a complete bar to this entire action.

Though the doctrine does not operate as a complete bar to the present litigation, some of the issues there determined may well bar a reconsideration of those same issues here. In the case of Sutton v. Wentworth, 1 Cir., 247 F. 493, 501, the court stated:

"There is a difference, sometimes overlooked, between the effect of a judgment as a bar to the prosecution of a second action for the same cause and its effect as an estoppel in another suit between the same parties upon a different cause of action. In the former case a judgment on the merits must be pleaded, and is an absolute bar to a subsequent action; it concludes the parties, not only as to every matter which was offered and received to sustain or defeat the suit, but also as to any other matter which might have been offered for that purpose. In the latter case, the judgment in the prior action may be offered in evidence, and operates as an estoppel only as to those matters which were there directly in issue and either admitted by the pleadings or actually tried."

This principle was recently approved by the Court in Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597, 598, 68 S.Ct. 715, 719, where the rule was stated as follows:

"But where the second action between the same parties is upon a different cause or demand, the principle of res judicata is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' "

Where the former decision has been dispositive of any issue in this case it will be pointed out as the various issues raised herein are taken up.

The result of the 1926 case was to grant General Electric a legal monopoly in the manufacture and sale of the incandescent lamps. General Electric operated under a system of licenses permitting use of its patents, 527 in number at the commencement of this action, under specified conditions. The license system involved two types, "A" and "B" with considerable differences in their requirements.

At the time the instant suit was filed, the following licenses were in existence:

| | "A" License |
| --- | --- |
| Westinghouse | dated August 1, 1927 (Ex. 25-G) |
| | "B" Licenses (Exs. 27–G, GE–65, GE–66) |
| Sylvania | dated August 1, 1933 |
| Consolidated | dated July 1, 1933 |
| Kenrad | dated July 1, 1933 |
| Tungsol | dated October 1, 1933 |
| Chicago Miniature [13] | dated January 1, 1934 |

These licenses were continuations or renewals of substantially similar licenses granted prior to 1922 as follows: Westinghouse, March 1, 1912; Sylvania, January 2, 1917; Consolidated, April 1, 1918; Kenrad, December 1, 1916; Tungsol, January 1, 1921; and Chicago Miniature, January 2, 1919.

The Westinghouse license, Exhibit 25-G, established price and quota restrictions, and provided for a non-exclusive license to General Electric of Westinghouse patents and an exchange of manufacturing information. Provisions were made for an increasing percentage in 1927 at 22.442% and by 1930 and thereafter 25.442% in dollars of the net aggregate sales of General Electric. In addition, no license was granted under General Electric's foreign patents and "no license is granted to export electric lamps, or sell such lamps for export, except to countries to which the Licensee [GE] would itself have a right to export them".

The "B" licenses (Exs. 28-G, 29-G, 30-G, 30b-G, 31-G, 32-G) contained no price restrictions but limited production to a per-

---

[13] There were other "B" licensees as listed in Exhibit 24-G prior to 1936. See discussion "Power to Exclude".

centage in dollars of the net aggregate sales of General Electric and contained an export restriction similar to that of Westinghouse.[14]

### The Alleged Adjuvant Monopolies

The Government primarily contended· that General Electric monopolized the incandescent lamp industry. In order to support and maintain this monopoly, it asserted that General Electric maintained separate illegal monopolies which it termed "Adjuvant Monopolies" claiming that separate anti-trust actions could have been maintained on each and listed them as follows:

(1) "All modern high-speed automatic lamp-making machinery manufactured and distributed in the United States is made and directly controlled by General Electric.

(2) "All machinery for producing all types of glass bulbs, tubing, and cane manufactured in the United States for electrical purposes is made or directly controlled by General Electric and Corning."

(3) "All lamp base-making machinery manufactured in the United States is made or controlled by General Electric."

(4) "General Electric is the only manufacturer in the United States that sells a complete line of lamp bases."

(5) "General Electric and Corning produce practically all of the large glass bulbs, tubing, and cane used in the manufacture of incandescent lamps in the United States."

(6) "General Electric manufactures or controls approximately 90% of the tungsten filament wire, lead-in wire, and support wire used in incandescent lamps in the United States."

(7) "General Electric expanded its distribution outlets from 39,777 to 83,391 in the period in question, and by this means, together with the 30,000 odd Westinghouse agents, who are tied to the General Electric marketing scheme, dominates lamp marketing in the United States."

(8) "General Electric has a monopoly of lamp patents. This was secured by means of its license agreements with Westinghouse, the B Licensees and foreign companies, agreements with large domestic industrial concerns, namely, American Telephone & Telegraph Co. and Radio Corporation of America, and by its deliberate effort to obtain from the Patent Office Patents covering every aspect of the lamp and its manufacture no matter how trivial and without regard to validity."

### (1) Lamp Making Machinery

Under the first of the so-called "adjuvant monopolies" the Government charged that General Electric controls the manufacture and distribution of all modern high-speed automatic lamp making machinery in the United States. Two manufacturing concerns were alleged to have been eliminated for all essential purposes from competition with General Electric. One was Alfred Hofmann & Company, and the other was the Eisler Engineering Company, both located in Newark, New Jersey. It appears from a series of letters of General Electric officials in late 1923 and early 1924 that the matter of licensing Hofmann and Eisler to make and sell lamp making machinery was given consideration. In speaking of the proposed license from GE to Hofmann, Mr. Morrison wrote to Mr. Appleton of GE on January 21, 1924 (Ex. 338-G).

"Our purpose, of course, in granting this license is to get the manufacture of our lamp making machinery under control with a view to protecting our foreign as well as our domestic interests."

And, again in another letter of the same day to Mr. Burchard (Ex. 339-G):

"Our purpose in entering into the proposed arrangement with Hofmann is to limit his right to supply machinery to the Licensees of the General Electric Company in the United States and its affiliated companies in Europe."

In April of 1924 a license was executed which provided, among other things, that Hofmann would receive the business of selling lamp machinery to the "B" licensees in return for agreeing not to sell lamp making machinery to others in the United States (Ex. 327-G). Subsequently General

---

[14] The discussion under "Patents", "Suppression of Trade by Domestic Licensees" and "Power to Exclude" details more specific features of the licenses granted by General Electric.

Electric itself sold lamp making machinery to the "B" licensees. The agreement was cancelled in 1930. General Electric claims the relationship was entirely valid and legal in that the contract concerned only such machinery upon which General Electric had patents and that the $65,000 paid Hofmann upon the cancellation of the agreement by General Electric was not in consideration for its cancellation but to settle a claim for damages asserted by Hofmann against General Electric.

The other competitor in lamp making, Eisler, was made defendant in four suits filed by General Electric in this district on twelve patents. Two of the cases were finally decided against General Electric by the Third Circuit Court of Appeals. General Electric Co. v. Eisler et al., 3 Cir., 1927, 20 F.2d 33 and General Electric Co. v. Eisler et al., 3 Cir., 1928, 26 F.2d 12. Still a third decision went against General Electric in General Electric Co. v. Eisler et al., 3 Cir., 1930, 43 F.2d 319. The fourth of the suits was dismissed because the patents had expired before the suit came to trial. General Electric denies that its suits against Eisler were instituted because it desired to eliminate a competitor in the lamp making machinery field but that they were instituted because it had patents which it believed were valid as issued by the Patent Office and that it was wholly within its rights to prosecute its suits against Eisler which it believed was infringing its patents.

General Electric produced catalogues of both Hofmann and Eisler to show that both firms still offer lamp making machinery for sale although it was admitted by its Chief Engineer of Equipment Works that the machinery built by them was less efficient than that built by General Electric itself (R.1894) and Mr. Poor, President of Sylvania, testified that he believed that the machinery exhibited by Hofmann and Eisler in their catalogues could not be effectively utilized in the profitable manufacture of electric lamps (R. 3292, 3294). It was brought out that General Electric sold lamp making machinery to its "B" licensees only on condition that in the event of a termination of the license agreement General Electric was to have the

option to repurchase such lamp machinery except that which had been owned by the "B" licensees for ten years or more. Neither Westinghouse nor the "B" licensees were licensed to make lamp making machinery for sale to others. General Electric denied that it had any intent to limit others so that it could exert a monopoly over the manufacture and distribution of lamp making machinery. It contended that others still make it, among them, Standard Tool and Manufacturing Company (R.3408), York Electric (R.3654) and Kahle Machine Company (R.3409). Sylvania installed a machine shop in which some machinery was manufactured in 1923 and 1924 and at the time of trial herein had nearly completed a new and large plant for this purpose (R.3329).

Bearing in mind that the narrow issue presented by the Government under this heading is its contention that General Electric accomplished a separate and complete monopoly of the manufacture and distribution of all modern high speed lamp making machinery in the United States, examination shows that the Government's proofs fall short of showing monopoly of machinery. The Hofmann license on its face permitted the licensee to manufacture machinery under General Electric patents and in so far as that machinery is concerned restricted its distribution. General Electric's contention that statements made by its officials always referred only to machinery under the patents of General Electric and that Hofmann was otherwise free to sell lamp making machinery not so patented is not convincing but on the contrary exhibits an attempt to restrain trade. But at best, on the Government's side, this does not connote monopoly but the attempt to restrain Hofmann from trading in lamp making machinery with particular emphasis in the field of supplying potential foreign competitors of General Electric and can involve no more than a violation of Section 1 of the Sherman Anti-Trust Act.

As far as the Eisler litigation is concerned, comments made in this opinion under the patent heading apply and the Government's contention is not supported by a showing of other than ordinary disposi-

tion to litigate patents issued by the Government.

■ The incorporation of the provision for buying back machinery from the "B" licensees tied to a termination of the patent license before the licensee owned the machinery for ten years is likewise susceptible to successful attack as to its validity because it is an effort to extend the patent monopoly prohibited in such cases as Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 and Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376. But even though there is spelled out from this provision a restraint of trade under § 1 of the Sherman Anti-Trust Act, the burden is upon the Government to show, aside from whatever other implications there may be in General Electric's conduct toward the manufacture of lamp making machinery, that there is a specific and separate and complete monopoly in this particular field. The undisputed contention of General Electric that the Hofmann concern, Eisler and other companies continued to manufacture lamp making machinery stands in the way of a conclusion that the Government has proved that General Electric monopolizes this field.

### (2, 5) Glass Machinery and Products

The next of the so-called "adjuvant monopolies" mentioned by the Government deals with the charge that machinery for producing all types of glass bulbs, tubing and cane manufactured in the United States for electrical purposes is made or directly controlled by General Electric and Corning. The fifth alleged "adjuvant monopoly" deals with glass bulbs, tubing and cane produced by the machinery to which reference is made in (2).

The Government submitted that its proofs laid the foundation for its argument that General Electric, through its own activities and through the activities of Corning, had secured a monopoly of the glass bulb, tubing and cane used in incandescent electric lamps in the United States; that General Electric and Corning had mutually agreed with each other not to invade their respective fields of making incandescent electric lamps and making glass bulbs, tubing and cane for such lamps; and that the monopoly was constructed by General Electric and Corning and controlled and guided by General Electric.

It alleged that the extent of the monopoly was practically complete in that General Electric and Corning manufactured approximately all of the glass bulbs used in the manufacture of incandescent electric lamps in the United States; that General Electric and Corning manufactured all the glass tubing used in radio tubes and for incandescent electric lamps; that only a small percentage of bulbs was imported into the United States; and that the majority of miniature bulbs used in the United States was manufactured by General Electric and Corning but Westinghouse and Tungsol manufactured miniature bulbs for their own use out of tubing made by Corning and some negligible quantity of miniature bulbs was also made by independents out of tubing made by Corning.

It further alleged that General Electric produced practically all but 6% of its requirements of bulbs, tubing and cane, the balance of which it was under contract to purchase from Corning; that it did not compete with Corning and made few and limited sales only of bulbs, tubing and cane, and that Corning was thus the only source of supply for glass parts available to lamp manufacturers except General Electric. It also alleged that General Electric, through agreements entered into by Corning, had the power to and did fix the price at which Corning sold glass parts to lamp manufacturers through their agreements; and that it was through such control of prices at which other manufacturers purchased glass parts that General Electric had been able to tighten and make more secure the monopoly over the manufacture and sale of incandescent electric lamps.

In answer to the Government's argument, General Electric submitted, among other things, that it had been entirely innocent of any part in the establishment of a general program of monopolization or restraint of trade; that its consistent course had been its interest in developing glass for its lamps and that neither its contracts nor course of business were

designed to do anything more than improve the quality and production of glass for its own use. It challenged the presence of proof in the case justifying aggregation of Corning and General Electric for the purpose of establishing claims of monopolization. It further contended that each of the agreements complained of by the Government was a legitimate and legal transaction consistent with General Electric's purpose of improving the quality of glass parts and reducing the cost of glass and incandescent electric lamps. General Electric insisted that its interest was primarily in the business of making and selling lamps and that its production of parts necessary to the assembly of the finished lamp was only incidental to its primary objective. In the case of some of the parts, such as bases, filaments and welds, General Electric claimed it found it practicable to produce in excess of its own requirements and to sell such excess to others. However, it stated that it had been its general policy with respect to glass to produce only for its own use and that this had not been the result of any agreement or understanding with Corning.

Under the provisions of a contract dated April 6, 1910 (Ex. 565-G) between General Electric, National Electric Lamp Company, Corning Glass Works and The Libbey Glass Company, it was provided, among other things, that General Electric and Corning should become entitled to certain rights in new improvements or inventions of machinery covered by United States patents for use in the manufacture of glass bulbs or tubing devised or acquired by either of the parties. That contract also provided that prices paid by General Electric for glass purchased from Corning and Libbey should be based upon sellers' manufacturing costs, and that such prices "shall in no case be based upon a cost exceeding 7-1/2% of the lowest cost * * * realized at the plant of any of the parties * * * ." Empire Machine Company [15] had been organized in 1909 by some of the owners of Corning for the purpose of

developing glass blowing machinery and had succeeded in developing a semi-automatic bulb blowing machine called "Empire E", which appeared to have possibilities of success. General Electric was anxious to have the right to use the "Empire E" and negotiations resulted in the contract dated Jan. 9, 1914 (Ex. 568-G) which was entered into by General Electric, Corning, Empire and American Blank [15], a corporation organized by Empire to hold title to its patents. Provision was made in the contract for Empire to transfer 25% of its stock in American Blank to General Electric and to deposit 37-1/2% of its stock in trust for the joint benefit of General Electric and itself. The basis of the contract was specified therein as follows:

"Whereas, the Empire Company owns or controls many Letters Patent and Applications for Letters Patent of the United States for inventions relating to glass-blowing by machinery, the use of which inventions the General Electric Company and the Corning Company are desirous of securing for the field covered by this agreement, and whereas, the parties hereto desire to co-operate to secure the introduction of improved machinery and methods which will decrease the cost of manufacturing incandescent electric lamp bulbs; * * *."

It was also provided:

"All inventions, including machines, processes and apparatus relating to glass-blowing by machinery which are now or may hereafter become the property of or under the control of the General Company or the Corning Company, or the Empire Company, shall, subject to the rights of other parties under contracts now in force, inure within the United States to the exclusive benefit of the American Company for the production of incandescent electric lamp bulbs, intended and adapted to be manufactured into electric lamps (but not the electric lamp itself or any step in the manufacture thereof, as distinguished from the manufacture of the bulb) as well as mold-blown articles of glass in so far as

---

[15] It will be recalled that American Blank and Empire Machine Company were dissolved prior to this suit. Cf. United States v. Hartford-Empire Co., D.C., 46 F.Supp. 541 modified by Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322.

the same are or may be used for electrical purposes or in connection with electric illumination, and proper license agreements shall be executed by the party holding control of any such inventions to vest in the American Company these rights. Neither the General Company, nor the Corning Company nor the Empire Company shall acquire any rights within the United States to inventions of the class specified unless the other parties to this agreement shall have opportunity to acquire equal rights to use the same upon the same terms; * * * ."

American Blank was obligated to grant to General Electric and Corning:

"sub-licenses under any and all the United States patent rights owned or controlled by the American Company. * * * ."

The parties to the agreements of April 6, 1910 and January 9, 1914, modified and amended the terms thereof, and on January 22, 1922, a new contract was entered into by General Electric, Corning, Empire and American Blank as of January 1, 1921, referred to as the "Four Party Agreement" (Ex. 555-G). By this agreement the contract of April 6, 1910 was terminated and that of January 9, 1914 was merged therein and terminated.

It appears from the recital of the new contract that in 1916 Empire acquired for the sole use of American Blank exclusive rights to the so-called Paddle Feeder of the Hartford Fairmont Company; Cf. United States v. Hartford-Empire Co., D. C., 46 F.Supp. 541, 548, for the production of bulbs in the United States and that pursuant to agreement between General Electric, Corning and Empire, General Electric acquired for the sole benefit of American Blank the exclusive right to use the inventions of the so-called Westlake bulb blowing machine and the so-called Danner tube drawing machine in the United States for certain fields. Exclusive rights to the inventions of the so-called Fagan cane machine for a certain field in the United States were also to be transferred to American Blank from General Electric. By this contract all United States rights under inventions relating to glass working by machinery, which on January 1, 1922 became the property of, or under the control of General Electric, Corning or Empire, were made to inure to the exclusive benefit of American Blank, for the production of bulbs, intended and adapted to be manufactured into incandescent electric lamps and other electrical devices comprising sealed enclosures (but not the electric lamp itself or any step in its manufacture as distinguished from the manufacture of the bulb) as were inventions relating to the production by machinery of glass tubing and cane. No rights were granted with reference to any patent relating to incandescent electric lamps or to the manufacture thereof as a part of which the bulbs, tubing and cane were used. American Blank agreed to issue non divisible and non-transferable licenses to General Electric and Corning under all the United States patent rights owned or controlled by it. It was further provided in the agreement that all United States rights under invention relating to glass working by machinery developed, owned or controlled by General Electric or Corning between January 1, 1922 and January 1, 1931 should also inure to the exclusive benefit of American Blank, which should grant sub-licenses under inventions to be thereafter acquired by it to Corning and General Electric without royalty. No rights should inure for the manufacture of the lamp or other device itself, or any part thereof as distinguished from the manufacture of bulbs, tubing and cane as such. Provision was made for payment to General Electric for the price of the rights to the so-called Westlake, Danner and Fagan machines in the sum of $1,315,000. in the following manner. Stock held in trust by Empire to the extent of 37½% of all of the stock of American Blank of a par value of $232,500. was to be transferred to General Electric and the balance of $1,082,500. was to be paid to General Electric out of royalties received by American Blank in accordance with a detailed scheme set out in the contract. The contract also provided that General Electric would be entitled to a license under all British patents controlled by Empire prior to January 1, 1922, and that Empire would be entitled to a license under all United States patents relating

782

to machines, apparatus or processes for making mold-blown articles of glass issued or to be issued to General Electric on inventions made prior to January 1, 1922. Finally, the contract provided that American Blank would be entitled to a license under all patents (excepting British) issued or to be issued on inventions owned or controlled by the Empire Company or to which the Empire Company was entitled and made prior to January 1, 1922.

The 1921 agreement was amended as of June 30, 1928 (Ex. 519-G) by the following provisions:

1. General Electric Company shall pay no license fee to the American Company.

2. United States rights under inventions relating to machines, apparatus, or processes for glass working by machinery developed by Corning or General Electric between January 1, 1922 and July 30, 1928 shall inure without charge or royalty to the exclusive benefit of the American Company for the production of bulbs, tubing and cane *and other glass parts*.[16]

3. All United States rights for improvements (as differentiated from inventions themselves) on any and all existing inventions now or thereafter patented, developed by Corning or General Electric between July 1, 1928 and December 31, 1940 [17] which by reason of contracts in force on January 1, 1922 have become or shall become the property of or under the control of either of them prior to January 1, 1941 [18] shall inure without charge to the exclusive benefit of American for the production of bulbs, tubing and cane *and other glass parts* [16] for use in making electric lamps and other electrical devices comprising sealed containers.

4. The word "improvements" was particularly defined as not including basically new machines, the intention of the parties being to limit the same to inventions which are improvements on existing machines, apparatus, and processes now or hereafter patented.

5. Non-exclusive rights for the United States shall inure without charge to American for the production of bulbs, tubing and cane *and other glass parts* [16] for use in making electric lamps and other electrical devices under inventions now owned or hereafter and prior to January 1, 1941 [19] developed by Corning or General Electric or which by reasons of contracts in force January 1, 1922 have or shall become the property of or under the control of either of them prior to January 1, 1941 [19] relating to:

a. Machines for glass working, etc.

b. Glass melting furnaces, molds, etc.

c. Machines for making up glass batch, etc.

d. Methods of glass furnace operation, etc.

e. Machines for packing bulbs, etc.

6. No rights relating to refractories shall inure to American under inventions controlled by Corning prior to April 1, 1932 *or between December 31, 1940 and January 1, 1951*.[20]

7. No rights shall inure to American for the manufacture of the lamp or other devices or to American under any patents relating to frosting, *and no license is granted American under any foreign patents*.[21]

8. Non exclusive rights shall inure to General Electric without royalty under United States patents controlled by American on June 30, 1928 and prior to January 1, 1941 [22] provided no rights shall inure to General for the production of bulbs, tubing and cane *or other glass parts* [20] for sale as such but only for the production of bulbs, tubing or cane, *or other glass parts* [20] to be manufactured by General within the United States, Canada, or *Mexico* [20] into electric lamps or other electrical devices.

9. Corning and General are at liberty to acquire from third parties rights under inventions of the kind or class inuring to American. In negotiating for such rights prior to January 1, 1941 [19] each will en-

---

16 Italicized description incorporated by amendment in 1935.

17 Changed to Dec. 31, 1951 by amendment in 1935.

18 Changed to January 1, 1951 by amendment in 1935.

19 Changed to January 1, 1951 by amendment in 1935.

20 Changed by amendment of 1935.

21 Stricken in 1935.

22 Changed to Jan. 1, 1951 by amendment of 1935.

deavor to provide an opportunity for the other to participate in the acquisition thereof.[23]

10. Corning grants General non-exclusive licenses to make and use within the United States all inventions now and prior to April 1, 1932 developed by Corning relating to refractories for the production by General Electric of bulbs, tubing and cane, *and other glass parts* [20] in the United States, Canada and Mexico.[20]

11. Payments to General Electric shall be reduced in the amount of 25% of the annual expenses of American but shall not exceed $1500 annually. Empire agrees to pay General (1) ½ net profits of American derived from foreign rights, and (2) an amount equal to 62½% of net profits of American from patent rights transferred to American by Empire and General.

In addition to the amendments footnoted the following provisions were incorporated in 1935:

1. Rights of American within the field described to inventions developed by Corning or General between January 1, 1941 and January 1, 1951 or which shall become the property or under the control of either of them between January 1, 1941 and January 1, 1951 by reason of contracts in force on January 1, 1922 shall be non exclusive.

2. Corning grants General a non exclusive license to make and use within the United States all inventions developed by Corning between December 31, 1940 and January 1, 1951 relating to refractories for the production of bulbs, tubing and cane.

In 1928 General Electric and Corning entered into a further agreement (Ex. 539-G) which superseded an agreement of 1922, and in which, as amended, each agreed to grant the other non-exclusive licenses under patents acquired prior to January 1, 1951, "relating to glass composition, or to batch, or recipe, or formula for glass". The license granted was limited to bulbs, tubing, cane and other glass parts to be used in the manufacture of lamps. No license was granted to General Electric to sell bulbs, tubing, cane and other glass parts, except to RCA Radiotron. The agreement provided for a complete exchange of information on production of products covered by the agreement.

The automatic bulb blowing machine field was again revolutionized with the development by Corning in 1930 of the high speed ribbon machine which strikingly increased the production of bulbs.[24]

In accordance with the terms of the Four Party Agreement, Corning, by an agreement dated September 23, 1933 (Ex. 525-G) granted an exclusive license to American Blank under its patents relating to the Ribbon Machine. American Blank on September 25, 1933 granted a non-exclusive license under such patents to General Electric with the same restrictions on General Electric sales as those contained in the Four Party Agreement (Ex. 526-G). On the same date Corning granted General Electric a non-exclusive license under these same patents (Ex. 527-G). This license

---

[20] Changed by amendment of 1935.
[23] This paragraph was included substantially in the 1921 agreement.

[24] Some idea of the increase in production of glass bulbs is gained from the following table:

| | Year | Type of Machine | No. of Bulbs | Hours of Production |
|---|---|---|---|---|
| Prior to | 1920 | Empire E | 2,500 | 8 |
| | 1920 | Early Westlake | 15,000 | 24 |
| | 1920 | Revised | 40,000–50,000 | 24 |
| | 1925 | Redesigned | 90,000–100,000 | 24 |
| | 1927 | Ohio Westlake | 160,000 | 24 |
| | 1933 | Improved | 250,000 | 24 |
| | 1933 | Ribbon | 350,000 | 24 |
| | 1937 | Ribbon | 900,000 | 24 |
| | 1946 | Ribbon | 1,250,000 | 24 |

agreement restricted General Electric to the manufacture of bulbs and machinery, and prevented its selling bulbs (except to RCA Radiotron) and machinery.

The Government claimed that Corning and General Electric control 100% of the trade in glass bulbs, tubing and cane; since the contract of 1914 each was already assured of license under whatever patents issued permitting operation by both under such patents; therefore, it was unlawful afterwards to cross license, there being no controversy between the parties. It claimed that the parties' recognition of this was demonstrated by the fact that the 1928 amendment provided that non-exclusive licenses should be granted to Corning. It contended General Electric and Corning continued to grant American non-exclusive licenses but treated them as *exclusive,* and that each followed a general policy of not licensing other companies to manufacture or sell bulbs, tubing, or cane for use in the electric field.

In disputing the Government's charge that it monopolized the manufacture or sale of glass parts for incandescent lamps and that its production cannot be aggregated with that of Corning, General Electric represented that in 1941 it made and sold approximately 56.6% of the large incandescent lamps sold in the United States; that it produced about 94% of its own requirements and that its sales to others were inconsequential. Thus, it made in that year about 53.2% of all the large lamp bulbs used in the country, and it argued that 46.8% were made by others in this country or were imported, from which it concluded that its percentage could not possibly amount to a monopoly of manufacture. General Electric also contended that its cross licensing or pooling agreements were entirely legal because they had no purpose or effect of restraining trade in glass or in lamps. Indeed, it argued, it would have been prejudiced by restraint of trade in glass from outside sources aggregating some $2,000,000 in the years 1935–1940 and would have suffered actual pecuniary detriment from any restraint on competition.

The evidence disclosed that in 1924 a firm called the Electric Glass Company sought to order through the Tungsten Materials Division of the General Electric Company one S–11 Bulb Blowing Machine. Mr. W. Ennes of the GE Tungsten Materials Division, to whom this order was directed, advised American Blank Company of the receipt of this order and that since the National Division at Cleveland had all the necessary parts for the assembling of this machine and were in position to make delivery he believed it would be good policy for it to give that Department an order from it as soon as it received the order from the Electric Glass Company (Ex. 839-G). Electric Glass Company promptly ordered from American Blank such a machine pursuant to instructions given it by Mr. Ennes (Ex. 840-G). This order found its way into the hands of Mr. A. D. Falck, then president of the Corning Company who stated that S–11 bulbs had always been a glass factory product and that "millions are produced by Corning Glass Works annually". He gave it as the opinion of the Corning Glass Company that the American Blank Company should advise Electric Glass Company that it was not at liberty to grant the license asked for or to authorize the use of a machine, as the rights for this purpose were vested exclusively in the existing licensees of American Blank Company (Ex. 842-G). Mr. Appleton, counsel for General Electric Company, concurred that no licenses should be issued by American Blank Company but upon a different ground. He believed that the Electric Glass Company should be advised by American Blank Company that it was not its policy to lease machines to manufacture bulbs of this size (Ex. 843-G). The American Blank Company indicated to Mr. Appleton its concurrence in his opinion and promptly advised Electric Glass Company to that effect (Ex. 844-G, 845-G). Again in 1929 an inquiry was directed to the Corning Glass Works by a banking firm concerning the possibility of procuring automatic machines for the manufacture of bulbs for incandescent lamps, radio tubes and other similar devices and met with the answer that they were held under license and were not open for sale or license to other companies for radio tube-

manufacture at that time (Exs. 848-G, 849-G).

In 1938 Western Electric Company advised Hartford-Empire Company of its desire to obtain a machine for making lamp bulbs. The inquiry was forwarded to the Corning Glass Works by the Hartford-Empire Company with the information to the inquirer that it did not market a machine for fabricating bulbs (Exs. 855-G, 856-G). On April 27, 1938 American Blank Company acknowledged the inquiry propounded by Western Electric Company, which had been forwarded by Hartford-Empire Company to the Corning Glass Works which in turn, referred it to the American Blank Company and advised Western Electric Company concerning the output of the machine and asked to be further informed if Western Electric would be interested in the lease or license of one or more of these machines (Ex. 857-G). On May 18, 1838 a further communication was sent Western Electric Company by the American Blank Company stating that if Western Electric Company were interested it might be possible to work out an arrangement whereby one of these machines could be purchased (Ex. 858-G). On July 28, 1938 the American Blank Company advised Western Electric Company that "a careful consideration of the patent and license situation concerning the machine controlled by this company for the manufacture of small bulbs from tubing renders it impractical to offer you a license for its use." (Ex. 859-G).

■ General Electric offered objection to the admission into evidence of the writings and statements of others to which reference has been made as being not binding upon it. No question is raised but that General Electric and Corning associated themselves as parties to the written agreements under consideration. The statements to which objection is taken were made by parties to those agreements, or in the case of inquiries from third parties, were induced or answered by parties to the agreements (Corning and American Blank). The statements were essentially in furtherance of the mutual objectives of Corning and General Electric. Therefore, they were admissible and rea-sonable and valid inferences could be drawn from them. In the case of Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, at page 249, 38 S.Ct. 65, at page 72, 62 L.Ed. 260, L.R.A.1918C, 497, Ann. Cas.1918B, 461, the court said:

*"In order that the declarations and conduct of third parties may be admissible in such a case, it is necessary to show by independent evidence that there was a combination between them and defendants, but it is not necessary to show by independent evidence that the combination was criminal or otherwise unlawful.* The element of illegality may be shown by the declarations themselves. The rule of evidence is commonly applied in criminal cases, but is of general operation; indeed, it originated in the law of partnership. It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them." (Italics supplied.)

The statements are significant, for in spite of the wording of the machine contracts between Corning and General Electric they point to a consistent, continued and uniform consideration by both Corning and General Electric as to decisions to be made by American Blank in the disposition of licenses, machines or permission for the use thereof. It is not enough for the General Electric Company to point to the fact that the machine contracts expressly gave American Blank the power to grant sub-licenses under any and all of the patents and that indeed American Blank had granted such licenses as evidence in Exhibits 765-G, 768-G and 782-G. They were licenses to Tungsol and to Westinghouse, licensees of General Electric. It is clear that a course of conduct was followed by Corning and General Electric which controlled implicitly the action of American Blank in granting licenses precisely as if Corning and General Electric had the exclusive licenses in their own hands.

786

The Government complained that the agreements and cross licenses between General Electric and Corning were contrived to establish in them the control of the manufacture and sale of glass for electrical purposes, which they divided into two fields. Corning's part was for the sale of the glass parts and General Electric's for the manufacture and sale of incandescent electric lamps. It observed that the agreements provided that:

(1) no license was granted to General Electric to sell glass, and

(2) no license was granted to Corning to manufacture or sell lamps.

It contended that the agreements themselves not only plainly disclosed the intention of the parties but that further evidence of the principles governing their activities is gleaned from a reference to interdepartmental communications between officials of each of the respective parties.

On December 13, 1926, the president of Corning wrote to its counsel, Mr. Dorsey, a lengthy letter in the course of which he referred to the relationship existing between Corning and General Electric in the following language:

"I think that Cross expects to concede the point as to.this particular machine. The incident, however, serves to illustrate the strictness with which General Electric clings to . the principle that it is not giving any rights to Corning for lamp making. The converse of this principle with us is that we are not giving any rights to General Electric for glass making except for use in its own lamp factories." (Ex. 1087-G.)

Again on June 22, 1928 in an exchange between Mr. Dorsey, Counsel, and Mr. Curtiss, President of Corning, Mr. Dorsey mentions that:

"You told me some time ago that you were not afraid of their [General Electric] going out of their licensed fields * * *." (Ex. 549-G.)

Evidence of the understanding of General Electric of its boundaries was suggested by the Government in a memorandum dated December 23, 1938, forwarded by Mr. J. E. Kewley of that Company to Mr. Gerard Swope, President, wherein it is said:

"As arranged .in our. agreements with Corning Glass Works and American Blank Company, no sales of glass parts for lamps are made by us excepting to Corning Glass Works. The only domestic sales of glass we make are to the R. C. A. Radiotron Co. as previously explained." (Ex. 572-G, p. 2465.)

In this memorandum it is also disclosed that:

"G. E. Co. has followed the practice of selling Radio Bulbs and Tubing Glass to R. C. A. at the same price as used by Corning." (Ex. 572-G, p. 2463.)

In a letter of March 13, 1939, Mr. Hughes of General Electric wrote to Mr. Soll of the Empire Division:

"Our agreements are such that we cannot furnish incandescent lamp bulbs to outside customers, and whenever we receive requests such as you sent to Mr. O. P. Anderson, and which originated with Pierce & Stevens, Buffalo, N. Y., we refer the person making the request to Corning Glass Works, Corning, N. Y. They are in position to furnish bulbs to anyone on the outside." (Ex. 865-G.)

The Government further submitted that orders for glass lamp parts of types of which only General Electric had a supply on hand, would be placed with Corning which would bill and collect the amounts due, but the merchandise would be purchased from and would be shipped by General Electric directly as an indication of General Electric's complete disinterestedness in competition with Corning. This is further emphasized by the fact that when General Electric with Corning's consent sold bulbs to Chicago Miniature under an "informal arrangement" Corning expected General Electric to make regular reports of such transaction (Ex. 879-G).

General Electric again declined to be bound by the statement of Corning representatives and asserted that the Government misinterprets statements made by its own agents, Messrs. Kewley (Ex. 572-G), Reider (Exs. 876-G–878-G) and Hughes (Exs. 865-G, 1087-G, 549-G). It insisted that the Government was unable to point to any substantial evidence of any agreement by General Electric not to engage in

the glass business. It reiterated that it was prompted to adopt the policy of not furnishing glass by business reasons of its own and not any agreement with Corning and argued vehemently that Corning made its independent decision to adopt the policy of not entering the lamp business and submitted that there was no evidence to support the contention that there existed between Corning and General Electric an agreement not to compete with each other.

The facts show that General Electric made some sales of bulbs and tubes with the specific consent and knowledge of Corning. At least two areas for this type of business occurred; one was in connection with the shipment of bulbs to Chicago Miniature and the other in the sale of bulbs to R. C. A. Radiotron. In each instance the prices were upon the same basis as the prices charged by Corning and were with the full knowledge and consent on the part of Corning. Indeed, the R. C. A. transactions were pursuant to an agreement granting the right to General Electric to supply R. C. A. Radiotron and when General Electric made shipments of bulbs to Chicago Miniature it was expected to, and promptly did, report to Corning the details concerning such shipments.

The Government alleged that by virtue of sales agreements with Corning General Electric enabled itself to secure control over Corning's prices. It specifically complained about an agreement between Corning and General Electric made as of June 30, 1928 (Ex. 570-G) extended by agreement to operate through 1950, by which General Electric agreed to purchase 11% of its requirements of bulbs from Corning. The percentage was to be gradually reduced to 6% for the year 1931 and the following years with an option to General Electric to increase it to 12%. The Government further alleged that Corning was guaranteed by General Electric sales of 33-½% of the total United States bulb consumption. Prices were established for the sale of glass to General Electric by Corning under formulae based in part on General Electric's cost of manufacture and a complete exchange of cost information was provided for. In 1925 Westinghouse agreed to buy all of its annual requirements of glass from Corning (Ex. 783-G) at a price as low as any other purchaser from Corning with the right to purchase elsewhere from any other manufacturer who would supply 75% of its requirements at a lower price. Corning agreed to supply Sylvania and Consolidated with all their requirements of bulbs, tubing and cane at a price as low as that to any other customer (Exs. 811-G, 826-G) conditioned on the purchase in carload lots. Corning agreed to supply independent lamp manufacturers at prices no more than 10% above the lowest price (Exs. 837-G, 838-G).

Under these contracts the Government complained that General Electric's cost of production influenced the cost to others, and that General Electric in effect underwrote the position of Corning as exclusive seller of bulbs. The Government argued that it was the purpose of General Electric to keep independent glass manufacturers from gaining a part of the market large enough to enable them to supply independent lamp manufacturers on a mass production basis and that this purpose was accomplished. General Electric, on the other hand, asserted that the contracts between Corning and Westinghouse and General Electric's "B" licensees expired before the institution of this suit by their own terms, and that if Corning had discriminated in the past against any other customer that the situation had been completely cured as a result of the filing of the Corning consent decree. However, it argued that there is no evidence that General Electric had in any way participated or had knowledge of Corning's sales contracts with its other customers and that General Electric at most had Corning's price lists.

The expiration of the contracts was within the period of a month of the filing of this suit and the consent decree filed on the part of Corning cannot be held to cover the issues raised in this case. The evidence discloses that the relationship between Corning and General Electric generated a condition whereby Corning preferred Westinghouse and General Electric's "B" licensees' business and that its other and independent customers were required to pay prices in excess of those with which Westinghouse and General Electric's licensees were favored.

General Electric contended that there is no evidence that it made any attempt to influence Corning's prices to Westinghouse or to any other customers of Corning. It denied that there was any connection between the percentage of General Electric's purchases and its power to fix Corning's prices. It asserted that the exchange of price information with Corning was solely for the purpose of promoting efficiency of production and lower cost of manufacture. It alleged that its contract with Corning was in the usual course of a purchaser including in its contract provisions beneficial to itself. In connection with the Government's contention that General Electric guaranteed Corning 33½% of the United States market and that it underwrote the position of Corning as exclusive seller of bulbs in the United States with the purpose of keeping independent glass manufacturers from gaining a part of the market large enough to enable them to supply independent lamp manufacturers on a mass-production basis, General Electric insisted that the Government's statements are based upon a misinterpretation of Article 5(b) of the sales contract (Ex. 570-G) which reads as follows:

"The Corning Company shall maintain adequate facilities for supplying (in conjunction with any other substantial sources of supply which may be available but excluding and in addition to the facilities of the General Company) a substantial part of the bulbs required in the manufacture of electric lamps in the United States. It is agreed that from thirty per cent (30%) to thirty-five per cent (35%) of the total requirements shall be the part thereof for which the Corning Company shall so maintain facilities and in consideration thereof, and for the purpose of inducing it to maintain such facilities, it is agreed that if, in any year after the calendar year 1928 the total sales by the Corning Company of bulbs used in the manufacture of electric lamps within the United States, plus the total of all such bulbs manufactured by any and all other manufacturers of bulbs within the United States (other than bulbs manufactured by or for the General Company by manufacturers other than Corning Company), plus all importations of bulbs (other than importations by or for the use of the General Company) for sale or use, shall be less than thirty-three and one-half per cent (33-½%) of the total consumption in said territory of bulbs manufactured therein and imported (including in such total any importation of bulbs made by or for the use of the General Company), then in the following year the General Company shall purchase from the Corning Company such additional quantity of bulbs as shall equal such shortage.

"The ascertainment and computation of the quantities of bulbs manufactured and/or imported, for the purpose of this Section (b) of Article 5, shall be made to the reasonable satisfaction of General Company and General Company shall not be obligated to purchase any additional quantity of bulbs unless and until it has been determined to the reasonable satisfaction of General Company, that the total sales of the bulbs by the Corning Company, plus the total of bulbs manufactured and imported as aforesaid, have been less than thirty-three and one-half per cent (33-½%) of the total consumption in said territory of bulbs manufactured therein and imported."

General Electric insisted that this provision did not constitute a guarantee to Corning of any percentage of the bulb business but that its obligation to make additional purchases from Corning arose only when Corning's sales plus the total domestic bulb production by others than General Electric and Corning, plus all importation of bulbs fell below 33½% of the total domestic consumption. General Electric further contended that the evidence shows that the purpose of this provision of the sales contract was to provide for an outside source of supply of glass adequate to protect General Electric against such curtailment in its own production as might result from tank failures, strikes, war shortages and similar hazards, and that in practice the provision has been ignored by the parties because General Electric has never been called upon to purchase any bulbs under it.

Nevertheless the evidence shows that Corning could remain secure in the knowledge that if its sales fell below the formula

as cited by General Electric, it could rely upon it to purchase bulbs in such amount as would fulfill General Electric's commitment in the contract. It is also significant that Corning produced all of the bulbs for sale in the country except those produced by General Electric and such as may have been imported; the latter two categories being of insignificant consequence. Even in the absence of any showing of direct connection between General Electric, Corning and .General Electric's licensees the hard fact remains that following in the wake of Corning's and General Electric's sales agreements there was an advantageous differentiation in price structures made by Corning to General Electric and its licensees over those who purchased independently from Corning and the base upon which these prices were fixed inevitably was formed out of General Electric's cost figures. General Electric produced over 55% of the bulbs consumed in the country for its own use, and its agreement to absorb any deficiency in sales by Corning up to 33½% of the total number of bulbs produced in accordance with the specific provisions aggregated nearly the entire production of bulbs. All of these considerations lead to the conclusion that General Electric wielded a very powerful influence over the price structure of the bulbs susceptible of and producing the resulting constriction of the market which the Government charged.

The Government alleged that in order to bring patent rights and licenses of other glass companies within the field created by General Electric and Corning, and in order to prevent competition Corning entered into agreements with the Hartford-Empire Company. It is claimed that by virtue of its agreements with Corning, General Electric secured the benefits of the agreements with Hartford. Hartford-Empire Company held patents for the manufacture of glass containers and in 1922 Corning secured for itself exclusive rights in the field of bulbs, tubing and cane for electrical purposes (Ex. 763-G). This charge is supported by reference to certain documents taken from the Corning files. One of these is Exhibit 545-G which consists of a letter written by Corning's attorney,

Mr. Sayles, in December 1927 to Mr. Falck in which he reviews the then existing agreements with Hartford-Empire and gives his opinion as follows:

"I have studied as best I could the Corning-Hartford-Empire agreement, and as I interpret it Hartford-Empire gets no rights in machines that Corning develops in the field of bulbs or mold blown articles usable in connection with electricity, and therefore there is no reason why Corning could not enter into a further agreement with General Electric to pool their future inventions."

General Electric contended that there is no evidence to show that it participated in or knew of the contractual arrangements between Corning and Hartford-Empire. It insisted that the statements of Corning's officers relative to the purpose of the Hartford-Empire contract were inadmissible against it and if these statements are considered they show no more than that Corning believed General Electric received some indirect benefits from the Hartford arrangements. General Electric submitted that such benefits without participation in or knowledge of the agreements between Corning and Hartford rendered it no party to them. It further denied that it received any benefit whatever from the Corning-Hartford relationship.

The evidence is convincing that the relationship between Corning and General Electric inspired the negotiations between Corning and Hartford-Empire in order to protect the field in which Corning and General Electric had agreed they would operate and it also appears that Hartford-Empire in its dealings with Corning and other glass producing interests always reserved the rights within Corning's field. Cf. Hartford-Empire Co. v. United States, 323 U.S. 386, 396, 398, 400, 421, 65 S.Ct. 373, 89 L. Ed. 322, modifying United States v. Hartford-Empire Co., D.C., 46 F.Supp. 541. See 46 F.Supp. 541, at page 554.

This was not the only instance where sources of potential competition and intrusion into the field were eliminated. Two others remained involving (1) Libbey Glass Company (Libbey) and (2) Kimble Glass Company (Kimble). The Government

showed that Libbey in 1918 entered into a series of agreements with General Electric under which it leased to General Electric its bulb and tubing producing facilities until July 1st, 1928 (Ex. 757-G). There was also an option agreement between the parties under which Libbey could require General Electric to purchase the property and if its option was not exercised prior to July 1st, 1927 then General Electric would have an option to purchase any time prior to July 1, 1928 (Ex. 750-G). Apparently neither of these options was exercised and in 1932 by a series of agreements with Libbey, Corning purchased the business including plants, equipment and good will of Libbey in the glass field which included tubing and cane (Ex. 762-G).

General Electric strenuously objected that there was no tie between the Corning-Libbey contract of 1932 and the 1918 contract between Libbey Glass Company and General Electric. It called attention to the fact that the 1918 contracts were submitted to the Attorney General in the course of the investigation which preceded the 1926 suit and claimed that due to shortages before World War I it made many attempts to augment the production of bulbs for its purposes. One of these efforts was to lease one of Libbey's plants and the lease arrangement called for options upon the part of Libbey to sell within a certain period and thereafter for General Electric to purchase within one year. General Electric contended that its contractual relation with Libbey did not prevent that firm from producing bulbs, tubing and cane for many years.

Even though it be conceded, as argued by General Electric, that there is no showing connecting General Electric with the purchase by Corning of the Libbey plant, it is nevertheless implicit in Corning's activity in reaching out for the absorption of this source of production yet available in the field that the effort was made to further close off the area in bulbs and lamps which Corning and General Electric had allocated to themselves. In 1926 and 1928 General Electric entered into cross licensing agreements (Exs. 994-G, 995-G) wherein Kimble granted General Electric non-exclusive licenses under its patents for the manufacture, use and sale of tubing and cane for incandescent lamps and other electrical devices "but not for other purposes" and General Electric granted Kimble a non-exclusive license under its patents for the manufacture, use and sale of vials, and other chemical glass ware "but for no other purpose". Kimble continued to make sales of bulbs and tubing to independent lamp companies until 1932.

The Government charged that in order to eliminate the competition furnished by Kimble, Corning entered into agreements with Kimble in 1932 in which each party agreed that for a period of 17 years it would not produce or sell tubing, cane and glass ware falling within the exclusive field of the other (Ex. 996-G). Corning's exclusive field was delineated as including products made from tubing and cane for use with electrical devices. Kimble's exclusive field included products to be used in the medical profession such as ampoules, droppers and vials. In 1940 the agreements were superseded by a new agreement which carried on the same division of fields (Ex. 999-G). The Government offered evidence to show that both parties carried out the terms of their agreements strictly, steering business into the respective channels they had contrived. General Electric challenged .the Government's allegations with regard to the Kimble-Corning agreements with the assertion that there is no evidence whatever to show a relationship between the General Electric and Kimble agreements and the Kimble-Corning arrangements. It sought to explain the fact that licenses by Kimble to General Electric were for the electrical field and those from General Electric to Kimble were for vials, ampoules, droppers and chemical glassware with the argument that these were the fields for which General Electric and Kimble had been licensed by Libbey under the Danner patents.

While there is an appearance of independent action as between General Electric and Corning, the fact is that General Electric's agreement with Kimble is in conformity with the restrictions established between General Electric and Corning in .the Four Party Agreement of 1921 as amended and the agreement between Corn--

ing and Kimble likewise follows that pattern. The design of the pattern is brightened when it is considered that through the seeming independent negotiations by Corning with Hartford-Empire, Libbey and Kimble the domination over the manufacture and sale of bulbs, tubing and cane for electrical purposes was promoted to a point where the products could be purchased only from Corning with the resulting benefits by way of stabilization of the field to General Electric.

The Government claimed that the acquisition of the Peiler and Pipkin patents showed how General Electric and Corning have conspired to maintain the monopoly. General Electric obtained an exclusive license to the Danner machine, rights to which Corning acquired through American Blank from General Electric. This patent issued in 1917 and General Electric and Corning regarded it as controlling the manufacture of tubing and cane. The Peiler Patent, issued to Hartford-Empire in 1926 upon an application dated 1912, preceded the Danner patent and dominated several of its claims. It is argued that General Electric and Corning were moved to purchase the Peiler patent in order in effect to extend the Danner patent from 1934 to 1943—nine years. The Government argued that in order to obviate the objection to the Peiler patent's questionable validity, Corning and General Electric licensed Libbey, Kimble and Demuth Glass Works following a successful infringement suit against the latter by Hartford-Empire and Corning. General Electric contended in defense of the charges against it revolving around the Peiler patent that its officers estimated that if their use of the Danner machine were held to constitute an infringement of the Peiler patent General Electric would make itself liable in damages to as much as $3,750,000 and that it was prompted to purchase royalty-free non-exclusive licenses under the Peiler patent as an insurance against the possibility of this liability. General Electric claimed that no letter was introduced in evidence between General Electric and Corning upon this subject. It discounted the letter from Mr. Dorsey, counsel to Corning, addressed to Mr. A. D. Falck,

its president (Ex. 1082-G) as inadmissible as against General Electric and of no probative force as to its purpose in obtaining a sub-license 4 years after the letter was written. It asserted that the fact that it was offered a sub-license under the Vello tube drawing machine purchased by Corning and that it declined to acquire such a sub-license demonstrated clearly that it had no interest in acquiring extended patent rights relating to tube drawing. It is critical of the Government's attack upon it in connection with the Demuth patent suit and charged that the Government unreasonably attempted to show that it had an interest in this suit and its outcome. It argued that in view of the fact that it merely had a paid-up, non-exclusive, sub-license giving it no control over the Peiler patent and no right to any royalties resulting from sub-licenses, made it obvious that it could have no motive to agree with Corning that it should refuse to sub-license others under the Peiler patent.

General Electric's association with Corning in the procurement of this patent was altogether too close for it to be permitted to relieve itself of the imputations of mutual interest of Corning and General Electric found in the documents from Corning's official files written by its responsible lawyers and officers wherein the advantages of the Peiler patent to the production of bulbs and incandescent lamps were reiterated (Exs. 1086-G, 1087-G, 1089-G, 1092-G and 1093-G). To be sure these documents are written by Corning officials, but in some instances they are addressed directly to General Electric executives and contain convincing recitals of what was going on in the minds of the parties. There can be no doubt of the joint estimate of Corning and General Electric of the Peiler patent and of the joint effort to get Kimble and Libbey to take out licenses and acknowledge its validity. Similarly there can be little doubt that General Electric approved the course pursued by Corning's counsel in the suit against Demuth when it was recalcitrant about taking a license and acknowledge the validity of the patent. It strains the imagination to conceive that General Electric did not know of and acquiesce in the arrangement to give Demuth

a royalty free license under this patent after it was unexpectedly declared valid and infringed, thus staving off any higher court decision upon it.

The Government contended that General Electric attempted to enlarge the patent monopoly on the inside frosting of bulbs by the use of the pipkin patent despite the fact that in 1925 an inter-office communication between its officials indicated that "the idea of inside frost is too old to be broadly patentable to anybody" (Ex. 1145-G).

In 1928 General Electric acquired the Pipkin patent, No. 1,687,510, relating to the inside frosting of bulbs. As of June 30, 1928 (Exs. 1107-G, 1108-G) General Electric licensed Corning under the Pipkin patent, and agreed to grant to Corning licenses under any other patents relating to inside frost owned or acquired by General Electric during the term of the agreement, to manufacture inside frosted bulbs and to sell such bulbs to the lamp licensees of General Electric. Corning agreed to grant licenses to General Electric under any inside frost patents which it might acquire during the term of the agreement which, as amended, was to run until January 1, 1951. Thereafter Corning refused to sell inside frosted bulbs to any company not licensed by General Electric unless it approved (Exs. 1116-G–1118-G). In 1937 General Electric entered into an agreement with the Inwald Company of Austria whereby General Electric acquired the United States rights to the Inwald patents relating to the inside frosting of bulbs and Inwald agreed not to sell its frosted bulbs for export to the United States. General Electric agreed to pay $94,500 as consideration (Exs. 1139a-G, 1139b-G).

The Government charged that General Electric obtained the Inwald patent although it had decided that it infringed the Pipkin patent (Ex. 1141-G) and that General Electric made no commercial use of the Inwald patent. The Government also pointed to a letter signed by one of the executives of General Electric in which it is stated:

" * * * the importance of securing some kind of product protection on the Inwald frosted bulb, either by showing that the Pipkin patent covers the Inwald product or by including product claims in the Inwald application, is emphasized because if our United States Pipkin patent is sustained and if the Inwald foreign rights will not be in the hands of our Associated Companies abroad, it is probable that foreign made Inwald frosted bulbs will, in one way or another, reach the unlicensed American lamp manufacturers. Our agreement with the Inwald Company does everything possible to control this through the Inwald Company itself, but it will be a difficult job at best." (Ex. 1140-G.)

General Electric, for its part, called attention to the fact that in Exhibit 1145-G no reference is made to the Pipkin invention and argued that this concerned a totally unrelated subject. It conceded that the idea of inside frosting per se was old but argued that the Pipkin patent was not for the mere idea; it was for an inside frosted bulb of specified characteristics, which resulted in the first inside frosted bulb of practical value. It referred to the fact that the Pipkin patent had been held valid and infringed by two Circuit Courts of Appeal (Ex. 225-G, at pp. 1279 and 1313), although finally the patent was held invalid by the Supreme Court, General Electric Co. v. Jewel Incandescent Lamp Co., 1945, 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43, but this was after its expiration. General Electric argued strongly that it cannot be said that it realized all along that the patent was invalid. It concluded that the Pipkin invention related to incandescent lamps and that the lamp licensees were entitled to it and decided to offer Corning a license to make inside frosted bulbs for its lamp licensees so that they could "get them more cheaply by having Corning do the frosting" (Ex. 550-G); and General Electric submitted that its license to Corning was therefore not in furtherance of any conspiracy between it and Corning to restrain trade but merely as a convenient way to permit General Electric lamp licensees to obtain the patented articles. It insisted that this license agreement with Corning under the Pipkin patent was in no way repugnant to the anti-trust laws. It further asserted that in 1928 General Electric licensed Corning to practice the Pipkin patent without any restriction as to those to whom Corning de-

sired to sell. As to the Inwald patent General Electric asserted that its officers thought this method might have certain advantages over the process under the Pipkin patent. After considerable experiment it was found that the Inwald process did not meet expectations and General Electric admitted that no substantial commercial use of this patent had resulted. It claimed that it was not its purpose in entering into the Inwald agreement to avoid competition from foreign made bulbs. It asserted that actually Exhibit 1140-G strongly supports the opposite view, for in it is disclosed that the writer had little confidence that the agreement with the Inwald Company would be adequate to protect the rights for which General Electric had paid a large sum and emphasized the importance of securing protection under the United States patent laws. General Electric asserted that it did not follow any program of acquiring patent rights for the purpose of keeping inside frosted bulbs out of the hands of independent manufacturers and that this is evidenced by the fact that when it was offered an opportunity to acquire rights under a certain Wetherbee patent on a method of inside frosting it decided to decline (Exs. 1123-G, 1124-G). Again in the letters comprising Exhibit GE-233 a similar instance, it insisted, is shown.

The Government claimed that General Electric ignores the fact that the license operated contemporaneously with the Westinghouse license and that General Electric's patent monopoly based on the Pipkin patent was exhausted when Corning sold the frosted bulbs yet General Electric effectively controlled the disposition of these bulbs by Westinghouse which it purchased from Corning both as to price and export.

It is to be conceded that the intrinsic facts in connection with the licensing by General Electric of the Pipkin patent to Corning under the circumstances as was done in themselves would hardly constitute a violation of the anti-trust laws. However, when consideration is given to the entire picture and the involvement of Westinghouse and its price fixing licenses, the activity engaged in by General Electric with Corning illuminates the general scheme and thus becomes added indicia of the intent and purpose to accomplish the objective of monopoly in the glass industry as it affects incandescent electric lamps, Cf. United States v. Griffith, 334 U.S. 100, 108, 68 S.Ct. 941; United States v. Patten, 226 U.S. 525, 543, 544, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325. While it is clear that the Inwald patent rights were never put to practical use the evidence discloses that a substantial sum of money was paid for them and contractual obligations obtained to protect the American market. The same reasoning adopted here as to the Pipkin patent leads to the inescapable conclusion that the transaction in Inwald is likewise a clear index to the intent of the parties to maintain a monopoly. United States v. Griffith, supra; United States v. Patten, supra.

In connection with the charge of the participation by Westinghouse in the agreements between General Electric and Corning the Government pointed out that Westinghouse purchased its glass from Corning under more favorable terms than those granted to any other lamp manufacturer except General Electric; together with General Electric's "B" licensees it was granted the right to purchase frosted bulbs from Corning; and had licenses from Corning and General Electric and American Blank to manufacture miniature bulbs in conformity with its agreements. These were benefits which accrued to Westinghouse and in turn, the Government charged, Westinghouse helped to support the maintenance of the General Electric-Corning monopoly. As evidence of this attitude upon the part of Westinghouse the Government introduced certain documents concerning transactions in spray gun manufacture by the De Vilbiss Company. It appears that in 1927 Westinghouse and De Vilbiss cooperated in the development of a spray gun for coloring inside bulbs. The work was done at the Westinghouse plant by employees of De Vilbiss and Westinghouse reimbursed De Vilbiss for its expenses (Ex. GE-96). On December 12, 1928 Westinghouse wrote a letter to De Vilbiss in which it discussed the policy to be followed in the distribution of the spray guns so developed. It appears that Nilco Lamp Works and Hygrade Lamp Company

(Sylvania) had asked to be supplied with such spray guns and De Vilbiss was advised by Westinghouse "since these Companies are 'B' licensees of the General Electric Company it is agreeable to us for you to supply these Companies with such guns." (Ex. 1164-G.) When the Save Sales Company applied in 1933 to De Vilbiss to purchase such a spray gun it was advised by De Vilbiss that "According to our agreement with the General Electric Corporation it is impossible for us to sell you one of the C-526 spray guns as used by them for coating the interior of lamp bulbs." (Ex. 1162-G.) This was drawn to the attention of an official of General Electric in 1934. General Electric contended that it had no knowledge of the Westinghouse-De Vilbiss transaction and made inquiry of both Westinghouse and De Vilbiss concerning the alleged agreement with General Electric. From the De Vilbiss letter to General Electric under date of January 24, 1934 it appears that De Vilbiss considered that there was a "working arrangements between our Company and the General Electric Company and Westinghouse Electric and Manufacturing company as it pertains to the special extension spray gun nozzle used for coating the interior of lamp bulbs." This letter describes the arrangement between De Vilbiss and Westinghouse whereby the appliance in question was developed with De Vilbiss supplying the engineering service paid for by Westinghouse on account of which De Vilbiss says:

" * * * we agreed orally that this particular nozzle would not be exploited generally to the trade.

"Our files contain no written agreement but this arrangement was made orally and has since been adhered to as being a fair and equitable obligation to the company paying for the development of this nozzle." (Ex. 1163-G.)

General Electric claimed that the Government apparently abandoned its charge that General Electric made any arrangement concerning the manufacture of the spray gun in question. It denied that the complaint in the case charges that General Electric asserted any responsibility for the Westinghouse-De Vilbiss arrangement or any evidence that General Electric had anything whatever to do with such agreement. In this contention General Electric is correct but this evidence is relevant and material in so far as it bears upon the participation of Westinghouse in the relationship between General Electric, Corning and itself. There is a clear indication here that Westinghouse in contemplation of what it considered its normal course of duty extended itself to see that only the licensees of General Electric should be served where this particular appliance was concerned. The Government sought to implicate Tungsol as a supporter of the alleged General Electric-Corning monopoly by exposing the relationship of Tungsol to American Blank as a lessor and eventual owner of American Blank machines for blowing miniature bulbs. Such a machine was first developed by General Electric in 1923. It was under agreement to transfer the rights under the patent relating to this machine exclusively to American Blank. General Electric sold such machines to, or permitted them to be manufactured by Westinghouse and the Miniature Incandescent Lamp Corporation, which was the predecessor of Tungsol. The question was raised by American Blank or Corning as to why General Electric had not transferred exclusive rights under these machines to American Blank, since Tungsol had two such machines and others were being built for it. Corning agreed that General Electric should grant exclusive rights under the patents relating to this machine to American Blank, and American Blank would license Tungsol and Westinghouse. Such a license was made to Tungsol by American Blank, first for seven and later for a greater number of miniature bulb blowing machines (Exs. 780-G, 766-G). Under this license title to the machines remained the property of American Blank and on the termination of the licenses it had the right to repurchase the machines. For this lease Tungsol paid over $10,000 and agreed to pay royalties based on the number of bulbs produced (Exs. 767-G, 768-G). Finally in 1935 Tungsol requested that it be given title to the machines and Corning approved such action (Exs. 778-G, 779-G). However, in the agreement transferring ownership to Tungsol it was obligated to continue paying royalty and to ob-

serve the same restriction on the use of the machines as was provided in the previous lease agreement (Ex. 765-G). During the negotiations Tungsol's attorney advised it that in his view the original transactions were in effect a sale and not a lease and that therefore American Blank had no right to charge royalties for the use of the machines. He stated:

"If, however, you feel that your relationship with the American Blank Company can be taken up independently of your relationship with the Corning Glass Works and the General Electric Company, we feel very strongly that by appropriate negotiation future royalty can either be avoided or very much reduced, and, perhaps back royalties recovered.

"If the question were simply one between you and the American Blank, and involved no other business relationships, we should have no hesitation in going into it further with a definite idea of avoiding future payments of royalties and possibly recovering royalties heretofore paid, although that possibility is a very dim one.

"Before even discussing this, however, the question of general policy must be determined." (Ex. 777-G.)

The Government asserted that Tungsol continued to pay a large amount of royalty to American Blank through 1939 (R. 3648 and Ex. 2307b-G). The Government concluded that Tungsol considered that its other business relationships with Corning and General Electric would be affected if it discontinued payments of royalty to American Blank as suggested in its lawyer's letter. From 1935 to 1939 Tungsol paid American Blank varying sums for royalties. These are bulked in the statement in evidence (Ex. 2307b-G). The only other evidence adduced by the Government in this isolated area is that Tungsol's lawyer advised it that there was a possibility of escaping from the payment of royalties but that its position with Corning and General Electric might be affected if it sought to discontinue such payments to American Blank. There is no explanation by Tungsol as to why it chose the course of continuing to pay American Blank royalties in the face of its counsel's advice and if this incident were to be analyzed by itself there would be

lacking definite proof of Tungsol's support of the general scheme. Only when it is considered in connection with Tungsol's relationship as a "B" licensee does this incident raise a color of participation by Tungsol in the monopoly scheme. When Tungsol's entire position and status is considered the arrangement is an index to its participation in the general conspiracy charged.

It was further claimed by the Government that the monopoly was also maintained by the elimination of domestic competition. Under this heading the Government showed that in 1935 three unlicensed companies, Premier Miniature Bulb Company, Dura Electric Company and Henry Lange, Inc., were producing miniature bulbs on machines considered by American Blank Company to infringe patents of General Electric. The Government submitted that Corning had the primary interest in the matter of preventing the use of tubing made by others than Corning in the manufacture of miniature lamps. Corning's counsel advised the companies that they were infringing patents held by American Blank (Exs. 949-G–951-G). The objective sought by Corning's counsel was to draw the companies into accepting licenses wherein means would be used that would insure the licensees purchasing all tubing from Corning. Since a requirement could not be legally utilized in the licenses that would compel the licensees to purchase all of their tubing from Corning, it was recommended that the desired result could be accomplished by limiting the licenses to one year and then refusing to renew if the licensee bought tubing elsewhere than from Corning (Exs. 955-G–958-G). At the time this situation arose title was still in General Electric and it granted American Blank licenses under these patents on November 1, 1935 (Exs. 963-G, 963a-G). Licenses prepared by American Blank and submitted to the three companies contained provisions for a term of one year and provided for royalties (Exs. 964-G–967-G). The licenses were not accepted and eventually suit was instituted against the companies (Exs. 975-G, 978-G, 986-G). Lange and Dura entered into a stipulation that they would be bound by the results of the suit against Premier

(Ex. 989-G). The case was tried against Premier and a decision was rendered that the claims involved were invalid (Ex. 781-G). General Electric argued that the suit in no event could have resulted in the elimination of domestic competitors since it is a fact that it went against the plaintiff. It sought to excuse itself from any responsibility in connection with the activity of Corning's patent counsel in the litigation. The exhibits offered by the Government in connection with this transaction run from 942-G to 990-G and none is more revealing than a letter dated January 8, 1936 written by Mr. Lange to counsel for Corning (Ex. 969-G) in which he sets forth the impact of the pressures by American Blank upon his company. General Electric may have been entirely free from many of the mechanics of this action but was an indirect party to the suit and it made the necessary license arrangements with American Blank preparatory thereto and cannot escape the implications that are patent as evidence of the entire arrangement with Corning to effectively armor their monopoly position.

The Government claimed that a serious threat to the alleged monopoly position of General Electric and Corning in the United States was the Dutch firm of N. V. Philips' Gloeilampenfabrieken, a limited company of Holland. Philips owned patents relating to glass machinery which it threatened to exploit either by manufacturing in the United States or by licensing other American Companies to manufacture (Exs. 431-G, 447-G, 448-G). The Government submitted that Philips threatened not only the position of Corning as the only company in the United States selling bulbs, tubing and cane for electrical purposes, but also was a threat to General Electric's alleged controlled sources of supply for bulbs, tubing and cane. When the matter of the sale of Philips' patent rights to Corning was breached in 1933 it indicated that it felt under obligation first to discuss the matter with General Electric which expressed an interest in purchasing the patents (Exs. 438-G, 439-G). Negotiations were conducted with Mr. Minor of International General Electric in 1935 (Ex. 448-G). Reports of these negotiations were made by Mr. Minor to Corning (Exs. 449-G, 450-G) and ar-

rangements were made for Corning officials to meet with officials of International General Electric in Europe to discuss the European bulb and lamp situation in which they might be interested (Ex. 451-G). After protracted negotiations a draft of the proposed agreement was transmitted by Philips to Corning (Exs. 459-G, 460-G) which provided for payments to Philips of $20,000 a year and gave exclusive licenses to Corning under Philips' United States glass machine patents; provided that Corning would supply glass to a Philips' United States subsidiary; and provided further that Philips would not be interested, directly or indirectly, in the manufacture or sale of glass or machinery in North America. Since such an agreement might be held to violate the antitrust laws (Exs. 463-G, 464-G), Philips made an agreement with another Dutch company to grant licenses and this agreement contained the non-import provisions. A Dutch company named Nieuwe Nederlansche Maatschappij Tot Vervaardigen Van Spiegelglas N.V. (Spiegelglas) was arbitrarily selected to be the immediate licensee of Philips. It was then to grant licenses to Corning under the Philips patents (Exs. 463-G–469-G) with provisions for payment to be made in Holland except if funds should be frozen by the United States Government (Ex. 476-G). All of these agreements were finally executed in 1937, effective as of January 1, 1936. Specifically they were:

(1) All exclusive license executed July 9, 1937 effective January 1, 1936 from Philips to Spiegelglas, a corporation of Holland, under Philips' United States glass patents (Exs. 420-G, 425-G).

(2) An agreement dated as above between Philips and Spiegelglas wherein Philips undertook not to be interested in the manufacture or sale of glass in North America (Ex. 421-G, 426-G).

(3) Sublicense and assignment executed July 19, 1937 as of Aug. 1, 1936 from Spiegelglas to Corning of all rights under Philips' patents (Exs. 422-G, 427-G).

(4) Agreement between Corning and Philips executed July 19, 1937 as of July 1, 1936 by which Corning agreed to supply bulbs to Philips' American licensees (Exs. 423-G, 428-G).

(5) Sublicense from Corning to General Electric dated March 1938 as of August 2, 1936 under Philips patent for the electrical field (424–G).

The Government claimed that the real purpose of these agreements was to keep Philips out of the United States glass market and that General Electric actively participated with Corning in accomplishing this purpose. General Electric entered into an agreement with Corning (Ex. 424–G) by which it obtained a license under the Philips' patents, agreeing to pay half of the sums due to Philips. In this way it was alleged that General Electric secured the benefits of the agreements with Philips and Spiegelglas, which contained the provisions restricting Philips from competing in the United States. General Electric argued that it merely took a sublicense from Corning without the knowledge of any possible illegality of the arrangement between Corning and Philips and so it could not be found to have joined in the conspiracy to prevent the importation of bulbs, tubing and cane into the United States. The Government's references to the transactions revolving around the so called Spiegelglas agreements were put forward in order to fortify its position that General Electric and Corning collaborated in order to construct monopolistic positions for each other. Notwithstanding the denials of the General Electric officials who testified that they knew nothing of the Spiegelglas agreement it is inconceivable that General Electric was unaware of the import of the series of agreements to which it ultimately subscribed when it undertook its sublicense from Corning. The deal with Philips was an effective effort at the protection of the Corning-General Electric mutual position and a view of the entire transaction from its inception to the ultimate sublicense to General Electric leaves no room for doubt that General Electric was aware of all of the implications for which it bound itself by sharing to the extent of one half the annual stipend to be paid to Philips.[25]

The Government also argued that General Electric entered into the transaction with respect to the European rights of the Westlake bulb and Danner tubing machines which similarly reflected its endeavor to maintain the alleged Corning-General Electric monopoly. Mention is also made of the Corning Ribbon Machine, the European rights for which General Electric admittedly never negotiated. It is unnecessary to discuss the issue raised by the acquisition of the Westlake and Danner European rights at this point in our consideration of the case as the matter is dealt with in the broader aspects of the Government's allegations concerning foreign transactions.

The Government adverted to the Corning negotiations with the Russian government to furnish it with ribbon machines (Exs. 404–G, 406–G). It brought to light a letter signed by Mr. E. A. Baldwin of International General Electric in 1934 in which he stated that he felt disturbed that the Russians might not respect territorial restrictions and that he considered that the ribbon machine situation in Europe resolved itself into one capital issue,

"namely: the protection of the American bulb market and all that goes with it, and the protection of the American investment in the European bulb market and all that goes with that * * *." (Ex. 406–G.)

The Government also showed that after International General Electric had conceded that it had no interest in the foreign rights to the Corning ribbon machine and Corning appeared to be closing with the Russians, officials of International General Electric Company and of International General Electric Company of New York, Ltd. sought to have Corning restrict the U. S. S. R. from exploiting any rights it might receive from Corning in North and South America and other countries where General Electric and the foreign countries in which it had an interest were operating (Exs. 411–G, 413–G). Another instance associated with Russia was brought forward by the Government when it showed that in 1935 RCA Radiotron sought to obtain from Corning a miniature bulb blowing machine for the use of one of its licensees in Russia (Ex. 407–G). In a letter from Mr.

---

[25] Considerations of the I G E—Philips contracts discussed later under the heading entitled "Foreign Agreements" strengthens this conclusion.

Hewlett Scudder of General Electric to Mr. W. C. Duncan of International General Electric, wherein this transaction was discussed, the following language appears

"I understand that you and I agree that the General Electric Company own the machine or let the Corning Company have it in such a way that General Electric Company controls its sale and probable use." (Ex. 408–G.)

From Exhibit 409–G it appears that General Electric came to a decision that it would decline to supply the machine and the Government assumed that this decision was based upon its fear that the Russians might use the machine in such a way as to be a threat to European licensees (Ex. 408–G). The illumination thrown by the Government's evidence with respect to the "Russian situation" casts only a feeble ray upon the relationships of Corning and General Electric in these instances and are but cumulative in demonstrating a cooperation between Corning and General Electric in the endeavor in this direction to protect their mutual monopoly.

General Electric submitted that the evidence wholly failed to support the charges of the Government with respect to its contracts and practices relating to glass and glass machinery, that they were legal in all respects and were the result of consistent effort to achieve "a productivity high in quality and quantity, and low in cost". It denied that it had been a party to a conspiracy with Corning or any one else to monopolize the manufacture and sale of glass, to refrain from competing in the sale of glass or to exclude the products of glass manufacturers. It asserted that it has not imposed unreasonable restrictions upon licenses in granting others the use of its glass and glass machinery patents and has consistently opposed unreasonable restrictions on its use thereof. It denied any responsibility for difficulties which competitors may have had with, or their decision to look to, Corning as their source of supply and generally contended that no grounds for relief have been shown by the Government with respect to this phase of the case.

█ The court cannot find itself in agreement with the position taken by General Electric. The various contracts to which reference has been made in which Corning and General Electric participated were designed to effect an exchange of patents relating to machinery for the production of glass and glass as it pertained to the incandescent electric lamp so that the field was divided between General Electric and Corning. The design matured so that they produced practically all the machinery for the manufacture of glass in the incandescent electric lamp industry and Corning produced all of the glass bulbs, tubing and cane not produced by General Electric in the United States. Corning confined itself to the production and sale of the glass bulbs, tubing and cane for electrical purposes; General Electric, for all practical purposes, to the production and sale of incandescent electric lamps. Always great care was taken by each of the parties not to overstep the boundaries they had established for themselves. Corning was granted security and stability for its output under General Electric's obligation to make additional purchases from Corning after the year 1928 when Corning's sales plus the total domestic bulb production by others than General Electric and Corning plus all importation of bulbs fell below 33½% of total domestic consumption.

General Electric found the relationship appealing to its interest too because it could calculate the cost of its purchased bulbs from Corning for its own use (which amounted to 6% of its requirements) at a price based partially on its own costs and its licensees received similar treatment from Corning with slight variations, while independents paid more. Corning negotiated with Hartford-Empire and Libbey and with Kimble to divide their glass production in such a manner that the electrical glass field would be strictly the domain of Corning and through it to General Electric. Any suggestion of competition in electrical glass by these companies was thereby effectively thwarted. This rendered a comfortable situation for Corning and at the same time redounded to the benefit of General Electric to the extent that it prevented encroachment on such influence as it had established on the single source of supply of electrical glass and its price from Corning. The incident of the contract for the

American rights to the Philips patents and the concomitant commitment that this country would not be exposed to competition with foreign glass demonstrated a vital cooperation between Corning and General Electric.

At the time that General Electric acquired the exclusive license to the Westlake machines from Libbey in 1918 its patents were in interference with the Empire machine to which both General Electric and Corning held non-exclusive licenses. General Electric therefore considered that it became possessed of rights in the controversy between the two machine patents. Notwithstanding the previous commitments between Corning and General Electric which accorded each to the other rights in their respective patents and licenses General Electric insisted that the 1921 Four Party Agreement was entered into to settle the controversy arising out of the interference proceedings between the Westlake and Empire machines. It appears that Corning resisted General Electric's claim that it should be reimbursed for Corning's share in the consideration given by General Electric for the acquisition of the Westlake license. This was considered by General Electric to constitute the kind of controversy to which the United States Supreme Court made reference when it used the following language in the case of Standard Oil Co. v. United States, 283 U.S. 163, 171, 51 S.Ct. 421, 424, 75 L.Ed. 926:

"Where there are legitimately conflicting claims or threatened interferences, a settlement by agreement, rather than litigation, is not precluded by the Act. * * * An interchange of patent rights and a division of royalties according to the value attributed by the parties to their respective patent claims is frequently necessary if technical advancement is not to be blocked by threatened litigation. If the available advantages are open on reasonable terms to all manufacturers desiring to participate, such interchange may promote rather than restrain competition. * * * "

Nevertheless the court agrees with the Government that there was no patent controversy or threat of controversy between Corning and General Electric in connection with the interference proceedings, for each was assured of licenses under whatever patents issued which would permit operation by both under such patents. There was simply an adjustment to General Electric for its outlay in acquiring the Westlake license and the 1921 Four Party Agreement was a natural evolution of the relationship between Corning and General Electric memorialized in written form. Cf. United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550.

These and other considerations heretofore discussed looked toward the perpetuation of the domination that General Electric and Corning secured over the entire industry in the manufacture and distribution of glass bulbs, tubing and cane. The end result could be none other than monopoly in their hands to the practical exclusion of all competition. United States v. Patten, 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.A., 325. The machinery phase, however, did not rise to the level of a separate monopoly but was a restraint of trade and competition which functioned to give the ultimate monopoly in glass products as they pertained to the incandescent electric lamp industry. United States v. Griffith, 334 U.S. 100, 105–107, 68 S.Ct. 941. General Electric and Corning have accordingly violated § 1 of the Sherman Anti-Trust Act in restraining trade and competition in the manufacture and distribution of machinery for the manufacture of glass bulbs, tubing and cane and § 2 of the Sherman Anti-Trust Act in monopolizing the manufacture and distribution of glass bulbs, tubing and cane. Likewise, American Blank, Empire and International General Electric [26] were necessary parties to the restraints exercised and thereby violated § 1 and § 2 of the Sherman Anti-Trust Act.

(3, 4) Lamp Base Machinery and Bases

Items 3 and 4 in the foregoing list of "adjuvant monopolies", as alleged by the Government, dealt respectively with the charge that all lamp base making machinery manufactured in the United States is made or controlled by General Electric and that

---

[26] IGE's part in furtherance of the general scheme is discussed in greater detail under the heading "Foreign Agreements".

General Electric is the only manufacturer in the United States that sells a complete line of lamp bases. The Government claimed that in addition to being separate monopolies they were used as supports for the entire alleged monopoly structure.

It appears undisputed that in 1912 the General Electric Company centered its lamp base making and base machinery making in the Providence Works as specifically authorized by the 1911 decree and that the acquisition was brought to the attention of the Attorney General in 1922. The lamp bases used on standard lamps comprising the large bulk of base production are unpatented and have been unpatented since 1922. This is also true of the basic machines upon which the standard bases are manufactured. Only one patent relating to the refinement of the threading machine, the use of which is not at all necessary to the successful manufacture of bases existed at the time of the commencement of this suit and that expired in 1947.

The Government specifically charged that Westinghouse willingly participated in a conspiratorial plan that it should not sell lamp bases to companies other than its own subsidiaries (Exs. 256-G, 257-G). It appears that on April 15, 1920, General Electric and Westinghouse agreed (Ex. 252-G) that General Electric was to provide Westinghouse with information for the manufacture of bases or machines for the consideration of the sum of $25,000 to be paid to it by Westinghouse. The 1927 license did not include the right to sell lamp bases and as a matter of fact it is shown that Westinghouse did not sell bases to lamp manufacturers except in small quantities.

General Electric contended that since Westinghouse was licensed to sell lamps and paid for "know how" although there was no specific agreement or restriction upon Westinghouse not to sell bases or machines it would have been entirely proper to have such an agreement. Westinghouse could sell bases not made with General Electric patents or "know how" and as a matter of fact at the time of the trial is said to have been selling such bases.

The Government urged that General Electric's intent to restrict the sale of bases or base making machinery is evidenced by its relationship with Waterbury Farrel Foundry and Machinery Company. In 1924 General Electric had developed a double-cut eyelet machine to be manufactured by the Waterbury Farrel Company and secured an agreement from that company not to sell this machine to any other customer for a period of five years unless General Electric was reimbursed for the expense of development (Ex. GE–175). In 1930 General Electric had Waterbury Farrel develop another eyelet machine at the expense of General Electric and under the same conditions restricting sale to other purchasers for a period of five years. On February 10, 1941, after this suit was brought, General Electric notified Waterbury Farrel Company that:

"Without determining the existence of such an agreement or its terms, you are hereby notified that such agreement, if it exists, is hereby cancelled and terminated and that you are under no obligation by the terms of such supposed agreement or otherwise, to obtain this Company's approval of those to whom you wish to sell such machines." (Ex. GE–177.)

Waterbury Farrel replied to the effect that the machine had been marked "private" in its records during all the years and that there was no written agreement, and that it felt that the understanding was a very satisfactory way of handling this very special machinery (Ex. 178–G).

General Electric contended that it paid for the development of all of these machines and that it had a right to agree with the Waterbury Farrel Company that these machines would not be sold to other customers for a period of five years unless the development costs were paid to it. It wrote Waterbury Farrel Company after the suit was started in connection with the pinning machine because it first had notice of this situation upon the filing of the complaint and felt obligated to inform Waterbury Farrel Company of its position as soon as it learned of the situation. General Electric stated that so far as the eyelet machine was concerned it bought only one of the machines and no one else ever bought one because it was impractical.

The Government next drew attention to the relationship of General Electric with the U. S. Tool Company in 1938. (Exs. 315-G, 316-G), when General Electric aided that company in the development of a lap-seam machine. General Electric endeavored to obtain an exclusive license to this machine and in Exhibit 317-G, Mr. Atkins of the Providence Base Works of General Electric wrote to Mr. Kenyon of General Electric Parts Department and concluded:

"The writer should attempt to negotiate an agreement with U. S. Tool Co. to be sure that G. E. is protected from other companies, domestic or foreign, getting into base business."

It was concluded that an exclusive license was hazardous and since General Electric and Westinghouse controlled 85% of all the bases in use in the country and through the "B" licensees controlled an additional 10%, the field in which the independent manufacturer of bases would sell his product would be rather limited (Ex. 318-G). Thereafter an agreement was finally negotiated with the U. S. Tool Company whereby General Electric was granted a non-exclusive license on all the inventions in question (Ex. 314-G).

Again General Electric pointed out that it had incurred large development costs in connection with this machine until it was brought to completion by the U. S. Tool Company. It denied any wrong implications in Mr. Atkin's letter of September 27, 1938 wherein he said:

"If for any reason we do not purchase the machine, I do not think they will dare to approch anyone except Westinghouse for fear of incurring General Electric's ill will." (Ex. 316-G.)

General Electric contended that a fair interpretation of this language meant that since it was heavily involved in the development costs of this machine that the U. S. Tool Company would hesitate to sell it to others without permission of General Electric until costs had been recouped for fear of incurring General Electric's ill will. Again this machine was unsuccessful and has never been used for actual production.

The Government alleged that price cuts were made on bases from time to time and that these were designed to discourage the rise of any competitor in the field (Exs. 272-G, 307-G, and 308-G). It also refers to Exhibits 278-G, 279-G, 289-G, 290-G and 291-G as instances of refusal upon the part of the Providence Base Works to supply lamp bases or parts. General Electric denied any motive upon its part to suppress competition by lowering prices and in the three instances when it was requested to furnish bases or parts, it claimed those parts were the subject of patented products that it had the right to decline to sell.

The proofs, however, show that in 1938 General Electric required all independent, unlicensed lamp manufacturers to sign letters in which they waived any right to a defense against an infringement suit which might be based on their use of purchased lamp parts or materials (Ex. 278-G) and unless this waiver was signed orders would not be filled (Ex. 279-G, R. 2123).

Still another effect of General Electric's alleged monopolistic position in the base field was suggested by the Government as disclosed when General Electric and Westinghouse determined not to encourage the development of the low-wattage 3-light lamp using a medium screw base. In correspondence by General Electric and Westinghouse officials the sales policy was expressed to be based on the theory that this lamp was inefficient and costly to the consumer (Exs. GE-183, 258-G and 261-G). The Government insisted that the major reasons for General Electric's opposition to the lamp was stated in a letter of Mr. Harrison of General Electric, dated March 29, 1937, in which he commented that the demand for these lamps seems definitely on the wane.

" * * * a fact which should not be unwelcome to the public utility companies since the tendency of these small sizes is to cut down rather than to build up the use of kilowatt-hours." (Ex. 268-G.)

The Government charged that General Electric refused to supply the Northern Incandescent Lamp Corporation, an in-

dependent, unlicensed manufacturer, with medium screw bases for a three-light lamp. Meanwhile the Eagle Manufacturing Company began to manufacture these bases. Thereupon the Government alleged that General Electric decided to do likewise so as to eliminate Eagle as a source of competition. Despite its aversion to the manufacture of these lamps General Electric went into the field. It is also alleged that General Electric was prompted by the motive of desiring to keep itself informed of quantitative information such as it could get by knowing who was producing how many bases. The Government pointed to Mr. Harrison's letter in which he said:

"As a matter of fact, Providence is making the bases because we have felt that the value of having accurate quantitative information on all such things exceeded the disadvantage of making them." (Ex. 266-G.)

The Government cited several instances where such information concerning independent manufacturers was sought and obtained by officers of General Electric from Mr. Atkins of the Providence Base Works. The Government charged that in its position as the supplier of bases to the industry General Electric was enabled in fact to maintain observers in the factories of its potential competitors and pointed to the memorandum report of Mr. Kenyon of General Electric (Ex. 305-G) as revealing "the penetrating power of a monopolist".

General Electric claimed with regard to the medium base for three-light lamps that it made such bases because in spite of its judgment of the poor economy of the lamp for the consumer there was a demand for it which moved General Electric to produce the bases and the lamps. It pointed to the very fact that Eagle Electric Manufacturing Company was manufacturing these bases as proof that General Electric had no monopoly on their manufacture and challenges the Government's statement that it refused to supply Northern Incandescent Lamp Corporation as having no foundation in the proofs. It insisted that any information it gathered concerning competitors was in the ordinary line of the usual business methods and that the sale of lamp bases was not used as a scheme of spying out the quantitative information as charged by the Government.

The lamp base works constitutes a highly desirable arm of General Electric whereby it supplies itself, Westinghouse, the "B" licensees and others with lamp bases. It is practically unchallenged in the manufacture and production of lamp bases and is the only manufacturer of a full line of lamp bases in the United States. Although it supplied lamp bases to all desiring them, it was able to annex conditions to purchase rights as evidenced by the waiver of defense requirement. This conditioning sales upon waivers of defenses, even though upon an unpatented device, was an invalid restriction by analogy to the doctrine expressed in Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 424, 91 L.Ed. 374; and MacGregor v. Westinghouse Electric & Mfg. Co., 329 U.S. 402, 67 S.Ct. 421, 424, 91 L.Ed. 380, that a licensee is not estopped to challenge the validity of a patent. In the instant case, were a manufacturer to refuse signing the waiver, General Electric would and did refuse sale of lamp bases. The resulting effect was to compel compliance since the full supply of lamp bases was limited to General Electric. Only when General Electric was caught in a draft of competition to satisfy the demand of the market created by an independent manufacturer of the three way lamp base did it activate itself to produce a similar type base of which its policy had heretofore discouraged the manufacture. It appears, therefore that General Electric had the power to and did exert that power to restrict trade by virtue of its unlimited control over the manufacture of lamp bases. What competition it met in the lamp base field was negligible and only existed where its policy had not successfully foreclosed market demand. The proof, however, fails to sustain the charge that General Electric deliberately engaged

in price cutting of lamp bases for the purpose of driving competitors from the market.

▮▮ The immediate case is analogous to that cited in United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, wherein it was stated that:

"Anyone who owns and operates the single theatre in a town, or who acquires the exclusive right to exhibit a film, has a monopoly in the popular sense. But he usually does not violate § 2 of the Sherman Act unless he has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1. For those things which are condemned by § 2 are in large measure merely the end products of conduct which violates § 1. * * * So it is that monopoly power, whether lawfully or unlawfully acquired, may itself constitute an evil and stand condemned under § 2 even though it remains unexercised. For § 2 of the Act is aimed, inter alia, at the acquisition or retention of effective market control. * * * Hence the existence of power 'to exclude competition when it is desired to do so' is itself a violation of § 2, provided it is coupled with the purpose or intent to exercise that power. · * * * It follows a fortiori that the use of monopoly power, however lawfully acquired, to forclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." 334 U.S. at pages 106, 107, 68 S.Ct. at page 945.

General Electric's relationship to the lamp base industry plus its practices have been such that it violated § 2 of the Sherman Anti-Trust Act by monopolizing the manufacture and distribution of lamp bases. As was stated in the Griffith case it

"is chargeable in legal contemplation with that purpose since the end result is the necessary and direct consequence of what (it) did." 334 U.S. at page 108, 68 S.Ct. at page 946.

Its conduct and position in connection with the production of lamp base manu- · facturing machinery failed to attain the level of a separate monopoly but supported the monopoly of lamp bases. These activities, however, were in violation of § 1 of the Sherman Anti-Trust Act since they unlawfully restrained trade by seeking to forclose sources of lamp base machinery.

Westinghouse was a favored beneficiary by virtue of its relationships with General Electric (Ex. 25-G). This is discussed in greater detail under later sections. But the clear cut proof that it conspired with General Electric in restraining trade and competition in the lamp base area is lacking. All that is present is an inference to be obtained from Exhibit 316-G, previously quoted, and the Government's charge must fall.[27]

### (6) Filament and Leading-in Wire

▮ The Government named the alleged monopoly of General Electric in filament and leading-in wire as another "adjuvant monopoly" which it secured in order to support its lamp monopoly. In 1916, when it granted lamp licenses to the "B" licensees, it was provided that the licensees could not manufacture drawn tungsten or leading-in wire and that all drawn tungsten should be purchased from the licensor. Previous to this agreement Sylvania was making its own wire but upon the execution of its agreement with General Electric it sold its wire plant to General Electric. Under the 1933-1934 licenses, the "B" licensees were permitted to manufacture materials used in the manufacture of lamps, but they were not permitted to sell any parts of the lamp. The Government charged that since each licensee was restricted to a quota it would have been uneconomical for a licensee to put up and maintain a high quality wire producing plant. Westinghouse has been permitted for many years to manufacture its own filament wire and other lamp parts but its license provides, "No

---

[27] The Government's contention that General Electric employed the Lamp Base Works as a means of determining the status of competitors is discussed in "Industrial Surveillance". The proofs herein sufficiently support the inference this this was an existing and auxiliary benefit.

license is granted to sell filaments or other parts of lamps." (Ex. 25-G.)

Also in connection with leading-in wire contentions the Government charged that in 1915 General Electric was manufacturing this wire under the Fink patent when it purchased the patent rights of Eldred relating to the manufacture of the so called Dumet wire. The Commercial Research Company controlled the Eldred patent. The Government contended that in the agreement with Commercial Research Company (Ex. GE-155) to secure that patent General Electric caused Commercial Research Company to limit its own facilities for the manufacture and sale of this material and thereby deprived all other lamp manufacturers of the only other source beside General Electric for leading-in wire.

The Government further claimed that the policy of General Electric with respect to essential lamp parts is disclosed by Mr. Reed in a letter to Mr. Sloan (both of General Electric), dated May 15, 1936, as follows:

"It is my understanding that we have for many years adhered closely to the policy of declining to sell incandescent lamp parts or materials (with the single exception of bases) to domestic manufacturers who are not licensed under the incandescent lamp patents of the General Electric Company. This has been true of unpatented as well as patented parts and materials." (Ex. 239-G.)

Further, that although General Electric was able to produce the best and cheapest wire parts for lamps, it refused to sell filament wire to independent lamp manufacturers. When Westinghouse supplied independents with some of this material General Electric drew its attention to the fact that it was violative of its license to supply this material (Exs. 246-G, 247-G).

The Government admits that independent wire manufacturers have appeared in the industry from time to time but it contended that General Electric inhibited their growth and capacity. It asserted that no "B" licensee could buy any substantial part of its wire requirements from a wire manufacturer other than General Electric without the fact being known to General Electric through its surveillance of the number of lamp bases the licensee bought and that no "B" licensee would risk his machinery subject to buy back options held by General Electric by giving enough business to a wire manufacturer to make it worth while to invest the capital necessary for the manufacture of a high quality product and so competition is frustrated despite the expiration of any patents which might have controlled the manufacture of the material. General Electric denies any monopoly in the manufacture and sale of filament and leading-in wire. It insisted that other manufacturers make this product, and specifically names the Callite Company as the supplier of filament wire.

Leading-in wire,[28] also called "welds", was made in large quantities by Sylvania, Westinghouse, Callite and several smaller companies. It appears that Tungsol purchased approximately 40% of its wire from Callite. No evidence is brought forward by the Government to support the contention that the sanctions it suspected General Electric would level against licensees who purchased wire elsewhere were actually enforced.

The agreement with Commercial Research was made in 1915 and the Eldred patent with which it was concerned expired in 1932. Other phases raised by the purchase of the Eldred patent are discussed in connection with the Fink patent under the general heading "Patents" herein. But for present purposes, the contention made that General Electric's arrangement with Commercial Research violated the antitrust laws is unsupported.

The evidence concerning the contact made with Westinghouse in 1939 (Exs. 246-G, 247-G) supports the charge that General Electric and Westinghouse violated § 1 of the Sherman Anti-Trust Act in suppressing trade in this field, but there is no evidence inducing the conclusion that General Electric monopolized the filament and leading-in wire field. Here again its

[28] In the discussion under "Patents" the description of lamp parts is given.

activities were such as to be auxiliary to its monopolization of the entire incandescent electric lamp industry.

## (7) Expansion of Distribution Outlets

The next "adjuvant monopoly" was claimed by the Government to reside in General Electric's expansion of distribution outlets, together with those of Westinghouse, said to be connected in one scheme to dominate lamp marketing in the United States. The charges are discussed in this opinion under the general headings of "Agency" and "Suppression of Trade by Domestic Licensees". The general conclusions reached under those discussions are that the agency system employed by General Electric and Westinghouse individually is valid under the 1926 case, and that distribution outlets involved in the individual systems are not monopolized but that General Electric and Westinghouse engaged in practices in this area which eliminated competition between themselves.

## (8) Patents

Finally the Government charged that General Electric created an illegal monopoly of patents by means of its license agreements with Westinghouse, the "B" licensees, foreign companies and by other practices.

In the present action, the Government charged that General Electric conducted monopolistic and price fixing practices not passed upon by the Supreme Court in 1926 and that General Electric lacked patents to justify any of these practices. Since the Just and Hanaman patent expired in 1929, the Coolidge patent in 1930, and the Langmuir patent in 1933, it claimed that General Electric has owned no patent "which covers completely the making of modern electric lights with the tungsten filaments" and that General Electric had no lawful basis for monopolizing the making, using and vending of incandescent electric lamps. It further asserted that General Electric, upon winning the favorable verdict in 1926 realized that when the Just and Hanaman, Coolidge, and Langmuir patents expired it would be without patents giving it basic and fundamental control of incandesent electric lamps; that

General Electric therefore pursued a course of conduct designed to accumulate patents covering improvements in machines, processes, and minor details or related to highly specialized adaptations of lamps in limited use which, coupled with threats of litigation, backed by the financial power it controlled, deterred competition in the manufacture of lamps; that General Electric since the expiration of the Langmuir patent in 1933 has not owned a single incandescent electric lamp patent which has been held valid and infringed by a court of last resort in a contested case; and that General Electric's litigious past together with an alleged false and misleading patent marking system aided in maintaining the monopoly on lamp manufacturing by barring real and potential competition through an inherent threat of costly patent litigation. The Government argued that of the number of patents owned by General Electric from 1927 to the date of the complaint more than half were not employed in the manufacture of incandescent lamps and insisted that when consideration is narrowed to the so-called "bread and butter" lamps, i. e., 25, 40, 50, 60, 75, 100, and 150 watt lamps, General Electric lacked patents for the completed lamp to justify the monopoly and restraints allegedly practiced by it.

General Electric asserted that each of the many lamps manufactured by it or its licensees was covered by some article patent owned by it when the complaint was filed. It contended that the Government did not charge in the complaint the invalidity of any General Electric patent and that the Government was estopped to deny the validity of any patent which it granted. It asserted that so long as the licensed patents cover a substantial and important portion of the article in question so that the price control of the article can be said to be normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly, and so long as the license is a bona fide license based upon a real desire upon the part of the licensee to use the licensed patents, the licensor insisting upon limitations in the license to protect his own business, price control of the entire article is proper. It insisted that it is proper to grant limited licenses under

machine and process patents whereby it could fix prices and limit the manufacture of the entire article. It claimed that the situation is somewhat analogous to the price and territorial controls attached to the sale of medical preparations made under a secret process and insisted that since a license under a secret process providing for price control is valid, a fortiori, a similar license under a process or machine patent is valid.

General Electric denied having a monopoly of patents, conducting vexatious litigation, or employing an improper patent marking system. It asserted that it did no more with its patents than it had the right to do. Patents had been issued to it by the score and it argued that if the patents meant anything, they were when issued by the United States Patent Office, presumptively valid, and that it therefore had the right to take into court those who appeared to infringe a patent and to generally assert its rights under the patent. It insisted that its patent marking system was not false but "strictly and literally accurate" It claimed that the Government's charges that it successfully monopolized all patents relating in any way to the incandescent electric lamp or its manufacture are without support and argued that the Government's statements ignore the fact that under all of the domestic licenses to which the Government referred, it secured a mere non-exclusive license under the lamp patents of its licensees.

■■■ No merit is found in General Electric's contention that the Government may not attack the validity of patents in an anti-trust suit in view of the pronouncement of the Supreme Court in United States v. United States Gypsum Co., 333 U.S. 364, 367, 68 S.Ct. 525, that when defendants rely upon patents to justify restraint of trade, the Government is entitled to an opportunity to prove that the patents are invalid. Actually the Government's attack is not centered against the validity of any patents. It has attempted to show that with the expiration of the Langmuir patent in 1933, General Electric had no product patent that covers the incandescent electric lamp which would permit it to fix the price on the completed lamp or to limit its man-

ufacture and distribution and that machine and process patents would not permit restraints upon disposition of the completed lamp.

A comparison of Exhibits 2245-G and 21-G supports the Government's contention that more than half the lamp income of General Electric in 1940 was derived from "bread and butter" lamps. The Government disclaimed interest in the specialized lamps such as the bipost lamp, sealed beam lamp, large lamp with mechanical base, and other lamps of patented specialized construction discussed by General Electric's patent experts Dr. Jeffries (R. 507–578) and Mr. Hughes (R. 1897–1899). Exhibit 226-G contains a list of patents owned by General Electric relating to incandescent electric lamps, lamp parts, processes and machines for the manufacture thereof with issue dates beginning January 23, 1923 and ending December 26, 1939. All of these patents have expiration dates after commencement of the suit. It shows that of all the patents therein itemized, 281 are not used. Exhibit GE-147 consists of four volumes containing 527 letters patent owned by General Electric, the first of which was issued April 19, 1910 and the last on December 31, 1940. The patents actually employed in the manufacture of the "bread and butter" lamps are listed in the following: Exhibit 2247-G, General Electric; Exhibit 2249-G, Westinghouse; Exhibits 2251-G, 2252-G and GE-150, Sylvania; Exhibit 2253-G, Kenrad; and Exhibit 2254-G, Consolidated. No "bread and butter" lamps are manufactured by Tungsol and Chicago Miniature. A comparison of Exhibit GE-147 and the lists of General Electric patents last above mentioned discloses 79 General Electric patents employed in manufacturing "bread and butter" lamps as follows:

| | Number | Inventor | Type |
| --- | --------- | ------------------------- | ------- |
| 1. | 1,188,196 | Needham | Product |
| 2. | 1,205,002 | Marshal | Process |
| 3. | 1,206,704 | Helfgott | Process |
| 4. | 1,210,237 | Walker et al. | Machine |
| 5. | 1,210,238 | Walker et al. | Machine |
| 6. | 1,213,852 | Fagan and Quackenbush | Machine |
| 7. | 1,247,068 | Benbow | Product |
| 8. | 1,268,647 | Van Keuren | Product |
| 9. | 1,280,704 | Fuller | Process |
| 10. | 1,284,648 | Gill | Process |

| | Number | Inventor | Type | | Number | Inventor | Type |
|---|---|---|---|---|---|---|---|
| 11. | 1,306,643 | Swan | Machine | 75. | 2,120,853 | Brown | Machine |
| 12. | 1,320,874 | Langmuir | Machine | 76. | 2,142,865 | Zabel | Process |
| 13. | 1,393,550 | Langmuir | Process | 77. | 2,152,793 | Donovan | Machine |
| 14. | 1,410,499 | Pacz | Product | 78. | 2,179,296 | Iden | Machine |
| 15. | 1,423,956 | Mitchell & White | Process, Product & Machine | 79. | 2,227,303 | Flaws | Machine |
| 16. | 1,453,594 | Mitchell et al. | Machine | | | | |
| 17. | 1,453,595 | Mitchell et al. | Process | | | | |
| 18. | 1,475,192 | Marshall | Machine | | | | |
| 19. | 1,498,908 | Fink | Product | | | | |
| 20. | 1,512,240 | Ryan | Machine | | | | |
| 21. | 1,536,833 | Fagan | Machine | | | | |
| 22. | 1,546,352 | Rippl | Machine | | | | |
| 23. | 1,546 353 | Rippl | Machine | | | | |
| 24. | 1,580,809 | Brown | Machine | | | | |
| 25. | 1,597,439 | Fagan | Machine | | | | |
| 26. | 1,631,378 | Martin | Machine | | | | |
| 27. | 1,646,258 | Raus | Machine | | | | |
| 28. | 1,655,140 | Fagan | Machine | | | | |
| 29. | 1,655,141 | Fagan | Machine | | | | |
| 30. | 1,655,466 | Inman | Process & Machine | | | | |
| 31. | 1,659,613 | Phelps | Machine | | | | |
| 32. | 1,661,866 | Zabel | Machine | | | | |
| 33. | 1,662,045 | Patterson | Machine | | | | |
| 34. | 1,687,510 | Pipkin | Product | | | | |
| 35. | 1,694,265 | Inman | Process & Machine | | | | |
| 36. | 1,698,321 | Staudenmeir | Machine | | | | |
| 37. | 1,708,756 | Fagan | Machine | | | | |
| 38. | 1,718,487 | Pipkin | Machine | | | | |
| 39. | 1,722,161 | Strickland | Machine | | | | |
| 40. | 1,722.195 | Bumstead | Process | | | | |
| 41. | 1,733,882 | Illingworth | Process & Machine | | | | |
| 42. | 1,736,766 | Burrows | Machine | | | | |
| 43. | 1,736,767 | Burrows | Machine | | | | |
| 44. | 1,742,966 | Muller | Machine | | | | |
| 45. | 1,747,040 | Akeroyd | Machine | | | | |
| 46. | 1,745,143 | Brown | Machine | | | | |
| 47. | 1,771,927 | Illingworth | Machine | | | | |
| 48. | 1,788,957 | Phelps | Process & Machine | | | | |
| 49. | 1,795,181 | Phelps | Product | | | | |
| 50. | 1,801,119 | Soepnel | Machine | | | | |
| 51. | 1,812,776 | Donovan | Machine | | | | |
| 52. | 1,834,781 | Inman | Process | | | | |
| 53. | 1,867,418 | Muller | Machine | | | | |
| 54. | 1,907,532 | Flaws | Machine | | | | |
| 55. | 1,907,533 | Flaws | Process & Machine | | | | |
| 56. | 1,960,066 | Rippl | Process & Machine | | | | |
| 57. | 1,960,067 | Rippl | Process & Machine | | | | |
| 58. | 1,962,902 | Kunath | Process & Machine | | | | |
| 59. | 1,990,375 | Hahn | Machine | | | | |
| 60. | 1,998,958 | Flaws | Product | | | | |
| 61. | 2,006,231 | Malloy | Machine | | | | |
| 62. | 2,027,157 | Flaws | Machine | | | | |
| 63. | 2,031,560 | Bumstead | Machine | | | | |
| 64. | 2,042,520 | Flaws | Machine | | | | |
| 65. | 2,053,137 | Donovan | Machine | | | | |
| 66. | 2,053,946 | Donovan | Machine | | | | |
| 67. | 2,054,675 | Illingworth | Machine | | | | |
| 68. | 2,069,079 | Rudd | Product | | | | |
| 69. | 2,069,086 | Donovan | Machine | | | | |
| 70. | 2,085,578 | Flaws | Machine | | | | |
| 71. | 2,089,055 | Flaws | Machine | | | | |
| 72. | 2,104,656 | Krejci | Machine | | | | |
| 73. | 2,104.663 | Metzger | Machine | | | | |
| 74. | 2,114,171 | Benbow | Machine | | | | |

Examination of the list hereinabove itemized supports the Government's contention that there are but 10 product patents owned by General Electric and employed in the manufacture of the "bread and butter" lamps following the expiration of the Langmuir patents in 1933. They are as follows:

1. Needham, 1,188,196
2. Benbow 1,247,068
3. Van Keuren 1,268,647
4. Pacz 1,410,499
5. Mitchell and White 1,423,956
6. Fink 1,498,908
7. Pipkin 1,687,510
8. Phelps 1,795,181
9. Flaws 1,998,958
10. Rudd 2,069,079

General Electric did not controvert the analysis which produces the above listed product patents but stood upon its insistence that it "has at all times owned important article patents covering not only all of the 'bread and butter' lamps, but substantially all other lamps manufactured by itself and its licensees".

The relevant factors of each of the 10 product patents are summarized as follows.

*1. Needham Patent, No. 1,188,196*

This patent, expiring June 20, 1933 related to a gas filled bulb and claim 5 provided:

"an incandescent lamp containing a double fluorid of sodium and aluminum".

The claims primarily related to the employment of a fluorid within the bulb to prevent blackening. In its use it was not employed for the higher wattages by General Electric and Westinghouse, although an appreciable use is shown by Sylvania and Kenrad.

*2. Benbow Patent, No. 1,247,068*

This patent, expiring November 24, 1934, related to the coiled-coil filament. At the time the coiled-coil filament came into wide-

spread commercial use, the patent had expired (R. 696, 2584-2585).

### 3. Van Keuren Patent, No. 1,268,647

This patent, expiring June 4, 1935, provided for a leading-in wire having a moisture free borate coating. Its principal use seems to be in connection with the Dumet leading-in wire covered by the Fink patent hereinafter discussed and had wide use in the "bread and butter" lamps.

### 4. Pacz Patent, No. 1,140,499

This patent, expiring March 21, 1939, covered the so-called "sagless" tungsten filament. Certain claims to it were held valid in Anraku v. General Electric Co., 9 Cir., 80 F.2d 958, and other claims were eventually held invalid in General Electric Co. v. Wabash Appliance Corporation, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, rendered shortly before the patent expired. This patent had wide application in the "bread and butter" lamps.

### 5. Mitchell and White Patent, No. 1,423,956

This patent, expiring July 25, 1939, covered the commercial form of the so-called "tipless" bulb. General Electric claimed this to be a lamp but an examination of the patent claims show that it refers to the construction of the bulb, General Electric Co. v. Eisler, 3 Cir., 20 F.2d 33.

### 6. Fink Patent, No. 1,498,908

 This patent, expiring June 24, 1941, covered the Dumet leading-in wire. Dumet wire is composed of special metals having a heat expansion characteristic of glass which General Electric takes credit for developing. The Government charged General Electric with bad faith in the procurement of this patent, particularly in the institution of a suit under 35 U.S.C.A. § 63. However, the proof shows its contentions that General Electric failed to notify the Commissioner of Patents of General Electric's interest are without merit since the Commissioner was notified by the reference to the bill of complaint (Ex. 229-G at p. 1515 and Ex. GE-158). Further, the Commissioner expressly acknowledged receipt of the bill of complaint in which was found reference to General Electric's conflicting interests (Ex. GE-159).

### 7. Pipkin Patent, No. 1,687,510

This patent, expiring October 16, 1945, related to the inside frosted bulb. It was held valid in General Electric Co. v. Save Sales Co., 6 Cir., 82 F.2d 100, and General Electric Co. v. Wabash Appliance Corporation, 2 Cir., 93 F.2d 671, but invalid in General Electric Co. v. Jewel Incandescent Lamp Co., 3 Cir., 146 F.2d 414, affirmed, 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43, a decision rendered after the present suit was instituted. Although the major portion of "bread and butter" lamps is frosted (R. 561), General Electric in 1940 made 14,000,000 lamps with clear bulbs of the "bread and butter" wattage (Ex. 2245-G).

### 8. Phelps Patent, No. 1,795,181

This patent, expiring March 4, 1948, related to the so-called "molded seal" bulb, its purpose being to properly seat the bulb in the base.

### 9. Flaws Patent, No. 1,998,958

This patent, expiring April 23, 1954, relates to a particular form of connection between the leading-in wires and the filament resulting in a better contact without crushing the wires. Although used prior to 1940 by General Electric, its use apparently has been discontinued (Exs. 226-G, 2247-G).

### 10. Rudd Patent, No. 2,069,079

This patent, expiring January 26, 1954, relates to an improved stem for electric lamps. This patent is not used by Sylvania (Ex. GE-150).

In summary the above product patents cover the following parts of an incandescent lamp:

Filament ........ Benbow, Pacz, Flaws
Leading-in wire... Van Keuren, Fink, Flaws
Bulb ............ Needham, Mitchell and White, Pipkin, Phelps
Stem ............ Rudd

The elements constituting a completed incandescent electric lamp are described in Exhibit GE 12 as follows:

"The lamp comprises essentially a doubly coiled fine filament of tungsten supported within a glass envelope. It is so supported partly by means of a pair of leading-in

wires which pass through the walls of the glass envelope and partly by means of a molybdenum wire surrounding its central portion, and held on a glass support fastened to the glass envelope. A metallic base attached to one end of the glass envelope or bulb, as it is commonly referred to, serves the dual function of supporting the lamp in a threaded supporting socket and of affording electrical connection to conductor terminals in the supporting socket."

The Needham, Benbow and Van Keuren patents all expired before the end of 1935. The Pacz and Mitchell and White patents expired prior to filing of the complaint in the instant cause. Although used prior to 1940, the Flaws patent is no longer used by General Electric in the manufacture of lamps although it had 14 remaining years of life as a patent. The Pipkin patent was subsequently found by the Supreme Court to be invalid. The Fink patent, never exposed to litigation, expired shortly after this suit was commenced. The Phelps patent likewise was never litigated and Westinghouse's patent attorney wrote that satisfactory lamps may be manufactured without it (Ex. 213G). The Rudd patent is not of sufficient significance to be used by Sylvania (Ex. GE 150, Ex. 2251G).

It is recalled that in the "Introduction" the history of the domestic licenses was gone into in some detail. There were two types of licenses, "A" and "B". Westinghouse was granted the only "A" license issued by General Electric. All other licenses granted by General Electric were "B" licenses either for small or large lamps. The "A" license granted the right to manufacture both large and miniature type lamps.

The Westinghouse license (Ex. 25G) executed June 15, 1928 as of January 1, 1927, stated that:

"This license and agreement relates to, and to machines and processes for the manufacture of, electric lamps as hereinafter defined.

 * * * * * *

"An electric lamp is for the purpose of this agreement defined as any device the primary purpose of which is to convert electric energy into light within the visible spectrum * * *".

A non-exclusive license under specified patents was granted "for improvements in electric lamps and improvements in machines, appliances or processes for the manufacture of such lamps, to make use and sell said electric lamps". Royalties were based upon an amount equal to 1% of the net sales by Westinghouse of "lamps of the kind covered by this license". The license was limited "to the sale of Class A. electric lamps in and for use in the United States in each calendar year to an amount expressed in dollars which shall not exceed the amount represented by "specified percentages of the aggregate net sales during the year of the licensor. The license was granted on condition that prices, terms and conditions of sale of the "electric lamps" made under the license were in accordance with those of the licensor and prohibited export of "lamps" except under qualified exceptions. A patent list was annexed to the license and consisted of practically all the General Electric patents involving incandescent electric lamps then in existence. The "B" licenses followed a similar pattern with a differentiation made between miniature lamps and large lamps and without a price fixing clause. The licenses provided for an accounting system to be employed by General Electric in which no distinction was made whether a product patent on an element of a lamp was employed in a particular lamp or whether process, or machine patents, or a combination of product, process and machine patents were employed. As long as any General Electric patent concerning incandescent electric lamps was employed in the manufacture of a particular lamp, that lamp was subject to the price, quota and export limitations of the license. Therefore, as an illustration, when Sylvania lamps were exported to Venezuela (Ex. 114 G, 115 G), and to Newfoundland (Ex. 116 G), General Electric held that the license export limitations barred such sales. Sylvania appreciated the understanding and found it not unwelcome.

General Electric officials recognized as early as 1926 that their patent basis required strengthening. George T. Morrison, then Vice President of General Electric expressed this opinion to Gerard Swope,

President of General Electric, in a letter dated April 28, 1926 (Ex. 64-G).[29]

"The important patents on which our Lamp Agreement with the Westinghouse Electric & Manufacturing Company is based are as follows:

"The Just and Hanaman Patent, covering broadly all kinds of tungsten filament lamps; expiring February 27; 1929.

"The Coolidge Patent, covering an incandescent lamp having a filament or drawn tungsten wire, either vacuum or gas-filled; expiring December 30, 1930.

"The Langmuir Patent, covering all commercial forms of gas-filled or Type 'C' Lamps; expiring April 18, 1933.

"The vacuum Lamp, which represents 54% of our lamp business in dollars and 70% in numbers, is covered by the Just and Hanaman and Coolidge Patents which expire, as stated above, on February 27, 1929 and December 30, 1930, respectively. I believe there are no other patents owned by the General Electric Company which would prevent others making this type of lamp when the Coolidge patent expires.

"It is unnecessary to enumerate here the many advantages that have accrued to the General Electric Company, the Westinghouse Company and the lamp industry as a whole, both in this country and in foreign lands, in the way of standardization, simplification and stabilization of the lamp industry as a result of our Lamp License Agreements. In view of the short time that will elapse before the expiration of these important patents it behooves us to at this time give very serious and careful thought to the working out of a plan that insure the continuance of the very satisfactory license agreements and co-operative arrangements which have contributed so much in the past to the development of the electrical industry as a whole, and made possible such satisfactory profits to those engaged in the business.

"I think we have the necessary material, in the way of important process patents, to form the basis of an agreement that would extend for many years beyond the expiration of the present agreements.

"The first step in this direction would be to take up negotiations with the Westinghouse Company for an extension of their present agreement, and this would involve giving the Westinghouse Company a larger participation in the business than they enjoy under the present arrangement. Just how far we would have to go in this direction would be a matter of negotiation.

"On various occasions during the past three years I have discussed this matter with Mr. Cary and taken the position that we would not expect in any new arrangement to give the Westinghouse Company a participation in excess of 20%. This of course was not satisfactory to him and he has mentioned a figure of 30%. We no doubt could compromise on 25%. Perhaps we could satisfy them with a smaller percentage, but I doubt it. I believe that we could be justified in going this far if we could make an arrangement that would permit them to reach this increased figure over a period of years, they getting a larger percentage of the growth in the business than we during the period agreed upon—say a growth of 1% per year during 5 years. Under our present agreement they pay us 1% royalty on their net sales up to their allotment, and for sales in excess of this they pay us 1% plus 10%. In a new arrangement permitting them a larger allotment I would insist that upon sales in excess of this allotment they pay a higher royalty than the 10% they now pay on their excess. In fact, I would make the excess royalty so high that there would be no incentive for them to go beyond their allotment say a 25% royalty.

"Whether or not we would be successful in getting the Westinghouse Company to pay us an increased royalty on the increased business allotted to them, over their present allotment of 17.25% is problematic. We might try on something like this.—They

---

[29] General Electric's objections to this letter are discussed in the section "Foreign Agreement".

are running now at about 20%. We might continue to let them continue to do 20% on the present royalty bases of 1% and increase the royalty by one-half of 1% for each percent they increase over 20% and up to the new percentage agreed upon, say, 25%. Personally I would not be so keen about increasing their present royalty on the increased allotment above their present allotment as I would be about fixing a high royalty for any excess done beyond the percentage agreed upon.

"The Westinghouse Company, of course, is the key to any lamp license arrangement in this country, and we must get them in line before making any arrangements with the other Licensees. In fact, it is necessary to get the Westinghouse Company in line if we are to be successful in working out arrangements with the foreign lamp manufacturers. You are familiar with the work that has been done and the plans that we have been developing in foreign countries during the past twenty-four years, all for the purpose of protecting our domestic lamp business against foreign encroachments when our important patents expire. That time is rapidly approaching. No better stimulus to the necessity of continuing these activities could be given than frequent reviews of what is going to happen to our lamp business when these important patents expire. The fact that we have had in this country such a satisfactory plan of cooperation between the various manufacturers has been helpful in getting the co-operation of the foreign manufacturers. It is of the utmost importance, therefore, that we have our house in order here, and as I have stated in the foregoing, the first step in this direction is to get the Westinghouse Company lined up in a new agreement."

A letter dated June 19, 1928 written by H. A. Couse, G. E. Lamp Department Counsel and obtained from the files of the New York Law Department addressed to Mr. Swope (Ex. 207-G) reveals that some consideration had been given to the possibility that "the trend of prices is downward, and that with some of the fundamental patents expiring within the next few years, there is likely to be increased competition."

The memorandum from Zay Jeffries (then Consultant to General Electric and later Technical Director at Nela Park) to T. W. Fresch (then Vice President of General Electric in charge of the Lamp Department) and obtained from the files of J. E. Kewley (Vice President of General Electric in charge of Lamp Department from 1934 to 1945) dated December 21, 1928, detailed the policy of the incandescent Lamp Department in connection with patent litigation as follows (Ex. 208-G):

"With reference to our discussion of this matter on December 20, 1928, I am noting below some of the points which were considered.

"I have taken a more or less active part in the lamp patent litigation since about 1916 * * * Whereas in the past we have found it possible to rely on three main patents, namely, Just and Hanaman, Langmuir, and Coolidge, it seems probable that it would be much preferable in the future to strive to adjudicate more patents and perhaps secure adjudication in more districts. The following is a copy of a letter from Mr. J. H. Anderson [Patent Attorney for the Lamp Department] to Mr. R. W. Davis [Sales Dept. of National Lamp Works at Nela Park] of October 3, 1928:

" 'The following is a list of our incandescent lamp patents which relate to the lamp itself. These are all article patents as distinct from process and machine patents although some of these article patents have also process claims. These article patents have the advantage that they could be used against imported as well as domestic lamps. I have not listed the process and machine patents of which we have a great number, and of course these would be effective against domestic manufacture.'

* * * * * *

"The above list might be increased somewhat by the addition of the Westinghouse patents, and will be increased by the issuance of some new patents in the future on which applications have now been filed.

"I believe we should establish the policy of filing suits on such of these patents as

have not been adjudicated as soon as we encounter definite infringement.

\* \* \* \* \* \*

"I should like to urge the general policy of active and aggressive litigation on some of these patents, the litigation of which has not been necessary because of the commanding position of Just and Hanaman, Langmuir, and Coolidge.

"I think it would also be proper to advise the Westinghouse Company of our policy and suggest that they follow the same policy with reference to their own patents in this field."

Mr. Fresch wrote to A. G. Davis [probably W. G. Davis, Manager Parts Manufacturing] on February 13, 1933 (Ex. 209-G) and stated that his letter was in reply to an earlier one from Mr. Davis and expressed the view that

"I believe that our chances for holding our proportion of the lamp business are better now than they have been for many years. My belief is not based entirely upon patents or prospective patents but upon a combination of our operating efficiency, our ability to invent the new precision machinery, which future developments will certainly require, and upon our ability to successfully complete a number of product inventions which are now in process. \* \* \*

"The success of our plan will depend in no small measure upon the cooperation of the Patent Department. \* \* \* I say this because most of the product patents which we contemplate will cover rather small details, no one of which may be of any considerable importance, but taken collectively I believe they will be of sufficient importance to be of considerable value to us.

\* \* \* \* \* \*

"In the work which we are doing it is probable that we shall ask the Patent Department to put in a number of applications which seem trivial, but I believe these applications should nevertheless be put through, not only because some of them may become important but also because some of them will be required to protect us from the applications of others."

In October of 1933 Mr. Jeffries wrote Mr. Fresch (Ex. 211-G) of suggestions in connection with Japanese baseless lamps then being imported into the United States. He stated that:

"This threatened practice makes the prosecution of our patents a much more urgent matter than would otherwise obtain. With the so-called basic patents all expired and with our decision not to take the Fink leading-in wire patent to court, there are three patents on which we now mainly rely. These are the ones mentioned above, viz., the Mitchell & White tipless lamp patent; the Pipkin inside-frosted bulb patent; and the Pacz non-sag filament patent. The Mitchell & White patent has been favorably adjudicated, but in a later case against Eisler it was limited to what might be called straight-through tubing as opposed to tubing which is bent near its junction with the lamp itself. A number of the Japanese lamps infringe the Mitchell & White patent, even with the limitation just mentioned. It seems probable that we may obtain a broader interpretation of the Mitchell & White claims which will give us stronger offensive powers against Japanese lamps, but even if the claims are restricted to so-called straight tubing the Mitchell & White patent is still a formidable weapon against a considerable proportion of the Japanese lamps now on the American market."

General Electric warned that the expressions contained in these and similar letters were merely opinions of officials and employees of the company not essentially burdened with the duty of formulating policy. It pointed to the testimony of high officers of the company like Mr. Swope who was asked whether he was in agreement with the critical expressions of the Morrison letter (Ex. 64-G) and he answered in the negative. Specifically, Mr. Swope did not agree that "there were no other patents owned by General Electric Company which would prevent others making this type of lamp when the Coolidge patent expires". (R. 1459). General Electric contended that Mr. Swope's opinion in this regard was more accurate and closer to the policy of General Electric

than that of Mr. Morrison and other officers and employees who were thinking along the same line. It is no detraction from the integrity of Mr. Swope's opinion when it is found upon an analysis of his testimony, the expressions cited above, and all of the circumstances surrounding this phase of the case, that the conclusion is reached that these contemporary statements graphically portrayed the climate of opinion and policy as it was conceived and born just prior to the expiration of General Electric's basic and controlling patents in 1933. These contemporary expressions confirm beyond doubt that General Electric was pinning its faith on some of the product patents herein discussed to perpetuate a similar basic patent control as was awarded to General Electric by the 1926 case. It is not even controverted that General Electric carried into effect the policy expressed in the above writings of patenting numerous machine, process, and article patents and prosecuted extensive litigation for patent infringements (Ex. 225-G, GE 78). Wherever it found evidence of any patent infringed by an independent manufacturer or distributor it brought action with many of these actions settled by consent decrees (Ex. 225-G) but contested cases in a large measure ultimately went against General Electric (Ex. 225-G, GE 78).

In the 1926 case, the Supreme Court found that General Electric owned three United States patents (Just and Hanaman, No. 1,018,502; Coolidge, No. 1,082,933; and Langmuir, No. 1,180,159) which the court held to "cover completely the making of the modern electric lights with the tungsten filaments, and secure to the General Electric Company the monopoly of their making, using, and vending." 272 U.S. at page 481, 47 S.Ct. at page 193, 71 L.Ed. 362. In United States v. Line Material Co., 333 U.S. 287, at page 311, 68 S.Ct. 550, at page 562, it was stated that:

"The General Electric case holds that a patentee may, under certain conditions, lawfully control the price the licensee of his several patents may charge for the patented device".

General Electric contended that the licenses it granted were in reliance on the 1926 case; that it has article patents covering every incandescent electric lamp manufactured by its licensees which authorizes price, quantity and export restrictions; and that it is immaterial if the patent does not entirely cover the product so long as a substantial and important portion of the product is covered rendering the conditions exacted a normal and reasonable adaptation necessary to protect the patentee's monopoly. Examination of its patent structure in existence after 1933 demonstrates that it had no basic and controlling patents on the manufacture of incandescent electric lamps but only improvement patents on elements constituting the completed lamp, process and machine patents, many of which are not used (Ex. 225-G). Its patent expert admitted failure to employ many of the patents and acknowledged that patents claimed to cover an incandescent lamp actually were patents upon some part of the completed lamp (R.1904–1939). Letters of General Electric officials emphasized their concern with the approaching end of the monopoly granted by the three basic patents of the 1926 case and the need for perfecting a future patent control.

GE cited the cases of General Electric Co. v. Willey's Carbide Tool Co., D.C., 33 F.Supp. 969 and American Lead Pencil Co. v. Musgrave Pencil Co., 1936, 170 Tenn. 60, 91 S.W.2d 573, to support its contention that price control is justified so long as a substantial and important portion of the article in question is covered by licensed patents. These cases are in conflict with the 1926 case for the Supreme Court was emphatic in its holding that the three patents therein were *entirely* controlling in the manufacture, use and sale of the tungsten filament lamp. In fact, in its brief submitted to the trial court in the 1926 case, General Electric admitted that the patents were "fundamentally controlling". Brief for General Electric in U. S. v. General Electric et al., Equity No. 1051, N.D. of Ohio, Eastern Division, January 27, 1925, page 7; Ex.G 1.

 There is no dispute with the proposition that every patent owner is given by statute a legal monopoly of the manufacture, use and sale of the things set forth in his patent claims. In the Line Material case the court stated that

"During its term, the valid patent excludes all except its owner from the use of the protected process or product. * * * This monopoly may be enjoyed exclusively by the patentee or he may assign the patent 'or any interest therein' to others. * * * As we have pointed out, a patentee may license others to make and vend his invention and collect a royalty therefor". 333 U.S. at page 308, 68 S.Ct. at page 561.

But the court therein held that:

"the precise terms of the grant define the limits of a patentee's monopoly and the area in which the patentee is freed from competition of price, service, quality or otherwise." 333 U.S. at page 300, 68 S. Ct. at page 557.

Therefore patent grants are to be strictly construed for a monopoly is a "protean threat" to fair prices. United States v. Line Material Co., supra, 333 U.S. 287, 308, 310, 311, 68 S.Ct. 550. Cf. Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 665, 64 S.Ct. 268, 88 L.Ed. 376; United States v. Masonite Corporation, 316 U.S. 265, 277, 278, 62 S.Ct. 1070, 86 L.Ed. 1461.

 General Electric contended that it is proper to grant limited licenses under machine and process patents. It argued that price fixing under a machine or process patent was held proper in Straight Side Basket Corp. v. Webster Basket Co., 2 Cir., 82 F.2d 245 and Ceramic Process Co. v. Cincinnati Advertising Products Co., D.C., 28 F.Supp. 794, appeal dismissed, Cincinnati Advertising Products Co. v. Ceramic Process Co., 6 Cir., 116 F.2d 497 and argued that "the point is not essential to the decision here". It asserted that in any event, "it is clearly proper to grant licenses under machine or process patents with quantity restrictions as distinguished from price restrictions on the product, since quantity restrictions are a direct restriction of the extent of use of the licensed machine or process". These contentions are without merit in the light of Barber-Colman Co. v. National Tool Co., 6 Cir., 136 F.2d 339 and Cummer-Graham Co. v. Straight Side Basket Corp., 5 Cir., 142 F.2d 646 wherein the Webster case was rejected. See United States v. Line Material Co., 333 U.S. 287, 301, 68 S.Ct. 550 (footnote 14).

 It was stated in Re Amtorg Trading Corp., 75 F.2d 826, at page 832, 22 C.C.P.A., Customs, 558, certiorari denied, International Agricultural Corp. v. Amtorg Trading Corp., 296 U.S. 576, 56 S.Ct. 102, 80 L.Ed. 407 that:

"The distinction between product and process patents is clear and is quite generally understood. The product patent is upon an invented or discovered article; the process patent is upon a method of making an article. It not infrequently happens that in the same letters patent invention is recognized in both the article and the method of making it, but it is the well-settled rule of law that a product patent protects only the product, and that a process patent protects only the process.

 * * * * * *

"Thus a process patent is not infringed by the sale of a product made by the process, the product itself not being patented, and a product patent is not infringed by one who uses the process by which it is made, the process itself not being patented."

This is reemphasized in Metro-Goldwyn-Mayer Corp. v. Fear, 9 Cir., 104 F.2d 892, at page 899, the court therein citing Keplinger v. De Young, 10 Wheat. 358, 6 L.Ed. 341; Merrill v. Yeomans, 94 U.S. 568, 24 L.Ed. 235; Salvage Process Co. v. James Shewan & Sons, Inc., D.C., 26 F.2d 258; Goodyear v. Central R. Co., of New Jersey, 10 Fed.Cas. No. 5,563, page 664; Welsbach Light Co. v. Union Incandescent Light Co., 2 Cir., 101 F. 131; Barton v. Nevada Consol. Copper Co., D.C., 36 F.2d 85; In re Amtorg Trading Co., supra.

 General Electric's argument that the situation is analogous to price and territory controls attached to the sale of medical preparations made under secret

815

process as in the cases of Fowle v. Park, 131 U.S. 88, 9 S.Ct. 658, 33 L.Ed. 67; and Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 402, 31 S.Ct. 376, 55 L.Ed. 502 is untenable. Under the patent law, a public disclosure is made, protected by a statutory grant of monopoly for a given period but confined to narrow channels guarding against the extension of that monopoly. General Electric is not in the position of the owner of secret processes as in the cited cases. During the pendency of its patents it was protected by them and no one could make use of them without license until their expiration. In the case of a secret process one who without fraud uncovers the secret is not controlled by the original owner and may put it to use. However even in the secret process cases the anti-trust laws may not be violated for it is held that the public interest is still the first consideration and the restraints accorded the owner of the secret are limited to what is reasonably necessary. Cf. United States v. Line Material Co., 333 U.S. 287, 307, 68 S.Ct. 550.

General Electric's position since 1933 has been such as to leave it bereft of patent control over the lamp as such. Yet its domestic licenses are contrived so as to provide it with control over the manufacture and distribution of the completed lamp as well as its parts.

General Electric claimed that the restraints were imposed in its licenses in good faith in reliance upon the 1926 case. Granted that such may have been a motive for the Westinghouse license in 1927, it cannot, however, excuse a continued exercise of the restrictive provisions after 1933 upon Westinghouse or those in the renewed "B" licenses of 1933 and 1934. After 1933, the purpose of General Electric was to perpetuate the same domination over the incandescent electric lamp industry as it exerted theretofore. Lacking the basic and controlling patents approved in the 1926 case, it marshalled an offensive of patents of lesser degree to maintain its paramount position of control in the industry. As has been seen, this was not coincidental but planned with well calculated premeditation. General Electric's position and the relationship of its licensees in many respects is analogous to the situation interdicted in United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525.

All "B" licenses granted by General Electric contained a provision that in consideration for the license granted by it, the licensee would grant General Electric a non-exclusive license with the right to grant sublicenses to make, use and sell incandescent electric lamps of all kinds, types and sizes within and throughout the United States, its territories and possessions, under any and all patents or patent rights presently owned or controlled or which may thereafter be owned or controlled by the licensee developed during the term of the license granted by General Electric for the life of such patents respectively. The "B" licenses further required the license of patents or patent rights held by officers and directors of the licensees. In addition to obtaining the beneficial use of the patents of its domestic licensees, General Electric secured the patent rights of its foreign licensees through its subsidiary, International General Electric, as discussed in "Foreign Agreements". Since the main buttress of its position in the incandescent electric lamp industry was patents, it followed the conscious policy of funneling into its control all patents held by its licensees and touching any phase of the industry. General Electric, however, minimized its privileges in this respect contending that it had a mere non-exclusive license. The license included the right to sublicense for the duration of the life of the patent. It was thus placed in the position of rendering impotent any possible advantages to which one of its licensees would normally be entitled as the owner of a patent (Exs. 29-G, 30-G).

In Transparent-Wrap Machine Corporation v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563, it was stated that:

"We are quite aware of the possibilities of abuse in the practice of licensing a patent on condition that the licensee assign all improvement patents to the licensor. Conceivably the device could be employed with the purpose or effect of violating the anti-trust laws. He who acquires two

patents acquires a double monopoly. As patents are added to patents a whole industry may be regimented. The owner of a basic patent might thus perpetuate his control over an industry long after the basic patent expired. Competitors might be eliminated and an industrial monopoly perfected and maintained. Through the use of patent pools or multiple licensing agreements the fruits of invention of an entire industry might be systematically funneled into the hands of the original patentee.

\* \* \* \* \* \*

"Congress, however, has made no specific prohibition against conditioning a patent license on the assignment by the licensee of improvement patents. But that does not mean that the practice we have here has immunity under the anti-trust laws. Indeed, the recent case of Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, Id., 324 U.S. 570, 65 S.Ct. 815, 89 L.Ed. 1198, dramatically illustrates how the use of a condition or covenant in a patent license that a licensee will assign improvement patents may give rise to violations of the anti-trust laws." 329 U.S. at pages 646–648, 67 S.Ct. at page 616, 91 L.Ed. 563.

The Court stated in the Line Material case that:

"By aggregating patents in one control, the holder of the patents cannot escape the prohibitions of the Sherman Act. See Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; United States v. United States Gypsum Co. [post, 333 U.S. 364, 68 S.Ct. 525]." 333 U.S. at page 308, 68 S.Ct. at page 561.

In this present case, General Electric regimented an industry by, among other things, its acquisition of patents to perpetuate a control over the incandescent electric lamp long after its basic patents expired to maintain a dominant position [30] rendering it possible for it to eliminate competition and maintain an industrial monopoly of the type recognized by the Transparent-Wrap case to be an eventuality

violative of the anti-trust laws.[31] Its aggregation of patents into its control permitted General Electric to monopolize patents and by so doing it violated § 2 of the Sherman Anti-Trust Act.

There remains for consideration two contentions of the Government in this area of patents: (1) the charge of vexatious litigation; and (2) the charge of false and misleading patent marking.

In its argument that General Electric prosecuted vexatious and oppressive patent litigation in order to maintain its monopoly position, the Government refers to a number of patent suits which it alleges were brought without probable cause. It goes into detail concerning four suits brought against a machinery manufacturer, Eisler, involving twelve patents. The suits were in this district, three of the cases being finally decided against General Electric by the Third Circuit Court of Appeals, 20 F.2d 33, 26 F.2d 12, and 43 F.2d 319. The fourth of these suits was dismissed by General Electric because the patents had expired before the suit came to trial (Ex. 225-G, p. 1214). The Government commented on other patent litigation of General Electric and analyzed Exhibits GE-78 to show that in the ten years from 1927 to 1937, General Electric instituted 51 suits involving patents on lamps other than the three 1926 case patents. It stressed the uniform lack of success by General Electric in all of this litigation as in itself sustaining the charge that the suits were brought without probable cause.

General Electric, on the other hand, denied that it used its patents as a means of wearing out its competitors by vexatious litigation. It offered the testimony of Mr. Reed that it was the policy as far as domestic infringements were concerned to sue a strong manufacturer who gave evidence of intention to contest the action rather than a distributor or a dealer and to bring no other action against domestic infringers until the court had passed upon the first action. Once the patent was held

---

[30] This phase is discussed under "Dominant Position".

[31] Under the topic heading "Suppression of Trade by Domestic Licensees" further restraints of competition resulting from the patent licenses are discussed.

valid, it was its practice to proceed against others. It stressed the fact that the Pacz patent and the Pipkin patent were held valid and infringed in Courts of Appeal. Anraku v. General Electric Co., 9 Cir., 80 F.2d 958, certiorari denied 298 U.S. 678, 56 S.Ct. 942, 80 L.Ed. 1399; General Electric Co. v. Save Sales Co., 6 Cir., 82 F.2d 100; General Electric Co. v. Wabash Appliance Corporation, 2 Cir., 93 F.2d 671, certiorari denied Wabash Appliance Corp. v. General Electric Co., 303 U.S. 641, 58 S.Ct. 610, 82 L.Ed. 1101, rehearing denied Id., 303 U.S. 667, 58 S.Ct. 749, 82 L.Ed. 1124. It contended that it acted only within its rights in bringing patent infringement suits to protect its inventions.

There appears to be little merit to the Government's charge of vexatious litigation for the very nature of a patent grants to the owner the right to protect it against infringers. Normally the patent owner is under no requirement to license the use of patents or even to use it himself. It seems apropos on the arguments of both the Government and General Electric at this phase of the case to raise the question of efficacy of the present patent system which permits the issuance of patents in the number disclosed in this case which, when subjected to the test of litigation, results in invalidating the work of the patent authorities. Cf. citations in footnote 4, Transparent-Wrap Machine Corporation v. Stokes & Smith Co., 329 U.S. 637, 647, 67 S.Ct. 610, 91 L.Ed. 563; Potts et al. v. Coe, Commissioner of Patents, 78 U.S. App.D.C. 297, 140 F.2d 470, rehearing 79 U.S.App.D.C. 223, 145 F.2d 27.

In regard to the patent marking claim, the Government charged General Electric with designedly frightening off competition by marking lamp cartons with a number of patents which General Electric claimed covered the lamp therein when but one of the patents covered the item contained. This charge appears to be on nebulous grounds. It has not pointed to a single instance of a competitor being prohibited from entering the incandescent lamp field for the reasons it here asserted. The printed notice on the lamp cartons read:

"The Mazda Lamp contained herein is manufactured by General Electric Company under *one or more* of the following patents * * *." (Italics supplied.) and was followed by a list of patent numbers, at least *one of which was employed* in the manufacture of the lamp contained therein. Testimony developed the fact that this was a practice often resorted to when multiple patents expiring at different times covered several objects and cannot be said to have deceived the public.

The Government undertook to show that each of the foregoing alleged "adjuvant monopolies" was in itself illegal as a separate, choate monopoly in addition to its claim that in each instance the structure described was in support of the monopoly over the incandescent electric lamp industry. Separated into water tight compartments that the Government places each of these activities of General Electric and viewed therein, the Government proved that General Electric in combination with Corning monopolizes the glass bulb, tubing and cane industry; that it individually monopolizes the lamp base industry; and that it individually monopolizes patents employed in the incandescent electric lamp industry. As for the remaining alleged "adjuvant monopolies", the Government's proof failed but it did prove individual restraints of trade and competition. Permitting all these activities, however, to intermingle in the general stream of evidence, they support the theory that General Electric has acquired the power to and in fact does monopolize the entire incandescent lamp industry in the United States. United States v. Griffith, 334 U.S. 100, 105–109, 68 S. Ct. 941; United States v. United States Gypsum Co., 333 U.S. 364, 401, 68 S.Ct. 525; Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926; United States v. Reading Co., 226 U.S. 324, 357, 33 S.Ct. 90, 57 L.Ed. 243; Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 41, 48, 33 S.Ct. 9, 57 L.Ed. 107; United States v. Pullman Co., D.C., 50 F. Supp. 123, 135.

"Agency"

In the early stages of the development of the incandescent lamp the Edison Com-

pany sold integrated systems including the power sources, transmission equipment and lamps. It also sold lamps to central stations which distributed them to their customers, sometimes absorbing all or a part of the cost of the lamps in the overall service charge. At that time there was a rather considerable variation in bases, sockets, voltages, etc., and in view of the large number of different types of lamps needed for the wide variety of uses it was necessary to maintain direct relations with the consumers in order to see that the proper type of lamp was used for particular purposes in particular localities.

In 1912 General Electric adopted its agency plan for distribution of lamps. According to General Electric, this is accomplished in three ways:

1. Sales to large consumers, such as industrial and commercial establishments, railroads and electric lighting companies under contracts usually negotiated by employees of the sales department.

2. Sales to such large consumers under contracts negotiated by agents, shipments being made from stock in their hands on consignment, or from General Electric warehouses, and

3. Sales to the consuming public through agents who deliver lamps from stock in their custody, which they have received on consignment from other agents whose functions are to recommend the appointment,

serve and supervise the operations of such served agents.[32]

Two selling groups carried out the objectives of this system: General Electric's sales department and selling agents. The latter consisted of two kinds: those who perform serving or wholesale functions known as B agents and those who perform retail functions known as A agents. The sales department is divided into an Eastern and Western Division. Each division has several sales districts, each with a manager and salesmen. They negotiate contracts with large consumers for the sale of lamps and promote the sales of lamps generally in their respective territories. The B agent is a large wholesale house engaged in distributing electrical, hardware or mill supply goods. General Electric stated that the eligibility requirements for this type of agency are designed to select substantial concerns capable of rendering adequate service to the agents served by them. After appointment the B agent receives a consignment of stock which he is authorized to distribute to designated General Electric agents, to any consumer within domestic territory to the extent of the consumer's requirements at specified prices and to any purchaser under contract with General Electric when authorized by it at specified prices. In order to maintain his status he was required to dispose of at least $5,000 in lamps during the given year; he

---

32 "About 15% of this manufacturer's lamp product is sold and delivered by it from its own sales offices and warehouses to the consumer. These are sales to large consumers who may be readily and economically reached by the manufacturer and who are in such geographical locations that their requirements may be efficiently supplied from its own warehouses and factories.

"About 27% of said lamp product is sold by it to large consumers with whom contracts of sales are made with the manufacturer but the contracts are serviced by the local agents, from their consigned stocks, on the same prices and terms as though the manufacturer had shipped the lamps as in the case of the 15% above mentioned.

"The remaining 58% of the manufacturer's lamp product is sold through its various agents throughout the country."

From a statement entitled "Domestic Distribution Plan Incandescent Electric Lamps (Large) General Electric Company January 2, 1939" enclosed in a letter from Mr. Couse to Mr. Reed, dated January 6, 1939 (Ex. 2236-G).

PERCENT SOLD THROUGH AGENTS & DIRECT TO CONSUMERS (Ex. 1168-G)

LARGE LAMPS

| Year | Agents % | Purchasers % |
|---|---|---|
| 1926 | 72.2 | 27.8 |
| 1927 | 72.3 | 27.7 |
| 1928 | 74.0 | 26.0 |
| 1929 | 73.2 | 26.8 |
| 1930 | 74.0 | 26.0 |
| 1931 | 74.0 | 26.0 |
| 1932 | 74.5 | 25.5 |
| 1933 | 76.3 | 23.7 |
| 1934 | 78.8 | 21.2 |
| 1935 | 79.9 | 20.1 |
| 1936 | 82.1 | 17.9 |
| 1937 | 82.6 | 17.4 |
| 1938 | 82.0 | 18.0 |
| 1939 | 81.8 | 18.2 |

was required to furnish General Electric with a complete monthly inventory of unsold lamps; to report the number of lamps sold by other dealers served by him and to pay General Electric each month a sum equal to the value of all lamps sold by him and by the dealers served by him. The agent was also required to pay for all lamps damaged or missing from his stock and from that of the dealers served by him.

WA agents were similar to B agents except that they were not required to carry as great an inventory, need only to have disposed of $1,000 worth of lamps during the given year and were not permitted to serve other dealers, generally functioning in the retail field. The A or retail agents (later supplemented with the S agents) were given designations in accordance with the type and volume of business done, required sales, working stock required to be maintained and the manner of reporting. Some of these were the A agents consisting of electrical dealers or general retailers who were required to dispose of a minimum of $500 of lamps annually; SA, similar to A but required to dispose of only $25 worth of lamps annually; AR consisting of department store, chain store or mail order concerns having retail stores and required to handle $500 annually; SAR, the same as in the $25 category; W R, chain stores selling at retail or wholesale to associated stores and doing a business of $2500 annually.

General Electric's testimony showed that the S agency came into effect on December 1, 1934. Studies had shown that many new types of dealers had taken on the sale of lamps in relatively small quantities. The B agents were not interested in promoting this business because it was expensive to handle. In order to provide a more satisfactory and attractive proposition for the small retailer and for the wholesaler which would cause them to promote and develop this type of business, the S agency was adopted. It applied to agents disposing of less than $500 worth of lamps annually and later this was reduced to a $200 annual requirement. Two new features characterized it that distinguished it from the plan under which the retail agencies operated prior to its inauguration in 1934. One was

a change in the method of reporting sales and the other was in the renewal by notice, in both of which departments the mechanics were simplified.

The served agents of which the S agent is typical are recommended by the B agents or the General Electric salesmen and are appointed by General Electric generally to sell lamps to consumers over the counter. They are usually small retail stores such as grocery, hardware, electrical goods, drug. and general merchandise stores. After appointment the agent receives a consignment of stock from which he sells lamps to the public. At stated intervals sales proceeds are remitted, less compensation to the B agency by whom he is served. The B agent remits the proceeds to General Electric along with the proceeds received from other agents together with the proceeds of sales he has himself made to consumers, less his compensation and the compensaton received for serving the S agents.

Utility operating agents were appointed. under designations conforming to the functions performed by the utility. CA agents. were central stations disposing of lamps to customers who received current from the central station and they were required. to dispose of $500 worth of lamps annually. SCA agents were similar to CA except that their required annual disposition of lamps amounted to less than $500. CB agents were similar to the CA classification except that they must have dealt in at least $5,000 in lamps annually and may serve dealers having A, SA, AR and SAR agencies.

Miniature lamps are sold directly by General Electric salesmen and by agents to large consumers such as automobile, radio and flash light manufacturers. They are also distributed to the trade by agents who are dealers handling automotive supplies and electrical merchandise. The same general rules govern the disposition of miniature lamps as those appertaining to large lamps. Such agents were likewise classified under various designations. They were, however, in the nature of wholesalers who sell outright to retailers and General Electric controlled only the sale price of such agent. General Electric ap--

points as selling agent of its Christmas tree lamps, manufacturers of Christmas tree lamp strings who sell the strings with the lamps installed in them and who also sell replacement lamps to wholesale or retail outlets. Photo lamps are sold partly direct and partly through agents.

The number of large lamp appointments grew from 25,571 as of June 1, 1924 (Ex. 1166-G) to a total of 92,336 as of September 30, 1940 (Ex. 2238-G) as shown in the table below.

(Exhibit 2238–G)

### NUMBER OF AGENCY APPOINTMENTS

| Large Lamps | As of Sept. 30, 1940 |
|---|---|
| Form of Contract | Number of Appointments 1940 |
| SA | 76,831 |
| SAR | 7,037 |
| SCA | 418 |
| TOT. S | 84,286 |
| A | 5,084 |
| AR | 1,142 |
| CA | 137 |
| WA | 1,038 |
| WR | 3 |
| B | 561 |
| CB | 10 |
| MP | |
| SPEC. | |
| SYN. | 75 |
| TOTALS | 92,336 |

| Minature Lamps | |
|---|---|
| DA | 470 |
| DB | 3,595 |
| DC | 147 |
| CRW | 33 |
| MD | 4 |
| XA | 15 |
| TOTALS | 4,264 |

| Photo Lamps | | | | As of Sept. 30, 1940 |
|---|---|---|---|---|
| On Record As of | | Number of Appointments | | |
| | PFD | PFR | PFW | TOTAL |
| 9–30–40 | 654 | 959 | 224 | 1,837 |

Rules and regulations established and published by General Electric to govern all large lamp agents provided that the dealer may handle lamps of only one "Mazda" manufacturer, either General Electric or Westinghouse; he may dispose of lamps only as authorized by General Electric which agrees to maintain a certain working stock in his custody; that the lamps may be sold only for use in the United States and its territories at prices fixed by General Electric. Retail agents may sell only to consumers and wholesale agents may deal only with other agents and consumers. The Office of Supervisor was established and maintained by General Electric. The function of the Supervisor was to pass upon each contract submitted by General Electric and Westinghouse to determine whether the proposed agent had the qualifications required by the sales rules, as well as to serve notice of change of sales rules on Westinghouse and to furnish sales rules and price lists to "B" licensees when price changes were made by General Electric. The cost of operating the office of Supervisor was borne by General Electric.

General Electric contended that the stock is consigned to the hands of all agents and remains its property subject to its control and on the termination of an agency all unsold lamps are to be returned to General Electric. General Electric determined the prices at which the agents shall sell to the consumers with whom they have been authorized to deal. The written appointments provide that agents are forbidden to attempt to control the prices at which any purchaser may re-sell a lamp (Ex. 1171-G § 3, Ex. 1176-G § 3).

The Government argued that even if the contracts established a bona fide agency relationship the operation of the system has been such that no true agency relationship exists. Along this line it contended that the legality of the present price fixing scheme depends upon the precision with which General Electric "adheres both in form and in practice to every detail of the approved activity" as held valid in the 1926 case on the basis of a true agency rather than that of sale. It insisted that it was common practice over the period of

1927 to 1941 for General Electric and Westinghouse agents to pay for lamps which they had not sold and as a result General Electric and Westinghouse were fixing resale prices on such lamps. It submitted that General Electric and Westinghouse wholesale dealers often permitted retail dealers, particularly those in the S classification to purchase lamps outright. In many instances the retail dealers did not have sufficient sales to warrant the wholesalers bothering with the accounting and checking even under the simplified procedure required under the S plan. Wholesale dealers required payment in some instances because they had assumed the obligation to pay General Electric for all lamps sold by retailers served by the wholesalers and were unwilling to assume credit risks. The Government stated that a large number of S agents paid for lamps on a C.O.D. basis or at the end of the month as for any other merchandise or operated with a fictitious working stock. It offered fifteen documents taken from the files of General Electric and Westinghouse as evidence that these conditions existed (Exhibits 1388-G–1404-G, not including Exs. 1390-G and 1401-G). Three Westinghouse documents: 1405-G, 1401-G and 1409-G, are offered to show respectively that dealers handling miniature lamps under DA appointments also maintained inadequate working stock (Ex. 1405-G) and that dealers operating under A and WA appointments sometimes pay for all lamps as shipped.

The Government conceded that General Electric and Westinghouse made some effort to police the agents, but charged that they never used a police force sufficiently large to insure strict obedience, and that they knew after a few years that violations would continue to a substantial degree.

General Electric denied the inefficacy of its policing system and contended that the Government brought forward "exceptions to the rule". The series of fifteen exhibits offered by the Government beginning with Exhibit 1388-G were inter-office communications usually from a higher manager to a lower one, complaining of violations of rules with regard to permitting agents to

pay for lamps upon receiving stock, failure to carry adequate stock, etc. Only three of the communications originated in the General Electric organization, Exhibit 1389-G in 1937, and Exhibits 1391-G and 1394-G in 1938. The others originated with Westinghouse as follows:

| Exhibit | Date |
|---|---|
| 1388–G | December 1936 |
| 1392–G | April 1938 |
| 1393–G | May 1938 |
| 1395–G | July 1938 |
| 1396–G | August 1938 |
| 1397–G | February 1939 |
| 1398–G | February 1939 |
| 1399–G | March 1939 |
| 1400–G | March 1939 |
| 1402–G | November 1939 |
| 1403–G | January 1940 |
| 1404–G | March 1940 |

Passing by the question of whether General Electric should be bound by the disciplinary communications of Westinghouse's agency system in this phase of the case, the Government's offer is not impressive. A number of years are here involved. Chiefly S agencies are accused. There were many thousands of them and at best but relatively few accusations are made. On the other hand the documents indicate almost a zeal upon the part of the responsible office heads to reduce the number of irregularities to a minimum.

In July of 1938 General Electric circularized its division managers concerning an arrangement for taking cash deposits by serving agents to gain "maximum credit protection consistent with the agency" (Ex. 1394-G). Westinghouse in the same month adopted a similar course (Ex. 1395-G). The Government alleged that this was a mere device to cover up payment for large lamps. Two plans were suggested in Exhibit 1394-G. One referred to a cash deposit for the personal protection of the serving agent to be taken from SA and SAR agents to be handled as security only. The other referred to a special order designed to provide a plan for serving on an agency basis certain electrical contractors, acting as SA agents, who normally pick up lamps as well as equipment and supplies

at the serving Agent's place of business. Electrical contractors were not required to have a working stock. The Government contended that this in effect permits continuance of sales on a cash basis to electrical contractors even where they are designated as SA agents, and. pointed ·to the form contained in Exhibit GE-20 as in latest use.

The Government conceded that the Supreme Court held in United States v. General Electric Co. et al., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, that in 1926 General Electric was then distributing its lamps through a bona fide agency system, but charges that in the period from 1927 to 1940 the formal nature of ·the agency system approved in 1926 by the Supreme Court became lost in the large increase in volume of distributing units. It particularly contended that the agency system was altered in a manner not contemplated in the 1926 ·case when the simplified or S agency plan was introduced in 1934. Under that plan an agent no longer took monthly inventories to determine lamps sold each month and transmitted payments accordingly. Instead the Government charged that the fiction of working stock was maintained on the books of the agent for eleven months of the year. An equally fictitious assumption was made that an agent ordering lamps was doing so in order to maintain his working stock at a fixed level, so that all orders placed with the serving agent represented lamps sold by the agent. At the end of eleven months a physical inventory was supposedly taken and bookkeeping adjustments were made to reconcile the fictitious working stock with the actual stock. It ·contended that an inventory was essential for the agent to determine whether he was keeping his working stock at a fixed level and if the assumption that placed orders to maintain his stock at a fixed level were in accord with the facts then it would be unnecessary to transfer credits at the end of the year because the physical inventory filed at that time would agree with the working stock figure. The Government charged that the simplified agency plan was deliberately intended to permit agents to pay for lamps as ordered and before they were sold during

the entire course of a year in the hope that this fact would be obscured by bookkeeping transactions at the close of the year. It further charged that the S agents constituted so large a proportion of the total number of agents and the plan so pervaded the entire system as to make it unlawful; that it was a fundamental change in the agency system and that the existing agency contracts do not establish a bona fide agency relationship.

General Electric answered that it adopted the S form of agency (Exs. 1179-G and GE-30) in 1934 in order to offer to small retailers an attractive business proposition and at the same time encourage serving agents to obtain new business. The system was approved only after its legal department had considered it in the light of the 1926 case and had concluded that it was valid under that decision. The original appointment of an S agent is for one year and before the expiration of that contract a notice providing for its renewal for another year is sent to the agent who, by reason of past performance, is entitled to renewal. If the agent does not wish to renew he rejects it by signing a notice of rejection and returning it, otherwise the contract automatically is renewed for another year. Another change designed to simplify the operations of small dealers was to eliminate a monthly inventory report and substitute another method of determining and reporting sales, as follows: The agent begins with a stock of pre-determined size recorded in a consignment memo. As he sells lamps from the stock he orders new lamps to replace them which are charged to his consignment account. At the end of a month the value of the lamps shipped to him as replacements is added to his opening working stock and the value of those on hand (value of working stock less value of sales, plus value of replacements) is deducted from the total in order to record ·the value of the lamps sold. General Electric or a serving agent sends a statement to the agent each month showing the value of the sales made during the preceding month. This amount less his commissions the agent remits to his serving agent who, in turn, remits to General Electric. · If the S agent accepts the figures.

of sales and unsold stock on the statement he so indicates by signing it. Before the end of the year a physical inventory is taken to check the accuracy of the accountings and to correct discrepancies, if any.

General Electric argued that the S agent may take an inventory if he desires but it is not necessary for him to report it monthly; that the stock of S agents generally is so small that the inventory can be taken by a casual inspection of the stock; that the simplified method conforms with good accounting practice; that General Electric carried the investment in the stock; and that the S agent has no reason to order more lamps than are necessary to replenish his working stock because he may have it increased and can get them on consignment rather than investing his own money to buy the lamps. General Electric denied the Government's allegation that the S agency plan "pervades" the entire agency system because it asserts that of all the General Electric retail sales following the installation of the S agency plan from 1935 to 1945 less than one third of the sales were made through S agents. Approximately 75% of all General Electric lamps sold through agents are sold by agents other than S agents, and it argues that the B (Ex. 1171-G), A (1176-G), and S (Exs. 1179-G and GE 30) contracts completely conform with the contracts considered by the Supreme Court in the 1926 case.

General Electric set up a trust fund agreement whereby it stipulated that lamp string manufacturers to whom it distributed Christmas tree lamps under the XA agency plan should require dealers to deposit in the trust fund account the value of all lamps shipped by General Electric less the dealer's commissions. Then, as the dealer reported lamps sold, General Electric withdrew from the fund an amount equal to the selling price of the lamps (Exs. GE-196, 1815-G, 1816-G, 1817-G). The Government asserted that this requirement was tantamount to compelling the dealers to advance the same amount of money as if the lamps had been bought outright C.O.D. and was not an agency whereby General Electric would carry the investment and relieve, as has been testi-

fied, the lamp string manufacturer from his obligation. General Electric admitted that it sought to cover poor credit risks with provisions for security for payment without destroying the agency form of transaction. Indemnity bonds, guarantors and deposits of cash or collateral to guarantee performance were among the methods used to secure performance by agents (Ex. GE-197). The cash deposit plan mentioned in Exhibit 1394-G was the subject of a bulletin of even date with it (Ex. GE 32) and was designed for ordinary agents with poor credit. The electrical contractors' form was likewise designed to cover the poor credit risk as indicated in Exhibit 1394-G. In connection with the Government's charge that it required security with the consignment of miniature lamps (as demonstrated in Exhibit 1421-G), General Electric explained that this is a letter concerning a particular agent whose credit was then considered unsound and that it merely suggested that trust fund or some other form of protection be used. General Electric insisted that the trust fund procedure used in connection with the Christmas tree lamp distribution was "simply a normal operation of security practice". This business was seasonal and brought serious credit risks not only from the fact that the XA agents made their sales late in the year but they also extended credit to their customers. Various methods of meeting these risks were followed, including the trust fund agreement of which the Government complained. General Electric explained that it determined in each case to what extent each agent's credit was sufficient and required the execution of the agreement for all lamps shipped in excess of that amount. As the agent received shipments he deposited in the trust fund an amount equal to the value of the lamps less his compensation. As he sold the lamps and reported the sales an amount equal to the sales value less his compensation was withdrawn by General Electric from the trust account. It asserted that it never withdrew money from the account until the lamps had been sold.

After reviewing all of the several means of security protection sought by General Electric for itself and its serving

agents as shown by the Government the evidence fails to sustain the Government's charge that these were devices to cover what were in fact sales. Invariably they were utilized to cover specific risks, not given general application, and on only infrequent occasions, in certain categories. In themselves or together with other factors they fail to divest the transactions to which they are directed of their agency form.

■ The Government alleged that neither General Electric nor Westinghouse followed the rules they had promulgated and that there was a convenient reciprocity between them in the matter of waiving the rules where each would realize an advantage thereby. It also accused General Electric and Westinghouse of permitting agents to continue in violation of the agency rules where such agencies made substantial sales or where if they were discontinued they would make good non-Mazda outlets. It charged that Westinghouse permitted Goodrich Company to pay each month for lamps shipped the previous month, and other lapses from the agency contract (Exs. 1411-G, 1412-G, 1413-G and 1415-G). It inferred from the language used in these exhibits that Westinghouse was likewise permitting abuses of the agency contract by Goodrich Company. It further charged General Electric and Westinghouse with permitting agents to operate without executing contracts, sometimes for six and seven months and even longer (Exs. 1425-G, 1436-G–1439-G). The government alleged that it was common practice to permit dealers to over report in order to qualify for higher rates of discount and to grant discounts to dealers from prompt reporting who did not qualify (Exs. 1444-G, 1455-G). It summed up its charges in this area as having reduced the agency rules "to a pretense and a sham".

The Government's evidence involved General Electric and Westinghouse indiscriminately and the objections of General Electric that it should not be held responsible for alleged derelictions by Westinghouse in which it had no part are passed over for on the merits of the charges, after giving cognizance to the Government's argument that isolated instances should be sufficient to characterize an entire system of dealing in matters of this kind, substantial weight cannot be accorded these charges. In the main the very reason for the existence of the documents to which the Government refers is that complaint was being voiced at a deviation from agency practice and frequently fear is expressed as to the consequences of such deviation. At most the Government has shown that on the lower echelons of the organization the rules were sometimes regarded as onerous and susceptible of causing loss of business, but the Government's documents are replete with evidence that in the higher and supervisory brackets all reasonable care was taken that the agency form should be strictly adhered to. The evidence is convincing that effort was extended and mechanics devised to enforce the provisions of the agency plan, that irregularities in it were not countenanced and where they occurred they were corrected. Considering the scope of the operation few instances were brought to light. In reference to Exhibit 1444-G, where it appears that an adjustment of a discount was allowed a firm that had attempted a small over reporting to bring itself within the $50,000 basis, the very adjustment was allowed with the warning that it should be made clear that such conduct was contrary to the terms of the B agency contract and was not to be condoned or tolerated. This appears to have been an exceptional circumstance and was not indicative of an indulgent policy toward the rules. Operating without a contract, or after one had expired, other irregularities undoubtedly occurred, but were infrequent, and were dealt with when shown to be in a manner inconsistent with the agency policy. The charge of convenient issuance of waivers of requirements by General Electric and Westinghouse is not substantiated. Policy in this regard is discussed in the memorandum Exhibit 1698-G. An analysis of all waivers granted between 1936 and 1939 showed a small number of B agencies handling less than one half of one per cent of the total lamps of all such agents and of the A agencies, an even smaller percentage. These figures support the enunciated policy. In this phase

of the Government's attack the agency plan is not successfully undermined.

The Government sought to show that General Electric was not entitled to claim that it supported the assertion of ownership and title in itself to the lamps in the hands of S dealers under the agency plan by making itself responsible for the personal property taxes on them. The Supreme Court gave consideration to this as a relevant element to confirm the view "that the so-called relation of agent to the company is the real one." 272 U.S. 476, 483, 47 S.Ct. 192, 194, 71 L.Ed. 362. The Government undertook to show what taxes had been paid by General Electric in Newark, N. J.; Trenton, N. J.; Detroit, Michigan; Washington, D. C.; and the County of Cook (Chicago), Illinois, for the years 1937, 1938 and 1939 on lamps in the hands of dealers. The facts were adduced in the form of a stipulation (R. 3911–3930). In Newark, General Electric paid taxes on the lamps in the hands of its dealers. In Trenton, it filed no return and paid no personal property tax. In the other three jurisdictions General Electric filed returns, paid personal property taxes, but paid no taxes on the lamps in the hands of its dealers. In all there were 33 dealers, 6 were in Newark. Of the 27 remaining in the other 4 cities, 14 paid no personal property taxes on lamps, 13 paid taxes, of whom 2 demanded and received reimbursement. The Government charged that in the case of over half the dealers neither they nor General Electric paid taxes and the lamps escaped taxation. It also showed that a provision relating to taxes appeared in the form of contract in force in 1940 as follows:

"The agent shall pay all taxes, excises and charges, which are now, or may hereafter be, levied, imposed or charged (whether by federal, state, municipal or other public authority), with respect to lamps distributed, sold and/or used by the agent hereunder." Exhibit 1171–G.

It argues that this provision referred to "all" taxes that were to be paid not only on the sale of lamps, but also upon their distribution and use. Apart from this it charged that General Electric took no active steps to inform agents that General Electric would reimburse them for taxes they paid, or to inform the taxing authorities that General Electric was the owner of the lamps found within their jurisdiction and that the taxes should be levied against General Electric. It further argued that the stipulated facts showed a fair sample of a condition representative of the state of these taxes as they were related to the large number of agents since 1927. General Electric answering the Government's charge concerning the tax clause, Exhibit 1171–G, stated that the evidence makes it clear that it was adopted for insertion in agency contracts in the early 1930's to meet the then recent imposition of sales taxes imposed by a number of states. It calls attention to the additional sentence not quoted by the Government as follows:

"The agent shall make all reports required by the public authorities with respect to such *sales and distribution of lamps*. When authorized by the law imposing such tax, excise or charge, and when consistent with the contract of the purchaser, *the agent, may, at its option, increase the price of lamps to the purchaser by an amount equal to such tax excise or charge.*" (General Electric's emphasis.)

General Electric contended that the wording of this provision was directed to taxes imposed for sale, distribution or use rather than for ownership. It asserted that the stipulation records conditions under which returns were required in the cities named, and that in Newark, General Electric maintained sales office, a service office and a factory. It included lamps on consignment in Newark in its personal property tax returns for the years 1937–8 and 1939, so indicating them in the return. It had no place of business and filed no return in Trenton because, its witnesses would testify, it did not believe it was required by law to file a return covering consigned lamps. In Chicago it maintained a sales office, service office and warehouse, filed personal property returns but did not include the value of lamps on consignment under the belief that the law did not require such action, and a similar situation applied to Detroit and Washington. Further, the stipulation itself indicates that a large number of the firms did

not include the value of the lamps in their returns of personal property because they understood that they held them under consignment. General Electric insisted that it continued the practice of making itself responsible for the payment of personal property taxes without variance and presented a summary of the payment of such taxes from 1926 to 1945 (Exs. GE-53, GE-165, GE-166, 2308-G–2313-G) and that its policy in this respect was made known to agents through national advertising material and was used by salesmen to induce the taking on of agencies (Exs. GE-267–GE-272). Unquestionably, as the Government points out, it is apparent that some of the lamps escape taxation, but General Electric argued that it should not be held responsible for laxity upon the part of the taxing authorities in requiring appropriate returns. It stands ready to reimburse any dealer for such taxes or to pay such a tax bill when directed to it.

The Government has not proved any substantial variance in the position of General Electric with regard to its accepted liability for the payment of personal property taxes on lamps which it regarded as on consignment in the hands of its agents than existed prior to 1926 for the facts support General Electric's contentions.

██ The Government made the charge that General Electric fixed resale prices in connection with the distribution of its sealed beam lamps used in automobiles. It referred to Exhibits 1832-G, 1840-G, 1845-G and 1853-G as evidence of a practice upon the part of General Electric salesmen to attempt to control the prices at which those headlight lamps were resold by dealers. While the documents in question evince a concern upon the part of the salesmen that lamps are being sold below list prices they also show an awareness upon their part that they could not legally fix a resale price. The instances in question do not affect the established agency pattern and cannot be said to go beyond the stage of mere suggestion of a resale price.

The Government has placed in evidence before the court the sales rules, forms of application for and appointment to various types of agencies in Exhibits 1169-G to and including 1197-G. The current agency forms, sales rules, etc., effective as of July 1, 1945, were offered in evidence by General Electric and are contained in Exhibits GE-29 and 30. The form of B and A contracts existing at the time of the 1926 case are to be found in Exhibit 1-G, at pages 229 and 375 respectively. Except for the S form of contract (Exs. 1171-G and GE-30), the general pattern and structure of the agency contracts are the same in all important and relevant respects. The types of agencies differ only in the authority that is extended to the agent to serve or not to serve other agents, limitations on the amount of lamps to be handled and other such particulars and the agency contracts vary so as to cover each form of agency. Only in the S agency is there a noteworthy departure from the conventional forms, which has been heretofore discussed. This was obviously to accommodate smaller distributors and cannot be said to be an innovation that made the agency system different from that considered by the Supreme Court in the 1926 case.

██ An analysis of the considerations of the Supreme Court accorded to the agency system in the 1926 case applied to the B, A and S contracts which are the subject of complaint in this case in the light of the Government's charges and the evidence (both documentary and oral) lead to the conclusion that there is no substantial change in the agency system from 1926. The rule laid down then still governs this phase of the case and to decide otherwise would be to overrule the decision of the Supreme Court.

It appears that at the time of this suit as in 1926 General Electric assumed all risk of loss of lamps in the hands of agents by fire or flood. General Electric carried its own insurance reserves on lamps in the custody of agents. It assumed the risk of obsolescence in lamps and the risk of price decline. Its policy of responsibility for taxes is the same as has been discussed. Where laws of states require merchants who sell goods not their own to indicate such fact or where the recording of agency appointments is required General Electric has supplied signs and directed recording as

required by such laws. In general as between General Electric and its agents no evidence has been brought forward showing that between each other the relationship was regarded as anything but that of principal and agent.

The evidence indicates a persistent industry upon the part of General Electric to maintain the agency scheme. There is much to show that it knew that it was essential to live within the judicial admonishment of the Supreme Court decision to preserve the agency system. General Electric has done this ·substantially with lapses so few in number as to be well within the margin for human error and without disturbing the general pattern which had been set for it. Accordingly, it follows that the disposition of the agency issue in this case is controlled by the 1926 case where it was held to be valid.

Two of the same adverse parties to this litigation—the Government and General Electric—litigated substantially the same agency contract issue in the Supreme Court case in 1926. All of the circumstances we have considered are almost identical with those which appeared in the 1926 case. The question of the validity of the agency agreements was put in issue by the Government at that time and the ruling of the Court was adverse to the Government. It now appears that the exposure of the same issue a second time is barred by reason of the rule of res adjudicata. Whether the decision is induced by that doctrine or estoppel upon the part of the Government to raise the question again or by the precedent created by the 1926 case is immaterial. The ultimate conclusion must be that the Supreme Court has passed judgment favorably upon the form of agency agreements in question in this case which in their present aspects are no different from what they were when under consideration in 1926. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597, 598, 68 S.Ct. 715.

However, there is a phase of relationship to the agency system which was not litigated in the 1926 case and which raises an issue of conflict with the anti-trust laws. General Electric and Westinghouse operate their agency systems under the joint supervision of a Supervisor appointed by General Electric. This supervisory mechanism was superimposed by General Electric as a governor to completely synchronize and co-ordinate the perfect enmeshment of the agency systems of itself and Westinghouse. In holding that the agency system of General Electric in itself has not been shown to be violative of the standards set by the 1926 case, reservations are maintained as to the effect of the operations of the supervisor as they are referred to later in this opinion.[33]

### Foreign Agreements

The Government charged that in order to assist in maintaining its dominance of the incandescent lamp industry upon expiration of its patent support in 1933 General Electric sought to accomplish three objectives: (1) to prevent the sale in the United States of lamps made by foreign companies; (2) to prevent domestic lamp manufacturers from obtaining lamp parts and lamp making machinery from foreign concerns; and (3) to acquire for itself inventions and patents developed by foreign companies, principally to increase its pool of patents and prevent other domestic lamp manufacturers from obtaining rights under such patents.

The Government alleged in its complaint with respect to foreign licenses that they:

"provide almost uniformly for (a) an exchange of patent rights relating to the manufacture of lamps; (b) an exchange of information relating to the manufacture of lamps; (c) an allocation of territory by which (1) the manufacture, sale, and sale for use in the United States of lamps, lamp parts, and lamp-making machinery are exclusively reserved to International General Electric, (2) the home market of the other party is exclusively reserved to it, and (3) certain other territory is made non-exclusive and in which both parties may manufacture and sell."

---

[33] See discussion in "Suppression of Domestic Trade", "Monopoly of Incandescent Electric Lamps", "Mazda" and "Public Business".

It is argued that an agreement known as the Phoebus Agreement of 1924 with a 1941 renewal was evidence of a world wide cartel in the lamp industry and part of an alleged conspiracy between the defendant Philips among others and General Electric to restrain trade and competition in the United States and to further the alleged lamp monopoly of General Electric. These agreements were introduced in the Government's rebuttal case and are not specifically referred to in the complaint but the Government claimed they are included in the phrase "among others" in paragraphs 106[34] and 107[35] of the complaint.

In regard to the Phoebus agreements, the Government contended that General Electric and IGE are parties for the reasons that IGE controls several if not all of the Overseas group mentioned therein and that International General Electric Company of New York, Ltd. is wholly owned by IGE, and in fact both are regarded by General Electric as the same. It claimed that the Phoebus cartel and the domestic licenses are directly related to the purpose of maintaining the General Electric lamp monopoly. It argued that the foreign contracts of IGE, its participation in the Phoebus Cartel, all with General Electric as the prime mover behind these activities and the intended beneficiary of International General Electric's works, are the component parts of a single plan to maintain complete control of the domestic lamp market and eliminate competition at any place in the world where it might set in motion forces which could disturb General Electric's domination of the United States market. It contended that the Philips license granted by IGE (Ex. 40-G) is part of the alleged general conspiracy to restrain trade and competition in violation of the Wilson Tariff Act in assisting in the maintenance of General Electric's domestic monopoly.

---

[34] "The agreements, among others, referred to in Paragraph 104 hereof, which General Electric has through International since 1927 entered into with the principal foreign lamp companies and has maintained to the present time, are as follows:

| | |
|---|---|
| Compagnie des Lampes (France) | Dated August 10, 1927. |
| Osram, G.m.b.h. Kommanditgesellschaft (Germany.) | Dated July 1, 1929. |
| Compania Mexicana de Lamparas Electricas, S.A. (Mexico) | Dated April 1, 1930. |
| N. V. Philips' Gloeilampenfabrieken (Holland) | Dated March 14, 1931. |
| Vereinigte Gluehlampen & Elektricitaets A.G. (Hungary) | Dated August 12, 1938. |
| International General Electric Company of New York Limited (England) | Dated April 14, 1939. |
| Associated Electrical Industries Limited (England) | |
| The British Thomson-Houston Company Limited (England) | |
| Metropolitan-Vickers Electrical Company Limited (England) | Dated August 24, 1939. |
| The Edison Swan Electric Company Limited (England) | |
| Ferguson Pailin Limited (England) | |
| Tokyo Shibaura Electric Co. Ltd. (Japan) | Dated October 12, 1939." |

[35] "The agreements, among others, referred to in paragraph 104 hereof, which General Electric has since 1927 unlawfully maintained with other foreign lamp companies, are as follows:

| | |
|---|---|
| Usines Carels Freres (Belgium) | Dated October 6, 1919 |
| Franco Tosi Societa Anonima (Italy) | Dated November 1, 1919 |
| General Electric Limited (England) | Dated April 1, 1922 |
| General Electric Sociedad Anonyma (Brazil) | Dated June 23, 1926." |

General Electric claimed that the IGE agreements are the lineal descendants of license agreements made around 1900 by General Electric and its predecessor, the Thomson-Houston International Electric Company, that they were fully investigated by the Attorney General prior to the 1926 case and the failure to challenge them in the 1926 case shows that they were considered proper. It claimed that it was confronted with local protectionism abroad and was forced to undertake local manufacture and investments in local concerns. It declared that it had a 96% interest in a British company's factory at Rugby as early as 1918, and investments at about the same time in a French and German company, a 60% interest in a Japanese company in 1918, complete control of a company in China in 1916 and a company in Brazil in 1922. It states that since IGE took over its foreign business in all areas of the world except Canada, the income of the company in dividends on all of its investments in foreign selling and manufacturing companies has been more than $50,000,000. IGE claimed that it had financial investments in many foreign companies and representation upon many foreign boards, but it claimed that the amounts and numbers were insufficient to control company policy. General Electric claimed that prior to the formation of IGE there was a demand for General Electric patents by foreign countries, but the exchanges could only be made with territorial restrictions. With the formation of IGE and the enhanced value of General Electric research and manufacturing experience, General Electric insisted that the renegotiated licenses exacted royalty and service charges amounting to total receipts of $4,500,000 to $5,000,000 between 1919 and 1939. Exhibits GE-115, GE-116 and GE-119 contain standardizing notices, equipment notices and construction data which General Electric contended are typical illustrations of "know-how" transmitted and received by IGE. A photograph showed many volumes of material not actually introduced. In defense of these IGE licenses General Electric referred to the contrast between conditions abroad and domestic conditions and claimed this refuted alleged culpability and substantiates the fact that the true purpose was to provide for the sale and exchange of valuable property in the form of inventions and manufacturing information and that the ancillary restraints were but normal precautions to protect the legitimate interests of the parties to them. General Electric pointed out that lamps made in foreign countries differ in sockets, bases, shapes and other respects and conform to the requirements of various voltage circuits; that uniformity exists in this country which makes possible high mass production methods not attained elsewhere; and that lamp prices abroad are considerably higher than in this country. Accordingly, General Electric contended that the market in this country for foreign made lamps as well as the market abroad for American made lamps has reflected these conditions and it claimed that there is no competition between the domestic licensees and the foreign companies. In addition, General Electric insisted that trade barriers have restrained the flow of lamps between this country and abroad with the exception of Japanese lamps which was attributed to the unique freedom of Japan from economic obstacles facing lamp manufacturers of other nations in that she was favored by a sharply devalued exchange, cheap materials and cheap labor. It contended that the territorial restraints in the foreign licenses and domestic licenses limiting exports are reasonable and therefore valid as ancillary to an exchange of manufacturing information. It claimed that it is recognized that there are individual restraints of trade that the Sherman Act was not intended to cover and stated that while agreements which have as their main purpose the division of territories have been held to be unlawful, territorial restraints have been upheld within the doctrine of lawful ancillary restraints of trade. It is argued that the exchange of patents and know-how is sufficient to support the foreign licenses and since the licenses go beyond the patents involved, emphasis is made upon the effect to be given an exchange of know-how.

Philips defended the 1931 license (Ex. 40-G) on the ground that its production problems in Holland differ from those in this country because the United States

is keyed to mass and standard production, whereas in Holland a much greater volume of hand work is employed on innumerable varieties and styles of lamps. Export from Holland to this country or vice versa it contended would be entirely impracticable and worse than the proverbial attempt to carry coals to Newcastle. It claimed that restraint of trade in the United States was precluded by American patents controlled by General Electric and sought to justify the license on the ground that it needed General Electric patents and technical assistance. It argued that the Sherman Act is inapplicable since Philips is a foreign corporation conducting its business abroad and it could not be held to have violated the anti-trust laws unless the Government shows that:

(1) it wilfully intended to restrain United States trade;

(2) the consequences of the acts of Philips were directly and substantially to restrain such trade; and

(3) such restriction was one of the principal purposes of the acts done.

Admissibility of the Phoebus agreement of 1924 and the 1941 agreement was contested by General Electric on the grounds that:

(1) they do not deal with the commerce of the United States but expressly exclude it; and

(2) neither General Electric nor IGE are parties to the agreement.

In addition to the above objections, Philips claimed irrelevancy of the Phoebus agreement and the 1941 agreement on the grounds that:

(1) They are agreements made abroad solely between foreign lamp companies and dealers all of whom were engaged in business solely abroad.

(2) They have no consequences in the United States, much less direct and substantial consequences.

(3) That the question of the Phoebus agreements and the 1941 modifications are moot anyway; as far as Phoebus is concerned since the outbreak of war in 1939, and the 1941 modifications since 1945.

(4) That as regards the so-called Kremenezky and Pintsch codicils to the Phoe-

bus agreement no relief as against Philips could be effectual anyway.

(5) That the Phoebus and 1941 modifications were not entered into or continued in order to further any alleged domestic lamp monopoly in the United States of General Electric or to restrict in any manner United States trade or as a part of any conspiracy for either of those purposes.

(6) That the Phoebus and 1941 modifications are not within the pleadings and Philips objection to their introduction in evidence should be sustained.

In 1919 General Electric established International General Electric as its wholly owned subsidiary to exploit its foreign rights and investments (Exs. 20-G, 59-G, R.1409-1495). By an agreement dated April 1, 1919, supplemented by agreements of May 1, 1924 and March 22, 1938 (Ex. 38-G) IGE was established as the foreign adjunct of General Electric. In the agreement (Ex. 38-G) Article I provided for territorial divisions whereby General Electric would confine itself to the United States, its possessions, colonies, territories and dependencies, exclusive of the Philippines, Puerto Rico and the Virgin Islands and IGE would cover the rest of the world. Article II provided that General Electric grant International General Electric access to its factories at all times and arranged for the interchange of detailed technical information and assistance in a variety of situations when required. Article III provided for an interchange of patents, patent rights and trademarks in the United States and foreign countries. Article IV provided that General Electric constitute IGE as its sole agent abroad with a power of attorney "to deal with, cancel, modify, carry out" all business arrangements in foreign countries provided General Electric would not make "quotations or sales to any other person or company in foreign countries, or to anyone for export".

In the actual operation of the agreement between IGE and General Electric, key officials transferred from one to the other. The relationship of necessity was very close from the very nature of the business being conducted and the ownership. (Exs. 381-G, 437-G, 447-G, 2220-G). Identification of certain officials of the two com-

panies as listed in Exhibit 2220-G is illuminating at this point. Mr. J. M. Woodward was the European representative of IGE until 1925 when he resigned to become general counsel to the Phoebus Group (Ex. 2120-G). Mr. Gerard Swope was the first president of IGE until he became president of General Electric in 1922. Mr. Owen D. Young was the chairman of the Board of Directors of General Electric from 1922 to 1940. Mr. A. W. Burchard was the vice chairman of the Board of Directors of General Electric and chairman of the Board of Directors of IGE from 1922 to 1925, when he retired as president of IGE, continuing his other duties until his death in 1927. Mr. C. H. Minor was president of IGE from 1925 to 1945. Mr. G. F. Morrison was Vice President of General Electric from 1916 to 1928 but retired from active participation in the management in 1925 due to illness, although he did not die until 1945. Mr. Charles W. Appleton was General Counsel of the Incandescent Lamp Committee of General Electric from 1921 to 1927 when he became Vice President of General Electric in charge of public relations with public utilities.

In Ex. 447-G, a letter to Mr. Swope in 1935 Mr. Minor underlined the close relations of General Electric and IGE, when he commented upon the advisability that he should be made a vice president of General Electric as follows:

"There is one difficulty in the situation, in that I have no direct responsibility for the domestic policy that becomes involved when situations develop where these companies with whom we have contractual relations take a definite decision to penetrate the American market. It has occurred to me · that it might be wise to again consider my election as a Vice-President of the General Electric Company. I have always thought, heretofore, that it was desirable to keep the two companies quite distinct, and I think you agreed with such a program. However, in my opinion this situation with Philips is likely to be repeated in our relations with other companies, in the course of the next few years, as our existing contracts gradually come to termination."

Commencing in 1919, representatives of IGE conducted extensive negotiations with foreign lamp manufacturers, continuations of contacts earlier established by General Electric. As mentioned in the "Introduction", there had been established a price stabilizing group in Europe which had maintained some form of order among European manufacturers (Ex. 2111-G). Mr. Woodward, in line with his primary duties, remained in close touch with all the leading incandescent lamp manufacturers in Europe sending to General Electric and IGE detailed reports of the European situation (Exs. 2111-G, 2112-G to 2117-G, 2124-G, 2127-G to 2130-G). He wrote Mr. Burchard and Mr. Morrison in January of 1924 (Ex. 2111-G) as follows:

"The matter of the Westinghouse agreement with the Osram Company is not grave, but it is important enough to get the most out of it possible under the circumstances, in the event that we have an opportunity to have the matter reconsidered.

"As a primary consideration I would like the factories in which we are interested through the Vereinigte Company in Austria, Hungary, Czecho-Slovakia and Poland, to have any rights (non-exclusive) which the Westinghouse Company may be in a position to grant, and I should like any lamp manufactured under these rights to have full freedom of sale throughout Germany, the Scandinavian countries, and the Baltic States including Finland. As long as these factories exist and the loyalty of Aschner continues, this affiliation of ours carries a maximum of menace for a minimum of investment, and insures a corresponding respect from Philips and Meinhardt.

"As a second consideration I should like the Westinghouse Company never to agree to respect the Osram patents in the territories even for which it may grant its own rights to the Osram Company. The Osram patents in some of these countries have a quality and value at least as vague as the future contributions of the Westinghouse Company. Therefore it seems to me to be the better tactics for the Westinghouse to exchange good wishes and experience with the Osram Company, but to retain freedom of action in any territory outside of Germany. This would leave the Westinghouse free to enter such territories as Lithuania and the Baltic States without

any particular danger to itself and create sufficient disturbance to make it quite to the interest of the Osram Syndicate to bring pressure to bear, in the best way it can, upon such concerns as Pintsch and Bergmann, as well as Radio, so that these latter companies shall not export into the territory in which the Westinghouse is interested. Up to the moment we have been able to exercise only what might be called moral control over these concerns—control which is apt to become weaker in time and needs a little bolstering up, even now.

"I did agree in principle to the arrangement between the Westinghouse Company and the Osram Company, but no details were discussed and in my own mind I did not contemplate anything except an exchange of rights and experience applying simply to the territories of Germany and America."

In April of 1924 he wrote Mr. Burchard again, a copy of which he sent to Mr. Swope (Ex. 2112–G) as follows:

"I probably will not be here on your arrival, and in view of the possibility that you may actually see Meinhardt, Philips and Aschner and be immediately drawn into serious discussion before I return for the Technical Conference, I wish to leave the following memorandum.

"I have agreed orally with Meinhardt and Philips, on a basis which will include Aschner, to a syndication of the commercial profits in the entire lamp business outside of the United States, Canada, England and the British Colonies. This involves a commitment on our part to bring into the syndicate France, Spain, Portugal, Belgium and Italy. You will note from the terms that they include even the domestic business in the exclusive territories of Philips and Meinhardt.

"This is not in accordance with the plan to claim percentages by territories which I understand from Mr. Henderson you and Mr. Morrison wished me to support, but on the other hand I do not believe it at all inconsistent with the ultimate object which you sought by that arrangement. While Mr. Henderson has been familiarizing himself with conditions here, I have given a great deal of thought to his proposition to claim 75% in those territories (China and Brazil) where our factories are located, and 33% in the remaining non-exclusive territory. Having nothing to trade on with which to support this claim I have not as yet advanced it, and I will not advance it unless you disapprove of the direction which the negotiations have taken. I feel that merely to advance a claim to a percentage in excess of that which we are holding or can hold, would not advance our cause very much. It would meet at first with a refusal and a demand for supporting argument and facts other than a strong desire. Negotiations would certainly be protracted indefinitely. Further, our politics for two and a half years has been to force propositions to come from the other side, employing every resource and sustaining all the losses necessary for that result.

"Circumstances and luck having brought about almost the precise situation which we have from the beginning desired, and the proposition having been made, I have given my adherence to it in the belief that you would approve it.

"In order to explain the development of this present situation I will go a little further into detail.

"In view of the conditions in which the entire Continental group have found themselves, and to which I have referred in my letters to Messrs. Lusk, Levis and Henderson,—copies of which I have forwarded to you for your personal advice,—the European Cartel, based purely on a price schedule, broke down utterly during February, although it was agreed to keep the prices effective up to the end of June. As a result of this breaking down, Meinhardt became convinced that our arguments as to the uselessness of a price schedule by itself are well founded. He therefore proposed to Philips a basis of syndication. The upshot was an agreement for the division of their commercial profits, making adjustments out of the increase of the present business, in the usual manner, to bring the relations to a 2 to 1 basis. Aschner was then brought into the argeement, and, as you may imagine, Meinhardt had the greatest difficulty in getting Philips and Aschner to any sort of basis whatever; but he knew their situation well, because he meets each in every field where he operates (except France) and he knew their necessities. It

was not at that time Meinhardt's hope to bring the American affiliations in. On the contrary I have reason to think it was his hope to use the strength of this syndicate in order to force the hands of the American group in the matter of issuing a price schedule. When he approached me and found that we are not at all hostile to the syndicate and approve of exactly the sort of association proposed, it was a matter of a few minutes to come to an arrangement on the principles. He brought Philips into the discussion at once.

"As a sine qua non I stipulated that the arrangement must extend for at least twelve years and preferably fifteen. Meinhardt was in entire accord with this and in fact had previously fought the question out with Philips, who wished only a short time affair, say from three to five years. I asked that the broad principles of the syndicate be laid down in a simple agreement, without any attempt to work out the inevitable adjustments necessary to make a fair deal, and that this broad agreement be initialed and accepted in good faith and all subsequent provisions be made to fall within its lines. Only in this manner is it ever possible to arrive at a finish of the negotiations with Philips. To be perfectly frank I think we should come to an agreement at the earliest date possible, since from this time on our position will become less favourable in most quarters.

"It was contemplated that a zone system should be used for supplying the lamps necessary to the different sales organizations, so far as that can be justified on economic grounds, and that a fixed output price can be established for the factories. The intention is to leave the business of any important country in the hands of the organization of that country if it is in position to hold a substantial portion of it. This will be essential in order to get our French associates into the arrangement, and will be a matter of considerable importance to us if we undertake to bring the English group in. It is obvious what this may mean to us if we are skilful in expanding the idea in the years to come. On these general principles Meinhardt's interests coincide more nearly with our own, and I think we can

utilize that fact to develop a satisfactory set of principles of operation.

"All of the business of the International Company will be involved. Meinhardt insisted on this, and it was an easy point for me to concede. I am satisfied that there is nothing improper in it, since it relates wholly to the business done outside the United States, which business I am satisfied, further, will be based upon lamps manufactured outside of the United States.

"The agreement contemplates bringing in all manufacturers within Osram territory on some proper basis. I rather object to including them in the syndicate, as I would prefer some other method of taking care of them along lines leading to their going out of the manufacturing business and remaining simply as factors. I avoided getting into the discussion of details, for the reason outlined above, and I strongly recommend that subsequent discussions as between principals do not be allowed to become much involved. The experts can take up these problems later and should be requested to work out arrangements within the terms of the broad agreement.

"Philips immediately requested me to issue schedules raising the prices throughout overseas territories. I refused; but said that we were willing to issue price schedules promptly after the initialing of the agreement.

"I think you know my estimate of the elements here. But I may again say by way of emphasis that I desire to effect an arrangement which will be to the absorbing interest of the Philips Company throughout as much of the remaining 'useful life' of Anton Philips as possible. He, and practically he alone, constitutes a danger to our American profits. Should our patent protection at any time become weak in all or part of America he will be our greatest menace, the least vulnerable and most resourceful of our competitors. He is insanely anxious to get into England, and for my part, if I could arrange it on a sound basis and without losing all my personal friends locally, I would get him there in short order. England is the greatest bait, carefully handled, which can be held out to him, and if we exercise the ordinary principles involved in poker, I am satisfied

that we can make arrangements which will be profitable and satisfactory for a long time to come.

"I have had no opportunity of discussing this with Mr. Henderson, as he has been on tour since the situation took its present form. However, I gave him a full explanation, in strict confidence, of my ambitions and hopes in this matter, before he started, in order that he might be guarded in his expressions to the people with whom he came in contact, and so avoid giving an impression of over-eagerness on our part. I did, however, draw Mr. Minor into the discussions immediately, for his information and to obtain his advice. I wish in the future to have Mr. Grauding included in our conferences if either group call in its staff. He has an exceptional acuteness for sensing the motives and states of mind of the people with whom we are dealing, as well as having a wide commercial knowledge and experience of his own.

"On the other hand I have requested Meinhardt and Philips to leave as many as possible of their staff out of the general discussion and to impose silence on those who are admitted. I explained that it would be practically impossible for us to exercise proper guiding influence over our friends the French and the Belgians, if it became publicly known in advance what direction the negotiations were taking. (One sentence omitted.) The continued discussion of this matter will take place next week. Both Meinhardt and Philips regard it as of primary importance, as the proceedings of the Technical Committee are relatively without interest to them; and they therefore propose to give their entire time while here to this matter.

"I have endeavoured to impress upon both of these gentlemen that absolutely nothing can be gained by attempting to trade on these negotiations at this time, and that we must all be prepared, in fact, to make some sacrifice at first. The gain will come through stabilization and the opportunity offered for further development after stabilization has been effected.

"I am returning to England immediately in order to follow up the request I have made that they proceed with the matter of syndicating their export business to the British Colonies. I found Mr. Lusk not particularly well recently, and I expect that the matter will lag. While Mr. Minor knows what I propose and supports it, he probably is not in a position to push it. In anticipation of the present turn of events I have avoided coming to a conclusion of the license agreements with any of the English manufacturers except Hirst. It always has been my intention to use the license for the purpose of inducing co-operation between themselves first and the Continental manufacturers later, should the occasion arise, as it now has. Neither their license royalties nor their importance in the export field were sufficient to make the licensing of them an otherwise urgent affair for us. If I find Mr. Lusk still not well I am inclined to the idea of allowing either Nash or Hirst to take the initiative, if they should so desire."

Mr. Morrison in July, 1924 wrote Mr. Swope concerning an agreement being drawn up between Westinghouse and General Electric (Ex. 2113-G) in which he expressed concern in keeping Westinghouse in line with the proposed foreign incandescent lamp holding company on which the "General Company" was working. Mr. Burchard wrote to Messrs. Swope, Morrison, Appleton and Minor in August, 1924 that in response to an inquiry relating to the negotiations with foreign lamp manufacturers, the following reply had been received from Mr. Woodward:

"Lamp negotiations moving constantly forward without any apparently insurmountable obstructions but with violent altercations between other parties and usual amount of delay on account of vacations important people extending beyond middle of September. We are utilizing our full resources to steer matters in direction desired and I expect to be in position on August 30th to write you definitely of the specific items of assistance we wish from you. The important items will be serious financial assistance to Kremenezky and pressure to be brought on Levy for settlement Belgian problem. Have had private interviews with Hirst and believe that we have found programme which will work out English situation notwithstanding previous unfavorable incidents. Am having second conference with Austro Hungarians Sunday at Zurich to be followed by Gen-

eral Conference Zurich Wednesday. The following week will meet Italian manufacturers with Grauding. Would appreciate you causing all legal criticism of contract be mailed me at earliest possible date. I propose rewrite this contract in form of partnership to share profits above a stipulated base. This will not change substance but I think will improve legal effect." (Exhibit 2114-G.)

In September, 1924 Mr. Woodward wrote Mr. Young (Ex. 2115-G) in reply to a request for the "essential items of our program". He stated that all parties engaged in business outside the United States and Canada undertook to cooperate by a general lamp agreement in the future development of the lamp business and that this was advantageous to IGE interests. He mentioned that all manufacturers were committed to "our program of standardization, as well as the adoption of our formulae for arriving at the economic life of lamps". He pointed out the necessary territorial divisions of the contracting companies and details as to patents, prices and other arrangements, and included a copy of the terms of the agreement for Mr. Young's consideration. In the same month Mr. Woodward inclosed a copy of the final printed draft of the negotiations in a letter to Mr. Burchard (Ex. 2116-G). He pointed out that he was summarizing the principal points of the agreement in a letter to Mr. Young. Exhibit 2115-G is dated the same as Exhibit 2116-G and apparently is the letter to Mr. Young to which he referred.

The negotiations resulted in the signing of an agreement at Zurich, Switzerland dated December 20, 1924 (Ex. 2278-G) under which the signators became known as the Phoebus S. A. Compagnie Industrielle pour le Development de L'Eclairage (Ex. 2120-G) referred to hereinafter as the Phoebus Group and the agreement as the Phoebus agreement. Mr. Woodward initially signed the agreement subject to the approval of IGE (Ex. 2117-G). However, IGE did not see fit to ratify the signature of its European representative.

Among those who did sign this agreement and who are of immediate concern are the following:

British Group —
 British Thomson-Houston Co., Ltd.
 Cryselco, Ltd.
 Edison Swan Electric Co., Ltd.
 General Electric Co., Ltd.
 Metropolitan-Vickers Co., Ltd.
 Siemens and English Electric Lamp Co., Ltd.
Campagnie des Lampes
N. V. Philips Gloeilampenfabrieken
Osram G. m.b. H. Commanditgellschaft
Vereinigte Gluhlampen & Elektrizitats, A.G.
Societa Edison per la Fabbricazione delle Lampade
Tokyo Electric Co., Ltd.
Overseas Group —
 Anderson, Meyers & Co., Ltd.
 Australian General Electric Co., Ltd.
 General Electric Company of Cuba
 General Electric, S.A. (Mexico)
 Societa Italiano per le Lampade Elettriche
 South African General Electric Co., Ltd.

By the terms of the Phoebus agreement the territory outside the United States and Canada was divided into "Home Countries" (Where only one local manufacturer could sell) and "Common Territory" (where all parties could sell). As to the territory divided it sought to maintain the relative position of the parties. Each party was given an allotment for the different countries, and the ratio between allotments was designated a party's "Local Participating Percentage". In determining allotments business based on sales made in or to the United States and Canada was excluded. The agreement provided for exchange of technical information and stated that:

"no party hereto will aid directly or indirectly in any manner whatever any lamp manufacturer not sharing the burdens and obligations of this agreement except in so far as existing contracts may necessitate it."

Penalties were provided for sales over quota and a mechanism was set up whereby conflicts between the parties might be referred to a Phoebus tribunal for settlement. Special provision by codicil was made to permit two firms Kremenezky and Pintsch, to continue shipping annually a specified number of carbon lamps to the United States and Canada on the assurance of each of the firms that the patent owner for the United States and Canada had agreed to grant the necessary licenses. (This feature was discussed in the "Glass Machinery and Products".)

The Phoebus agreement was amended to an immaterial extent by an agreement made in Paris, dated April 24, 1931 (Ex. 2278-G, p. 96) in which the British Thomson-Houston Co., Ltd., signed for the Overseas Group (Ex. 2136-G). The 1924 agreement became obsolete with the outbreak of war in 1939 and a new agreement was executed January 15, 1941 (Ex. 2278-G, p. 32) which embodied most of the features of the 1924 agreement. It eliminated the Kremenezky and Pintsch codicils and terminated in 1945. It similarly excluded the United States and Canada and on its face dealt only with the competition of foreign manufacturers abroad and not with competition between foreign and American manufacturers. Its signators are as follows:

> British Thomson-Houston Company, Ltd.
>
> A. C. Cossor, Ltd.
>
> Crompton Parkinson Limited
>
> Cryselco Ltd.
>
> Edison Swan Electric Co., Ltd.
>
> General Electric Co., Ltd.
>
> Metropolitan-Vickers. Electrical Co., Ltd.
>
> Philips
>
> Siemens Electric Lamps & Supplies, Ltd.
>
> Overseas Group (by I.G.E. Co., Ltd.) [See Ex. 2136-G]

In conducting the negotiations leading to the Phoebus agreement Mr. Woodward was aware of the implications of the antitrust laws and he wrote that he was "satisfied that there [was] nothing improper in it, since it relates wholly to the business done outside the United States, which business", would be "based upon lamps manufactured outside the United States". (Ex. 2112-G, and see Exs. 2115-G, 2117-G.) After the execution of the Phoebus agreement (Ex. 2278-G) Mr. Woodward accepted the office of General Counsel of the Phoebus group, resigned as the European representative of IGE and was appointed European Counsel of IGE, in 1925.[36]

Following the Phoebus agreement of 1924 IGE effected license contracts with foreign manufacturers, some of the signators of the Phoebus agreement as follows:

1. General Electric Ltd. of London, April 1922 modified May 1923 and June 1931 (Ex. 48-G).

2. G. E. Sociedad Anonyma of Brazil, June 23, 1926 (Ex. 44-G).

3. Societa Edison Clerici, Fabbrica Lampade of Italy, July 1, 1926 (Ex. 39a-G).

4. Campagnie de Lampes of France, July 1, 1927 in Paris, August 10, 1928 in New York (Ex. 42-G).

5. Osram of Germany, July 1, 1929 (Ex. 39-G).

6. Compania Mexican de Lampanas Electricas, S. A. of Mexico, April 1, 1930 (Ex. 46-G).

7. Philips of Holland, March 14, 1931 (Ex. 40-G).

8. Vereinigte of Hungary, August 12, 1938 (Ex. 41-G).

9. I. G. E. Co., Ltd. of England, April 14, 1939 (Ex. 49-G).

10. A. E. I. of England; The British-Thomson-Houston Co., Ltd.; Metropolitan Vickers Electrical Co., Ltd.; The Edison Swan Electric Co., Ltd.; and Ferguson Failin, Ltd., August 24, 1939 (Ex. 43-G).

Some of these subsequent agreements were renewals or continuations of contracts made by General Electric or its predecessor, The Thomson-Houston Company. The Expiration dates of certain IGE license agreements as of 1929 are found in an appendix to the license agreement with Osram (Appendix A of Exhibit 39-G). Appendix A to Exhibit 40-G, page 23, the agreement with Philips, lists a summary of parties to and terms of the license agreements effected by IGE as of 1931 as follows:

"1. The General Company has heretofore granted to the Allgemeine Elektricitate Gesellschaft, of Berlin, Germany, exclusive manufacturing rights and information and non-exclusive selling rights, for Holland and non-exclusive selling rights for the Dutch Colonies in respect of that portion of the scope of this agreement not included in the following definition:

---

[36] In 1931, IGE (London) Ltd., paid the expenses of Mr. Woodward and his office. (Ex. 2136-G.)

"All electric lamps for illuminating, heating or medical purposes operating by any or all of the following methods: Incandescence of a refractory filament or by luminescence of gas or by cathode incandescence (except so-called arc or enclosed arc lamps not operating in a sealed container); all parts thereof and all machines and processes for their manufacture.

all of the lamps thus defined being specifically excluded from the grant to Allgemeine Elektricitats Gesellschaft.

"2. The General Company further has heretofore granted to the British Thomson-Houston Company, Ltd.; and The Associated Electrical Industries, Ltd., both of London, England, for the Dutch Colonies, non-exclusive selling rights for electric lamps as included in the scope of this agreement.

"3. The General Company further has heretofore granted to the Tokyo Electric Company, Ltd., of Tokyo, Japan, for the Dutch East Indies non-exclusive selling rights for electric lamps as defined in the clause above quoted as being excluded from the grant to Allgemeine Elektricitats Gesellschaft.

"4. The General Company further has heretofore granted to the General Electric, S. A. of Brazil, and to the Compania Mexicana de Lamparas Electricas, S. A. of Mexico, and to the China General Edison Company, Inc., of Shanghai, China exclusive manufacturing and selling rights for the respective territories of Brazil, Mexico and China, for electric lamps as defined in the clause above quoted as being excluded from the grant of Allgemeine Elektricitats Gesellschaft.

"5. The General Company further has heretofore granted to Osram G. m. b. H. Kommanditgesellschaft of Berlin, Germany, exclusive manufacturing rights for Denmark, Finland, Norway, Sweden and Switzerland for electric lamps as defined in the clause above quoted as being excluded from the grant to Allgemeine Elektricitats Gesellschaft.

"6. The General Company further has heretofore granted to the British Thomson-Houston Company, Ltd., and The Associated Electrical Industries, Ltd., exclusive manufacturing and selling rights for electric lamps as included in the scope of this agreement for Northern and Southern Rhodesia and the British possessions, protectorates and mandatories in Africa, North of Rhodesia, including Soudan, and including Nigeria and the West African colonies.

"7. The General Company further has heretofore granted, or agreed to grant, to the Electric Lamp Manufacturers (Australia) Limited, exclusive manufacturing and selling rights for electric lamps as defined in the clause above quoted as being excluded from the grant to Allgemeine Elektricitats Gesellschaft."

The foreign license agreements of IGE follow an identical pattern. In general, these were territorial restrictions with the United States and Canada recognized as being excluded. The patent and technical exchanges between the parties made available to the foreign licensees all the known American developments in the incandescent lamp industry, whether owned by General Electric or secured through its domestic licensees by virtue of the contract with IGE. In addition to the principal party agreeing with IGE to restrict its activities to the assigned territories it was required that the parties hold their controlled companies and licenees to these restrictions. Certain of the agreements permitted IGE to fix the condition of sales and minimum prices in Mexico and South America (Exs. 39-G, 40-G, 41-G). Certain of the agreements had termination dates in 1955 (Ex. 40-G, 41-G, 43-G). Osram's license had a termination date in 1970 (Ex. 39-G) and Compagnie des lampes in 1983 (Ex. 42-G).

General Electric ownership direct or in direct in members of the Phoebus agreement or foreign licensees is as follows (Ex. 59a-G):

| Name of Company | Percentage Dec. 31, 1940 |
|---|---|
| Osram, G. m.b.H. | 21.45 |
| Philips | 11.85 |
| Philips Holding Co. | 2.47 |
| Cie. des Lampes—Ordinary | 37.03 |
| Cie. des. Lampes—Founders | 33.47 |
| Vereinigte | 10.64 |
| A.E.I.—Ordinary | 40.66 |
| —Preferred | 20.72 |
| Tokyo Shibaura Electric Co. | 28.14 |

838

There was a small IGE representation on the boards of A.E.I., Compagnie des Lampes, Osram, Philips, and Vereinigte (Ex. GE-128) as follows:

"This is one of their greatest concerns in dealing with Westinghouse. They realize fully the desirability of getting some set-up preventing Westinghouse sending

| | 1925* | | 1930 | | 1935 | | 1939 | |
|---|---|---|---|---|---|---|---|---|
| | No. of Board | I.G.E. Rept. | No. of Board | I.G.E. Rept. | No. of Board | I.G.E. Rept. | No. of Board | I.G.E. Rept. |
| Associated Electrical Industries* | 12 | 6 | 13 | 1 | 11 | 1 | 14 | 1 |
| Compagnie des Lampes | 12 | 4 | 13 | 3 | 9 | 3 | 11 | 3 |
| Osram | 15 | — | 15 | 3 | 15 | 3 | 15 | 3 |
| Philips Mfg. Co. | 7 | 1 | 7 | — | 6 | 1 | 6 | 1 |
| United Incandescent (Vereinigte) | 10 | 1 | 10 | — | 11 | 1 | 11 | 1 |

Exhibit 20-G lists General Electric's subsidiaries and percentage of voting power in each held by General Electric or by its immediate controlling subsidiary. Extracted therefrom are the subsidiaries of IGE of immediate concern and its percentage of voting power in each.

| Name of Company | Percentage of Voting Power |
|---|---|
| Anderson, Meyer and Co., Ltd. | 84.1 |
| Australian General Electric Co., Ltd. | 100.0 |
| China General Edison Co., Inc. | 100.0 |
| Cia. Mexicana de Lampara Elec., S. A., (Mexico) | 66.7 |
| General Electric Co. of Cuba | 100.0 |
| General Electric Co. (P.I.) Inc. | 100.0 |
| General Electric Co., S.A. (Argentina) | 100.0 |
| General Electric, S.A. (Brazil) | 100.0 |
| General Electric, S.A. (Mexico) | 100.0 |
| I G E Co. (India) Ltd. | 100.0 |
| I G E Co. of New York, Ltd. | 100.0 |
| South African General Electric Co., Ltd. | 100.0 |

In March 1927 Mr. Woodward wrote Mr. Minor (Ex. 2129-G) that members of Phoebus were fearful of the competition from the American made lamp.

lamps to the European market. In my opinion it would be a great error for the General Company to assist in weakening this potential threat. For reasons which you may think more of than I do, the Germans especially fear Westinghouse activities in Russia in the future.

In April 1927, Mr. Swope wrote Mr. Appleton (Ex. 2130-G) that Mr. Woodward had written him and quoted from Mr. Woodward's letter "for your consideration as follows":

"1st. That I wanted an agreement made now which would determine where W. would stand relatively to us at some future date or in some future situation which relationship would come in effective operation under conditions controllable by us.

"2nd. I wanted W. meanwhile to be free to achieve any position relative to others in field which it can achieve by itself.

"3rd. In order for W. to have such freedom we need not and should not change the existing license—which is freedom itself.

"4th. Whenever W. shall have reached the highest measure of progress it can on its own account, we can subject it to the terms of the agreement referred to under the 1st paragraph.

* 1925 figures for British Thomson-Houston Company.

"5th. You have to follow this program whether you like or not because of the necessity you are (or the Overseas group is) under to compel any *new licenses* to accept the same burdens and obligations (it has) undertaken with others in the Overseas Territory.

"6th. Westinghouse cannot afford to accept these burdens now and will not if it is truthfully and fully informed as to what they are—and therefore must fight its way to the point when it can force the necessary concessions, which we, tied as we are, can never secure for it.

"7th. This fight by the Westinghouse will probably scare the European competitors into being good toward us—for maybe ten years."

Mr Woodward's concern for Westinghouse was, but repetitious of earlier expressed fears of General Electric officials. Mr. Burchard wrote Messrs. Morrison, Terry and Appleton in June of 1925 (Ex. 2124-G) and quoted from Mr. Woodward's letter dated June 3rd, 1925, as follows:

"A point has been reached where every important lamp manufacturer in Europe has recognized the patents of the General Electric Company in all overseas countries, and has taken, or engaged to take, licenses under those patents upon our usual terms and conditions.

"The only important lamp manufacturer in the world who has not taken a license or recognized these patents is the Westinghouse Lamp Manufacturing Co. or its international subsidiary. I think that, in view of the facts above recited, it is only proper to request the Westinghouse Company to consider the situation with a view to giving like recognition to our rights. Protracted delay in this matter is likely to be quite embarrassing to the International General Electric Co. in its relationships with its licensees."

A year later Mr. Morrison repeated much the same in a letter to Mr. Swope (Ex. 64-G) quoted in its entirety in the discussion on patents. Before the negotiations of the new patent licensing agreement with Westinghouse Mr. Morrison called attention to the early expiration of the Just & Hanaman, Coolidge and Lang-muir patents upon which General Electric's control of the incandescent electric lamp field rested. He acknowledged the stabilizing influence of the General Electric agreements on domestic and foreign lamp trade and indicated that an agreement with Westinghouse was essential to the proper maintenance of domestic trade by meeting foreign licensees' fears of American exportation.

In January 1927 Mr. Burchard wrote Messrs. Appleton and Frech that in connection with the Westinghouse negotiations he understood that it was proposed to increase Westinghouse's percentage. He expressed his misgivings and further stated:

"There is one point, however, which I think perfectly clear, and on which any new incandescent lamp license to the Westinghouse Company with a larger minimum royalty percentage must be absolutely conditioned, namely,—that they will become parties to an arrangement which will assure their effective cooperation with us in the foreign field. They are not now cooperating with us effectively in the foreign field and are taking advantage of the present effort to stabilize the foreign lamp business to increase their business in the foreign field at a very much higher rate than that corresponding to the general growth of this part of the business. The definite assurance of their effective cooperation in the foreign field should certainly be made a sine qua non to the granting of a new license in the domestic field." (Ex. 65-G.)

Mr. Woodward's letter to Mr. Minor in March 1927 (Ex. 66-G) is even more revealing. He wrote that Osram was concerned with Westinghouse sales in territory in which Osram was interested. Mr. Woodward considered it undesirable for Osram's representative, Dr. Meinhardt, also President of Phoebus, to discuss the situation with Westinghouse. He assigned as reasons the fact that General Electric held in the United States all of Osram's knowledge, experience and patent rights and could not afford to have Osram's information transmitted directly to Westinghouse by reason of the fact that General Electric was authorized "in fact bound" by the IGE-Osram contract "to make it

a condition that the Westinghouse Company shall observe the same territorial and commercial restrictions" that were provided in the agreement.

"The territory in which Osram is actually interested to control Westinghouse operation lies outside of the United States and outside of Germany, but in practically all of this territory the International General Electric Company and not Osram controls the existing patents * * *".

Mr. Woodward felt that there was no particular advantage from the IGE or General Electric standpoint "in any deal which Osram might make with Westinghouse which would keep Westinghouse out of the European countries in which Osram owns the patents." He closed with the feeling that he considered it of "primary importance that our interests and not Osram should keep control of the initiative in dealing with the problem of Westinghouse Company's overseas business".

General Electric's license agreement with Westinghouse (Ex. 25-G) provided that:

"No license is herein granted under foreign patents; and no license is granted to export electric lamps, or sell such lamps for export, except to countries to which the Licensee would itself have a right to export them."

The "B" licenses contained even greater restrictions. They provided (Ex. 30-G, 29-G) that:

"No license is granted under foreign patents; no license is granted to export incandescent lamps or to sell lamps for export."

The "B" licensees were not without knowledge as to the reason behind this restriction for in 1937 Mr. John Woolridge of Sylvania wrote as follows (Ex. 113-G):

"Confidential

FOREIGN LAMP SALES

November 22, 1937

Mr. W. A. Coogan—New York Office
"I want to acknowledge your letter of November 17 on the above, also a copy of your letter of November 16 to Mr. Erskine, which Mr. E. J. Poor has discussed with me.

"When I first spoke to you last month in New York in regard to investigating foreign lamp markets, we had in mind at that time the possibility of inflating our lamp sales before December 31. In line with a recently adopted policy, we have decided against such inflation, due to the fact that we are allowed to carry over into 1938 any shortage in our quota up to 10% of the quota.

"Accordingly, what we want to do now is mainly examine the lamp markets in the various foreign countries, particularly South America, Cuba, Mexico, Australia and Canada. We do not want to make any quotations nor send any samples out at this time.

"The following is the type of information which we should like to collect, with your help, for each of the above countries. There is no particular hurry, if we can obtain it during the next few months:—

"1. The various important brands sold in the country.
"2. Are there any lamp factories in the country?
"3. The types of lamps generally in use in the country, i. e. the voltages, wattages and finishes, in order to determine whether they are similar to our types.
"4. The list prices and the distributors' discounts.
"5. The duty.
"6. Transportation costs.

"When we have the above facts, we can then determine whether there are any foreign countries where we could possibly meet competition with American costs, and at that time we can investigate as to whether there would be any way for us to utilize this to our advantage.

"In your letter to Mr. Erskine, you spoke of a possible license from the G.E. to export lamps to certain countries. I don't know whether I explained the situation to you, but the fact is that in the world at large the more important electrical interests, such as the G.E. Siemens of Germany, Philips of Holland, etc., are closely bound together in a cartel with the result that they have entered into binding agreements, apportioning world markets between

the respective companies. Accordingly, you can see that if the G.E. broke their agreement and allowed us to export into a foreign country which was assigned under the cartel agreement to a European manufacturer, that European manufacturer would have a claim to enter the American market in competition with us and probably could not be restrained from doing so. This is something which would probably not be to our advantage.

"Right now we are very much interested in checking carefully conditions in foreign countries, with the thought in mind that in certain countries the cartel arrangement might some day break up, in which case we might then obtain a foothold through export. Right now the only foreign country I know of where the cartel agreement does not control is Japan,—but as you know, exports to Japan are simply out of the question because of cheap Japanese labor."

The Westinghouse link is graphically set forth in Exhibit 2138-G in which in 1932 Mr. H. R. Boswell, then Lamp Division Manager of Westinghouse Electrical International Company's London Office, wrote to Mr. Harold Smith, General Counsel, in New York. He acknowledged receipt of communications from the New York office and inclosed a memorandum as follows:

"1) American customers holding domestic contracts but who also require lamps for export.

"Regardless of whether the domestic contract is with G.E. or Westinghouse, either I.G.E. or Westinghouse International has the right to offer the customer an export contract under which lamps will be supplied for export at the domestic list prices, less the customer's domestic contract discount.

"Once an export contract is closed with one company, (I.G.E., for instance) then the other company (Westinghouse International in this case) has not the right during the life of the said contract to quote or accept orders at the contract price. Naturally both companies have the right to negotiate for and offer renewal contracts on equal terms.

"Should a customer holding a domestic contract not execute an export contract but nevertheless wish to purchase lamps for export, then either company may accept the order at domestic list prices less the customer's domestic contract discount.

"2) American customers who do not hold domestic contracts but who nevertheless require lamps for export.

"Either I.G.E. or Westinghouse International has the right to offer the customer an export contract under which the lamps will be supplied for export at domestic list prices, less such discount as the customer would have been entitled to had he been executing a domestic contract for the same annual volume of business.

"3) Sales at prices ruling in countries of destination.

"Any American customers whether they have or have not a domestic or export contract may be supplied at any time with export requirements for any individual country at the prices, terms and conditions of sale ruling in that country."

The effect and interrelationship of these foreign agreements is set forth in a letter from Mr. Couse to Mr. E. J. Poor, Chairman of the Board of Sylvania August 18, 1939 (Ex. 121-G) as follows:

"I have your letter of July 28, regarding the export of Hygrade lamps. During the last year, we have received a number of complaints about the Hygrade lamps being offered for sale in foreign countries.

"As you have long known, the International General Electric, acting for the General Electric Company has disposed of its patent rights and manufacturing and technical information in foreign countries under agreements whereby the purchaser is protected against competition by the seller and the seller is protected against competition by the purchaser. Under these agreements, the General Electric Company is responsible not only for its own acts but for those of its licensees. Where an American licensee uses in the manufacture of lamps machinery, parts and materials purchased from the General Electric Company and then exports such lamps, the foreign companies have a just cause of complaint and they have complained. While your B

license from the General Electric Company does not contain a covenant on your part not to export, it does provide in Article III, Section E, that

" 'No license is granted under foreign patents; no license is granted to export incandescent lamps or to sell lamps" for export.'

"In my opinion, therefore, the export of lamps covered by article claims of patents of the General Electric Company or made by the use of patented machinery or processes is outside the license and is an infringement of such patents.

"I have no doubt that there might be a commercial advantage to you in exporting lamps but, because of the agreements aforesaid, it is the duty of the General Electric Company to refrain from itself violating said agreements or, by failure to act, permitting its licensees to violate the agreements under existing circumstances.

"That unlicensed lamp manufacturers export some lamps is beside the point. The unlicensed manufacturers have not had the benefits of a B license, and the General Electric Company is not responsible for their acts."

It is true that Mr. Couse establishes in this letter the defense emphasized by General Electric in its argument, namely that only the export of lamps is prohibited where they are covered by article claims of patents of General Electric or made by the use of patented machinery or processes. But as heretofore indicated the basis for this defense is unmerited.

During the course of the discussion concerning the General Electric-Corning relationships, Philips' part in the general scheme of foreign relations was therein detailed. As was there pointed out, General Electric's relations with Philips primarily concerned the glass bulb, tubing and cane phase of the incandescent electric lamp industry. The "Spiegelglas" Agreement which secured Philips' cooperation was a direct result of negotiations conducted by International General Electric.

A striking indication of the depth of feeling concerning Philips is communicated by Mr. Minor, President of IGE in his letter on May 25th, 1935, to Mr. Swope, President of GE (Ex. 447-G), wherein he reported upon a meeting with Philips Board of Directors. He recited that for 15 years Philips had exported into the United States the so called handblown glass tubing and bulbs with occasional violation of their agreements to export only hand made materials but with the devaluation of the dollar the market was entirely lost to them. Philips felt that they should now be compensated for the loss of this market. He goes on as follows:

"After many weary hours of discussion and listening to the over-exaggerated egotism of a feudal system of exploitation that reminds one of the pirates of old, you can write down the following in bold letters as the present policy of the Philips organization, and I mention it in this way because the results impinge primarily upon General Electric domestic business rather than on the General Electric international business.

*"Having regularized the lamp and radio business of the world, as well as having completed working agreements with the principal makers of X-ray equipment in Europe, it is the policy of the Philips Company to exploit by manufacture and/or licenses under its patents—except insofar as they may be limited or abridged by a most technical interpretation of the existing lamp and radio contracts, as well as the option letter—the makers of the United States."* [Emphasis by Mr. Minor.].

■ On the face of the Phoebus agreements General Electric and IGE are not parties, United States trade is expressly excluded and the Sherman Act has no extra-territorial operation. American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416. There appears to be present merely an agreement between foreign companies doing business abroad except for the codicil relating to Pintsch and Kremenezky deleted from the 1941 agreement and no longer material. No restraint or conspiracy is present on the face of the agreements but the Government has undertaken to demonstrate this by explorations in the nether surface.

■ The Government contended that General Electric and IGE are in substance

parties to the Phoebus Agreement and the 1941 agreement by virtue of their interlocking relationship since IGE controls several if not all of the Overseas Groups and IGE, Ltd. of London is wholly owned by IGE. The evidence overwhelmingly supports the Government's contentions for it is a fact that IGE was the manipulator which brought into being the Phoebus Cartel and General Electric activities in the United States were geared to the Phoebus agreement and were controlled by virtue of it. The Phoebus agreement and the 1941 agreement are complements of the domestic monopoly and a part of the general conspiracy charged. The Government interrelated the formation of Phoebus with Westinghouse's license of 1927 and interrelated the agreements between IGE, Philips and Phoebus to show IGE complicity by its submission of a dispute with Philips to the Phoebus tribunal for arbitration (Exs. 2133-G, 2298-G). It encountered numerous obstacles in its submission of the Phoebus agreement and the 1941 agreement into evidence; it was not presented at the trial until rebuttal; principals are lacking as signators; the Phoebus agreement terminated in 1939; the 1941 agreement terminated in 1945.

At times, the connection seems tenuous but a design is apparent. It is uncontested that General Electric dominated the field of manufacturing incandescent electric lamps in the United States in 1924, but that domination was found to be legal in the 1926 case. General Electric feared entry of foreign competitors into the United States even though there may have been immediate technical difficulties preventing foreign competitors from meeting American standards of production. In order to adequately protect its domestic market it employed its wholly owned foreign subsidiaries as the medium to develop an effective cartel system in Europe that would make home territories inviting to foreign manufacturers. IGE played a prominent part in the negotiations leading up to the Phoebus agreement with comprehensive reports being rendered to General Electric by IGE'S European representative, Mr. Woodward, the chief architect of the Phoebus agreement. Once the

Phoebus agreement was in effect, IGE negotiated the individual foreign license agreements each containing territorial restraints keyed to the Phoebus agreement and all requiring subsidiaries and licensees of the parties to respect the territorial limitations. It was IGE's burden to maintain the balance of marketing conditions originally established by the Phoebus agreement by preventing American manufacturers from invading the foreign markets. This would be no problem in so far as General Electric was concerned since it had authorized IGE to conduct its foreign business. Domestic licensees of General Electric were the invaders with whom the Phoebus parties were concerned. The duty of preventing a European invasion fell upon General Electric and this was the consideration governing the Westinghouse negotiations leading to the export prohibitions in the 1927 Westinghouse license. The subsequent "B" licenses contained a similar restriction. Thus Phoebus provided the foreign cartel with IGE serving as the link to General Electric in regimenting the incandescent lamp industry into a gigantic world cartel, the hub of which was General Electric. The motivating factor governing all IGE foreign contracts from its very inception was the intent to maintain the dominant position of General Electric in the United States by protecting it from foreign competitors.

The gloss of separate corporate entities employed to insulate General Electric from the consequences of these maneuvers avails nothing in the face of the plain intent to monopolize the incandescent electric lamp industry in the United States and protect this dominant position from foreign competition.

IGE was designed to continue General Electric activities in the foreign field. Its European representatives conducted a campaign the purposes of which were the stabilization of the European market and the diversion of European manufacturers from the United States. Westinghouse was a dangerous element able to upset these foreign relations and it had to be satisfied on the domestic front that it might not be tempted to the foreign field. Although much of the ground-work was laid

prior to 1927, it is plain that the conspiracy came into play that year by the fact that the 1926 decision gave the signal for plans to meet the oncoming eventuality of a loss of the legal monopoly in 1933. Westinghouse, it is true, did not sign the new license agreement until 1928 but the preliminary negotiations leading to its execution hung upon the IGE and General Electric commitments to fend off American competition in the foreign market and the premise of the Westinghouse license expressly states that it was *made* January 1, 1927 although not executed until 1928 (Ex. 25-G).

 General Electric and IGE sought to minimize the effect of the Woodward, Burchard and Morrison correspondence discussed herein by claiming that they amount to nothing more than the personal views of the particular individuals concerned. They argued that the writers did not control or influence the policies of General Electric in renewing foreign licenses or domestic licenses and that the views expressed were not adopted or followed by those responsible for General Electric policy. A considerable portion of General Electric's testimony was devoted to this aspect of the case and great pains were taken in attempting to limit the effect of the contemporaneous documents. With regard to Mr. Morrison, General Electric argued at length that while he had the title of Vice President, he had retired from active duty or participation in the management of the Edison Lamp Division because of ill health in 1925. It contended that the oral testimony adequately demonstrated that he was not consulted with respect to the policies of the Lamp Department in 1927, that the actions of the Lamp Department were not influenced by his views and that the Westinghouse agreement was not actually executed until 1928. General Electric further sought to minimize the effect of Mr. Morrison's letter, Exhibit 64-G, by pointing to the fact that his views in the past had not always been adopted. In connection with Exhibit 65-G, General Electric claimed that Mr. Burchard was primarily concerned with the affairs of IGE, that it was written 10 days before his death and a year and a half

before the signing of the Westinghouse license. In contesting the effect of Exhibit 2130-G, General Electric contended that the domestic situation was not Mr. Woodward's realm of responsibility and that it was dated in 1927 well before the signing of the Westinghouse license. In regard to the Woodward correspondence concerning the Phoebus agreement (Ex. 2278-G), General Electric and IGE argued that it clearly demonstrated that they do not relate to United States commerce and are therefore inadmissible pointing to Mr. Woodward's statement in Exhibit 2117-G that he was concerned that the agreement did not violate the anti-trust laws. The testimony of General Electric has failed to disturb the import of the Woodward-Burchard-Morrison documents, but on the contrary has served to strengthen them. The situation differs in nowise from what was stated in United States v. Corn Products Refining Co., D.C., 234 F. 964, at page 978, appeal dismissed, Corn Products Refining Co. v. United States, 249 U.S. 621, 39 S.Ct. 291, 63 L.Ed. 805:

"The documents were never intended to meet the eyes of any one but the officers themselves, and were, as it were, cinematographic photographs of their purposes at the time when they were written. They have, therefore, the highest validity as evidence of intention, and, although in many instances Bedford attempted to contradict them, his contradiction only served to affect the general credibility of his testimony."

More recently the Supreme Court commented in United States v. United States Gypsum Co., 333 U.S. 364, at pages 395, 396, 68 S.Ct. 525, 542, as follows:

"The government relied very largely on documentary exhibits, and called as witnesses many of the authors of the documents. Both on direct and cross-examination counsel were permitted to phrase their questions in extremely leading form, so that the import of the witnesses' testimony was conflicting. On cross-examination most of the witnesses denied that they had acted in concert in securing patent licenses or that they had agreed to do the things which in fact were done. *Where such testimony is in conflict with*

*contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact. \* \* \*"* [Italics supplied.]

Cf. United States v. Hartford-Empire Co., D.C., 46 F.Supp. 541, 553. There is something of an inconsistency in General Electric's attempt to limit the meaning of Mr. Morrison's letter, Exhibit 64-G, because in discussing the issue of res judicata it stresses the importance of his depositions submitted to the Attorney General in connection with the 1922 investigation (Ex. GE-6, item 89A, GE Brief pp. 166–167.)

■ These challenged documents were obtained from the files of General Electric and IGE officers holding key positions. They mirror well the contemporaneous thoughts and the policy considerations of General Electric and IGE officials, and the testimony at the trial failed to limit them. The authors of the documents were no minor figures but men of the stature of "elder statesmen" who governed, controlled and established the policies of General Electric in their time. The conduct of General Electric has been too well geared to the teachings of these documents for their meaning to be discounted. (Cf. Exs. 338-G, 339-G and 390-G). These documents have revealed the intent that governed the policy of General Electric and have lifted the corporate veil of IGE to expose it as a facile tool and active conspirator in a scheme whose primary purpose was the maintenance of General Electric domination over the lamp industry in the United States by preventing foreign competition.

■ During the course of the trial, the Phoebus Agreement was constantly referred to and formed the basis of the Government's cross examination of a number of witnesses, particularly Mr. Herman F. van Walsem, President of Phillips; Mr. Hendrick Hesselink, Sub-Managing Director of Phillips; Mr. Hijmans, Vice President and head of the Patent Department of Philips; and Mr. Minor of General Electric. No contest was made of its genuineness but solely of the issues of whether its introduction into evidence and the Government's reliance upon it is outside the limits of the complaint. From the plain wording of the complaint, paragraphs 104 to 115 inclusive, General Electric was sufficiently informed that it would be material to the issue. The evidence, moreover, demonstrates that the Phoebus agreement resulted from activities of General Electric and IGE officials. Although their corporate signatures are not on Phoebus, their activities were keyed to Phoebus. International General Electric's, General Electric's and Philip's objections to it are therefore without merit.

■ General Electric argued that territorial restraints in its licenses were reasonable and therefore valid as ancillary to an exchange of manufacturing information. In support of its argument it contended that the exchange of technical and manufacturing information and "know-how" was a primary purpose of the license agreements and was clearly evidenced by its substance and importance. It referred to the mass of accumulated industrial information which it had compiled and argued that the "protection of one's labor is afforded even though the subject matter may not be strictly a 'trade secret'. It may stand 'like a trade secret'". It claimed that the parties to the license agreements sought technical and manufacturing information and "know-how" and sought access to each other's research laboratories and that the material involved was of the utmost importance. It insisted that the "ancillary restraints were not to eliminate or even reduce potential or actual competition, but were simply to protect the parties against competition which would only have been of their own creating." In concluding it insisted that the proofs established that patented inventions and a vast body of "everchanging manufacturing information and 'know-how' has been exchanged between International General Electric and its foreign licensees."

The Government argued that the reliance upon "know-how" demonstrated that General Electric recognized the weakness of its patent situation and that the agreements related to patented as well as unpatented materials. It contended that it was inconsistent for General Electric to

argue that there was no competition in the foreign market and at the same time claim that it was protecting against competition. Since patents were predicated upon inventions and issued pursuant to a public policy and "know-how" does not depend upon such a statutory grant, the Government claimed that "know-how" could not be given the broad protection accorded the owner of a patent. Its primary contention was that the exchange of patents and "know-how" was ancillary to the purpose of eliminating competition by an allocation of territory and that the agreements and territorial allocations included all products not merely those embodying "know-how" received from the foreign licensees. It challenged General Electric's failure to produce evidence of current "know-how" that the court might pass upon whether such was in the nature of a trade secret and pointed out that the "B" licensees never received "know-how" yet made lamps meeting the most rigid specifications. "Know-how" is a vague term and it is difficult to be certain to what extent it was utilized by General Electric, International General Electric and the foreign licensees. Certainly General Electric's witnesses could give no clear definition when testifying. Nor could General Electric produce evidence that it was embodied in all products covered by the licenses negotiated by International General Electric. Restraints exercised under a patent grant are circumscribed within narrow limits and measured by the precise terms of the grant but restraints exercised under authority of "know-how" are measured by the use made of it. "Know-how" as employed by General Electric has not been based upon the sale of a business making the territorial restrictions reasonably ancillary thereto. The secret and confidential nature of the material has not been exhibited. General Electric claimed that it received "know-how" from the foreign licensees in return for its "know-how" and enjoyed substantial remuneration for it to boot. International General Electric did not discount the value of its licensees' "know-how" claiming it to be of immense value since its foreign subsidiaries had production problems similar to those of its licensees.

 General Electric claimed that the territorial restraints were *reasonable*. Reasonableness has been considered a test since early pronouncements of the courts. In the case of Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, at pages 406, 407, 31 S.Ct. 376, 384, 55 L.Ed. 502 the Court stated that:

" 'The true view at the present time,' said Lord Macnaghten in Nordenfelt v. Maxim Nordenfelt Gun & Ammunition Co., [1894], A.C. p. 565, 6 Eng.Rul.Cas. 413, 'I think, is this: The public have an interest in every person's carrying on his trade freely: so has the individual. All interference with individual liberty of action in trading, and all restraints of trade of themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is a sufficient justification, and indeed it is the only justification, if the restrictions is reasonable,—reasonable, that is, in reference to the interests of the parties concerned, and reasonable in reference to the interests of the public, so framed and so guarded as to afford adequate protection to the party in whose favor it is imposed, while at the same time it is in no way injurious to the public.'

"The present case is not analogous to that of a sale of good will, or of an interest in a business, or of the grant of a right to use a process of manufacture. The complainant has not parted with any interest in its business or instrumentalities of production. It has conferred no right by virtue of which purchasers of its products may compete with it. It retains complete control over the business in which it is engaged, manufacturing what it pleases and fixing such prices for its own sales as it may desire. Nor are we dealing with a single transaction, conceivably unrelated to the public interest. The agreements are designed to maintain prices after the complainant has parted with the title to the articles, and to prevent competition among those who trade in them."

In United States v. National Lead Co., D.C., 63 F.Supp. 513, at page 524, affirmed 332 U.S. 319 (see page 325), 67 S.Ct. 1634, 91 L.Ed. 2077, the court held:

"It is suggested that the 1920 Contract may escape the condemnation of the Sherman Act by recourse to the doctrine which validates covenants in restraint of trade when reasonably ancillary to a lawful principal purpose, such as the sale of a business. United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271 [46 L. R.A. 122], affirmed [Addyston Pipe & Steel Co. v. United States], 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. Such a principal purpose is, in the case at bar, supposed to be the sale by TAS of its American business to TP, accompanied by a license under its patents; and conversely, the sale by TP of its foreign business to TAS, accompanied by a license under its patents.

"The shortest answer to this suggestion is that, in fact, TAS had no American business to sell, and that TP had no foreign business to dispose of. At best, each had an opportunity and a hope. Certainly the world-wide territorial allocation was unreasonable in scope when measured against the business actualities. This is a case where if not the sole, at least one of the principal, objects was 'to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster.' United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 282, 283; Greater New York Live Poultry Chamber of Commerce v United States, 2 Cir., 1931, 47 F.2d 156, certiorari denied 283 U.S. 837, 51 S.Ct. 486, 75 L.Ed. 1488."

Reflecting these expressions upon the circumstances of this case without conceding that the exchange of "know how" could be the basis for territorial restrictions, the parties to the contracts herein are found to have received their quid pro quo in the mutual exchange of valuable information each to the other. The interest of the public in the world wide divisions of territory set up and the far flung effects upon competition and trade encompassed in them is very great. No matter how reasonable the restraints have been considered as between the contracting parties they were entirely unreasonable in so far as the interest of the public is concerned.

It has been all too evident that the primary purpose of the foreign licenses was to restrict competition in the United States by dividing markets in the foreign countries, all geared to the Phoebus agreement and domestic licenses to reduce interest of potential foreign competition in United States trade. There is in the foreign licenses a striking similarity to the situation interdicted in United States v. National Lead Co., supra. General Electric's objections to the use of the word "cartel" are immaterial for as the criterion is not one of semantics, it is rather as the trial court in the National Lead Co. case observed:

"Whether the form of association they created be called a cartel, an international cartel, a patent pool, or 'a technical and commercial cooperation,' is of little significance. It is a combination and conspiracy in restraint of trade; and the restraint is unreasonable." 63 F.Supp. at page 523.

General Electric has contended that there was no competition between the domestic licensees and the foreign companies. This contention loses force in the fact of the revelations made in the series of exhibits, 88-G to 129-G that show a lively competition might have developed but for the territorial restrictions placed upon the General Electric domestic licenses. It is true that General Electric's domestic licensees sought to evade these restrictions and were subjected to pressures from it (Exs. 106-G, 107-G, 108-G, 117-G, and 121-G) but notwithstanding, they deemed it to their best interests to succumb.

Philips is the only foreign licensee before the court and while the restraints were primarily precipitated by General Electric through IGE, Philips participated therein and is equally responsible. IGE is chargeable with unlawful conduct by virtue of its being the direct tool of

General Electric in the manipulation of the foreign agreements. Westinghouse [37] and the "B" licensees [38] are likewise violators by virtue of their engagements in and practical fulfillment of the clauses in their licenses prohibiting them from engaging in the export trade. A conspiracy and combination to restrain trade and competition in violation of § 1 of the Sherman Anti-Trust Act have been made out and General Electric, International General Electric, Philips, Westinghouse, Sylvania, Consolidated, Kenrad, Tungsol, and Chicago Miniature were co-conspirators.[39]

### Mazda

In general, the Government contended that one of the steps in the acquisition and maintenance of the General Electric monopoly structure was to extend the trademark "Mazda" to Westinghouse lamps with the purpose of misleading the public into the belief that there was only one generally accepted and recognized standard incandescent lamp, the Mazda lamp. It claimed that it was unlawful for General Electric to utilize the goodwill of Westinghouse in permitting it to use the Mazda mark; that a trademark cannot serve two masters and since it was employed by General Electric and Westinghouse, its use was an imposition upon the public. It asserted that General Electric employed Mazda as a name of a tungsten filament lamp which could only be manufactured by General Electric (Exs. 2281-G, 2283-G) because of its ownership of the basic and controlling patents (Just and Hanaman, Coolidge, and Langmuir), the mark had become associated with a tungsten filament electric lamp resulting in the Mazda mark becoming public property upon expiration of these patents in 1933.

General Electric contended that the Government's argument confuses two distinct branches of business in which General Electric was engaged relating to the production of lamps:

"(a) The manufacture and sale of lamps; and

"(b) The collection and selection of technical information useful in lamp manufacture and the sale of specifications embodying General Electric's selection of the best combination of technical expedients available to General Electric for its use in lamps. These specifications are sold directly to lamp manufacturers selected by General Electric as 'Mazda' licensees, and indirectly to the public as actually embodied in lamps by General Electric and its 'Mazda' licensees. This second branch of business is known as General Electric's 'Mazda' Service."

It insisted that "Mazda" has always been correctly advertised as a service (Ex. GE-135) and that its goodwill is symbolized by the symbol "GE" whether or not "Mazda" is used. It argued that the use of "Mazda" was proper citing Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L. Ed. 526; Keebler Weyl Baking Co. v. J. S. Ivins' Son, D.C., 7 F.Supp. 211, 214 and asserted that the use of a trademark as a symbol of service has been sustained in a line of cases, citing, among others, American Viscose Corp. v. Crown Craft, Inc., D.C., 28 F.Supp. 884; Finchley, Inc. v. George Hess Co., D.C., 24 F. Supp. 94; H. Freeman & Son v. F. C. Huyck & Son, D.C., 7 F.Supp. 971. It claimed that in its initial announcements of the adoption of "Mazda" in 1909 demonstrated that it was for a service and therefore could not be restricted to tungsten lamps (Ex. 135-GE) and in fact Mazda service had been extended to certain lamps which do not employ the tungsten filaments (Exs. GE-138 through GE-142, inclusive). Licensing Westinghouse to use the Mazda mark for the duration of the patent license it alleged was consistent with lawful use since it was a

---

[37] Although not stressed in the opinion, Exs. 2137-G, 2142-G, 2145-G, 2147-G, 2148-G, 2153-G, 2156-G and 2161-G weigh heavily against Westinghouse and further show this defendant to have been actively engaged in the foreign aspects of this case. These documents further rebut General Electric's contentions that Westinghouse did not conspire with it.

[38] Other links between GE and the "B" licensees are discussed under the heading "Suppression of Domestic Trade".

[39] Corning was not discussed in this section although it was found to have violated the Sherman Anti-Trust Act where it applied to the glass agreements.

"necessary limitation to insure the embodiment of one factor in the standard of excellence required of lamps bearing the 'Mazda' mark".

Exhibit GE-135 is a compilation of typical advertisements employed by General Electric since the Mazda mark was first employed and runs back to 1909. Tab 1 of Exhibit GE-135 states:

"For the purpose of insuring that the incandescent lamps manufactured by them, respectively, shall have the advantage of the latest discoveries and inventions in the art, wherever made, the foremost lamp companies of America have made arrangements, whereby the technical staff of the Research Laboratory of the General Electric Company in collaboration with the technical staff of the National Electric Lamp Association and others, shall regularly follow the work which is being done in the factories and laboratories of the leading foreign and American Lamp companies and shall keep constantly informed as to the progress and development in methods and processes in each, distributing the information thereby secured to the lamp manufacturing companies enjoying the benefit of this arrangement, and selecting from all known materials and processes those best fitted for each different style and type of metal filament incandescent lamp made for or by the respective American companies.

"For the purpose of identifying the lamps made in accordance with the information thus obtained, the Research Laboratory has adopted as a trade-mark the word

MAZDA

and its presence on any metal filament lamp evidences that the expert knowledge and selective skill of its technical staff entered into the production of that lamp and that the best materials and processes known to it as fitted for that type of lamp have been employed in its manufacture."

Continually stressed in the advertisements has been the statement that "Mazda" is the mark of a Research Service. The meaning of "Mazda" is set forth in Tab 9 of Exhibit GE-135, as follows:

"Mazda is the trademark of a world-wide service to certain lamp manufacturers. Its purpose is to collect and select scientific and practical information concerning progress and developments in the art of incandescent lamp manufacturing and to distribute this information to the companies entitled to receive this Service. Mazda Service is centered in the Research Laboratories of the General Electric Company at Schenectady.

"The mark Mazda can appear only on lamps which meet the standards of Mazda Service. It is thus an assurance of quality. This trademark is the property of the General Electric Company."

There can be no doubt that General Electric organized and maintained at the expense of many millions of dollars research laboratories in which scientists, technicians, and the most modern agencies of investigation were employed to promote maximum efficiency in the manufacture of incandescent electric lamps and the machinery for their production. There can be no doubt that the research field was regarded by General Electric as a very fundamental department of its great business. Indeed, this intelligent policy is very probably one of the factors accountable for the phenomenal growth and advances that were made in the business. It took pains to show the public the depth of its scientific and technical investigations in its advertisements devoted to the "Research-Laboratories" of General Electric Company (Ex. GE-135, tabs 9 to 22). There can be no doubt that it applied its mark "Mazda" to the results of its research as that was embodied in the incandescent electric lamp and other of its products. The proof adduced by the Government fails to show, however, that the "Mazda" mark per se was invalid. Its contention that "Mazda" was keyed to tungsten incandescent lamps and passed into the public domain upon expiration of the Langmuir patent also falls because of lack of proof that the word "Mazda" became a general trade name of the tungsten filament lamp. Under ordinary circumstances there would be no vice in General Electric licensing the use of the "Mazda" symbol conditioned upon observance of its technical specifications as the American Viscose and similar cases hold or in denying a license to any one.

But in a consideration of the use made by General Electric of the mark "Mazda" within the area of the anti-trust laws different implications arise. General Electric contended that a department of its business was devoted to the sale of its collected and selected specifications "directly to lamp manufacturers selected by General Electric as 'Mazda' licensees, and indirectly to the public as actually embodied in lamps by General Electric and its 'Mazda' licensees".

Who were the customers in this department in the United States? The only "Mazda" license granted by General Electric was that to Westinghouse in 1927 (Ex. 26-G) and its duration was conditioned upon Westinghouse remaining a patent licensee of General Electric. Insured of a production quota based upon General Electric's total lamp production with its prices similarly fixed by General Electric (Ex. 25-G), Westinghouse was in the status of a controlled competitor. The "B" licensees craved the use of the "Mazda" mark but were denied it. Similarly no independent manufacturer was granted this right. It is therefore apparent that the second branch of the business was illusory. It was for the benefit of General Electric and only one customer of its choice—Westinghouse.

When consideration is given to this aspect in conjunction with the conduct of General Electric and its sole "Mazda" licensee, Westinghouse, in their joint use of the mark, as discussed in "Public Business" and "Suppression of Trade by Domestic Licensees" and the General Electric activities discussed in "Electrical Testing Laboratory", the design in the general pattern of monopoly by General Electric of the incandescent electric lamp industry becomes very vivid. "Mazda" formed a panoply to screen interrelated General Electric-Westinghouse activities.

## Public Business

The Government contended that General Electric conspired with Westinghouse to secure favorable action from public officials in the establishment of lamp bid specifications making it difficult for those lamp manufacturers not permitted use of the "Mazda" trademark to secure public business. It claimed that General Electric designed to and did engross all sources of lamp business which could be controlled through private contracts. Due to the nature of public business with the usual requirements of bidding, it sought to instigate specification requirements that would limit participation of outsiders in this respect. The Government insisted that General Electric and Westinghouse acted in concert and pointed to Exhibit 2286-G wherein the Supervisor advised General Electric and Westinghouse sales officials of the need for close cooperation in carrying out the activities outlined in the Supervisor's Annual Review for securing governmental business and pointed to the record wherein the Supervisor, Mr. Davis, admitted that such concerted action was followed to assist Westinghouse in obtaining political business (R. 2028-2033). It claimed that this concerted action is further evidenced by the Supervisor's instructions to Westinghouse sales officials to advise the City of Detroit, Michigan, purchasing officials that the similarity of bids between General Electric and Westinghouse was due to the license agreement. The Government further contended that by various inducements, public officials were persuaded to draw specifications in such a manner that only General Electric and Westinghouse could participate and that the specification form usually was drawn to require "Mazda" lamps, which only General Electric and Westinghouse could meet and stressed the series of Exhibits 2041-G to 2097-G. An additional contention made by the Government was that efforts were made to prohibit other manufacturers from supplying lamps to political bodies by preventing them from supplying "Mazda" lamps. It claimed that if political bodies made it necessary to supply a full line of lamps, then only General Electric and Westinghouse could comply, because they would prevent other manufacturers from filling out their lines by buying Mazda lamps. Exhibits 1724-G to 1743-G, inclusive, show that a deliberate policy was followed, sometimes successfully, of not selling for "resale" in order to accomplish this purpose. Independent agents carrying Hygrade or Champion lamps were warned that if they bid suc-

cessfully on the basis of the latter lamps they could not fill out their lines with Mazda lamps (Ex. 1725-G). Agents acting as a source of supply of Mazda lamps to Hygrade were vigorously recommended by General Electric to be "eliminated" (Exs. 1737-G, 1738-G). Hygrade and Champion were scolded and threatened with lawsuits for interfering with contracts between General Electric and its agents (Exs. 1727-G, 1729-G to 1731-G, 1733-G, 1734-G). An effort was made to get a city to require in its specifications that lamps furnished by any one distributor must all be the same brand (Ex. 1735-G). And finally all agency contracts were revised to expressly prohibit sales for resale—thus providing grounds for the previously threatened lawsuits (Ex. 1739-G).

General Electric argued that it sold lamps to public bodies through its agents and its sales districts and that most of the business was through ordinary negotiations between buyer and seller with very little on the basis of contracts awarded by bids and only the larger public body contracts were obtained by bids. It pointed to Exhibit GE-161 to demonstrate that in 1939 it had contracts in 16 states covering $236,000 worth of lamp purchases while in the remainder $323,000 worth of lamp purchases were made from competitors. It contended that there was substantial competition between it and its competitors for the public business. It argued that the Government's charges arise from a misunderstanding of the problems facing General Electric in securing public business and that many of the public body requirements were such that they were ill adapted to lamp business resulting in the rejection of many General Electric bids because the bidding requirements were unrelated to lamps. General Electric claimed that it met with Westinghouse only to analyze the situation and subsequently as a result of many conferences with public officials, many irrelevant and unnecessary provisions in bidding requirements were eliminated. In answer to the Government's contention that the similarity of action is the equivalent of conspiracy, General Electric argued that the Government neglects the fact that Westinghouse was under a license from General Electric under which it could give no more favorable terms or conditions than the licensor, General Electric, and that there being no showing of conspiracy in connection with the public business, exhibits from sources other than General Electric were inadmissible against it. As to the charge that it sought to induce public bodies to draw up specifications for bids which only it and Westinghouse could meet, General Electric argued that it recommended against the uses of product (technical) specifications because of the inability of the average public purchaser to apply highly technical specifications to lamps purchased and that when approached as to recommended specifications, it urged the Bureau of Standards' specifications. It admitted that some public bodies did require "Mazda" or "Mazda or equal", but argued that this had resulted from these public bodies having received satisfactory service from Mazda lamps and that such is legal, citing Smith v. Seattle, 192 Wash. 64, 72 P. 2d 588. It claimed certain political bodies designated a particular brand in requests for bids and that General Electric was entitled to urge any purchasers, including a public body, to designate its brand of lamp as a criterion. It claimed that the Government's charge that it attempted to have bids thrown out when it appeared that General Electric would not get the bid and then have the business readvertised is not only not the case but that the evidence fails to support this assertion, urging again objections to exhibits not from General Electric files. As to the charge that "B" licensees were eliminated from the public business, it submitted that Exhibit GE-161 shows to the contrary and that the testimony relied upon by the Government merely shows that two "B" licensees failed to bid for reasons of their own.

■ The argument of General Electric presents a striking fallacy. Exhibit 26-G demonstrates that Westinghouse was licensed to employ the "Mazda" trademark and no other manufacturer was licensed to employ the "Mazda" symbol. General Electric first argued that there was substantial competition with its competitors and that Westinghouse could not give more favorable terms than General Electric as

its licensor; and on the other hand, that General Electric was entitled to urge any purchaser, including a public body, to designate its brand of lamp as a criterion. In urging the "Mazda" mark, it is apparent that General Electric was in effect restraining trade and competition since it was reducing the market to the only two manufacturers under the "Mazda" mark and these had the relationship of licensor-licensee.

Exhibit GE-161, limited solely to state agencies, presents more of a picture than General Electric has urged. It demonstrates that when the business obtained by Westinghouse is added to that of General Electric, 27 states produced $314,000 worth of business for them, or roughly 60% of the total large lamp contracts of state purchasing agencies in 1939. Four states had no centralized purchasing agency and their purchases from unknown manufacturers totalled $2,000. The remaining 17 states produced business totalling $243,408.-43 for manufacturers not entitled to use the Mazda mark. This exhibit, in addition, does not include figures for cities many of which have a lamp business equal to and exceeding that of states.

General Electric claimed no unlawful conduct in urging that its brand be specified. This contention would be acceptable under circumstances where only General Electric is involved. But it neglects the fact that it and Westinghouse together engaged in a deliberate campaign to exclude competition by seeking to have established a standard which they only were able to meet. They sought to bolster their position through means of a joint device (The "Mazda" or equivalent specification) to get public body business rather than to obtain it on the basis of the lowest bid upon products the standards of which were established by a disinterested and neutral authority and General Electric admitted that it at no time authorized any manufacturer other than Westinghouse to employ the Mazda mark. Exhibits 2060-G and 2061-G, as examples, illustrate the method in which General Electric operated to have favorable specifications established. The implications of Exhibits 2048-G, 2049-G, 2053-G, 2056-G, 2058-G, 2063-G, 2075-G and 2085-G, among others, are not to be overlooked but clearly indicate a pattern of conduct designed to restrict competition. It is apparent that when either General Electric or Westinghouse could not secure public business on the basis of the lowest bid, their purpose was to exclude competition through the activities of their sales representatives in having bids thrown out and readvertised after new specifications drawn encompassing terms favorable only to them had been adopted. These were not the zealous efforts of an over-ambitious sales force but the deliberate policy of General Electric coordinated through means of the Supervisor. The series of Exhibits, 1724-G through 1743-G, clearly demonstrate that even the "B" licensees of General Electric were placed in disadvantageous positions. Although the "B" licensees were not entirely foreclosed from the public business, their path was made difficult, this being one of the few occasions where the "B" licensees were antagonistic to the interest of General Electric with Sylvania being most noteworthy in this respect. Public contracts were but a relatively small portion of the total percentage of the incandescent electric lamp business in the United States but nevertheless there was an amount substantial enough to attract competition which General Electric and Westinghouse sought to foreclose. The evidence fully sustains the contention that General Electric and Westinghouse cooperated in a joint effort to restrain competition in this area by seeking to deprive independent manufacturers of a market through the design of restricted specifications and by so doing violated the Sherman Anti-Trust Act, § 1.

■ General Electric has objected to the Westinghouse correspondence as being inadmissible against it but under the co-conspirator rule such declarations are admissible since independent evidence demonstrates that Westinghouse and General Electric combined to restrain trade and competition.

### Electrical Testing Laboratories

The Government charged that one of the means which General Electric adopted to preempt the market in lamps sold directly

to large corporations and public bodies and to exclude the rise of competition was the Electrical Testing Laboratories (ETL). It alleged that ETL was supported mainly by General Electric which in turn permitted itself to be used as a device in representing that the Mazda lamp was approved as the result of tests made objectively by an impersonal laboratory institute and was in fact the standard American lamp. It further charged that General Electric used ETL for the purpose of obtaining confidential information from its competitors and from employees of the United States Bureau of Standards. General Electric argued that ETL is an independent laboratory and if there was any divulgence of confidential information it was upon rare occasions and quite unofficial.

Originally the ancestor of ETL was formed prior to 1901 by a group of lighting companies to assure themselves of the quality of the lamps they were purchasing and was of prime importance to them since in the early days they supplied lamps for renewal purposes to their customers without charge. At that time, the testing of lamps was conducted in the factory of the Edison Lamp Works at Harrison, New Jersey, a division of General Electric, the lamp manufacturers supplying the testing facilities and the lighting companies bearing the expenses. Between 1901 and 1904 the testing facilities were removed to New York where the laboratory is now located. All of the stock of ETL was always owned by the central stations or lighting companies and General Electric has never been a stockholder. ETL holds itself out to make tests in the field of lamps and other electrical products and appliances for anyone desiring to use the service upon payment of a fee. In 1937 or 1938 its total income was approximately $500,000. Two-thirds of this income, or about $330,000 was attributable to lamps and about half of that amount was received from General Electric and Westinghouse, 22% or 23% of the total income of ETL in all its testing activities coming from General Electric alone (R. 1962).

General Electric resented the Government's charge that it made "contributions" to ETL, but officials of General Electric themselves, refer to its payment by that term, as in Exhibit 1885-G, where it is said:

"For a period of time approximately 18 to 20 years the Incandescent Lamp Department have contributed $70,000 annually to the support of the Electrical Testing Laboratories, of which $60,000 was contributed by the Edison Lamp Works and $10,000 by the National Lamp Works. In the case of the latter, an arrangement was made whereby the Lamp Department might have the privilege of sending lamps for test to the Electrical Testing Laboratories, the cost of which could be charged against this contribution. During recent years we have sent lamps in for test which averaged from $6,000 to $7,000 per year, and it is our intention in the future to send additional lamps for test, so we will utilize the entire $10,000. We thus receive some value from the National Lamp Works' contribution in the way of test information."

In Exhibits 1896-G and 1897-G, ETL complied with General Electric's request to ascertain how many Slater lamps Brooklyn Edison Company was purchasing. In Exhibit 1943-G a suggestion is made by one General Electric official to another that it might be well to discuss with an officer of ETL some details of a contract between Sylvania and Boston Edison Company. Exhibits 1909-G, 1910-G and 1911-G show that ETL bought two 25-watt T-10, Birdseye show case lamps for General Electric. Exhibit 1916-G is a letter of a General Electric official showing that he had requested ETL to obtain information as to competitive brands of lamps found on the open market and the immediate location where they could be secured and had received a list of 23 such brands. Exhibit 1918-G shows that a General Electric official wrote that ETL quoted the City of Fall River a figure of $800 to run tests on lamps the contract price of which was only $350, and he assumed that ETL "just don't want to make the test". Beyond the discrepancy of the cost of the test and the lamps there is nothing to show the unreasonableness of the proposed charge and the representative of ETL on the witness stand stated that the cost of tests could not be regulated by the amount of lamps involved in the prospective contract,

and that ETL in fact did not know the amount of the contract price, but did desire to make the test.

From Exhibit 1899-G it appears that a General Electric official wrote that he has had information from ETL that it had been instructed to make a service test of street series lamps for Poughkeepsie and this prompted the writer to "wonder" whether Poughkeepsie is entirely satisfied with the Sylvania lamps it was using and to request the recipient of the letter, a subordinate local official, to explore the situation and not to mention ETL in the discussion. Other exhibits refer to the transmission by ETL to General Electric of reports of a confidential nature. In Exhibit 1891-G, Mr. Kewley of General Electric pays special tribute to ETL's friendliness to the Mazda lamp and its influence in keeping Mazda lamps "on customer lines, rather than other brands".

Another series of exhibits, 1923-G to 1925-G, 1928-G to 1932-G and 1938-G, were offered to show that General Electric secured confidential information on the results of tests on competing lamps from the United States Bureau of Standards allegedly accomplished through the efforts of a deceased agent of General Electric in his contract with a representative of that Bureau. In this latter connection, the question of whether a Bureau of Standards official mentioned made indiscreet disclosures is raised with no opportunity for him to be heard.

█ A consideration of the evidence of the Government and the testimony adduced by General Electric leads to the conclusion that ETL was substantially supported financially by General Electric and was utilized by it to obtain information in its aggressive pursuit of incandescent electric lamp business. It further served as one of the means whereby General Electric could maintain a surveillance over the entire incandescent lamp industry. That employees and officials of both ETL and General Electric were in close and intimate contact is beyond question. Undoubtedly the influence of General Electric was such that it obtained information, sometimes of a confidential nature, which no other customer of ETL was able to obtain. However, the showing made fails to support the theory of the Government that such influence as General Electric had over ETL constituted a direct violation of the anti-trust laws. At most, it illustrates the aggressive tendencies General Electric exhibited in seeking to maintain its dominant position.

### Public Utilities

Another activity by which the Government claimed General Electric acquired and maintained its monopoly in the manufacture of incandescent electric lamps was in seeking to coordinate its acts with those of public utilities so as to promote their individual interests at the expense of the public and suppress newcomers who might disturb this activity. It asserted that public utilities were interested in increasing and maintaining a kilowatt hour load at the highest peak and General Electric was interested in not merely selling lamps to and through public utilities but in preventing the other manufacturers from selling their lamps through them. An additional objective alleged to be accomplished by the harmonization of activities was to strengthen the notion that "Mazda" was the only acceptable standard electric lamp. Thus it is claimed that General Electric and Westinghouse influenced public utilities to discourage the use of competitive lamps.

In seeking to sustain its contention, the Government pointed to Exhibit 1948-G, wherein Mr. Harrison of General Electric wrote that:

"In general, the relationship between the public utility and the lamp manufacturer is a peculiar one. Only in the field of street lighting does it approach that of buyer and seller; elsewhere it is a partnership arrangement. Sixty per cent of the lamp manufacturer's income is derived from lamps burned on circuits supplied with energy by the utility company and 60% of the utility company's revenue is derived from the sale of current consumed in incandescent lamps. Of course, the lamp manufacturers are in; the position of minority partners for the utility company's sale of current, for lighting is perhaps 15 times the lamp manufacturer's net proceeds from the sale of lamps. However, for many years it has been the policy of both parties to look at the matter

broadly and to the interest of the industry as a whole. To cite just two or three examples, it might be mentioned that the lamp manufacturers have never featured their 10, 15, and 25-watt lamps, although the immediate effect on their business would unquestionably have been favorable. More than one 15-watt lamp would always be required to take the place of a 60-watt lamp. And again, there has always been a uniform price on all lamps on the so-called bread-and-butter line. This has been convenient from the merchandising standpoint, but it has also been very helpful from the standpoint of building utility load. The 75-watt lamp has recently been added to this price group and the demand for it has been substantially doubled thereby. Again, we have consistently rated our lamps in watts, and increases in efficiency have not resulted in corresponding reductions in central station load. If a lumen rating had been adopted even as recently as 1926 (after the change-over to gas-filled lamps), the present 60-watt lamp would by this time be down to a consumption of 52 watts. It is our belief that in view of the inadequate levels of illumination which are still prevalent in this country, the public is better off with the added light than they would have been with the reduced wattage. At the same time our immediate profits would have been greater and we would be much better protected against foreign competition if we were on a lumen basis. We are now under pressure from the European lamp companies to go over to this basis with them.

"The public utility companies on their part have been particularly helpful to the lamp manufacturers. For many years, every question of mutual interest and major importance has been discussed in the Lamp Committee of the Edison Association. The utility companies have consistently given their support to Mazda lamps in discussions with customers, and for their own uses, have purchased these lamps exclusively."

In this connection the Government contended that General Electric constantly featured the higher wattage "bread and butter" lamp and stressed this in dealing with utilities and that special plans were offered by which utilities were to give away free lamps of the 100 to 150 watt size (Exs. 1959-G to 1963-G). It urged that the General Electric motive is demonstrated in Exhibit 1995-G wherein Mr. Barnes, head of the sales promotion department wrote that:

"We have been promoting the 100-watt lamp in every ad and in every radio program, even though our profit on 100-watt lamps is only about one-third of our profit on 25-or 40-watt lamps. We are playing a kilowatt hour development game and believe we should be rewarded for it."

Claiming that uniformity of prices on the "bread and butter" lamps is largely designed and used to influence utilities, the Government pointed to Exhibit 1956-G where Mr. Potter wrote of efforts to help utilities sell kilowatt hours by a general price reduction in March 1938. This reduction which abolished differences between the 100-watt and lower wattage lamps (Ex. 1966-G) was asserted to remove the price hurdle from purchases of the higher wattages. It is insisted by the Government that the major reason for maintaining wattage ratings was the desire for the continued support of the utilities, pointing to Mr. Sloan's letter to Mr. Duncan in 1934 (Ex. 1945-G) and Mr. Sloan's letter to Mr. Kewley in the same year (Ex. 1947-G). Contending that General Electric was bursting with monopolistic profits and secure in the knowledge that it would receive the major share of lamp sales, the Government claimed that General Electric could afford an extensive program of market development in which the public was sold lighting rather than General Electric lamps (Exs. 1994-G, 1971-G and 1995-G). Thus General Electric, from its dominant position, so it is contended, could give additional help to the utilities load building activities by discouraging the production and sale of lamps which consumed less electricity, such as promoting higher wattage lamps in preference to smaller lamps, withholding production of small three-way lamps (Exs. 261-G, 268-G, 270-G, 271-G, 272-G and 1983-G) and the coordination of an extensive advertising campaign (Exs. 1941-G, 1942-G and 1948-G).

General Electric argued that against its record of increased efficiency and lowered prices, the Government's charge of "mulcting" the public is incongruous. It claimed that it always had a natural cooperation with public utilities to develop the lighting industry since utilities were important distributors of lamps in the early days, although the role has become relatively unimportant in later years. Cooperation between the two was natural and both have worked to improve lighting facilities resulting in making available to the American public more, better and cheaper light than anywhere else in the world. It denied a policy or practice of withholding the promotion of low wattage lamps by agreement or otherwise and claimed that higher wattage lamps have been used in increasing numbers over the years because of the higher degree of illumination and efficiency secured and that it has been General Electric's policy to offer the most efficient lamp at the lowest cost, both in lamp cost and current consumption. It asserted that wattage rating rather than lumen rating was a factor in increasing lamp efficiency and reducing the light cost and was advantageous to the customer in advising as to the amount of current used rather than the unfamiliar lumen rating.[40] It claimed that the low-wattage three way lamp was not immediately available due to initial technical difficulties of production and inefficiency of the lamp with a relatively small market. The price reductions complained of were claimed to have resulted from the reduction in the costs of manufacture due to employment of mass production methods and the fact that the lamps reduced in price constituted the bulk of General Electric's lamp sales. Finally, General Electric argued, that it is inconceivable that:

"It is a violation of the Sherman Act to seek to maintain a favored position with and retain good will of important customers and distributors and to try in legitimate ways to sell them more of your own products."

 There may be an anti-trust case against the public utilities and General Electric in this particular phase, but the proofs developed by the Government fail to do other than to prove that General Electric pushed an aggressive advertising campaign and sought to utilize all avenues by which its lamp products could be distributed and sold. The early history of the lighting industry shows that utilities were important distributors of incandescent lamps and in a number of cases were the only source of such lamps. As the industry grew and lighting fixtures were gradually standardized, it was but a natural evolutionary process for General Electric as well as other lamp producers to seek to continue relationships whereby their products would be more extensively employed. It would be lacking in realism, however, if it were supposed that General Electric or the public utilities were conducting their business for purposes other than to create the maximum demand for their respective products. The most that the Government has shown in this section under consideration is that officers and employees of General Electric endeavored to sell a maximum number of lamps. If the lamps General Electric sold induced the sale of additional electrical current by the public utilities as the Government suggested, there is still no convincing proof offered by it that the anti-trust laws were violated or that this was a design that gave General Electric its monopoly in the industry. The proofs fail to show any combination with public utilities to restrain trade and competition, and evidence only the concomitants of an aggressive policy of seeking market outlets.

## Suppression of Research and Development

The Government claimed that General Electric carried on a calculated policy to suppress and restrict research activities upon the part of "B" licensees. It alleged that this was accomplished through the provisions of the "B" license agreements whereby they were required to cross license General Electric under all patents in any way relating to incandescent lamps for the entire life of each patent, whereas their rights to the patents they received from General Electric expired with the licenses.

---

[40] There is a further discussion on lumen rating under the heading "Deterioration of Product".

The incentive of the "B" licensees to conduct research, the Government argued, was stunted because their quotas of production could only be a very small percentage of General Electric's sales and if large sums were spent upon lamp research General Electric would benefit many times from the results as against the advantages that would accrue to the "B" licensees. In the case of Westinghouse, General Electric stood to derive three times the benefit that Westinghouse itself could enjoy. The Government further claimed that General Electric's alleged program of buying up patents and patent rights; acquiring such rights from foreign lamp manufacturers even though most of the patents were not used; and the practice of filing as many patents as possible including obviously trivial ones was for the express purpose of preventing others from having fields of research to explore and develop in the lamp business. It was said to be also designed to intimidate other manufacturers from instituting new research for fear of bringing on themselves vexatious patent litigation.

Exhibit 197-G is relied upon by the Government in supporting its claims. This is a letter from Mr. Eyre, Counsel for Tungsol, written on September 13, 1935, to Mr. Harper, president of that company, in which he says, among other things:

"5. * * * Mr. Reed said that for fifteen years no question had ever come up with reference to this cross-licensing, and that General Electric Company had never obtained any benefit from it. (Naturally enough, since a lamp licensee had no inducement to develop new inventions if General Electric Company can freely take whatever they develop.)"

The Government pointed out that both Mr. Walter E. Poor (R. 3446) and Mr. Edward J. Poor (R. 3471) testified to the effect that the research efforts of Sylvania were not expanded because they felt that the patents to be procured thereby would be of little value to their company, one saying the reason therefor was that "we would have to give 80 percent of the rights of the patent to General Electric", and the other that it was because "the cross license agreement provided that we give the patent rights to the rest of the industry without any recompense for it". Exhibit 1854-G

was offered by the Government to show that Mr. Harrison wrote to Mr. Kewley concerning the small inducement of Westinghouse to expend large sums on research and that he said:

"Westinghouse has never done and probably will never do their real share of the work in these fields. They can't afford to because we would reap three-fourths of their purely creative work. Hence, they can only afford to do enough and at such places as will make a showing before their utility customers."

General Electric referred to Exhibit 2249-G as listing more than 50 Westinghouse patents in force on January 27, 1941, which were then being used by Westinghouse in the manufacture of 62 types of lamps covered by the exhibit. Forty to fifty Westinghouse patents were in use by General Electric under the renewed Westinghouse license. Exhibit 227-G is a list dated June 1, 1940 containing patents issued to Westinghouse between April 10, 1923 and May 21, 1940, and enumerates a total of 403 patents, 221 of which Westinghouse used in the manufacture of lamps. During the years 1928 to 1940, 178 applications were filed by Westinghouse and General Electric argued that this is conclusive evidence that a large amount of research work was done by Westinghouse while its renewed license was in force. Exhibit GE-259 contains copies of 33 Sylvania patents on incandescent lamps and all except two were issued to it after it renewed its contract in 1933. General Electric pointed to the testimony of Mr. Walter E. Poor that Sylvania established an engineering development and research department in 1920 and as much as $130,000 was spent for those purposes in connection with incandescent lamps in 1936. (R. 3444). Exhibit 2306b-G shows that from 1934 to 1939 Sylvania spent over $250,000 alone in research as distinguished from engineering development. Exhibit 149-G notes further Sylvania patent activity. General Electric referred to the testimony of Mr. Walter E. Poor (R. 3319-3320) as diluting the Government's quotations from other parts of his testimony that Sylvania had little incentive toward research because of the cross-licensing arrangement. General Electric also pointed to the testimony of Mr.

858

Dwight H. Marsh of Consolidated as to its engineering organization and the developments that company had made (R. 3127–3128); and referred to the testimony of Mr. Rieben, President of Tungsol, and its activity in research and development work (R. 3595–3605) as well as to that of Mr. Gast of Chicago Miniature who told of the development work of his company on very small lamps used by the medical profession in brain surgery (R. 3667–3671). General Electric stressed that the same provisions of the cross licenses were contained in the original "B" licenses and were before the Attorney General in 1922 and contended that the arrangement was clearly reasonable in view of the fact that "B" licensees had the right to cancel their licenses at will on only six months' notice to General Electric whereas General Electric had no such right (Ex. 29–G at p. 126, Ex. 30–G at p. 177).

 General Electric alone spent between 25 and 30 million dollars in research from 1927 to 1940 (R. 2666). Of course this dwarfs all other efforts by comparison and renders incentive in other companies a question fraught with speculation. But in the light of the activity in research and development shown by Sylvania, Tungsol and Consolidated, the proofs of the Government are left in a position where they can be a basis only for conjecture as to how far, if any, the cross-licensing provisions of the "B" licensees deterred these licensees from expanding research and engineering development. However, the vice lies in the clause establishing a quota on sales of the incandescent lamp. This placed the "B" licensees in such a position that with their income circumscribed to a given fraction of General Electric sales, they could not support expenditures necessary to operate extended research and engineering development projects. It is this condition which restricted the growth of the "B" licensees and promoted the domination of General Electric over the incandescent lamp industry.

The other features raised by the Government in this section concerning the threat against other manufacturers of vexatious litigation and aggregation of patents has been dealt with under the heading of "Patents".

Fluorescent License

The argument in this connection revolves around the following portion of a license to Consolidated, dated July 1, 1939:

"(B) In the event the incandescent lamp license agreement between the parties hereto, dated * * * July 1 * * *, 1933, shall be terminated for any reason whatsoever, this present agreement shall terminate simultaneously therewith." Exhibit 2167-G, pp. 7238, 7239.

- The Government contended that the effect of this provision was to grant a fluorescent license only on condition that Consolidated should continue to submit to the restrictive provisions of the incandescent license, and thereby to extend the incandescent lamp monopoly of General Electric. Paragraph 313 of the amended complaint charges that the termination provision of the license required

"Consolidated to renew its incandescent lamp license with General Electric, in such terms as the latter might be willing to grant, if Consolidated were to retain its fluorescent lamp license after 1944." General Electric argued that the issue now presented is different from the issue tried. However, no objection is made to the presentation of the issue now raised, and whether or not this issue is embraced by the allegation of the complaint is deemed immaterial.

The Government relied upon United States v. Paramount Pictures, D.C., 66 F. Supp. 323, Id., D.C., 70 F.Supp. 53 (not ruled upon by the Supreme Court when the instant case was briefed), which condemned "block booking" of motion pictures, and Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852, which applied the same principle to the use of one patent monopoly to exploit another patent monopoly. A collection of cases on this principle was noted by this court in the case of HPM Development Corp. v. Watson-Stillman Co., D.C., 71 F. Supp. 906. General Electric denied the alleged purpose claimed by the Government and sought to substantiate the denial with testimony showing its intent, and claimed that the incandescent license had no application to any lamps except those which were subject to its patent monopoly. Fur-

thermore, it claimed that if the Government's argument were correct it would be unlawful for any licensor to grant a license on more than one patent without providing that the licensee could terminate the license as to any one or more patents separately.

■ The contention of General Electric does not overcome the plain meaning of the provisions of the license to Consolidated for it seems clear that the continuation of the fluorescent lamp license depended upon a continuation of the incandescent electric lamp license. This is an enlargement of the patent monopoly and violative of the Sherman Act or as it was stated in United States v. Paramount Pictures, 334 U.S. 131, 157, 68 S.Ct. 915, 929:

"That enlargement of the monopoly of the copyright was condemned below in reliance on the principle which forbids the owner of a patent to condition its use on the purchase or use of patented or unpatented materials. See Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 459, 60 S.Ct. 618, 626, 84 L.Ed. 852; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 491 [315 U.S. 788], 62 S.Ct. 402, 404, 86 L.Ed. 363; Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 665, 64 S.Ct. 268, 271, 88 L.Ed. 376."

The immediate defect of the fluorescent license with the annexed condition is in the implied threat which it held. It had a coercive effect in persuading the licensee to hew to the General Electric incandescent lamp program under penalty of losing fluorescent rights. In this respect, the restrictive condition brought compliance to General Electric exactions and served as one of the many means to maintain the balance in the industry which it dominated.

### Argon Gas

The Government charged that "General Electric's argon gas activities tend to prove a purpose to monopolize and General Electric's great power". It claimed that as a result of agreements and understandings between General Electric and the principal suppliers of argon gas in the United States, General Electric controlled the sales of argon gas and forced lamp manufacturers to look to General Electric for their supply of high ratio argon. This resulted in arbitrary and non-competitive price figures and as the supplier of high grade argon to its incandescent lamp licensees, no incentive was left to independent producers of argon gas to maintain high ratio argon production facilities to supply unlicensed lamp manufacturers.

General Electric argued that the Government's contentions are based upon a failure to grasp the peculiar nature of the business of producing argon and the history of General Electric's connection with it. It denied any unlawful understanding with independent argon producers and contended that it exercised no restraint upon the production and sale of argon to anyone wishing to purchase it. It stated that a full line of argon gas may be purchased from independent producers and pointed to the fact that Sylvania effected such purchases. In reference to the charge that it sought to limit the independent producers to low ratio argon by means of an "understanding" making up for that difference by purchases of nitrogen and oxygen, General Electric argued that the Government's evidence failed to show any unlawful purpose. On the contrary, it asserted that the long time relationship with the independent gas producers plus the fact that it was having some patent infringement difficulties with one company persuaded it to arrange for the loss of business due to the entry of General Electric into the field contending that "the Sherman Act does not require disregard of the amenities in commercial dealing". General Electric argued that its entry into the manufacture of argon was due to a desire to produce a better and cheaper gas, which it has done, and that no law requires it to sell to anyone it does not desire as a customer where there are independent producers in the field.

Argon, a gaseous element extracted from the air, is used in incandescent electric lamps in combination with different amounts of nitrogen to prevent vaporization of the tungsten lamp filament. Different proportions of argon and nitrogen are used according to the arcing tendencies of a lamp of a particular wattage, the percent-

age of argon to the total of argon plus nitrogen constituting the "ratio" of the gas. The quality of the gas has reference to its purity, i. e., freedom from other elements. Until 1933, when the basic patents controlling the production of argon gas expired, General Electric purchased all of its supply from Air Reduction Company (Airco) and Linde Air Products Company (Linde). General Electric had been experimenting with the production of argon seeking a means of producing a cheaper and higher quality product. This was perfected and upon expiration of the basic argon gas patents owned by Airco in 1933, it commenced the manufacture of argon gas for its own purposes. Prior to this period Airco was under contract to sell exclusively to General Electric on the theory that sales of argon to unlicensed users of General Electric's gas filled lamp patents might involve it in claims of contributory infringement with General Electric since the latter owned certain patents concerning the use of argon gas in incandescent electric lamps (R. 2504–2511, Ex. 352-G). Once General Electric had developed high ratio argon gas, its licensees sought to purchase argon from it (Exs. 359-G–362-G). However, General Electric sought to maintain friendly relations with Airco. Airco still claimed infringement of its patents and was a General Electric customer in other lines (Exs. 354-G, 355-G, 356-G). An arrangement was entered in 1937 whereby General Electric would supply high ratio argon to the "B" licensees and urge them to continue purchasing low ratio from Airco. General Electric would purchase oxygen and hydrogen in an amount sufficient to make up for the loss of the argon business formerly given to it by General Electric (Exs. 367-G–369-G).

The Government makes much of the use of the words "assign" and "understanding" in Exhibit 368–G. General Electric insisted that "consign" was meant where "assign" was used but there is no real significance in the Government's contention. Similarly General Electric attributed a different interpretation to the word "understanding". There are other exhibits which are as obscure and suspect. The Government sought to induce the belief that General Electric designed its own manufacture of pure argon gas and its replacement of the value of its business with Airco as a device to leave independent lamp manufacturers with nowhere to obtain pure argon. A suspicion of this arises from what proof the Government has submitted. But no illegality appears in the acquisition of General Electric's position with respect to the production and sale of its argon gas. There is a sufficient showing that Airco at least attempted to compete with General Electric in selling to Sylvania even though it fixed its price identically with that of General Electric (Exs. 373-G, 374-G and 379-G). The square cut evidence that Airco was rendered impotent to sell argon gas to others or that it refused to sell to any independent lamp manufacturers is completely lacking and if this were present it should have been produced if not from Airco because of its alleged dependency upon General Electric, then certainly from one or more of the allegedly injured independent lamp manufacturers. The proofs are at most in such a state of balance that there is not a sufficient preponderance that General Electric illegally dominated the argon gas industry or that its control of argon arose to the level of a by-product of a monopoly and the Government's contentions in this regard must fall.

### Suppression of Trade by Domestic Licensees

### (A) Competition Between General Electric and Westinghouse Eliminated.

The Government charged that in furtherance of the maintenance of General Electric's monopoly competition between Westinghouse and General Electric was eliminated in that: (1) General Electric required Westinghouse to follow the agency system; (2) the provisions of the licensing agreement relating to price fixing were in effect a bilateral agreement between Westinghouse and General Electric to fix prices; (3) there was agreement between the two organizations not to compete in the solicitation of agents; (4) they eliminated competition between themselves and others in the sale of Christmas tree

lamps; (5) they eliminated competition between themselves and large consumers and distributors; and (6) they combined to eliminate non Mazda competition.

Under the first claim the Government asserted that the proofs show that General Electric and Westinghouse followed General Electric's sales rules and used identical agency forms, usually printed on the General Electric Press (Exs. 1169-G–1197-G, 1201-G–1259-G, 1260-G–1299-G· and 1305-G–1372-G). It claimed that General Electric's executives both orally and in writing admitted that they understood that Westinghouse was required to use the agency system and the forms and rules under which it was operated (R. 781, 857, 862, 1225–1226, Ex. 1377-G). It argued that Westinghouse, under its obligation to fix the sales price of lamps to the consumer according to those of General Electric, had no choice but to follow its agency system because any other method of distribution to the consumer would have been impractical.

General Electric conceded that Westinghouse had sales rules, forms of agency appointment and purchase contracts similar to those of General Electric which were printed for it by the latter. It contended, however that Westinghouse adopted the agency system prior to 1912; that the Government brought the same contentions to the notice of the Supreme Court in the 1926 case where they were rejected and that the decision of the Court is as applicable to the contentions now raised as it was then. It claimed that the agency system had been in practice for fourteen years before the 1926 decision and that it was simply continued after the date of the new license in 1927 as a convenient manner of carrying out the license relationship between itself and Westinghouse. It argued that opinions expressed by its officers were based upon their interpretation of what the license provided and could not be admitted to vary the terms of the unambiguous written license which contained no such agreement and it denied that there was any proof of agreement outside the license or any conspiracy upon its part.

The Government contended that its charge that the provisions of the licensing agreement relating to price fixing were in effect a bilateral agreement was evidenced by the joint agreement between them on changes in sales rules, on promotional activities and on means of eliminating competition of independent manufacturers. It argued that conferences held between executives of the two companies were not merely for the purpose of giving notice by General Electric to Westinghouse of proposed changes in rules and having Westinghouse accept or reject them but rather that they were frequently held for the purpose of coming to mutual agreements on changes (R. 735 and 802–803) and to discuss sales problems; that where a situation arose wherein it was found that General Electric was not getting certain political body business because of the provisions in the sales rules, through treatment by the Supervisor and the action of both companies they came to agreement as to price, terms and conditions of sale (Exs. 2229-G and 2228-G); that there was shown an understanding upon the part of Westinghouse's Mr. Cheney of the necessity of making the "S" agency plan operate properly (Ex. 2237-G) and that there was proposed a discussion of means of meeting low price miniature lamp competition and that such discussion took place (Ex. 255-G, R. 1074). The Government urged that General Electric surrendered its freedom of action in return for Westinghouse's agreement to use the agency system, and that during 1936-1939 General Electric appointed over 200 B and A agents who did not meet the eligibility requirements (Ex. GE-36) making it necessary for it to secure a waiver in each case from Westinghouse. Had Westinghouse refused to grant such waivers the Government submitted that General Electric would have been required to give up the distributors or give notice of a change in the rules and such a continuous change in sales rules would have made apparent the fiction of the agency system. The Government referred to the mutual rights of the companies to examine each other's books and contended that the only reason for Westinghouse to examine General Electric's books was to ascertain its total sales and the prices quoted by General Electric which it contended was proof

of the fact that they were in agreement not to compete with each other.

General Electric challenged the Government's conclusion that prices were fixed as the result of a bilateral agreement with the argument that the premises on which the conclusion was based were not proved; that the Government sought to prove price fixing by showing alleged bilateral action on other matters which was neither bilateral nor conspiratorial and that the contentions were resolved in the 1926 case. It contended that Westinghouse adopted rules for sales and appointment of agents identical with its rules because it was legal for General Electric to require Westinghouse to sell at no more favorable terms and conditions of sale and to grant its agents no more favorable terms than General Electric granted its agents; that it alone determined its sales rules and policies and when it decided to make changes in them the license provided that Westinghouse was entitled to notice (Ex. 25-G, par. 21) and it was only natural for it to meet with Westinghouse to explain the proposed changes and secure a waiver of notice in order that the changes could be effected promptly or if not granted, the notice would be given. It denied that the Government proved that Westinghouse determined changes or that they were agreed upon by it and Westinghouse and submitted that the meetings were necessary to permit exchange of experience between the two organizations and discussion of the complex mechanism for marketing lamps through the many types of concerns to be dealt with if the proposed changes were to be understood and effectively carried out. It further denied joint promotional activities with Westinghouse and claimed that it solely determined its policy with regard to distribution of the D line lamps but that since the same factors were applicable in the case of Westinghouse it was natural for it to adopt a similar policy and that there was no evidence upon the part of the Government that agreement upon the principles involved arose from any wrongful intent. It contended that the mere existence of similar activities or the concurrent adoption of sound business policies by two companies with no proof of concerted or conspiratorial action would not give rise to the inference of conspiracy. It objected to Government Exhibit 2237-G, an inter-office communication by Westinghouse Lamp Sales Department, in which comment was made upon the "S" agency plan as being inadmissible against it and that in any event it claimed that it fell far short of proving unlawful participation by Westinghouse in working up the "S" agency plan. It countered that Westinghouse's right to examine its books and records was entirely reasonable as proper protection because Westinghouse's quota was based upon the volume of General Electric's sales and it would be justified in checking the basis upon which the quota was determined.

The Government reasoned that it had established an agreement between General Electric and Westinghouse to follow the same prices and the same methods of distribution and that such agreement is illegal; that even basic controlling patents did not justify a contract between a licensor and licensee that neither will sell the price fixed product to wholesalers or retailers but only to consumers through agents. It argued that the decision in the case of Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949 (where patents were absent) required the condemnation of an agreement between General Electric and Westinghouse under which the latter was required to use the agency system and the standards and terms of compensation fixed by General Electric in the absence of some right flowing from patents to enter into and perform such an agreement. It asserted that General Electric, by force of the ownership of patents, imposed upon its licensee a control of the conduct of the licensee not embraced in its patent monopoly when it required Westinghouse to employ the agency system and to use the same standards for selecting agents and for compensating them in contravention of the holding of the Court in the case of Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 456-458, 60 S.Ct. 618, 84 L.Ed. 852. It noted that since 1933 there were no patents "completely" covering the incandescent lamp and that thereafter the

patents owned by General Electric were not such as to justify the restrictions. It cited the case of United States v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 as of special significance because of its discussion of the 1926 General Electric case.

In the license agreement between General Electric and Westinghouse (Ex. 25-G) it was provided that:

"The prices, terms and conditions of sale, as at present in force, are those set forth in Schedule 'B,' and the Licensee is licensed to sell such lamps only in accordance with said Schedule, and only under the Licensor's form of contract, i. e., the 'Contract for Purchase of Incandescent Lamps' set forth in Schedule 'B' (or another contract form containing equivalent provisions and no provisions inconsistent therewith) and in compliance with the General Sales Rules in said Schedule * * *."

This provision is practically identical with a provision that appeared in the 1912 license which was before the Supreme Court in the 1926 case, wherein the Court said:

"The contention is also made that the license required the Westinghouse Company not only to conform in the matter of the prices at which it might vend the patented articles, but also to follow the same plan as that which we have already explained the Electric Company adopted in its distribution. It does not appear that this provision was express in the license, because no such plan was set out therein, but even if the construction urged by the government is correct, we think the result must be the same."

* * * * * *

"If the patentee goes further and licenses the selling of the articles, may he limit the selling by limiting the method of sale and the price? We think he may do so provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly. * * *" 272 U.S. 476, 488, 489, 490, 47 S.Ct. 192, at page 196, 71 L.Ed. 362.

The last pronouncement upon the effect that is given to the decision on the 1926 case is to be found in the opinion of the Supreme Court in United States v. Line Material Co., 333 U.S. 287, 299–304, 68 S.Ct. 550, 556, as follows:

"That case was decided in 1926 by a unanimous court, Chief Justice Taft writing. It involved a bill in equity to enjoin further violations of the Sherman Act. While violations of the Act by agreements fixing the resale price of patented articles (incandescent light bulbs) sold to dealers also were alleged in the bill, so far as here material the pertinent alleged violation was an agreement between General Electric and Westinghouse Company through which Westinghouse was licensed to manufacture lamps under a number of General Electric's patents, including a patent on the use of tungsten filament in the bulb, on condition that it should sell them at prices fixed by the licensor. On considering an objection to the fixing of prices on bulbs with a tungsten filament, the price agreement was upheld as a valid exercise of patent rights by the licensor.

"Speaking of the arrangement, this Court said: 'If the patentee * * * licenses the selling of the articles (by a licensee to make), may he limit the selling by limiting the method of sale and the price? We think he may do so provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly.' 272 U.S. at page 490, 47 S.Ct. at page 197, 71 L.Ed. 362. This proviso must be read as directed at agreements between a patentee and a licensee to make and vend. The original context of the words just quoted makes clear that they carry no implication of approval of all a patentee's contracts which tend to increase earnings on patents. The opinion recognizes the fixed rule that a sale of the patented article puts control of the purchaser's resale price beyond the power of the patentee. 272 U.S. at page 489, 47 S.Ct. at page 196, 71 L.Ed. 362. Compare United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408. Nor can anything be found in the General Electric case which will serve as a basis to argue otherwise than that the precise terms of the grant define

the limits of a patentee's monopoly and the area in which the patentee is freed from competition of price, service, quality or otherwise. Compare Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 665, 666, 64 S.Ct. 268, 271, 272, 88 L. Ed. 376; United States v. Masonite Corp., 316 U.S. 265, 277, 278, 280, 62 S.Ct. 1070, 1077, 1078, 1079, 86 L.Ed. 1461; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas. 1918A, 959.

"General Electric is a case that has provoked criticism and approval. It had only bare recognition in Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 456, 60 S.Ct. 618, 625, 84 L.Ed. 852. That case emphasized the rule against the extension of the patent monopoly, 309 U.S. at page 456, 60 S.Ct. at page 625, 84 L.Ed. 852, to resale prices or to avoid competition among buyers. 309 U.S. at pages 457, 458, 60 S. Ct. at pages 625, 626, 84 L.Ed. 852. We found it unnecessary to reconsider the rule in United States v. Masonite Corp., 316 U. S. 265, 277, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461, although the arrangement there was for sale of patented articles at fixed prices by dealers whom the patentee claimed were del credere agents. As we concluded the patent privilege was exhausted by a transfer of the articles to certain agents who were part of the sales organization of competitors, discussion of the price fixing limitation was not required. In Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 398, 67 S.Ct. 416, 419 [424, 91 L.Ed. 374], where a suit was brought to recover royalties on a license with price limitations, this Court refused to examine the General Electric rule because of the claimed illegality of the Katzinger patent. If the patent were invalid, the price fixing agreement would be unlawful. We affirmed the action of the Circuit Court of Appeals in remanding the case to the District Court to determine the validity of the patent. The General Electric case was cited with approval in Carbice Corporation of America v. American Patents Development Corporation, 283 U.S. 27, 31, 51 S.Ct. 334, 335, 75 L.Ed. 819. Other courts have explained or distinguished the General Electric rule. As a reason for asking this Court to reexamine the rule of the General Electric case, the Government states that price maintenance under patents through various types of agreements is involved in certain pending cases. Furthermore, the point is made that there is such a 'host of difficult and unsettled questions' arising from the General Electric holding that the simplest solution is to overrule the precedent on the power of a patentee to establish sale prices of a licensee to make and vend a patented article.

"Such a liquidation of the doctrine of a patentee's power to determine a licensee's sale price of a patented article would solve problems arising from its adoption. Since 1902, however, when Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058, was decided, a patentee has been able to control his licensee's sale price within the limits of the patent monopoly. Litigation that the rule has engendered proves that business arrangements have been repeatedly, even though hesitatingly, made in reliance upon the contractors' interpretation of its meaning. Appellees urge that Congress has taken no steps to modify the rule. Such legislative attitude is to be weighed with the counter-balancing fact that the rule of the General Electric case grew out of a judicial determination. The writer accepts the rule of the General Electric case as interpreted by the third subdivision of this opinion. As a majority of the Court does not agree with that position, the case cannot be reaffirmed on that basis. Neither is there a majority to overrule General Electric. In these circumstances, we must proceed to determine the issues on the assumption that General Electric continues as a precedent."

Regardless of any contention that the 1927 license as practiced prior to 1933 exceeded the authority given it by the Supreme Court in the 1926 case as appears to be urged by the Government, it is beyond any doubt that such authority rested upon the patents found by the Court to be basic and controlling in that case. It has been found herein that such patent control expired in 1933 and with it went any right to

impose the method of sale and price restrictions theretofore considered inherent in General Electric's patent monopoly. Thereafter no legal basis existed for even the joint action and arrangements conceded by General Electric to have been practised. Thereafter General Electric and Westinghouse were no longer licensor and licensee but two competitors operating under forms condemned by the anti-trust laws.

General Electric argued that it cannot seriously be urged that at the time of the execution of the 1927 license that the contemplated continuation by it and Westinghouse of a practice which had just been approved by the Supreme Court as entirely legal was a conspiratorial act nor could the restrictions imposed by General Electric as licensor, similarly approved, be said to be evidence of conspiracy. On the contrary, the precariousness of the future for the basic and controlling patent position of General Electric was foreseen by it in approximately 1927 and it thereafter laid its plans so that it should achieve the same monopoly control, dominance and reward after the expiration of its basic patents as it had enjoyed theretofore. This resolves in the Government's favor the first two elements of its charge hereunder.

In connection with the third element of the Government's charge that competition was eliminated between General Electric and Westinghouse because there were agreements between them not to compete in the solicitation of agents, it pointed to the license agreement which provided that Westinghouse should not appoint agents, persons or companies whom General Electric affirmatively disapproved as being irresponsible representatives (Ex. 25-G, pp. 81-82); and that there was a mutual limitation upon the appointment of agents when the agencies were terminated for cause. In the case of a General Electric agent, his agency could not be renewed for a period of six months and if he had been a Westinghouse agent, General Electric would not appoint him for a year while Westinghouse would not appoint an agent whose appointment General Electric had cancelled in less than a year. Reports by both companies were made to the Super-

visor so that control over reappointments could be maintained by him (Exs. 1795-G–1797-G, 1800-G, 1801-G, R. 872). It further contended that neither General Electric nor Westinghouse would solicit the other manufacturer's business under the terms of the WR agency, (Exs. 1791-G, 1792-G); that a number of automotive concerns holding DA agency appointments as well as with other lamp manufacturers, were selected by representatives of General Electric and Westinghouse for appointment under WA contracts with the respective concerns (Ex. 1668-G); and that on occasion agreements not to compete were made between district managers of General Electric and Westinghouse, applying only to their districts, and an instance was cited in which Westinghouse had "an understanding with our competitor in this particular district extending the moratorium on WA solicitations of competitive accounts to a period of 18 months, in other words they can take an 'A' agent of ours but cannot offer him a WA appointment until 18 months after securing the contract". (Ex 1790-G).

General Electric insisted that there was vigorous competition in the solicitation of agents between it and Westinghouse and that the record showed that a state of facts existed which was contrary to the Government's contention; that since both companies operated under the same rules as provided in the license they sought similar outlets which met the requirements of the rules and in the endeavor by each company to take away the agents of the other, vigorous competition was brought about as attested by the frequent turn-over of agents especially on the retail level (Exs. GE-34A, GE-34B and GE-35). It contended that the Supreme Court in the 1926 case found no vice in the identical provision contained in the 1912 license that Westinghouse was forbidden to appoint a person as agent of whom General Electric did not approve as not constituting a direct restraint of free competition and was not invalid upon its face (Ex. 1-G, par. 13). In justification of the one year and six months' suspension rules relating to the reappointment of agents after cancellation of their appoint-

ments for cause, General Electric argued that they were reasonable policy regulations dictated by General Electric's independent business judgment, and not in the nature of a conspiracy to "blacklist" such agents; that Westinghouse adopted a similar policy entirely independently; and that the only function of the Supervisor was merely to report to the company involved that an application for an agency fell within the one year rule where that appeared under the policies of the companies as they had been separately stated to him. It contended that there was no competent proof of the charges that it agreed with Westinghouse not to compete for particular types of agency appointments and questioned the admissibility of the exhibits offered by the Government as not binding upon it, nevertheless, insisting that when the letters were read in their entirety they carry no implication of illegality and are entirely within the powers contemplated by the license.

 After 1933 there was no justification for the joint action which General Electric admitted took place between it and Westinghouse in connection with the solicitation of agents. General Electric was without authority to compel Westinghouse to submit for its approval, as to responsibility, candidates for agency appointments. In the Supervisor structure, viewing the situation in the light in which General Electric puts it, it is found that those agents who were removed for cause by either company, were suspended for reappointment with either company for a year. There is no question that, however independently this arrangement was contrived, the observance of the rule and the operation of the mechanism resulted in agreement by the two companies out of which flowed a barrier to competition at least for the appointment of such disqualified agents. But the Government's proofs in connection with the charge that neither General Electric nor Westinghouse would solicit the other manufacturer's business under the terms of the WR agency; the selection by representatives of both companies of a number of automotive concerns holding DA agency appointments for appointment under WA contracts; and the suggestion of

an understanding between competitive district managers of a number of automotive concerns holding DA agencies for appointment under WA contracts and the suggestion of an understanding between competitive district managers for an 18 months' moratorium on WA solicitations are relatively rare and are not convincing that substantial agreement not to solicit occurred in these suggested areas.

In the fourth category the Government charged that General Electric and Westinghouse eliminated competition between themselves and others in the sale of Christmas tree lamps. Practically all such lamps manufactured in the United States were produced by General Electric and Westinghouse. They were distributed to lamp string manufacturers under an agency plan denominated "XA". When this plan was adopted in 1934 General Electric distributed to 10 of the 15 manufacturers in the United States. Exhibit 21-G (also offered as Exhibits GE-194 and GE-195) is a chart showing the quantity and net receipts for Christmas tree lamps manufactured by General Electric, Westinghouse and other manufacturers, as well as imports into the United States in the years 1923 to 1940, inclusive. The Government pointed to intensified competition with Japanese imported lamps in 1932 and the substantial growth of this type of lamp business thereafter. The Government charged that under the direction of Mr. Potter of General Electric in 1933 General Electric and Westinghouse combined their efforts to promote the distribution of Mazda Christmas tree lamps at prices fixed by General Electric to the exclusion of all other competition by securing so-called "commitments" from chain stores that they would handle only the Mazda line of Christmas tree lamps (R. 2328-2329, R. 2294-2296, Exs. 1812-G, 1814-G). The XA dealers were required to sell only to jobbers, chain stores and department stores (R. 2274, Exs. 1234-G, 1817-G). The Government charged that despite testimony that General Electric did not designate resale prices to retailers they were suggested as expressed in Mr. Potter's letter (Ex. 1825-G). It also contended that the inference that Westinghouse

looked upon the XA plan as a means of fixing resale prices is justified from a telegram written by Mr. Cheney of Westinghouse in which he suggested that an XA contract should be granted so as to control the resale price (Ex. 1477-G).

In denying the Government's charge that General Electric and Westinghouse eliminated competition between themselves and others in the sale of Christmas tree lamps, General Electric called attention to Mr. Potter's explanation of Exhibit 1814-G, which it is claimed precluded any inference that it had agreements with XA agents that it would not appoint other XA agents. It claimed that Exhibit 1812-G was written in 1933 and could not have been describing the XA plan for that arrangement did not come into existence until the following year, 1934. General Electric contended that the Government was not justified in strictly construing Mr. Potter's use of the word "commitment" as "agreement", it claimed that in the early nineteen thirties it and Westinghouse were the only manufacturers of Christmas tree lamps in the United States and that the reference to Westinghouse in Exhibit 1812-G without more is no proof of conspiracy (R. 2265, Exhibits GE-194 and GE-195). It was claimed not to be evidence of an agreement or understanding between General Electric and Westinghouse, existing at that or any other time. General Electric denied that it prepared any "white list" of concerns to whom XA dealers could sell. It contended that it had a right to designate the classes of concerns to which its agents could sell and that the designation of a partial list of concerns coming within those classes was consistent with the XA agency plan. It insisted that it was intended merely to simplify the work of XA agents in determining whether concerns qualified within the revised definitions of jobbers, chain stores and department stores. It denied that there was proof in the Government's case of any illegal resale price maintenance. It suggested resale prices but never took any steps to enforce any such prices other than to attempt to persuade retailers to sell at that price, which it contended was entirely legal. It claimed that Exhibit 1825-G demonstrated this for it referred to some

retailers who had decided not to sell at the suggested prices. Exhibit 1477-G, it claimed is not only inadmissible as against it but obviously contains an erroneous use of the word "resale" by a Westinghouse employee.

The letter dated June 28, 1933 (Ex. 1812-G) from Mr. Potter, then Eastern Sales Manager of General Electric, to all division managers described a projected Christmas tree lamp campaign as follows: "Christmas Tree Lamp Plans 1933

"To All Division Managers:

"We regret the delay in forwarding to you definite word about our Christmas Tree plans for this coming season. A great many complicated problems had to be solved before any decision was made.

"However, after even considering handling all accounts directly ourselves, we have come to the conclusion that this business, at least this year, can best be served by placing it with one or two of the more reliable outfit manufacturers.

"Therefore, the General Electric Company will probably make XPM contracts with the Noma Electric Company and the Royal Electric Company.

"Plans of these two companies already under way indicate that their prices should be very competitive with our foreign competition, and also provide more than a fair margin of profit for wholesalers and retailers.

"This fact, together with the rather definite commitments we understand have been made by the largest variety chains like Woolworth, Kresge, Grant, etc., to handle exclusively Mazda strings and lamps, or else to actively push Mazda and supply Japanese only as a last resort, together with the fact that General Electric Supply and Graybar will handle only Mazda—are barometers which point to a very successful year for Mazda Christmas Tree lamps.

"While the large wholesale chains and many of the larger independents, as well as the large variety chains have been lined up for Mazda lamps, there are, however, many smaller independent jobbers, small variety and drug chains, department stores and public utilities which as yet have not been approached. These groups we hope will be

contacted by you as soon as possible and very strongly urged to wholeheartedly endorse the Mazda lamp program—at least they should be sold on not committing themselves for Christmas Tree lamps and string business until the Noma Company plan is presented to them.

"In talking with these groups you may wish to comment on the following:

(1) The low profit on foreign made lamps.

(2) The unsatisfactory experiences from both the profit and good will angle experienced by concerns which handled foreign lamps last year.

(3) The fact that we will publicize and advertise Mazda Christmas Tree lamps this year, to a much greater extent than ever before.

"If you have any trouble selling the Mazda idea to any important jobbers or others, please advise us so we can give all the assistance possible from Nela Park.

"Just think of the opportunity before us—General Electric Company and Westinghouse, as lamp manufacturers, Noma Electric and Royal Electric, as outfit manufacturers; General Electric Supply, Graybar and Westinghouse Electric Supply, as jobbers (as well as many independents already declared for Mazda) the largest and most important variety chains and, with your help, a large percentage of the independent jobbers, smaller variety and department stores and public utilities—all for a Mazda Christmas Tree plan this year.

"More information will be sent soon. Meantime, let's put Mazda back on the Christmas Trees this year."

From this plan the XA Christmas tree lamp agency system developed in 1934 and was followed by Westinghouse. It aimed at the Japanese competition and became a highly successful exploitation of the Christmas tree lamp.

■ The Government's conclusion that General Electric and Westinghouse combined their efforts to promote the distribution of "Mazda" Christmas tree lamps at prices fixed by General Electric to the exclusion of all other competition, under the scheme suggested by it, is not sustained. The obtaining of so-called "commitments"

does not seem important here and the proof that General Electric and Westinghouse fixed resale prices is insufficient to show other than "suggestions" as to those prices.

■ The fact is that the Christmas tree lamp campaign was so successful that General Electric could not fill the demands of the trade and as lately as 1939, Japanese competition had not been crowded out. Under these circumstances, the question presents itself—was Westinghouse, the only other major domestic manufacturer of these lamps, free to compete normally in the market? The answer must be in the negative because it was restrained after 1933 by its 1927 license from General Electric as to price, the number of lamps it could manufacture, and, to the extent of disapproval by General Electric, of its outlets for distribution. An illustration of how this worked is furnished in Exhibits 1821-G to 1824-G, inclusive. It appears therefrom that on June 14, 1939 Moore-Handley Hardware Company of Birmingham, Alabama, wrote to Westinghouse advising that it was a customer of Good-Lite Electric Manufacturing Company of Bridgeport, Connecticut, and that it desired to purchase Westinghouse Mazda Christmas tree lamps from that firm. It could not because Good-Lite carried only General Electric Mazda and Japanese lamps. It therefore solicited Westinghouse to attempt to stock Good-Lite with Westinghouse lamps as it preferred to carry a complete Westinghouse line. Westinghouse replied on July 3, 1939 that (Ex. 1824-G)

"With reference to your inquiry as to the possibility of getting Christmas Tree sets with Westinghouse lamps from the Good-Lite Electric Manufacturing Company, Bridgeport, Connecticut:

"We have been handling this matter with our Executive Office and regret very much that we have been unable to make these arrangements.

"Our entire production of Christmas tree lamps is being sold to the following concerns:

> Noma Electric Corp.
> New York City
> New York Merchandise Co.
> New York City
> Rayman Mfg. Co.
> Brooklyn, N. Y.

"We are advised that the entire output of the Good-Lite Electric Manufacturing Company is equipped with G. E. lamps."

In an interdepartmental communication (Ex. 1823-G) the same information was developed with the statement that Westinghouse regretted its inability "to solicit the business of Good-Lite Electric Manufacturing Company, but we are unable to furnish any additional quantity of lamps". It appears clear, therefore, that General Electric and Westinghouse were in combination to the extent that trade and competition were restrained between them in the United States and that this affected the supply demanded by the market in Christmas tree lamps.

As to the fifth charge in this area the Government claimed that General Electric and Westinghouse eliminated competition among themselves and large consumers and distributors. It contended that there was an agreement between them and automobile manufacturers not to solicit automobile dealers for the sale of miniature lamps in return for an agreement upon the part of the manufacturers to purchase General Electric or Westinghouse lamps or to follows the prices set by General Electric in the sale of miniature lamps purchased from other companies. It submitted that such agreement was spelled out from the course of conduct. It referred to Exhibits 1770-G, 1770a-G and 1771-G, inter-sales department correspondence written in 1934, as demonstrating that General Electric refused to consider the appointment of a General Motors dealer as a distributor since to do so would be to jeopardize its cordial relations with General Motors. "Also a few cases of this type will result in forcing the General Motors Chevrolet Company to readjust its billing discounts on lamps to its dealers to a point where they could be competitive with our DB proposition." Correspondence written in 1935 was offered to show that General Electric worked out a price schedule with Ford in line with that followed by General Electric even though many of the lamps sold by Ford were manufactured by Tungsol and General Electric refused to appoint Ford dealers as distributors (Exs. 1772-G, 1774-G). In 1939 a communication from Westinghouse registered the fact that we will not solicit or accept for appointment any distributor or agent of Ford automobiles" (Ex. 1775-G). In 1938 Westinghouse wrote Packard Motor Car Company (Ex. 1480-G) explaining its distribution plan of miniature lamps and that if it purchased lamps from Westinghouse on a PMD contract it could set its own discounts whereas if its dealers operated on a DB or DA contract they would be obliged to adhere to the regular Mazda lamp jobbers policies for resale. In a 1938 interdepartmental communication (Ex. 1481-G) within Westinghouse Mr. Conklin, Manager of the Automotive Products Sales, wrote concerning the problem of getting Chrysler Company upon the same basis as Ford Company saying:

"It is hard for me to believe that Chrysler will adhere to our standard resale discounts inasmuch as at present on our competitors' products they are allowing as much as 58% discount." In 1939 in another interdepartmental communication within Westinghouse (Ex. 1836-G) the author expressed himself to the effect that:

"if we are able to secure the Miniature lamp business of the Chrysler Parts Division, I am confident we will be able to regulate their resale schedule."

General Electric claimed that the only evidence offered by the Government to sustain its charge that it and Westinghouse agreed with automobile manufacturers not to solicit automobile dealers for the sale of miniature lamps in return for agreements by the manufacturers to purchase General Electric lamps or agreements by the manufacturers to follow General Electric prices on lamps purchased from other companies were some instances in which General Electric did not appoint automobile dealers as distributors of General Electric miniature lamps. It asserted that it did not appoint retail concerns as agents in the miniature lamp field (R. 751). Automobile dealers thus were not eligible for agency appointments (Ex. 1772-G), but miniature lamps including automotive lamps, were distributed by General Electric agents to the trade for resale and thus automobile dealers handled General Electric as well as other lamps although not as agents. It denied any understanding or agreement between

it and any automobile manufacturer with respect to the solicitation or appointment of agents or distributors or with respect to the price at which lamps were to be resold and contended that the Westinghouse letters were inadmissible against it.

■ There is no convincing evidence that there was an agreement between General Electric, Westinghouse and automobile manufacturers not to solicit automobile dealers for the sale of miniature lamps as consideration for an agreement upon the part of the automobile manufacturers to purchase General Electric or Westinghouse lamps or to follow the prices set by General Electric in the sale of such lamps. General Electric did not appoint automobile dealers as miniature lamp agents but confined this form of distributorship to manufacturers, jobbers and wholesalers. Westinghouse policy in respect to automobile lamps was identical with that of General Electric pursuant to the license. The correspondence of both General Electric and Westinghouse which underlies the Government's contentions, at most, indicates an effort upon the part of both to persuade purchase of Mazda lamps and to adhere to discounts which would in effect fix prices. After 1933, beyond the invalid relationship between General Electric and Westinghouse which suppressed competition, no agreements as alleged by the Government between them and automobile manufacturers have been established by its proofs.

■ The Government charged that General Electric had agreements with large wholesale lamp dealers, both in the miniature and large lamp fields that they and General Electric would not compete with each other in the solicitation of retail dealers. Attention was called to agreements between General Electric, and Graybar Electric Company and General Electric and General Electric Supply Corporation, and their amendments (Exs. 1783-G–1789-G), correspondence (Exs. 1779-G–1782-G), and the testimony of Mr. Boynton (R. 755). The agreements provided a list of contracts which were to be dealt with directly by General Electric, General Electric Supply Corporation and Graybar Electric Company. If through error any of the contracts were transferred contrary to the agreement, restitution would be made to the company that had lost the contract by the transfer of an equivalent amount of business to it. The correspondence was offered to show that such a loss had occurred to Graybar and how restitution was made therefor. The arrangement with Graybar was attacked by the Government as eliminating competition in that Graybar, a large wholesale organization doing business on a national scale, is a B agent of General Electric, and that General Electric Supply Corporation, a wholly owned subsidiary of General Electric, also acting as a nation wide wholesaler, is also a B agent (R. 754).

In connection with the Government's charge that General Electric had agreements with National Carbon Company, Graybar Electric Company and General Electric Supply Corporation that the latter two would not compete with each other in the solicitation of retail dealers, it claimed that they sold as its agent its lamps and "Eveready" lamps manufactured by it. National Carbon bought lamps for installation in flashlights and it distributed replacement lamps as an agent for General Electric. Where Graybar and Supply were satisfactorily serving agents or business for General Electric, it claimed it would not disturb that business and conversely business satisfactorily served by General Electric would not be disturbed or solicited by Graybar and Supply who had freedom to compete with Westinghouse agents or other manufacturers. Since they were its agents, it contended that no competition was concerned. It had arrangements with each to service large purchase contractors listed as hotels, industrial companies, railroads, etc., all of whom buy General Electric lamps through one or the other of these agents (Exs. 1786-G, 1787-G). This was all its business and the effect of the arrangements was to eliminate waste motion and effort by directing that one or the other of the agents should serve certain accounts. It contended that it would not benefit by having its agents continuously taking business from each other nor would this increase competition. It argued that it had a right to limit its agents to particular accounts for such

sound business reasons and it was only fair to provide that the agents should not suffer from the arrangement and for this purpose provisions were made for the restitution of business between them.

This contention of the Government goes to the legality of the agency system as practised by General Electric. Heretofore it had been found that this system of agency distribution came within the approval of the 1926 case. The proofs disclose only arrangements by General Electric for the handling of its business through its agents, assignment and reassignment of accounts and adjustment in compensation to the agents with no suppression of competition or trade, and the Government's charges herein are not sustained.

The Government charged that dealers were pressed to eliminate the handling of non-Mazda lamps and that General Electric and Westinghouse permitted illegal operations by dealers if necessary to secure business which would otherwise go to non-Mazda lamp manufacturers. Reference was made to a number of interdepartmental communications (Exs. 1483-G, 1486-G, 1487-G, 1489-G, 1490-G, 1501-G, 1503-G) and a letter from a dealer to General Electric (Ex. 1502-G) to substantiate the argument that it was the policy to induce distributors to handle only the Mazda line of lamps and to disassociate themselves from the handling of non-Mazda lamps. Along this line it charged that General Electric conducted annual sales campaigns to secure new business and to eliminate outlets for non-Mazda lamps. It cited the 1939 "Contract Crusade" as an instance in which salesmen were given credit for each new contract obtained, emphasis being laid upon that part of the contract which dealt with the elimination of non-Mazda lamps from the stores of the wholesale dealers. The rules provided (Ex. 1502-G at p. 5704) that to secure credit in cases where certain agents agreed to discontinue the purchase of all non-Mazda lamps a specific letter signed by an executive of the concern and approved by the Division Manager had to be submitted. The Government contended that this was a campaign, in effect, to secure agreements not to compete. It offered Exhibit 1525-G, a letter from a whole-sale dealer to General Electric which contained the statement "We hereby agree to discontinue the purchase of non-Mazda lamps" as a typical example of such action. Exhibits 1528-G and 1530-G were also offered to show that unless an unequivocal statement of discontinuance was contained in the letter credit would not be forthcoming. It contended that competition between General Electric and Westinghouse was restrained in the interest of eliminating the handling of non-Mazda lamps and to this end waivers were requested and granted. The Government further contended that special considerations were given to dealers who agreed to eliminate non-Mazda lines. It referred to Exhibits 1710-G and 1711-G as an instance of this procedure where a wholesale dealer's appointment had been cancelled for irregularities. The dealer asked for reinstatement. It appeared that he had taken on competitive lamps after the cancellation of his General Electric appointment but that he agreed to change to Mazda business if he were reinstated. His reappointment was approved. In Exhibits 1660-G, 1693-G and 1694-G the Government contended that proof is found that the agreement to discontinue the practice of handling non-Mazda lamps was urged upon the Supervisor by Westinghouse as a reason for appointment. Finally in this area it was charged by the Government that General Electric offered distributorships of other electrical appliances to persuade dealers not to handle non-Mazda and to take on the sale of General Electric lamps. In Exhibits 1613-G and 1717-G it was submitted that there was proof that influence was exerted or brought to bear along this line. In order to determine which desirable dealers could be induced to handle General Electric lamps if they were offered the distributorship of other lines, surveys were made from time to time of dealers not handling General Electric lamps (Exs. 1714-G, 1719-G). Exhibit 1722-G shows, contended the Government, that dealers who attempted to cease handling General Electric lamps were threatened with the loss of their distributorship on other lines.

General Electric answered that it had been its policy to persuade dealers to handle

872

General Electric lamps exclusively but that they were at liberty to handle as many lines as they desired. It contended the Government's evidence was insufficient to show that it deviated from this policy and that actually more B agents handled competing lines than handled General Electric lamps exclusively. It claimed that it conducted sales campaigns as competitive measures common to all sales organizations but denied that penalties or restrictions were imposed upon those who failed to agree to discontinue handling competitive lines. It insisted that the documents presented by the Government were too few in number to show that it followed a deliberate policy of placing "fetters" on competition. It admitted that while some of the agents in letters stated that they would discontinue handling competitive lamps, it claimed failure to give such a letter had no effect on the agents' reappointment. It sought to discount the letters showing that special considerations were offered, contending that they were Westinghouse internal correspondence inadmissible against it, and contending that, as to Exhibit 1694-G, there was no evidence that the agency was granted, much less that it was granted upon condition or agreement that this agency would not use or deal in the lamps of a competitor. It insisted that the Lamp Department was entirely separate and distinct from other departments of General Electric and that the control of distributorships in these other lines of goods produced by General Electric was not within the realm of the Lamp Sales Department nor was it the policy of General Electric to offer other lines of its goods in return for an agent's promise that he would not use or deal in a competitor's goods. It insisted that Exhibit 1722-G relied on by the Government is inadmissible against it as hearsay and that it is quite inadequate to show that such was a General Electric practice.

There can be no doubt that General Electric followed an aggressive policy to persuade agents to handle only General Electric or Mazda lamps and that it conducted intensive sales campaigns to increase the efforts of its salesmen to gain that objective. During one of these campaigns in 1939 the Government showed that General Electric offered bonuses to them in the way of credits for securing new agencies, and for such agencies as would handle exclusively General Electric or Mazda line lamps where these intentions were recorded in writing. The thread of the urge upon agents to carry only General Electric or Mazda lamps appeared from the top to the bottom of the sales organizations of General Electric and agents were persuaded, or otherwise decided, to handle General Electric or Mazda lamps to the exclusion of all other kinds. There is, however, no proof of reprisals taken against an agent for carrying other lines and General Electric's assertion that more agents carried multiple lines than exclusively General Electric or Mazda lamps was never rebutted by the Government.

█ The Government proved that suggestions were made by some of the General Electric sales force that inducements for exclusive handling of its or Mazda lamps should be made by way of holding out distributorships of General Electric products other than lamps but it has not shown that these suggestions ever ripened into activity. The comment by a Westinghouse sales force representative (Ex. 1722-G) that he understood General Electric had acted unethically in threatening to cancel a distributorship of one of its other products in the hands of a DB lamp agent if he cancelled its lamp agency is plain hearsay and, in the absence of any other evidence to connect it to some action, it proves nothing.

Westinghouse consistently followed an identical policy with General Electric in accordance with the requirements of the license agreement. Agents were submitted for the scrutiny of the Supervisor and waivers were granted where the protection of General Electric or other mutual Mazda interests was concerned. The primary consideration of General Electric and Westinghouse was to create the maximum distribution of Mazda lamps. The quota allowance of Westinghouse increased only as the volume of this distribution increased. The secondary consideration was the sharing by General Electric and Westinghouse of the product of maximum distribution of

Mazda lamps within the quota set by the framework of the license. With the expiration of the basic and controlling patents in 1933, the framework of the license collapsed and two competitors were joined in a common effort under a common symbol. Any rivalry that existed between them was devoid of the elements of normal competition as is sought to be preserved by the Anti-trust laws and their association was designed to and did eliminate such competition between themselves.

The price of Westinghouse's cooperation with General Electric is evident. Under the Corning-General Electric agreements, it received the benefits accruing therefrom. It was the favored beneficiary of all that flowed from employment of the "Mazda" symbol. It was granted a share in the foreign lamp markets by virtue of the agreements negotiated by International General Electric. Granted a larger share of the domestic lamp business, its policy and program were those of General Electric since both operated under the "Mazda" symbol. Competition that menaced General Electric menaced Westinghouse and correspondingly reduced its percentage of production. Westinghouse proved to be a valuable ally to General Electric in extending and maintaining dominance over the incandescent electric lamp industry in the United States.

The conclusion is that the Government has prevailed in its contention that in furtherance of the maintenance of the General Electric monopoly of the incandescent electric lamp industry in the United States, competition between Westinghouse and General Electric was eliminated. The joint activities engaged in by Westinghouse and General Electric operated to suppress competition in the United States and thereby violated § 1 of the Sherman Anti-Trust Act.

### (B) "B" Licensees

The Government charged that the "B" licensees joined with General Electric and other defendants in carrying out the unlawful monopolies, conspiracies and combinations in restraint of trade alleged in the complaint beginning with the dates upon which the renewed licenses and agreements were entered into. It alleged that the purpose and effect of the licenses and agreements as to General Electric, Westinghouse and the "B" licensees were to limit the production of the "B" licensees, thereby preventing their free and uncontrolled competition with General Electric and Westinghouse in the United States, preventing the exportation from the United States to foreign countries of lamps manufactured by the "B" licensees in order to assure to General Electric the continued operation of its restrictive agreements with foreign companies, thereby precluding such foreign companies from competing or aiding other domestic manufacturers to compete with General Electric in the sale of lamps in the United States, enlarging and extending the patent monopoly of General Electric by giving it rights under all patents relating to lamps, machinery and appliances having to do with the manufacture of lamps owned or acquired during the term of each of the agreements by each of such "B" licensees or by each of their officers and directors for the lives of such patents; precluding such "B" licensees from questioning or attacking the validity of the patents of General Electric and Westinghouse relating to lamps and to the manufacture of lamps; assuring to General Electric and Westinghouse the continued control and domination of the domestic lamp industry and lamp market after the expiration of General Electric's controlling lamp patents; assuring to each "B" licensee sources of supply of lamp machinery, materials and parts, particularly at advantageous prices.

The Government argued that the evidence showed that where lamps manufactured by the "B" licensees were being sold at prices not in line with those of General Electric, it caused them to correct the condition under circumstances which demonstrated that there was a general understanding between General Electric and the "B" licensees to stabilize and fix prices as condemned under the anti-trust laws.

General Electric insisted that its patents were sufficient at all times to support the "B" licenses and that they were continuations of their predecessors granted prior to the 1926 case. It argued that the renewed "B" licenses were granted and accepted in

good faith and not pursuant to any conspiracy to monopolize or restrain trade. It denied any price control.

The "B" licensees offered evidence and argued separately. Their respective positions conformed substantially and their defenses have been considered together except in such details as may be applicable to the individual cases. They denied that there were price controls, direct or indirect, and contended that they became licensees in good faith prior to 1933 when General Electric's patent position was secure and that their renewed licenses in 1933 and 1934 were but continuations of their former relationship with General Electric. They claimed that there were no restraints per se in the licenses and that the mere taking out of a patent license even from an unlawful combination does not in and of itself make the licensee a co-conspirator. They denied any intentional participation in the conspiracy connecting them with General Electric, Corning, foreign licensees or with each other.

The "B" licenses, continuations of licenses entered into prior to the 1926 case, were signed on the following dates: Consolidated, July 1, 1933; Kentucky Electric Lamp Company, July 1, 1933 (in 1929 Kenrad acquired the assets of this company, in 1936 dissolved it, and on August 1, 1936 took over its license and manufacturing and selling quota); Sylvania, August 1, 1933; Tungsol, October 1, 1933; and Chicago Miniature, January 1, 1934. Except for the differences in the amount and type of lamps which General Electric permitted each "B" licensee to manufacture and sell in the United States, the licenses and agreements were identical and provided as follows:

"(a) Each licensee is licensed non-exclusively by General Electric under its patents then owned or thereafter to be acquired which relate to incandescent electric lamps or to the manufacture thereof;

"(b) Each licensee is limited in its sales in any one year to a certain fixed quota or percentage which is based on General Electric's total net dollar sales for that year;

"(c) If in any one year a licensee should sell less than its quota, it could, in the next succeeding year, sell an additional amount equal to the amount of the shortage, but not more than 10% of the quota for the year in which the shortage occurred;

"(d) If in any year a licensee should sell an amount 10% or more in excess of its quota, such act would constitute a breach of the agreement;

"(e) Each licensee is required to pay upon its lamp sales a royalty of $3\frac{1}{3}\%$ with a discount of 10% for prompt payment and proper reporting, and such royalty is computed on the basis of the prices charged by General Electric for such types of lamps;

"(f) Each licensee is required to pay an additional royalty of 20% of its net sales in any year in excess of 5% over its quota for that year;

"(g) Each licensee is expressly precluded under General Electric's patents covered by the license from (1) manufacturing lamp bulbs, glass tubing, cane glass or lamp bases, (2) exporting lamps or selling lamps for export, and (3) selling any part of an incandescent lamp or any machine, appliance, or material, or any part thereof;

"(h) Each licensee is licensed to manufacture, solely for its own use as a licensed lamp manufacturer, any lamp-making machinery, appliance or materials covered by any patent or patents listed in the license and agreement, or to purchase the same in each case, solely for such use, but only from such others licensed by General Electric to manufacture them for sale;

"(i) Each licensee has granted to General Electric a non-exclusive license with the right to grant sub-licenses, to make, use and sell incandescent lamps of all kinds and machines, appliances and materials for the manufacture of such lamps, under all patents and patent rights which the licensee or its officers and directors then, or thereafter during the term of the agreement might own or control for the life of the patents respectively;

"(j) Each licensee has agreed to grant to General Electric upon demand, non-exclusive licenses under any foreign patents such licensee might own, to enable General Electric to abide by its contracts with others;

"(k) Each licensee has agreed to keep its books, warehouses, and factories open to the inspection of General Electric;

"(l) Each agreement is to continue in force until December 31, 1944, unless sooner terminated by General Electric for breach of conditions thereof by the licensee;

"(m) Each licensee can cancel the agreement upon six months' notice in writing to General Electric;

"(n) Each licensee has agreed not to advertise or sell lamps bearing the mark 'G. E.,' 'Mazda,' 'Edison,' 'National' or any other mark or brand used by General Electric; and,

"(o) General Electric and each licensee have admitted the validity of the patents under which each is licensed, but such admission is to be limited to the life of, and the fields of use covered by, the licenses."

Consolidated, Kenrad and Sylvania were limited to the manufacture and sale of large type lamps, and Tungsol and Chicago Miniature were limited to the manufacture and sale of miniature type lamps.

The selling quotas of each of the "B" licensees were fixed at the following percentages of General Electric's net sales in and for use in the United States:

LARGE LAMPS

| | Percent |
|---|---|
| Consolidated | 3.89093 |
| Sylvania | 8.124 |
| Kenrad | 1.7584 |

MINIATURE LAMPS

| | |
|---|---|
| Chicago Miniature | 2.975 |
| Tungsol | 26.71956 |

The Government conceded that no "B" license agreement required the licensee to follow General Electric prices and that the agreement specifically provided "that no restriction is placed on the prices at which the licensee may sell lamps". (Exs. 29-G, 30-G). It argued that this provision was merely designed as color and that an important factor in keeping the prices in line with those of General Electric was Article 3, Section C of the "B" license (Ex. 29-G at p. 118, Ex. 30-G at pp. 168-169) where the sales of "B" licensees for the purpose of the quota were computed at General Electric prices. Thus, it reasoned, a lamp sold

for three cents would absorb ten cents of the limited quota if ten cents were the General Electric price. Since the number of lamps which could be sold was limited, there was incentive to support the General Electric price structure rather than to cut prices. Another such factor, it urged, was the provision that the "B" licensees were obliged to pay royalty to General Electric based on General Electric's net sales price which had the effect of making it advantageous for the "B" licensees to see that their prices would be approximately those followed by General Electric for if there was a differential between General Electric prices and those of the "B" licensees (assuming that the prices of the "B" licensees were lower than those of General Electric) a royalty basis would operate to reduce the profits of the licensees.

General Electric opposed the Government's analysis, insisting that it was incorrect since the "B" licenses provided that the sales of the "B" licensees should be computed at their own net sales. Therefore, lamps sold by "B" licensees for three cents would absorb but three cents of their quota. It argued that the royalty provisions had no effect upon the "B" licensees' prices since a study had shown the royalty charged was insufficient to influence prices and that its prices were used as the basis for computing royalties for convenience and uniformity.

Exhibit 29-G was the standard form of miniature style lamp "B" license granted by General Electric. Exhibit 30-G was the large style lamp "B" license. The clauses in the licenses concerning quotas were identical and provided as follows:

"The licensed amount for the calendar year 19 * * * shall be computed on the Licensor's net sales for the entire year; and the Licensee's sales during the entire year 19 * * * shall be regarded as having been made under this license". (Ex. 29-G, p. 118)

"This license is limited to net sales of large Style incandescent lamps in and for use in the territory aforesaid in each calendar year to an amount expressed in dollars which shall not exceed an amount equal to * * * per cent (* * * %) of the net sales of the Licensor during that

year in and for use in the United States of large Style incandescent lamps embodying or made in accordance with or by the use of any of the inventions with reference to which license is hereby granted by the Licensor". (Ex. 30-G, p. 168)

A study of these clauses exposes the error in the Government's argument. Licensees could observe any price structure desired so long as the assigned net sales quota was not exceeded. This quota, based upon the net sales of General Electric in dollars, fluctuated with General Electric sales and was in no manner affected by the price charged by the "B" licensees.

A patentee is free, in establishing a royalty on a patent to fix any base that it desires. This figure may be high and thus force licensees to charge prices higher than it, or it could charge a flat price rather than a percentage royalty. At any rate, General Electric based royalties upon a fixed percentage of its prices up to the limit of the quota, and an increased percentage for sales in excess of the quota, the latter for purposes of forcing the "B" licensees to remain within the quota assigned them. A patent owner, of necessity, would not use a base that could be altered at will by a licensee. There is no merit, therefore, to the Government's charge that General Electric based royalties upon its prices for the purpose of price fixing.

A price fixing understanding between General Electric, Chicago Miniature and Tungsol that price levels would not be undermined is said by the Government to have been evidenced by the following circumstances.

In the case of Chicago Miniature it appears that Mr. E. A. Anderson of General Electric directed an interdepartmental memorandum on October 19, 1936 to Mr. Boynton (Ex. 159-G) in which he wrote:

"We learned confidentially from the Ford Motor Company that Chicago Miniature had been in to try to sell Ford headlight bulbs similar to our Mazda 2330 at a price of 7.7 cents each. However, they wanted to furnish only 50,000 per year.

"It occurs to me that it is a little unfortunate that this Licensee should go to our large customers to use up some of its small quota. The quotation of much lower prices never does any good to the situation. It would seem more helpful if this concern would dispose of its product in the trade that is now buying non-licensed lamps and where the quality is not so extremely important but where price, or the fact that the concern does not qualify under our sales rules, is a factor."

This was evidently passed on to Mr. Sloan for in Exhibit 160-G, dated October 20, 1936, he wrote Mr. Boynton the following:

"With reference to Mr. E. A. Anderson's letter to you of October 19th, on the subject of Chicago Miniature operations. There are certain things to this letter that I agree with Mr. Anderson, seem somewhat unreasonable. On the other hand I do not think we can always expect the B Licensees to solicit only the business of non-licensed manufacturers. Experience has shown, through the last several years, that it is quite impossible for them to meet their quota if they confine their solicitation to this channel.

"There are certain phases of the problem brought up by Mr. Anderson however, which I shall discuss with the officials of the Chicago Miniature when I see them, which will be within a week or two."

This apparently led to a conference with Mr. Reed and resulted in the following communication from Mr. E. C. Yale of Chicago Miniature to Mr. Sloan, dated November 10, 1936 (Ex. 161-G) as follows:

"I want to thank you for your kindness in arranging the meeting last week with Mr. Reed.

"We feel that this arrangement, if it works out satisfactorily with Mr. Reed, will be a great help to us.

"I have given a great deal of thought to your suggestion with reference to price quotations, and I am wondering if you would be willing to send us a condensed list of the maximum discounts on original installations, so that we can use it as a basis to prevent a situation such as has developed with one of the Detroit manufacturers.

"This would be especially helpful in the flashlight and radio panel lamp field, as we

have a good many manufacturers using this equipment in this area.

"Under no circumstances do we want to undermine prices to such an extent that it is embarrassing to any one else, or to cause a condition which might tend toward a further price reduction.

"Let me say again that I appreciate the fine cooperation that you have given us and if at any time you feel that we are asking for too much information from you, don't hesitate to say so."

Mr. Sloan answered on November 12, 1936 (Ex. 162-G) as follows:

"Answering your letter of November 10th, I was wondering, while you were here, why you were not familiar with our published schedules. Since that time I looked the matter up and found that while we are not required, under the license, to advise "B" Licensees regarding our price schedules, we do so as a matter of cooperation, and I find that Mr. Gast has received copies of all the bulletins which have been issued to our Sales Divisions governing list prices; discounts, both regular and supplemental; new prices, and all other features affecting our price structure.

"Therefore I believe, if you will look into Mr. Gast's file, you will find all this information. If you do not, please let me know, for it is our sincere desire to keep you well informed on this matter."

In the case of Tungsol the Government relied on a communication addressed by Mr. Parker of General Electric to Mr. W. B. Masland of Tungsol, dated October 9, 1939 (Ex. 155-G), as follows:

"I have just received word that your Cleveland representative has quoted the Ohio Valley Battery Company of Wheeling, W. Va., our $750 DB agent, a 60¢ price on sealed beam lamps. I can hardly believe this is possible as it is my understanding that you are allowed that price only to your Class A wholesalers and I do not understand how this concern could be included in that group as it is operating only as a DB agent for us.

"I have also had word that the Philco Rubber Company, located at 3rd and H Streets, Washington, D. C. are selling Tung-Sol glass sealed beam lamps to the Chrysler dealer in Washington at a 67¢ price.

"While I appreciate that many of the statements which will come to both of us may be only rumors, these two seem to be based upon facts and we would appreciate your checking them."

Mr. Masland replied October 25, 1939 (Ex. 156-G), as follows:

"Here are copies of inter-office letters that refer to the two cases called to our attention in your letter dated October 9th.

"While it appears that neither complaint is justifiable, I have used the incidents to remind all of our Sales Representatives that our original policy still stands and must be adhered to.

"As you observe, many statements which come from the field will be based on rumor rather than fact, but I think they should be 'smoked out' anyway.

"If it is found that the enclosed information is incorrect, I will be interested in having the matter reopened."

The Government argued that these letters are in contradiction to Mr. Parker's testimony that "This concern that they made this offer to was not a full fledged wholesaler and I thought I was doing a favor to Tungsol Company in calling to their attention that one of their salesmen in the field had apparently made a slip from their policy" (R. 853); and to the testimony of Mr. Boynton that General Electric did not fix or attempt to fix the resale price of sealed beam lamps (R. 761). It took the position that these proofs met the requirements that would permit a reasonable inference that defendants had acquiesced in a price fixing system and had conspired to maintain prices even though the prices were not fixed in identical amounts. It claimed that the evidence related largely to price maintenance by the "B" licensees but this is the equivalent to price fixing.

That the "B" licensees supported the General Electric price structure is said by the Government to be shown by the following documents which passed within Sylvania. In 1935, Mr. E. J. Poor, Chairman of the Board of that Company, wrote Mr. Erskine of its Emporium Company the following (Ex. 168-G).

"In considering our lamp selling policy which has been in effect for eighteen years and has been very successful, it must be borne in mind that an important part of the policy is to support the definite market established on Mazda lamps and that our company is large enough so that this support operates as an umbrella under which the smaller licensees can operate. It is always easier to sell on price but considering that we have a quota and that price selling by us would tend to depress prices over the whole industry and reduce our prices along with everyone elses, failure on our part to recognize our responsibility to the industry and resort to any direct price selling for our own selfish advantage would be something that I would not want to have anything to do with.

\* \* \* \* \* \*

"Our profit for lamps is always judged on the basis of what our position is to go ahead on a large market if such an opportunity offers itself. Any college boy with the back-ground and goodwill that we have built up could come in here, cut out advertising, reduce selling expenses to about one-half of what it is, cut prices slightly and increase profits substantially so that the immediate picture would look rosy. We also could do the same thing if the profit went out of the lamp business and it became like the tube business. Certainly, the lamp business is not like the tube business in any sense of the word now, because there is no leadership in the latter industry and no company is endeavoring to support a profitable market. The one thing to my thinking and Abbott's thinking that has added to the sale of Sylvania tubes is his insisting on carrying out a policy that will increase our goodwill and make our line attractive to our customers.

"A decrease in our sales expense of $100,000 would be entirely offset by what we would receive on lamps if prices were reduced 2% of the list. I am inclined to a policy of increasing our sales expense still further and getting still higher prices for our lamps. That is not the easy thing to do but is the courageous thing to undertake and has the advantage of further supporting the market. It calls for everyone in the Sales Department working harder and

using his full ability and it particularly calls for more expert, capable and hard working sales effort by the men in the field, which is a thing we are striving for at the present time. Although our proposition in the dealer and jobber end is not as attractive and competitive as it used to be, because of the change in the Mazda set-up last December, I know it can be offset by more able, aggressive and resourceful selling in the field without any change in our proposition.

"As you know, I talk very intimately with the G. E. sales people in regard to the fundamentals involved in the lamp business and for that reason I recognize better than anyone else in the company to what extent we can break down the present set-up between G. E. and Westinghouse and make the lamp business less profitable. I know, too, we are criticised for not endeavoring to use the same policies and accepting the same industry policies on tubes as we do on lamps and I have tried very hard in a number of memorandums to you in the past year to inspire and encourage a different line of thought in connection with our tube sales.

"You touch on the matter of separating lamp and tube sales and although the present organization set-up is not clean cut, it certainly will cost us a lot more money if we move along the line you apparently are favorable to.

"In regard to our comparison with Marsh, in 1934 we obtained for our lamps about 1.2% of the list more than he did, our selling expense was 1.2% more, so we actually netted, after sales expense, about the same. Our manufacturing cost, including royalty, research and development (particularly on gaseous discharge lamps) was about 2% of the list more than his, so in the final picture before administrative expense and profit, Marsh was 2% of the list better than we. So far this year our yield is about 1.1% of the list better than his, our sales expense is 4.3% more than his, manufacturing expense is 1.1% more than his,—so our final result is 4.4% worse than his. He advises that he finds it necessary to increase sales expense substantially and is preferring to do this rather than to lower his prices, although he now actually has published prices

out on his lamps that are lower than ours. That, of course, increases our cost of sales and this can only be defended because of the necessity and advantage of supporting the market.

"The above figures are very confidential and I hope you will see that no one other than Max Balcom knows anything about them, as it has taken a long time to build up the basis of confidence that results in this exchange of information."

The Government contended that the prices of the "B" licensees were, in general, almost identical to those established by General Electric as was evidenced by the testimony of Mr. Reed. In answer to the question, "Would the royalties payable by the licensees have been very much reduced if, for example, the royalties have instead been based on their own sales price?" he replied "No. We made a study of that and the difference would have been less than two tenths of one per cent in royalty; that is to say on the royalty rate they were paying." (R. 1139.)

It further contended that in furnishing the "B" licensees with copies of its sales rules and eligibility requirements, ostensibly for the purpose of giving them changes in General Electric price which would affect the computation of their royalties, there was provided a means whereby the "B" licensees were influenced to follow the same eligibility rules for their distributors as those followed by General Electric and to maintain the General Electric price structure, and that this was shown by the statement contained in the letter dated November 12, 1936 (Exhibit 162-G), from Mr. Sloan to Mr. Yale of Chicago Miniature heretofore quoted.

General Electric and Tungsol denied that the correspondence concerning them involved price fixing. Tungsol contended that the letters were typical salesmen's discussions and vague enough to be open to various interpretations but not rationally open to an interpretation of an agreement or understanding to fix prices and claimed that the letters were written at a time when it was purchasing sealed beam headlights from General Electric since it had no machinery to make them. General Electric insisted that knowing Tungsol's policy of discounts to wholesalers, it was but a friendly gesture on its part to inform Tungsol of what it thought to be a mistake by its sales force.

General Electric and Chicago Miniature denied that the correspondence between them evidenced a price fixing scheme. Both insisted that the letters involved a sale of lamps below costs for inventory purposes. Chicago Miniature claimed that it did not as a result of Mr. Yale's letter (Ex. 161-G) take any action to alter its policy of price competition. General Electric argued that Mr. Sloan's testimony explained the situation (R. 2557-2559) as follows:

"Earl Anderson, serving the headlamp and car companies in their requirements for incandescent lamps, has always met terrific competition by way of requests from the purchasing agents for continually lower prices. He has believed that the record of the Lamp Department is such that these automobile companies are getting the lowest prices that we know how to produce, and, generally speaking, over the years prices have continually come down.

"I would say that we do not know how lamps can be made any cheaper or at lower prices than the lamps which we are selling to the car companies. He was greatly surprised to be told by a car company that lamps were available from the Chicago Miniature Lamp Company at prices substantially 25 per cent under ours. He so reported to me because he thought if their prices were that much lower than ours we ought to find out how we could get ours down.

"I discussed the matter with Ellis Yale, of the Chicago Miniature, and asked him how it was possible to sell lamps at those prices. He said that was just a small lot of about 50,000 lamps.

* * * * * *

"I was told that this price was offered on a special lot of 50,000 lamps they wished to dispose of at the end of the year in order to reduce their inventory.

"I stated that the prices were so far below ours that the Ford Company had taken the position that these represented current price quotations so far as they were con-

cerned on any quantities of lamps that they wished, and that probably under those circumstances they would not be able to buy any more from us.

"Mr. Yale said that he had no knowledge of what the prices were, and I recalled to him that they were in his office.

"Q. Did you at that time or any other time have any understanding or agreement with Chicago Miniature as to the prices which that company should charge for lamps? A. No.

"Q. And did anything happen after the conversation you have told us about? A. No, nothing particular."

General Electric insisted that the Sylvania documents were inadmissible against it, but aside from that it argued that it has long been recognized by courts that there is nothing illegal in an interest in a competitor's prices or obtaining information as to them in order to be guided in fixing one's own prices. Sylvania made the same argument and frankly admitted that to support the lamp market was a policy dictated by economics and its own self interest but not from an understanding with General Electric and that courts have consistently recognized that in any industry dominated by a single producer, the market becomes stabilized. General Electric contended that its sales rules were widely circulated in the industry, and furnishing them to the "B" licensees, who could easily have obtained them elsewhere, could not have had the purpose or effect claimed. Further, that except for Tungsol, which gave its wholesalers an option, the "B" licensees distributed their lamps by outright sale and not by consignment to agents. The "B" licensees insisted that the sales rules were their only means whereby General Electric prices could be determined in fixing their royalty payments.

The "B" licenses specifically provided that "no restriction is placed on the prices at which the licensees may sell lamps" (Ex. 29-G, p. 124; Ex. 30-G, p. 175). No evidence of direct agreement or understanding upon the part of General Electric and the "B" licensees aside from or in derogation of the license provision was produced. Representatives of General Electric and the "B" licensees testified that there was no attempt to fix the prices of the "B" licensees.

There was a paucity of circumstantial evidence produced by the Government to show an indirect understanding or agreement on the subject.

The only documents involving Consolidated, Exhibits 165-G, 168-G, are utterly devoid of any suggestion on the subject. The Sylvania documents consisting of Mr. Poor's statements in Exhibits 167-G and 168-G do no more than establish a unilateral determination to support the price market established on Mazda lamps. The correspondence between Mr. Parker of General Electric and Mr. Masland of Tungsol (Exs. 155-G and 156-G) revolved around a suggestion that concerned itself not with the height or depth of Tungsol's prices but that prices had been quoted by Tungsol to the wrong type of dealer, not in accordance with Tungsol's known normal policy. The documents and conduct of Tungsol here are equally susceptible of an inference that there was no concert of action as the inference of understanding suggested by the Government, if not more so. The letters in which Chicago Miniature was concerned (Exs. 159-G, 160-G, 161-G, 162-G) revolve around an incident in which General Electric brought to the attention of Chicago Miniature an extraordinary price situation and reflect no greater weight of evidence as to understanding on prices than the Tungsol correspondence above referred to. These references are too few and infrequent to establish the understanding or agreement sought by the Government to be proved by them.

There were not submitted by any party the price schedules of the "B" licensees by which an actual comparison could be made. It was not contested, however, that they were different and generally lower, the Government insisting that the differential was not consequential. The inference sought by it to be drawn from Mr. Reed's testimony on royalties is not sufficient evidence to provide a definite conclusion on the similarity of price structure without more as to the actual prices. The sales systems of all the "B" licensees with the exception of Tungsol were different from

General Electric's, and its resemblance was only in part.

■■■ It is understood that there may be price fixing although prices are not identical and the proofs need only establish that which will permit a reasonable inference that defendants have acquiesced in a price fixing system, have conspired to maintain prices, and that maintenance of prices is the equivalent of price fixing, United States v. Paramount Pictures, supra. However, even if the "B" licensees followed the price structure of General Electric, the lack of a preponderance of proof of an understanding, agreement or concert of action upon the part of General Electric and the "B" licensees defeats the Government's contention as to price fixing.

It appears that the Government needlessly belabored the price fixing argument. General Electric purposely inserted the provision against price fixing in the "B" licenses for it could accomplish its full mission of control by way of its quota provisions. General Electric had nothing to fear from aberrations from its price structure as the "B" licensees might affect them. It was well aware of their manufacturing costs and knew that any considerable departure from the market would be disastrous to them and would constitute economic suicide upon their part.

The Government claimed that General Electric utilized the provision of the license agreement relating to the export of lamps as a means of preventing lamp sales by the "B" licensees in the foreign field. General Electric and the "B" licensees denied this contention. General Electric and the "B" licensees insisted that a reading of the license shows that there was no restriction which prohibited them from exporting lamps and contended that the licenses were specifically limited to the manufacture of patented lamps in the United States. Therefore, they argued, it would have been an infringement of General Electric patents for them to have exported lamps covered by the patents.

In the discussion under "Patents" it was pointed out that General Electric made no distinction whether one patent or a number of patents were employed in the making of a lamp, if any General Electric patent was employed, that lamp was subject to the restrictions within the license. The licenses contained a clause which read:

"No license is granted under foreign patents; no license is granted to export incandescent electric lamps or to sell lamps for export." (Ex. 29-G, at p. 120, Ex. 30-G, at p. 171.)

In 1938 Osram learned that one of its Venezuelan customers intended to handle Sylvania lamps. This was brought to the attention of International General Electric and through it to General Electric (Exs. 114-G, 115-G). General Electric took the matter up with Sylvania who admitted (Ex. 117-G) that it desired to engage in export business and that during 1938 and 1939 in a kind of experimental manner it had exported small quantities of lamps but concluded that "naturally we will satisfy you on the matter." On August 18, 1939 Mr. Couse notified Sylvania that it must cease exporting (Ex. 121-G).

The Government contended that in this letter Mr. Couse recognized that exports by the "B" licensees would be in violation of General Electric's foreign agreements; that Sylvania could not violate General Electric's foreign agreements unless it was bound into the whole General Electric foreign network and that it was obvious that General Electric considered Sylvania so to be and that Sylvania was aware of the international scope of the conspiracy (Ex. 113-G). General Electric merely insisted that all Mr. Couse had in mind was that General Electric was under a duty to sue for infringement if its licensees were exporting lamps outside their license agreements and that the "B" licensees were not parties to the foreign agreements and clearly could not have violated these agreements.

On February 22, 1940, Mr. Kennett, a sales representative of Tungsol advised a prospective Cuban customer of Tungsol that "under the terms of our license agreement we are not permitted to sell lamps for export" (Ex. 109-G). Mr. Kennett repeated much the same in Exhibit 111-G written March 5, 1940 to Amtorg. Tungsol insisted that its understanding was that

Tungsol merely "had no license to export". General Electric contended that Mr. Kennett's letters were merely a layman's way of saying that the license did not extend to sales for export.

No matter how the export provision in the "B" licenses is characterized, its effect in halting any attempt on the part of the licensees to export was the same. While Sylvania was not a party to the foreign agreements, it had a detailed knowledge of General Electric's obligation to them and a consciousness of advantage to it to support General Electric in that obligation. In Exhibit 113-G, quoted in its entirety in the discussion "Foreign Agreements", Mr. Wooldredge of Sylvania makes this understanding very clear. Regardless of Mr. Kennett's (Tungsol) reaction, layman's or otherwise, to the phraseology of the license, it is apparent that Tungsol was aware that it was not to export lamps or even to dispose of its lamps to customers who would export them. Tungsol's co-operation with General Electric not to export lamps is disclosed in Exhibit 106-G, a letter from I G E to Mr. Reed dated February 5, 1937, and Mr. Reed's answer in Exhibit 107-G, dated February 8, 1937, in which confidence was expressed by Mr. Reed that Tungsol was conscientiously doing all that it could to avoid making shipments to purchasers who intended to export lamps. Mr. Couse on February 11, 1938 (Ex. 108-G) wrote similarly. These documents sustain the contention of the Government that General Electric utilized the export provision of the "B" licenses as a means of preventing lamp sales in the foreign fields and that Tungsol and Sylvania by their acceptance of the licenses knowingly acquiesced in General Electric's purpose. Beyond the fact that the same clause appeared in the licenses of Consolidated and Chicago Miniature, there is no evidence concerning them with regard to the exportation of lamps. This is understandable for the reason that their quotas were so small that they were filled by catering to the domestic demand.

As to the Government's allegations that the "B" licensees became co-conspirators with General Electric in 1933-1934 by their accepting the renewal licenses which contained the restrictive conditions, the "B" licensees argued that their acceptance of the licenses was bona fide and was due to General Electric's then patent position. They understood that the 1926 case upheld General Electric's patents and submitted that they were confronted with a mass of product, machinery and process patents; that there was no step in manufacturing lamps which did not collide with a General Electric patent; and since they had extensive investments in the lamp industry, they were impelled by the very judgment in the 1926 case and sound business reasons to undertake the renewals.

The "B" licensees admitted that negotiations were conducted some time prior to the signing of the licenses. Mr. Edward J. Poor of Sylvania testified that in 1931 Tungsol, Consolidated, Kenrad, Economic Lamp Company and Sylvania received copies of the new license agreement; that they met in New York thereafter to discuss the situation; and that in 1932 Mr. Couse appeared before the group to discuss modifications which they sought (R. 3464-3466). Eventually the licenses were signed after bargaining at arms' length. The "B" licenses were standardized and each licensee was aware of the identity of the other "B" licensees, the restrictions imposed, as well as the general position of each in the incandescent electric lamp industry in the United States.

General Electric and the "B" licensees found support for their positions that the licenses were valid and legal, from the opinions of the lower courts in the cases of United States v. Line Material Co., D.C., 64 F.Supp. 970; and United States v. United States Gypsum Co., D.C., 67 F.Supp. 397; and quoted copiously from them. Unhappily for them, these decisions were reversed by the Supreme Court since the argument in this case. United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550; United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525.

In United States v. Line Material Co., supra, two patentees cross-licensed interdependent product patents for the manufacture of drop out fuses. One patentee was granted the exclusive right to license other manufacturers. Manufacturers were desir-

ous of employing the patents and had co-operatively explored their validity. Unable to determine a successful basis for attack and faced by infringement suits, they accepted licenses for use of the patents which contained price fixing provisions. The form of the proposed license had been circulated and had been signed only after every possibility of escape had been explored. The sublicensees had met, discussed the licenses, and finally consented to accept them.

"The licenses were the result of arm's length bargaining in each instance. Price limitation was actively opposed in toto or restriction of its scope sought by several of the licensees, including General Electric, the largest producer of the patented appliances. A number tried energetically to find substitutes for the devices. All the licensees, however, were forced to accept the terms or cease manufacture. By accepting they secured release from claims for past infringement through a provision to that effect in the license. The patentees through the licenses sought system in their royalty collections and pecuniary reward for their patent monopoly." 333 U.S. at page 297, 68 S.Ct. at page 555.

Because of the price fixing arrangement between the two patentees, the Court held the agreements to be in conflict with the Sherman Anti-Trust Act and reversed the trial court.

It is true that in the instant situation, there is not present the element of cross-licensing and price fixing by the exclusive licensee as in the Line Material case, but there are other elements equally at fault. As against these factors, it has been shown in this case that in 1933 General Electric lacked patent support upon which to base industry wide licenses for the incandescent electric lamp and the quota restrictions provided for in its licenses were the equivalent of the price fixing controls in the Line Material case.

The "B" licensees aroused sympathy for their position, when they insisted that they faced a mass of adjudicated and unadjudicated General Electric patents in 1933 which they concluded placed an insurmountable barrier to their business operations without a license from General Elec-

tric. Sylvania particularly urged that the lawfulness of its entrance into the 1933 agreement must be determined in the light of what the patent situation then appeared to be. However, the licensees in the Line Material case were confronted with the same situation in 1939 and yet in 1948 the Supreme Court held that they were parties to an unlawful restraint:

"Licensees under the contract who as here enter into license arrangements, with price fixing provisions, with knowledge of the contract, are equally subject to the prohibitions". 333 U.S. at page 315, 68 S.Ct. at page 564.

The guideposts constructed by the decisions in the cases of Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S. Ct. 172, 87 L.Ed. 165; Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 424, 91 L.Ed. 374; and MacGregor v. Westinghouse Electric & Mfg. Co., 329 U.S. 402, 67 S.Ct. 421, 424, 91 L.Ed. 380, which point licensees to action looking toward the confinement of patentees to the restricted monopoly of their patents were unfortunately unavailable to the "B" licensees in 1933. Nevertheless, the Line Material case holds them accountable. As was stated in United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915:

"There is some suggestion on this as well as on other phases of the cases that large exhibitors with whom defendants dealt fathered the illegal practices and forced them onto the defendants. But as the District Court observed, that circumstance if true does not help the defendants. For acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one". 334 U.S. at page 161, 68 S.Ct. at page 931.

The "B" licensees fully conceived their positions as favored beneficiaries under the protection of the General Electric licenses although at times they chafed under the restrictions. By their general adherence, however, to the General Electric program they became co-conspirators with it and as such violated Section 1 of the Sherman Anti-Trust Act: United States v. Paramount Pictures, supra; United States v. Line Material Co., 333 U.S. 287, 315, 68

884

S.Ct. 550; United States v. United States Gypsum Co., 333 U.S. 364, 388, 389, 68 S.Ct. 525; United States v. Masonite Corporation, 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L. Ed. 1461; Interstate Circuit v. United States, 306 U.S. 208, 226, 227, 59 S.Ct. 467, 83 L.Ed. 610.

### Clayton Act

■■■ The Government additionally charged that General Electric and Westinghouse have violated § 3 of the Clayton Act, 15 U.S.C.A. § 14.[41] It referred to the evidence submitted to show how non-Mazda competition was eliminated and charged that in their sales, contracts for sale, or contracts for the distribution of incandescent lamps manufactured by General Electric and Westinghouse for use, consumption or resale within the United States, they imposed the condition that the purchaser or distributors should not use or deal in any other incandescent electric lamps. General Electric insisted that there is no basis for the claim that its transactions with its agents were in effect "sales". It contends that they were true agency relationships, and that all of the Government's evidence which constituted the basis for the alleged violation of the Clayton Act dealt with agency appointments except three purchase contracts in which any inference that they were violations of the Clayton Act is likewise unjustified.

In the discussion under "Agency" it was pointed out that General Electric followed a firm policy of adhering to an agency relationship as approved in the 1926 case. The evidence submitted by the Government fails to support its contentions of sale or resale. The cases cited by it, such as Butterick Co. v. Federal Trade Commission, 2 Cir., 4 F.2d 910, certiorari denied 267 U.S. 602, 45 S.Ct. 462, 69 L.Ed. 808, are not persuasive that the General Electric and Westinghouse agency contracts were unlawful contracts of sale in violation of the Clayton Act in the light of the definitive holding of the Supreme Court as to the General Electric agency status in the 1926 case. Accordingly, the Government has failed to sustain the burden of showing that any contract of General Electric or Westinghouse was violative of the Clayton Act.

### Philips

The Government contended that Philips violated § 73 of the Wilson Tariff Act in making agreements to unlawfully restrain the importation of glass bulbs, tubing, cane and glass machinery into the United States; § 1 of the Sherman Anti-Trust Act by unlawfully restraining the importation and exportation from the United States of incandescent electric lamps and machinery; and that by the combination of these foregoing activities it was unlawfully conspiring with General Electric to assist the latter to secure and maintain a monopoly of the incandescent electric lamp industry in the United States in violation of § 2 of the Sherman Anti-Trust Act.

Philips argued that a variety of legal, geographic, economic and political factors existed which precluded the possibility of competition between Dutch made and American made incandescent electric lamps and glass parts and that it acted independently and in its own interest and was never a party to a conspiracy with General Electric. It insisted that the Sherman Act can apply to foreigners acting abroad only (a) when they have wilfully intended to restrain trade, (b) when their action has had or is having a direct and substantial effect upon United States trade, and (c) when

---

[41] "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

such effect was the principal purpose or one of the principal purposes of their action. It claimed that the Government had not even proven a prima facie case that any of these prerequisites of its liability under the anti-trust laws had been shown and that the Government had not proven that there was any restraint of United States trade from any of the activities complained of. It argued that it had no knowledge of General Electric being the ultimate beneficiary under its contracts with Corning and denied that its purpose was to extend a General Electric monopoly.

It is proposed in this section to explore the charges of the Government against Philips, incorporating herein by reference those discussions involving Philips' activities as they heretofore appeared in relation to the glass and foreign agreements ("Glass Machinery and Products" and "Foreign Agreements").

Philips, a Dutch corporation, was founded in 1891, with its principal offices and plant at Eindhoven, Holland and its principal officers and directors have always been Dutch citizens. Its early interest was the manufacture of electric lamps for the Dutch market. With the growth of the use of electric lamps, it gradually developed markets in other countries and commenced the exportation of lamps, including some to the United States. Certain of its lamps conflicted with General Electric's Just and Hanaman patent which culminated in an infringement suit in 1916, General Electric Co. v. Laco-Philips Co., 2 Cir., 233 F. 96. This case held the Just and Hanaman patent valid and infringed and Laco-Philips, an independent importer of Philips' lamps, paid substantial damages. Philips attempted to obtain a license from General Electric but was denied. The entry of the United States into World War I prevented importation of foreign lamps but upon its cessation, IGE commenced to operate in Europe. In 1919 IGE negotiated an agreement with Philips (Ex. P-5).

In the 1919 agreement the recital stated that General Electric was engaged in the manufacture of incandescent electric lamps and that IGE held all the General Electric rights outside the United States. By its terms Philips and IGE provided for the exchange of patent rights and manufacturing information. Philips was granted Holland as its exclusive territory with North America the exclusive territory of IGE. Certain nations were excluded from the scope and operation of the agreement and the rest of the world was established as non-exclusive territory. Philips was granted the right to export its products to its non-exclusive territory subject to the proviso that IGE could establish minimum selling prices for lamps in all parts of the non-exclusive territory and such prices were to apply to Philips. In addition it provided that:

"In cases where the General Company or the Philips Company have contracts with other affiliated companies (a list of such present contracts being attached hereto-marked Exhibit A) containing provisions similar in character to those of this contract, in respect to assignment of or licenses under patents, or obligations with respect to exchange of technical, engineering, or manufacturing information, or with respect to the sale of lamps, each party will, during the period of this Agreement, cause its affiliated companies in each case to do whatever is necessary, so far as can be accomplished by enforcement of the agreement between the parties hereto and their respective affiliated companies, to secure for the other party the benefits accruing from such obligations of its affiliated companies, it being understood that each party shall use its best endeavors to carry out this provision, but neither shall be liable in damages for failure on the part of an affiliated company to carry out such obligations."

By an attached statement it provided for a small IGE representation on the administrative board of Philips (Ex. 40-G, p. 27). The agreement was to terminate in 1930.

Philips extended its manufacturing facilities in Europe and entered into a number of agreements with foreign companies seeking to stabilize the European market. These arrangements constantly broke down and eventually led to the signing of the Phoebus Agreement in 1924. By this agreement, its home territory was defined as Holland, Belgium and Luxemburg.

886

In line with the terms of the 1919 agreement, there was an extensive exchange of "know-how" with IGE and frequent exchange visits to the establishments of General Electric and Philips. Technological developments at Philips' plant kept pace with its progress in Europe. Since the Phoebus agreement required that:

"The parties hereby agree to adopt, within a period to be fixed by the General Board, the recommendations of the Incandescent Electric Lamp Manufacturers' Technical Association made at the meeting held in Paris, April 14–16, 1924, with respect to standardization, lamp efficiency and other related matters." (Ex. 2278-G, p. 51).

it exchanged a considerable amount of manufacturing information with members of the Phoebus cartel. There existed in Europe no standard system of voltage control and sockets as existed in the United States, each particular nation having its own types and within a given nation there was no uniformity. Uniformity, if any, existed only in the particular exclusive areas of the contracting parties to the Phoebus Agreement. Therefore American lighting equipment was often not suitable for use in Europe unless conversion apparatus was employed.

Although IGE had not been a party to the Phoebus Agreement it nevertheless observed many of its terms as discussed under "Foreign Agreements" and thereby maintained frequent contacts with Philips. With the approach of the termination of the 1919 Agreement, Philips and IGE in 1928 commenced negotiations for a new agreement and continued until an agreement was signed in the United States on March 15, 1931, by Mr. Minor for IGE and Mr. Anton Philips for Philips. This agreement modified the 1919 agreement by providing for a smaller IGE board representation. Glass products and machinery were excluded from it. The exclusive territory of Philips was Holland, Belgium, Luxemburg and their colonies; and the exclusive territory of IGE was Japan, the United States, Canada and Newfoundland and their territories. There were various countries excluded from the agreement and all other territory was non-exclusive. The agreement was to terminate July 1, 1955.

Philips exported small quantities of glass products to the United States until 1933 when there was a sharp decrease (Ex. P-1). Devaluation of the dollar, increased transportation and insurance charges, and tariff rates thereafter made negligible its glass exports. It owned United States glass patents and was desirous of realizing upon them since its exports in glass were no longer economically practicable. Negotiations were commenced with Corning. This information was forwarded to General Electric by Corning and IGE notified Philips of General Electric's relationship with Corning. Although IGE acknowledged that it could not require Philips to abstain from the United States bulb market its interest might interfere with the friendly relations and cooperation existing between them (Ex. 447-G). Arrangements were made whereby representatives of Corning, IGE and Philips met in Europe. The result of these negotiations was the signing of the glass agreements in 1937 (Exs. 420-G to 423-G, exclusive), as discussed in the glass agreements section. Under these agreements Philips gave up its American patent rights for ten years in return for a monetary consideration and agreed that it would not sell glass for export to the United States nor give aid to American glass manufacturers.

There was no violation of § 73 of the Wilson Tariff Act by Philips, General Electric or Corning when they became parties to the glass agreements in 1937. Economic, political and legal interferences had taken place which Philips claimed reduced the potentiality of American trade in glass bulbs within the next ten years to something less than a hope. It alleged that it was motivated by the realities of the situation and sought to capitalize upon some property remaining to it since there remained no possible trade in bulbs. It urged that it simply exercised its judgment that the possibilities were not worth as much as it could derive out of its agreement with Corning and in signing the glass agreements it was capitalizing upon what it could obtain from its

patents. The Wilson Act, § 73, requires that the combination, conspiracy, trust agreement, or contract should be between persons either of whom as agent or principal "is engaged in *importing* any article from any foreign country into the United States". There is no proof that either General Electric, Corning, or International General Electric was engaged in importing glass bulbs. The Government supported its charge of the Wilson Act violation by the cases of United States v. Sisal Sales Corporation, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042, and United States v. General Dyestuff Corp., D.C., 57 F.Supp. 642. It is plain that the appellees in the Sisal case were importers. The General Dyestuff case is on a demurrer to an indictment and the point is not raised. This ruling in favor of Philips on the Wilson Act charge, however, does not take the evidence as to the glass agreements out of the case. Its significance must still be examined in connection with the Government's charges against Philips for violations of § 1 and § 2 of the Sherman Anti-Trust Act. It is not to be viewed as an isolated and independent incident as Philips would have it but must take its place in the chain of circumstances and conduct between Philips and General Electric so as to give full perspective to their entire dealings.

Philips claimed that the Phoebus Agreement did not prohibit a party to that agreement from entering the United States and provided no penalty if such were done for the reason it contained a clause which reads as follows:

"In determining any allotments, business based on sales made in or to the United States of North America and Canada (including Newfoundland) shall not be considered." (Ex. 2278-G, p. 57.)

As was noted in the discussion under the heading "Foreign Agreements", the Phoebus Agreement itself had no application to United States trade and all that appeared was an agreement between European manufacturers. But IGE keyed its agreements with foreign licensees in accordance with the terms of Phoebus and rendered effective the understanding that the United States was excluded territory thereby protecting General Electric from competition in the United States by members of Phoebus.

In December 1936 Mr. Boynton wrote Mr. Sloan (Ex. 81-G) of a reported price quotation by Philips in the United States. Mr. Sloan wrote Mr. Reed (Ex. 82-G) of this report. Philips contended that this was the only request it received in the period 1919 to 1940 for lamps and that this isolated incident should not be characterized as a significant restraint of trade. Mr. van Walsem testified that it refused the order because it was forbidden by the contract (R. 2823). The circumstance of the single price quotation by Philips was, of course, of no particular significance except that it reflected the sensitivity of General Electric toward any deviation by Philips from the policy established by the 1931 agreement and the reaction of Philips to the request and to that policy. In this respect it was sufficient to demonstrate a chafing by Philips under the restraint.

A year later Mr. Reed cabled Mr. Minor, then in Paris (Ex. 84-G), of a report that Philips' engineers were on their way to the United States to solicit lamp orders. The engineers turned out to be Mr. Hesselink, of Philips and four technicians making an annual visit to the United States to visit General Electric installations. However, in September 1937, a meeting was held which was attended by Mr. Hesselink, Mr. Graner, United States representative of Philips, Mr. Reed of General Electric, and Messrs. Brown, Herod and Sears of General Electric. Mr. Herod prepared a memorandum of this meeting as follows:

"The Philips representatives were definitely told that their contract was with the I.G.E. Co. and that, by the terms and conditions of the license grants and covenants therein contained, Philips could not solicit orders or accept orders for any products within the scope of the I.G.E.—Philips Agreement for the exclusive territory of the I.G.E., even for the subsidiaries of I.G.E. and G.E. Companies, except as the I.G.E. permitted. They were further advised that it was our policy in our exclusive territory to endeavor to supply from our own factories our own requirements

and those of our licensees, controlled companies and others, and that if we decided that Philips' equipment or lamp making machinery or parts could be more advantageously used than those we could supply, we would not adopt a 'dog in the manger' attitude, but would use them; but the decision as to what should be used or not rested with us in the I.G.E. and not with any of the subsidiary or controlled companies. The Philips' representatives accepted this policy, the reciprocal to apply in Philips' exclusive territory. (It was not expressed to the Philips' representatives, but such stand is also justified on the basis that under our contract they receive our confidential information and experience, which enables them to manufacture and design their equipment in conformity with ours.)

"In connection with Mr. Graner's letter to Mr. Duncan dated August 16, 1937, regarding the form of procedure for the introduction of visitors to the Philips' factories, the misunderstanding which the I.G.E. Company had that Mr. Graner wished by his personal voucher to certify to the correctness of the I.G.E. and G.E. statements, was cleared up. Apparently this was just due to the wording of the letter, and the voucher or certificate is to be given only by the 'writer of the letter' of introduction and not by Mr. Graner.

"It was agreed that there were not objections to Prof. Hesselink proceeding to Cleveland and going on to Canada and visiting the Canadian factories, subject to the conditions expressed in paragraph 1."

Mr. Herod testified substantially to the same facts as in Exhibit 85-G (R. 1757, 1798).

Philips argued that the differences between United States and European lamp markets and manufacturing and distribution methods precluded competition with General Electric. It claimed that the intensity of the American market geared to a standardized product induced the manufacture of machines designed to turn out immense quantities of a comparatively few styles of lamps of similar voltage while in Europe, where lamps were of innumerable styles and many voltages, almost "custom made", machinery for their manufacture had to be essentially different from the American. Distribution methods in Europe were equally different from those adopted by General Electric in the United States. These factors were further accentuated by the patent position of General Electric here and abroad, differences in the prices of lamps in the United States and Europe, costs of transportation and insurance, customs duties, and currency exchange, all of which operated, according to Philips, like a "thick and high dam" holding back any flow of trade in lamps between United States and Holland and Belgium and as the years went by the factors and their cumulative effect became a greater and heavier burden to operation in each other's market. It contended it would have had to engage in an entirely different business from that which it conducted abroad if it were to attempt to compete with General Electric in the United States at an expense and under conditions which would have made it fanciful to engage in such an endeavor and that the same conditions acting in reverse would have precluded General Electric from competing in Holland and Belgium.

Impressive as Philips' argument seems, there are factors which it overlooks. Following the Laco-Philips decision in 1916 and the refusal of General Electric to grant it a license, it could not export because of World War I until 1919 if it had desired to do so. In 1919, the IGE contract barred it from the United States. It claimed that nothing in either the 1919 or 1931 agreements contained such a prohibition, that these agreements merely reserved exclusive territories, but this argument is a matter of semantics for in their practical operation and as understood by the parties, the agreements meant that Philips was to stay out of the United States and it governed itself accordingly. Its incentive for exporting incandescent electric lamps into the United States, therefore, by virtue of these agreements, was destroyed. It permitted its attention to be diverted from the American market when it executed the 1919 agreement with IGE and Phoebus and the 1931 agreement gave this policy renewed and stronger roots, except that it retained its liberty to

export glass bulbs, tubing and cane into the United States. In 1937, this activity was closed off by the glass agreements giving General Electric security from invasion of the United States by the only known producer of glass and glass making machinery who constituted any threat in that direction. Philips, by its own assertion, did not regard itself as a threat but it was certainly willing to represent itself as one at least to the extent of bargaining Corning into an agreement to pay as much as $25,000 a year for 10 years (half of which liability was met by General Electric) and it claimed it had knowledge of the Corning-General Electric relationship. While it is admitted that no United States law could impel Philips to enter competition, there is a showing by the Government that it did more than remain passive in the face of conditions. It contributed actively by its agreements and activities to accomplish General Electric's purpose of restraining competition in the United States from any and all sources which would interfere with its domination of the incandescent electric lamp industry. At the same time, in addition to other benefits, it acquired security that neither General Electric nor any one else, by reason of General Electric's influence, would disturb the status quo which it enjoyed in its home markets for "concerted abstinence from commerce is proscribed even where there are valid unilateral reasons for abstaining". United States v. National Lead Co., D.C., 63 F. Supp. 513, 530, affirmed 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077.

Philips insisted that even though it had no purpose for entering the American market, it signed the 1919 and 1931 agreements that it might exchange trade secrets and "know-how" with IGE, that the contracts were for the primary purpose of protecting the property rights therein and that the territorial restrictions were therefore a necessary form of protection ancillary to the primary purpose of the agreements. Such justification of territorial restrictions was disposed of in the discussion of "know-how" under the heading "Foreign Agreements" and is equally applicable to Philips.

Philips claimed that it had no knowledge that it was violating the American anti-trust laws and that it had no intent to do so and insisted that when the 1919 and 1931 agreements were negotiated it did not consult any American lawyer in regard to their validity under American law, but had relied upon IGE to act in accordance with American law. In 1935 Mr. van Walsem of Philips wrote Mr. Minor of IGE in connection with an agreement being negotiated (Ex. 2274-G):

"I enclose herewith copy of a draft agreement which has been prepared by us as an elaboration of the Heads of Agreement signed by us in Paris with regard to X-ray.

"As we thought you would prefer not to mention in this agreement the payments to be made by your company to us, we have not referred to them in the agreement, but this, of course, does not prejudice our claim to these amounts.

"We have also, for certain political reasons, preferred not to mention Philips Metalix Corporation as a party to this agreement, but it is, of course, our intention that the agreement granting them a license referred to in the first paragraph of clause 4 of our agreement with you is entered into forthwith. We have not made a separate draft for this agreement, because mutatis mutandis it can be identical to the present one.

"We have also refrained from embodying in the present draft the provisions agreed between us with regard to the collaboration between your company, Siemens and us on minimum selling prices and conditions. It was rather difficult to do so and at the same time keep the agreement free from conflicts with the American anti-trust laws. We are, therefore, content to leave this understanding to a gentlemen's agreement between you and us, which will, we are sure, be carried out by both of us in the spirit in which it was entered into. Will you please let me know whether you agree to this draft, in which case I will see to the engrossment."

Mr. van Walsem, however, testified, that he did not take the anti-trust laws seri-

ously until 1940 (R. 2804, 2852). In the face of Exhibit 2274-G, it is difficult to accept such a defense but on the contrary strengthens the belief that Philips was well aware of the United States anti-trust laws.

It was a fortuitous circumstance that officers of Philips happened to be refugees in the United States and available for service of process when this action was commenced. Philips contended that it had been haled before the court because of agreements it entered into in its native land which were entirely legal there and that it has been put to great trouble and expense in defending this suit. It contended that the court should seize this opportunity to announce the rule that foreign corporations like Philips engaged in business abroad may enter into agreements among themselves or with American corporations or with individuals freely and without fear of anti-trust suits here, so long as what they do is not done wilfully to restrain United States trade and does not have a direct and substantial restrictive effect upon it. Thus, it claimed, "a different test must be applied when considering the legality of acts of foreign corporations whose activities are wholly abroad, and a fortiori if such acts are done abroad than if Americans are involved."

It is admitted that the industrial climate of Europe was that of cartelized operation often with governmental participation. The norm of Europe was such that cartels were a matter of course and not limited by any public policy as in the United States. See League of Nations, Review of the Economic Aspects of Several International Agreements (1930); Knorr, The Problems of International Cartels and Intergovernmental Commodity Agreements, 55 Yale Law Journal 1097. Philips trangressed no law of Holland in entering into the agreements with IGE or the Phoebus Agreement. Nor is it necessarily a wrong doer simply because it entered into a number of agreements in Europe with European manufacturers. The question herein revolves around the course of conduct followed by Philips in its relations with IGE and the resulting effect of such conduct upon United States trade and Commerce.

In United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, it was stated that:

"We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States. * * * On the other hand, it is settled law * * * that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends; and these liabilities other states will ordinarily recognize. * * * Two situations are possible. There may be agreements made beyond our borders not intended to affect imports, which do affect them, or which affect exports. Almost any limitation of the supply of goods in Europe, for example, or in South America, may have repercussions in the United States if there is trade between the two. Yet when one considers the international complications likely to arise from an effort in this country to treat such agreements as unlawful, it is safe to assume that Congress certainly did not intend the Act to cover them. Such agreements may on the other hand intend to include imports into the United States, and yet it may appear that they have had no effect upon them. That situation might be thought to fall within the doctrine that intent may be a substitute for performance in the case of a contract made within the United States; or it might be thought to fall within the doctrine that a statute should not be interpreted to cover acts abroad which have no consequence here. We shall not choose between these alternatives; but for argument we shall assume that the Act does not cover agreements, even though intended to affect imports or exports, unless its performance is shown actually to have had some effect upon them. Where both conditions are satisfied, the situation certainly falls within such decisions as * * * United States v. Sisal Sales Corporation, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042. * * *" 148 F.2d at pages 443, 444.

After a review of all the facts and circumstances concerning Philips brought forward by the Government as well as the evidence adduced by Philips and its arguments, forcefully made, the conclusion appears inevitable that Philips knew full well that its activities, though with parties other than General Electric, were dictated by it. If it did not know, it should have known, particularly after 1933, that they were a substantial contribution to the scheme whereby the domination of General Electric over the United States market of incandescent electric lamps would be perpetuated and competition thwarted. It is not sufficient for the defense of its position that it considered itself well compensated for that contribution and was not aware that the anti-trust laws of this country were affected. Philips was perhaps the chief leader in its industry in Europe, as skillfully managed, intelligent, efficient and effective in its own sphere as General Electric was on its larger scale. In its enlightened state its very apathy to the impact of its real relationship with General Electric upon those laws was an indifference to them that amounted to a willingness to be a party to a breach of them. There was actual knowledge on the part of Philips of the United States anti-trust laws and it governed itself accordingly. Just as it was concerned with the anti-trust laws in the X-ray situation, it is a reasonable inference that such a concern governed its actions in signing the 1931 agreement and the glass agreements.

▬ As to the second requirement for the finding of a violation on the part of Philips that its activities must have had a direct and substantial effect upon trade, its allegations and arguments that conditions made it impossible for it to conduct business abroad after 1933 have been given all the credit which they deserve. They did not thwart the glass agreements where Philips procured an annual stipend for ten years to refrain from the use of its United States patents in glass, among other things, and Philips is left upon the ground that it was, at least to the extent of its own power and ability, willing to prevent any birth or rebirth of trade here. Even though there is no showing as to the extent of commerce restrained, it deleteriously affected commerce by entering into the agreements with IGE and Corning since it lent itself to the General Electric plan of throttling potential sources of foreign lamp parts. Cf. United States v. American Tobacco Co., 221 U.S. 106, 139–141, 183–185, 31 S.Ct. 632, 55 L.Ed. 663. Philips was aware of the relationship existing between IGE and General Electric and understood General Electric's position in the incandescent electric lamp industry in the United States, and it knew of the Corning-General Electric relations. As was stated in United States v. Griffith, 334 U.S. 100, at page 105, 68 S.Ct. 941, at page 944:

"It is, however, not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the anti-trust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements."

Competition was aborted by the agreements to which it became a party and it thereby came into conflict with the anti-trust laws for they "are as much violated by the prevention of competition as by its destruction". United States v. Griffith, supra, 334 U.S. at page 107, 68 S.Ct. at page 945. "For acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." United States v. Paramount Pictures, 334 U.S. 131, 161, 68 S.Ct. 915, 931. By virtue of its contractual relations with Corning and IGE, it became a party to the restraints of trade and monopoly exercised by General Electric and was in violation of § 1 of the Sherman Anti-Trust Act.

For reasons stated herein together with those discussed under the heading "Monopoly of Incandescent Electric Lamps", Philips is likewise found to have violated § 2 of the Sherman Anti-Trust Act for having aided and assisted in the maintenance of General Electric's monopoly of the incandescent lamp industry in the United States.

Philips objected to the following exhibits: 2297-G, 3379-G, 2129-G, 2358-G, 430-G, 382-G, 387-G, 64-G, 2272-G. It advanced as grounds for its objections to them that

they were statements made prior to the alleged formation of a conspiracy and were not admissible other than against the party making such statement. It also objected to them on the ground that conspiracy being absent, they were not admissible to show the furtherance of the conspiracy. It objected to Exhibits 2274-G, 437-G, 447-G, 448-G, 84-G, 431-G on the grounds that they were hearsay, incompetent or irrelevant so far as they related to Philips. The objections must be overruled except for Exhibit 448-G for the reasons set forth to similar objections made by General Electric in the section "Disposition of Objections and Motions". Such material appearing in the exhibits which contained hearsay or opinion only was rejected and they were regarded for their competent use only.

### General Electric's Monopoly of the Incandescent Electric Lamp Industry

It is proposed now to consider various of the factors which the Government advanced as the basis for the charge that General Electric has a monopoly of the incandescent electric lamp industry.

### (1) Dominant Position

Exhibit 21-G, entitled "Estimated Trend of Domestic Lamp Business, 1908 to 1941" is a table of statistics concerning the production of incandescent electric lamps from 1908 to 1941 [42] inclusive. It shows in columnar arrangement for each of said years the production of incandescent electric lamps by General Electric, Westinghouse and the "B" licensees. Other manufacturers' production and imports are also disclosed and the table is divided into classifications of large and miniature lamps. The quantity of each source and its percentage of total and the net receipts for each and its percentage to total are shown.

Taking up the five year period just before this suit, beginning with 1936 and ending with 1940, the Government claimed that General Electric produced directly, and allegedly controlled through the production of Westinghouse and the "B" licen-

sees an average of 91.1% of the dollar volume of all the large lamps manufactured, distributed and sold in the United States; 90.9% of the miniature lamps; 98.6% of the Christmas tree lamps or an average of 91.3% of the dollar volume of all lamps manufactured, distributed and sold in the United States. It further claimed that during the whole period complained of, 1927 to 1941, the percentage of control had remained approximately the same, and in 1940 it was approximately the same as it was in 1917. The Government charged that these figures point to the consistent maintenance of monopoly and monopoly power on the part of General Electric, although the controlling lamp patents had expired.

General Electric attacked the Government's claims and termed its computations "unreliable" because they are based on percentage of dollar value rather than on quantities of lamps and that they omit figures shown on Exhibit 21-G relating to imports, which it alleged were especially swollen by imported Christmas tree lamps. It alleged that a proper computation over the period reveals that the total domestic sales of General Electric and its licensees were actually 80.26%. Furthermore, General Electric argued that the Government in any event is unjustified in "lumping" the business of General Electric and its licensees together to arrive at a total figure as if the combined business were that of General Electric, when the only connections between them were legal license agreements and business contracts. The Government replied that a footnote to its chart indicated that imports of large lamps were excluded and that they amounted to an average of less than one per cent and that the difference in using dollar percentages and unit percentages is also trifling amounting to less than one per cent.

General Electric insisted that for the year 1940, just prior to the bringing of this suit, it sold slightly over 58% of the large incandescent electric lamps sold in the United States. In 1924, the proportion was 60%,

---

[42] Christmas tree lamps are included in the miniature classification for the years 1920 and 1921. They are separately accounted for in the years 1922 through 1941, and in 1941 automotive lamps and fluorescent lamps are separately accounted for.

in 1919, 68% and in 1912, 82% (Ex. GE-237). It claimed that its miniature lamp business decreased even more. In 1912 it was 90%; 1919 nearly 65%; 1924 nearly 57%; and 1940 about 51% (Ex. GE-238). It claimed that at the end of the period when the Government charged it was guilty of "monopolistic acts", 1940, it did far less of the total incandescent electric lamp business than it enjoyed in the year prior to 1924.

Some difficulty was experienced in reconciling the figures on the Government's chart in its brief with Exhibit 21-G, but analysis of that exhibit discloses that General Electric's average percentage of quantity of large lamps for the years 1927 to 1940 was 59.8%. The high for the period was 63.7% in 1927 and the low was 57.8% in 1932. The combined percentages of General Electric, Westinghouse and the "B" licensees for large lamps over the same period averaged 89% with a high of 94.2% in 1927 and a low of 86% in 1935. The average of the miniature lamps over the period for General Electric was 50.-3% and combined with Westinghouse and the "B" licensees it was 84.3%. For Christmas tree lamps the average for General Electric was 44.8%. During the same period the average of Westinghouse was 10.6%. General Electric's average percentage of the total of all lamps during the period was 55%, while combined with Westinghouse and the "B" licensees it amounted to an average of 82.2%

The Government conceded that the point at which size or relative size becomes a monopoly cannot be determined by percentages alone, but it contended that it is strong evidence of market control and the fact of exclusion. It cited the following cases in support of the importance of size: American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Swift & Co., 1932, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999; United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Lehigh Valley Railroad Company, 1920, 254 U.S. 255, 41 S.Ct. 104, 65 L.Ed. 253; United States v. United States Steel Corporation, 1920, 251 U.S. 417, 40 S.Ct.

293, 64 L.Ed. 343, 8 A.L.R. 1121; United States v. Reading Co., 1920, 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; United States v. United Shoe Machinery Co., 1918, 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968; Standard Oil Co. v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A., N.S., 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 1911, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; William Goldman Theatres v. Loew's Inc., 3 Cir., 1945, 150 F.2d 738; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416; United States v. Corn Products Refining Co., D.C. 1916, 234 F. 964; United States v. E. I. Du Pont De Nemours & Co., C.C. 1911, 188 F. 127.

However, size as such is not illegal per se. Only the acquisition and use of it as the power to monopolize or the intent to exercise the power is condemned. In this connection the Supreme Court stated in the case of American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575:

"Without adverse criticism of it, comparative size on this great scale inevitably increased the power of these three to dominate all phases of their industry. 'Size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past.' United States v. Swift & Co., 286 U.S. 106, 116, 52 S.Ct. 460, 463, 76 L.Ed. 999 An intent to use this power to maintain a monopoly was found by the jury in these cases." 328 U.S. at page 796, 66 S.Ct. at page 1133, 90 L.Ed. 1575.

Nevertheless, the fact stands out that General Electric and its licensees exerted a combined position that presented an almost impregnable front to those manufacturers not part of their combination. General Electric's emphasis upon its individual percentage decrease over the course of years does not hide the clear cut picture that the supposed loss of percentage was absorbed by its licensees who were combined with it. The size of the combination herein coupled with General Electric's intent to dominate the industry serves as an indicia of monopoly. Cf. United States v. Griffith, 334 U.S. 100, 107, note 10, 68 S.Ct.

941; International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431; United States v. International Harvester Co., 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416.

### (2) Profits ·

The Government charged that the alleged monopoly by General Electric enabled the General Electric Lamp Department to make such extraordinarily high and exorbitant profits as to go far in themselves to prove the exercise of monopoly power. From the Summary of Operations and Balance Sheet of the Incandescent Lamp Department of General Electric for the year ending December 31, 1939 (Ex. 2110-G) it appears that the Lamp Department had a net income of $17,462,132 compared to a net income of $48,148,666 for the entire company (R.3854, 3855) or 36% of the entire net income. Comparing the net investment in the Lamp Department of $76,493,919 (Ex. 2110-G) with the net worth of the company of $364,462,753 (R. 3852) it appears that 36% of the total income was earned on 21% of the capital invested or that the rate of return on capital invested in the Lamp Department was 60% higher than the rate on the capital invested in the rest of the company. The Government also showed from a table compiled by the Statistical Division of the Bureau of Internal Revenue of corporation income tax returns for the years 1930 to 1939 (Ex. 2364-G) that the average rate of profit for all American corporations after taxes for the year 1939 was 4.4%. For General Electric it was two and one half times that rate, or 11% (R. 3852). For the Lamp Department it was 22.83%. Lastly the Government drew attention to the fact that in the depression year of 1930 all corporations' income tax returns showed a loss of 0.61% (Ex. 2364-G). Actually this is shown for 1931, as the information for 1930 was not available, while in 1930, it appears that the net income from the Lamp Department of General Electric was 34.39% (Ex. 2110-G). The Government pointed to the fact that the high rate of profit enjoyed in this business would normally attract outside capital to the industry and that this occurred but was repulsed as illustrated in a communication from Mr. Couse of General Electric to a prospective investor wherein he wrote on August 3, 1933:

"In recent years the General Electric Company has received many applications for licenses * * * and has adopted a policy of refraining from granting further licenses." (Ex. 142-G.)

General Electric challenged the propriety of the Government in relating profit to costs and expenses (R. 2366-2369) and denied that the record supports the claim that the Lamp Department has earned excessive profits. As to the first claim of the Government that the Lamp Department earned 36% of the income of General Electric for the year 1939 it commented that the comparison is futile because lamp manufacture is a mass production business which has the inherent value of utilizing capital investment more efficiently than in types of manufacture employed in making products such as dynamos, turbines, etc., where mass production is not possible. As to the Government's second claim concerning the comparisons of the Lamp Department's and General Electric's earnings for the year 1939 as compared with all other American corporations, General Electric contended that it is unrevealing of anything except good management. It argued that the Government's comparison of its income with that of 412,758 corporations indiscriminately grouped in the income tax data resulted in no valid conclusion. It preferred to compare its income with that of 50 manufacturing corporations taken from a list of approximately one thousand companies surveyed by the Securities and Exchange Commission for net worth and net profits for the years 1936 to 1939 (Ex. GE-210). This selective group, it contended, gave possibility of a more valid comparison, although it felt that it was still at a disadvantage as the comparison was made between the Lamp Department income, a single department of General Electric, with the whole income of the respective compared companies. This comparison, General Electric submitted, shows that a substantial number of corporations had a higher ratio of net profit to net worth than either General Electric or the

Lamp Department. General Electric met the Government's third proposition that in the depression years of 1930-1931 General Electric was able to sustain its net profit rate notwithstanding losses suffered by business in general, with the contention that this was not due to its alleged monopoly position but that during this period the total sales of all lamp manufacturers decreased very little and that in 1933 an increase had begun (Ex. 31-G), which indicated that the public demand for lamps was not as much affected by the depression as the public demand for and ability to buy other products.

The attacks made by General Electric upon the comparisons by the Government of General Electric and its Lamp Department and by the Government of General Electric's comparisons are all not without merit. The adoption by the Government as a standard of the reported tax data on income of nearly a half million corporations indiscriminately grouped is equally unrealistic as the controls set by General Electric for its comparison consisting of 50 selected successful manufacturing companies of the country.

█ It is an undisputed fact, however, that General Electric and the Lamp Department enjoyed substantial profits. Standing alone this, of course, does not render it violative of the anti-trust laws. Like size, itself, it can only be given consideration along with myriad other circumstances for the purpose of determining whether in combination they are elements in the generation of that power to monopolize that constitutes violation of the law. Cf. United States v. Columbia Steel Co. et al. 334 U.S. 495, 527, 68 S.Ct. 1107.

### (3) General Monopoly Powers

The Government argued generally that due to its size, financial position and dominance in the incandescent electric lamp industry, General Electric had the power

(a) to intimidate businesses from selling to purchasers who might compete with General Electric;

(b) to deteriorate the quality of the lamps it produced and with its technical knowledge to produce a better product; and

(c) to exclude lamp companies from domestic licenses.

### (a) Intimidation of Business

In this connection, the Government pointed to Exhibits 316-G and 318-G to demonstrate General Electric's alleged complacent certainty of its position and power. Both of these exhibits were pertinent to the discussion of lamp bases, but additionally evidenced General Electric's understanding of its position in the industry. Exhibit 316-G was a letter from Mr. Atkins in the Parts Manufacturing Department and later Manager of the Cleveland Lamp Works to Mr. Kenyon, Manager of the Providence Base Works in which he wrote that:

"If for any reason we do not purchase the machine, I do not think they [U. S. Tool Co.] will dare to approach anyone except Westinghouse for fear of incurring General Electric ill will."

Mr. Atkins again wrote to Mr. Kenyon that (Ex. 318-G):

"If we decide not to give U. S. Tool any extra compensation, we do not think there would be much possibility of their selling it or the tools to outside manufacturers. The fact that Westinghouse and ourselves control 85% of all the bases used in this country, and that we through our B Licensees control an additional 10%, makes the field in which an Independent Manufacturer of bases could sell his product rather limited."

General Electric denied oppressive action against any manufacturer and maintains that at no time did it restrain competition.

█ The Government has offered no direct proof that General Electric intimidated business. However, when it is considered that the position of General Electric, its licensees, and independent lamp manufacturers has remained relatively unchanged over the years as reflected in Exhibit 21-G, analyzed under the heading "Dominant Position"; that this position together with the very nature of the restraints exercised by General Electric as discussed throughout the opinion, limited the entry of newcomers into the industry; and the actual decrease of independent

manufacturers; the conclusion must be that General Electric has at least the power to intimidate other businesses from selling their products to purchasers who might compete with it. Cf. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

### (b) Deterioration of Product

The claim of the Government of deterioration of the product was based upon the testimony of Dr. William David Coolidge, who testified that the efficiency of light production of the tantulum lamp was approximately six lumens, that this was doubled to "perhaps twelve lumens" with the advent of the vacuum tungsten filament lamp, and again doubled to "let's say 24 lumens" when the gas filled tungsten lamp was introduced (R. 1627). Against this the Government referred to Exhibit GE-14, a schedule showing approximate lamp efficiencies in initial lumens per watt which indicated that from 1927 to 1942 the 60 watt gas filled tungsten lamp increased from 11.1 lumens per watt to 14 lumens in 1942. From this the Government concluded that General Electric does not produce a commercial standard line lamp better than 14 lumens, although Dr. Coolidge testified that 24 lumens were possible.

General Electric contended that this misstates the record, calling attention to the fact that Exhibit GE-14 relates only to the efficiency of 60 watt lamps, while Dr. Coolidge addressed his testimony not to the 60 watt lamp only but generally to any size of lamp. It drew attention to Exhibit 1200-G, column 14, pages 4411-4415, where lamps of the standard line having wattages of 75 and more had rated lumens of more than 14 and that in special lamps of high wattages, the output of 24 lumens was reached and exceeded. It contended that the testimony in its behalf showed that the higher the wattage of the lamp the more efficient it was.

It is unreasonable to infer from the state of this showing that General Electric had the power to deliver to the consuming public a 60 watt lamp having an efficiency rating of 24 lumens as the Government argued.

For its second support of its charge of deterioration of the product the Government relied upon an episode in connection with flashlight bulbs. In the 1920s a flashlight bulb manufactured by General Electric would have a life coextensive with three batteries. This was reduced to two batteries and in 1932 the engineering department of General Electric made a study of a proposal to change the design life of flashlight lamps to one battery life. This is set forth in a memorandum signed by Mr. Prideaux (Ex. 1858-G). In it he reports:

"We believe that increases in the current drain of certain flashlight lamps would be propitious at the time the life is reduced. We would suggest increasing Mazda lamp No. 10 from .27 ampere to .30; and 13.14 and 31 from .30 to .35. This would result in increases of candlepower of 11 and 16 percent respectively, or added to the increases resulting from higher efficiencies, would total approximately 18 and 25 percent. This higher candlepower would be acceptable to all flashlight users. The decreased battery life resulting from the increased current should not be a hardship to any except meter-reader service and where it may be considered offset by the higher candlepower.

\* \* \* \* \* \*

"The effect of what we will call the breakage and discard factor, which includes actual lamp breakage plus the discarding of the lamp before failure, accounted for approximately one third of our lamp business in 1931, if we assume that an average service life would be 2-1/4 batteries rather than 2, due to a large number of batteries deteriorating rather than being used up by burning the lamp. We might, therefore, expect a 60 to 70 percent increase in lamp business rather than 100 percent increase if the life of our lamps are cut in half."

This memorandum was the basis for an inter-departmental letter from Mr. Porter to executives of General Electric:

"Two or three years ago we proposed a reduction in the life of flashlight lamps from the old basis on which one lamp was supposed to outlast three batteries, to a point where the life of the lamp and the

life of the battery under service conditions would be approximately equal. Sometime ago, the battery manufacturers went part way with us on this and accepted lamps of two battery lives instead of three. This has worked out very satisfactorily.

"We have been continuing our studies and efforts to bring about the use of one battery life lamps. I think you will be interested in the attached analysis which Messrs. Prideaux and Egeler have worked up covering the various points involved in going to the one battery life basis. If this were done, we estimate that it would result in increasing our flashlight business approximately 60 per cent. We can see no logical reason either from our standpoint or that of the battery manufacturer why such a change should not be made at this time.

"Messrs. Parker and Johnson now have this matter up with the battery manufacturers and I would urge that every assistance be given them to put it over." (Exhibit 1860-G.)

General Electric contended that the main purpose of the change in the life of the lamp was to lower the total costs of light to a flashlight user by making the design life of lamps then in use shorter so as to cause them to give more light, and that, incidentally, it was estimated that its sales of flashlight lamps would be increased about 60%.

It was testified by Mr. Harrison that the lamps of shorter life were put on the market along with the less efficient lamps of longer life so that the customer could take his choice, the lamp with the shorter life being sold at a lower price. Later it was found that some of the efficient lamps were burning out before the battery was consumed to the customer's dissatisfaction and the design of the lamp increased to the life of about two batteries at no increase in price (R. 2173).

A considerable amount of testimony was presented by General Electric to show that the length of life of any particular lamp is not a measure of the quality of the lamp, the contention being made that the more important consideration is the amount of light that the lamp will give for the amount of electricity it consumes. It was testified by Mr. Harrison (R. 2162) as follows:

"When the temperature of the filament is low, the light is given inefficiently, but the tendency of the filament material to evaporate is reduced, and it evaporates slowly. Therefore, the lamp filament lasts a long time. If you burn it at very high efficiency, high temperature, the filament evaporates much more rapidly and finally it gets so thin, at least in spots, that it eventually falls all to pieces."

Exhibit GE-181 is a condensation of his testimony showing how two 100 watt lamps having design lives of 750 hours would cost the consumer less than one 100 watt lamp to operate for the same light designed for a 1500 hour life.

The Government insisted that General Electric was primarily interested not in giving the consumer more efficient light but basically in increasing its sales of flashlight lamps and that the reason it returned to the two battery life formula was because one of the battery manufacturers was unwilling to approve the change as is indicated in Exhibit 1861-G.

The third basis for the charge of deterioration leveled by the Government against General Electric also involved miniature lamps. One of these, in 1936 and 1937, was a night lamp known as C-7, designed for a life of 2000 hours and the other was the Christmas tree lamp known as C-7-½, designed for a life of 500 hours. The Government charged that General Electric was opposed to any plan which would permit the substitution of the long lived night lamp for the Christmas tree lamp having the shorter life because it was concerned with loss of sales and the opposition of the Christmas tree string manufacturers. It pointed to Exhibit 1867-G, a memorandum dated July 30, 1937, from the Incandescent Lamp Department to managers and salesmen, as follows:

"We have been informed that some of our B agents contemplate ordering C-7 night light lamps for use in multiple Xmas Tree sets, rather than purchase C-7-½ multiple Xmas tree lamps from our Xmas Tree Outfit manufacturers. While the cost of the C-7 night light lamp to a jobber is

slightly higher than that of the C-7-½ Xmas Tree Lamp, this may be offset by the advantage of crediting sales of night light lamps to their MAZDA lamp sales.

"We do not recommend the use of C-7 night light lamps in Xmas Tree sets because:

"1–Night light lamps are less rugged than multiple Xmas Tree lamps and will not give the customer as satisfactory service in multiple Xmas Tree sets.

"2–Naturally our Xmas Tree Outfit manufacturers object to the use of C-7 night light lamps in their Xmas Tree outfits, because they do not want to lose the sale of C-7-½ multiple Xmas Tree lamps.

"We urge that whenever substantial orders for C-7 night light lamps are received from our B agents, that you have them investigated to determine whether they are to be used in multiple Xmas Tree service. If so every effort should be made to convince the B agent that the regular C-7-½ multiple Tree lamps should be ordered from his regular source of supply or Xmas Tree outfit manufacturer."

The Government insisted that the argument put forth that the C-7s were less rugged in construction and that the consumer would not receive satisfactory service from them if they were used as Christmas tree lamps was obviously for promotional purposes because of the emphasis on the loss of sales. To support this it pointed to the letter of the Noma Electric Corporation bitterly complaining that even the C-7-½ lamp was "too healthy" and calling for General Electric to help in the "serious problem" of restraining the use of the C-7 lamps as Christmas tree lamps (Ex. 1865-G) and the reassuring reply by Mr. Potter that:

"I hope you have not become too panicky about the possibility of our B Agents using Night Light lamps instead of the Christmas Tree C-7-½. This Night Light Business has been quite a problem for us and we saw no other way to handle it, but in order to forestall any activity such as you fear we are sending out a letter to our Divisions requesting them to analyze all orders which they may receive on a B Agency for this type of lamp and point out in each individual case the danger of supplying such a type for Christmas Tree use. I think you need have no great concern about this practice growing." (Ex. 1864-G.)

General Electric disclaimed the Government's charge that it emphasized the sale of the C-7-½s for Christmas tree lamps without thought of the consumer's interest but insisted that technical reasons for different designs of the lamps were the paramount considerations.

It argued that the night light was a small lamp designed to throw a spot of dim light for use in hallways, nurseries, etc. It was required to burn throughout the night and the amount of light produced was unimportant so that long life could be given to it. The Christmas tree lamp of similar size and shape was entirely different in purpose being required to produce the sparkle and brilliance of particular interest to Christmas tree decoration. Designed to give brilliant light it had a shorter design life. Even so, it would last the ordinary consumer about 10 Christmas seasons, disregarding shocks in handling. The night lamp, although it would fit into the socket of the Christmas tree lamp, was unsuited because it lacked brilliance and was not of the rugged construction to meet the rougher handling to which the Christmas tree lamp was exposed. The C-7-½ was a new product introduced to take the place of the old one which was constructed in series and in which, if one lamp burned out, all of the rest of the lamps on the string ceased to burn, and General Electric acknowledged that it was anxious that it be accorded a good reception. However, it contended that the decision to push the promotion of C-7-½ lamps for Christmas tree use was solely on the ground that it was properly designed for that purpose while the C-7 was not and would give unsatisfactory service if used for Christmas tree purposes. General Electric argued that both the flashlight and Christmas tree lamp allegations of the Government were in reality illustrations of constant effort to furnish the public with better lamps at lower prices rather than actions in disregard of its interest as alleged by the Government.

Although the Government's contention that it has proved that General Electric could have produced a 60 Watt lamp giving 24 lumens of light has been rejected, these latter contentions with regard to flashlight bulbs and Christmas tree lamps illustrate an existing ability upon the part of General Electric to shorten the life of a lamp. At the same time it should be borne in mind that the life of a lamp is inextricably related to the power of its light in that the greater the strength of the light the shorter will be the life of the lamp. It is realized that flashlight and Christmas tree lamps are lines of lesser importance in the incandescent electric lamp industry, although the overall production and profit in them is far from inconsequential. Despite assertions of good faith, sound business discretion, great technical research, and consideration for the interest of the consuming public, there was manifested in the two situations a paramount concern in what would afford the maximum return in profits to the manufacturer and that General Electric had the power in the instance of the flashlight lamp, to shorten the life of the lamp, and in the instance of the Christmas tree lamp, at least, to promote a product with a short life for a specific use over one that had four times its life. However, the total proof leads to the conclusion that by virtue of General Electric's dominating position in the industry and relative lack of competition it had the power to set the standard of efficiency of incandescent electric lamps for the entire industry and in so doing to determine what should be their length of life, and this constitutes an attribute of monopoly.

### (c) Power to Exclude

In connection with the Government's argument as to the manifestations of monopoly, it contended that General Electric had been capable of excluding from the manufacture of incandescent lamps those seeking to enter the field. It referred to Exhibit 142-G wherein Mr. Couse wrote in answer to a request for a license that:

"In recent years the General Electric Company has received many applications for licenses under its incandescent lamp patents and has adopted the policy of refraining from granting further licenses. For years the General Electric Company has expended large sums of money in research and development work and, as inventions made were patentable, it applied for and obtained patents thereon. The General Electric Company is primarily a manufacturer, and its large expenditures in research and development work are for the purpose of improving its products and its manufacturing equipment and processes.

"If the General Electric Company were a mere engineering concern whose business aim was to derive income from patents, its policy of licensing would probably be different, but—as I have said—it is primarily a manufacturer. It has a large investment in lamp manufacturing plants and equipment and a large number of employees engaged in the manufacture of lamps. The granting of additional licenses would involve the risk of rendering useless a part of its investment in plant and equipment and of requiring it to release some of its employees. Therefore, no change is contemplated in the policy of refraining from granting further licenses."

It is argued that there has been a high mortality rate in the number of companies engaged in the manufacture of lamps, all due to the industrial climate created by General Electric, and pointed to Exhibit 24-G which lists the number of companies that at one time or another had been licensees of General Electric. It contended that between 1912 and 1940 some 36 different companies were licensed by General Electric. Of this number 18 were large lamp manufacturers; 14 were miniature lamp manufacturers; 2 manufactured large and small lamps; and one manufactured special lamps. However, the Government claimed that in 1940 only 3 companies were licensed to manufacture large lamps; 2 companies licensed to manufacture miniature lamps; and one company licensed to manufacture large and miniature lamps. That this number was partly reduced by consolidation and acquisition by remaining licensees the Government contended was immaterial. It asserted that only three independent miniature lamp manufacturers in business prior to 1927 are in the field today (R. 3626-3628) and that no substantial new

capital had been invested in the large lamp business after 1927 (Ex. 21-G, R. 3677, 3514.)

General Electric argued that when the court sustained the Just and Hanaman patent in 1916, General Electric Co. v. Laco-Philips Co., 2 Cir., 233 F. 96 approximately twenty-five incandescent lamp manufacturers were infringing this patent (R. 1130). With substantial investments and numerous employees they would have been in serious straits had it sought to enforce its patents against them. Not desiring this and at the same time in order to protect its patent position, it offered to all tungsten lamp manufacturers then in existence licenses with certain restrictions based upon the amount of business conducted by these infringers in the past (R. 1131-1132, Ex. 31-G at p. 273, Ex. 32-G at p. 302, Ex. 33-G at p. 330). All but one infringer, it contended, accepted licenses (R. 1133). It claimed that from time to time these infringers transferred their assets, including license rights, to other licensees with the result that the number of licensees in the field had been reduced at the time of the suit (R. 1133, Exs. GE-65, GE-66).

An examination of Exhibit 24-G shows that 21 companies previously licensed by General Electric were acquired or consolidated with other licensees of it; the quotas and licenses of 4 were transferred to other licensees; one license was cancelled; 4 companies showed no later activities; while 6 companies remained licensees as of 1940. Limiting considerations to the period after 1933 when the Langmuir patent involved in the 1926 case expired, companies licensed by General Electric were Westinghouse, Sylvania, Chicago Miniature, Tungsol, Kentucky Electric Lamp Co., Economic Electric Lamp Co., and Consolidated. In 1936 Economic Lamp Co. was acquired by Sylvania.

It was determined in the patent discussion that General Electric possessed no valid product patents after 1933 which permitted it to place restrictions on the completed incandescent electric lamp of the "bread and butter" variety. The failure of companies to survive as manufacturers of incandescent electric lamps is not unusual since previous to 1933 General Electric

possessed a legal monopoly. Following 1933, the expense of entering the field was practically prohibitive although there were persons interested (Ex. 142-G). General Electric's apparently impregnable position was a formidable barrier to anyone who contemplated entering the lamp manufacturing field and this coupled with the knowledge that it controlled the manufacture of lamp bases, lamp manufacturing machinery, along with a tight block on the supply of glass, created a situation sufficient to deter entry. The link to unlawful monopoly is apparent from the fact that upon expiration of the lawful patent monopoly in 1933, there was no new entry into the field and there were no new General Electric licenses.

General Electric has argued that it is not required to license anyone it does not wish in order to protect its manufacturing position, since it could not by royalties secure the income attainable by manufacturing. Standing by itself General Electric's right to limit or deny patent licenses to those whom it does not desire to license without assigning a reason is not to be questioned. The Government's reliance upon the premise that General Electric denied licenses seems inconsistent in the face of its contention that General Electric lacked a valid patent basis to sustain the license restrictions which it demanded.

The power to exclude does not flow from the fact that General Electric denied licenses but is the direct result of its being the dominant force in the industry. General Electric controlled certain sources of essential parts necessary to manufacture lamps and restricted access to those sources. Similarly, it maintained a widespread system of surveillance whereby it was able quickly to determine newcomers in the field. Applying its massive dominance over the industry it could by asserting patent control, by controlling and restricting domestic sources of parts and machines, by sealing off the foreign source of parts and machinery through the foreign agreements, and by its exertions in behalf of the Mazda mark seriously limit domestic competition. All of these conditions generated the power to exclude competitors from the industry. Cf. American Tobacco

Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575.

#### (4) Industrial Surveillance

In the normal conduct of a business there is a valid interest in the progress and status of a competitor. The sources of information correspondingly can be as varied as can be the means of securing such information. There have been cited numerous instances of how General Electric kept itself informed of the state of the incandescent electric industry in all its phases whether under its control or not.

From time to time, officials and employees of General Electric visited the facilities of other manufacturers and distributors of incandescent electric lamps. Certain of these visits were for the legitimate purpose of detecting infringement of General Electric patents. Reports of these visits found their way into the files of General Electric which contained information however, totally unrelated to patent infringement. During the course of its efforts to establish the Mazda marked product as the standard specification to be set by public bodies, General Electric obtained various pieces of information concerning possible competitors. It prosecuted aggressive quests for information at the Bureau of Standards and ETL directed at other manufacturers and distributors. The very act of filling orders for lamp bases by General Electric's Providence Works provided means whereby reports were made from which the probable number of lamps to be manufactured by those purchasers could be calculated. A wealth of information was funneled through the Supervisor from sales personnel of both Westinghouse and General Electric in all parts of the country. General Electric accumulated this data at a central point in its organization for strategical and tactical planning by the Lamp Department in halting encroachments upon its frontiers of the incandescent electric lamp industry.

Although these activities in collating information may have been innocent isolated by themselves and might be readily countenanced as between genuine competitors, here they emanated from a dominant force in the industry to envelope its controlled allies and the few remaining independent manufacturers. In that light, viewed in their aggregate, they represent a picture of espionage and policing activity. This surveillance was not for the ordinary purpose of sharpening competition but rather designed to reinforce and maintain the domination of the industry; and to inhibit the growth of existing, and abort the birth of, new competition. These activities, part of the general pattern of conduct, do not of themselves rise to the level of a violation of the Sherman Anti-Trust Act but they disclose a manifestation of monopoly in the incandescent electric lamp industry by General Electric. Cf. United States v. Eastman Kodak Co., D.C., 226 F. 62, 78.

#### (5) Conclusion

Without attempting to enumerate them in the order of their importance, the previously determined individual restraints of trade and competition and the activities manifesting a monopoly are summarized as follows:

(1) Dominant position in the industry of General Electric.

(2) Lack of a valid patent support to sustain price, quantity and export limitations in the incandescent electric lamp domestic licenses in existence after 1933.

(3) Combination with and integration of Westinghouse resulting from and evidenced by the following:

(a) Westinghouse's enjoyment of a favored position under the glass agreements.

(b) Mutual use of the Mazda trademark by General Electric and Westinghouse.

(c) Common solicitation and elimination of agents.

(d) Joint use of the Supervisor.

(e) Joint effort in soliciting public business.

(f) Cooperative efforts in Mazda sales campaigns.

(g) Westinghouse's adherence to the restrictions established in the "A" license.

(4) Combination with Corning to monopolize the manufacture and distribution of glass bulbs, tubing and cane.

(5) Combination with Corning, American Blank and Empire to restrain trade and

competition in the ·manufacture and distribution of machinery for manufacture of glass bulbs, tubing and cane.

(6) Employment of International General Electric as a means of eliminating foreign competition through

(a) Foreign subsidiaries,

(b) Phoebus Agreement and the 1941 agreement,

(c) Separate agreements between International General Electric and the individual members of the Phoebus combination encompassing the general terms of the Phoebus Agreement and coordinated with General Electric's domestic licenses.

(7) Lamp base monopoly.

(8) Lamp machinery restraints.

(9) Filament and leading-in wire restraints.

(10) General Electric's profits in the incandescent electric lamp industry.

(11) Public business activities.

(12) The monopoly of incandescent electric lamp patents.

(13) Invalid restriction in fluorescent licenses.

(14) The power to intimidate and exclude manufacturers from the incandescent electric lamp industry and to fix the standards for the industry.

(15) Industrial surveillance.

■ The aggregation of the foregoing activities and manifestations inevitably leads to the conclusion that General Electric monopolized the incandescent electric lamp industry in violation of the Sherman Anti-Trust Act, § 2. United States v. Griffith, 334 U.S. 100, 105-109, 68 S.Ct. 941; American Tobacco Co. v. United States, 328 U.S. 781, 809, 810, 66 S.Ct. 1125, 90 L.Ed. 1575; Associated Press v. United States, 326 U.S. 1, 12, 65 S.Ct. 1416, 89 L. Ed. 2013; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 431, 432.

By virtue of their having acted in combination with General Electric and acquiescence in the relationships established with it as previously determined, Westinghouse, Philips, Corning, Sylvania, Tungsol, Kenrad, Chicago Miniature and Consolidated have violated § 2 of the Sherman Anti-Trust Act. United States v. Paramount Pictures, 334 U.S. 131, 161, 68 S.Ct. 915.

Disposition of Objections and Motions

There was little oral testimony offered on the part of the Government to develop its case, reliance being placed upon documentary evidence or cross-examination of defense witnesses. The major portion of the documents is from the files of the defendants supplied on request of the Government and by stipulation their genuineness and authenticity were admitted. Preliminary objections were offered to their admissibility at pre-trial hearings. Certain documents were admitted into evidence subject to objections of General Electric and International General Electric as contained in their motion to strike for reasons therein specified on which decision was reserved.

In objecting to the documents presented by the Government, General Electric argued that those obtained from co-defendants and others were inadmissible against it and International General Electric to prove the charge of conspiracy for the reasons that:

(1) They contain narrative statements of past facts not within rule of admissibility of statements in furtherance of a conspiracy.

(2) They contain statements of opinion inadmissible as a statement in furtherance of a conspiracy.

(3) They contain statements made prior to the formation of the alleged conspiracy by persons who are alleged to have later become co-conspirators.

(4) They contain statements made by persons other than General Electric officials and are not admissible to prove the existence or scope of the alleged conspiracy.

There is a particular burden thrust upon a trial court in anti-trust cases by the Supreme Court as a result of its decision in United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, in the admission and rejection of evidence and declarations of defendants. The key is the determination that a prima facie case of conspiracy has been established. It stated that:

"We are unable to accept, however, the ruling of the court that declarations of each

defendant were admissible only against the defendant making the declaration. A consideration of that point really involves the heart of the case since the treatment of the declarations may vitally affect the outcome. Some may have doubts as to whether the agreements and bulletins alone are sufficient to establish a conspiracy but the admission of the separate declarations against all greatly strengthens the government's position. We think that the industry-wide license agreements, entered into with knowledge on the part of licensor and licensees of the adherence of others, with the control over prices and methods of distribution through the agreements and the bulletins, were sufficient to establish a prima facie case of conspiracy." 333 U.S. at pages 388, 389, 68 S.Ct. at page 538.

It therefore followed that:

"With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy." 333 U.S. at page 393, 68 S.Ct. at page 541.

Cf. Interstate Circuit v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610. This language is particularly appropriate to our instant situation in view of General Electric's objections to the admissibility of documents and the claim that the Government failed to prove a conspiracy to restrain trade.

Broad discretion and great latitude are permitted in the reception of evidence in conspiracy cases. Clune v. United States, 159 U.S. 590, 592, 593, 16 S.Ct. 125, 40 L.Ed. 269; Nee v. United States, 3 Cir., 267 F. 84; Walker v. United States, 8 Cir., 93 F.2d 383, 394, certiorari denied 303 U.S. 644, 58 S.Ct. 642, 82 L.Ed. 1103. In anti-

trust cases, it is deemed essential to develop fully the background of the facts out of which the conspiracy is alleged to have arisen and in the midst of which it operated. More recent decisions of the Supreme Court strongly emphasize this principle. See United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525; United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550; United States v. National Lead Co., 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, Id., 324 U.S. 570, 65 S.Ct. 815, 89 L.Ed. 1198; United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L. Ed. 1408; United States v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Socony-Vacuum Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416.

The documents herein presented a panorama of corporate practices in a specialized field covering a period of fifty years. A major industry has been exposed to a searching inquiry to determine whether in the light of the facts developed, practices detrimental to trade and commerce of the United States are in existence. Exaggerated and over refined niceties in the rules of evidence must give way to the broad terms of Rule 43(a), Federal Rules of Civil Procedure,[43] if full effect to the anti-trust laws is to be given.

General Electric sought to separate the documents to which it objected into isolated parts and apply the principles of evidence it advanced and which have been enumerated. However, as the Court commented in United States v. Patten, 226

[43] "In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules. All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. The competency of a witness to testify shall be determined in like manner." 28 U.S.C.A.

U.S. 525, at page 544, 33 S.Ct. 141, at page 145, 57 L.Ed. 333, 44 L.R.A.,N.S., 325:

"the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."

■ The vertebrae forming the backbone, or prima facie proof of the conspiracy charged by the Government consisted of the following documents:

(1) the domestic license agreements between General Electric, Westinghouse and the "B" Licensees;[44]

(2) the foreign license agreements between General Electric and International General Electric, General Electric and foreign manufacturers, International General Electric and foreign manufacturers, and subsidiaries of General Electric and International General Electric;[45]

(3) the so-called glass agreements between General Electric, Corning, Philips, Westinghouse, American Blank, Empire, and the "B" Licensees;[46]

(4) the documents upon which it is concluded that General Electric lacked a patent monopoly after 1933 permitting it to restrict the manufacture of the completed incandescent lamp or limit the import or export of the same;[47] and

(5) the undisputed declarations of General Electric and International General Electric officials.[48]

The documents emanating from General Electric plainly indicated those parties with whom it associated thereby rendering admissible documents secured from its co-defendants and third parties proven to have been associated with it for the purpose of considering whether there is ultimate proof of a conspiracy to evade the anti-trust laws of the United States. Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 249, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461; Interstate Circuit v. United States, 306 U.S. 208, 226, 227, 59 S.Ct. 467, 83 L.Ed. 610. Cf. Allen v. United States, 7 Cir., 4 F.2d 638, 691, certiorari denied Mullen v. United States, 267 U.S. 598, 45 S.Ct. 353, 69 L.Ed. 806; Lefco v. United States, 3 Cir., 74 F.2d 66; United States v. Manton, 2 Cir., 107 F.2d 834, 848, 849, certiorari denied Manton v. United States, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012.

Hearsay matters not recognized as exceptions to the hearsay rule have been disregarded in documents otherwise found to be admissible in evidence. Accordingly the motion to strike the exhibits is denied except for those documents marked for identification, certain other documents whose authorship was never precisely determined and documents not pressed against General Electric or International General Electric by the Government as set forth in the footnote.[49]

Although the Government failed to support certain allegations of the complaint, the preponderance of evidence produced in

---

[44] Government Exhibits Nos. 25 to 32 inclusive, 2167, 2167a, 2167b.

[45] Government Exhibits Nos. 38 to 51 inclusive (49a id-G excluded), 1135, 1136a, 1136b, 1139a, 1139b, 2136, 2160a, 2278.

[46] Government Exhibits Nos. 402a, 402b, 402c, 420 to 428, inclusive, 481, 482, 484, 485, 518 to 534, inclusive, 539, 540, 546, 555 to 571 inclusive, 750 to 759 inclusive, 761, 763, 765, 766, 767, 768, 774, 782 to 786 inclusive, 811, 812, 826, 827, 836a to 836e inclusive, 963, 963a, 994, 995, 1075, 1076, 1107 to 1110 inclusive, 1153, 1155 to 1159 inclusive.

[47] Government Exhibits Nos. 21, 22, 226, 2245, 2247, 2249, 2253; G. E. Exhibits Nos. 147, 150, 151, 152.

[48] Government Exhibits Nos. 64, 65, 66, 71, 72, 73, 75, 76, 77, 83, 84, 85, 92, 96, 97, 99, 100 to 104 inclusive, 106, 107, 108, 114, 115, 116, 118, 119, 121, 123, 124, 127, 129, 130, 132, 133, 136, 137, 138, 142, 144, 145, 147, 148, 151, 152, 153, 154, 155, 159, 160, 162, 164, 169 to 175, inclusive, 185, 187, 188, 193, 195, 206, 207, 208, 209, 211, 216, 219, 225, 239, 267, 276, 317, 318, 329, 330, 333, 338, 339, 340, 348, 351, 383, 386, 387, 388, 390 to 393 inclusive, 399, 405, 418, 447, 449, 492 to 510 inclusive, 550, 572, 660, 698, 771, 772, 774, 843, 861, 865, 873, 876, 878, 896, 911, 1114, 1115, 1118, 1373, 1376, 1377, 1460, 1133, 1137, 1139, 1146, 1141, 1145, 1385, 1497, 1501, 1503, 1509, 1525, 1573, 1583, 1725, 1728, 1730, 1797, 1799, 1801, 1812, 1854, 1855, 1856, 1860, 1862, 1864, 1867, 1885, 1887, 1893, 1901, 1919, 1928, 1929, 1945, 1948, 1965, 2077, 2097, 2106, 2110, 2111 to 2120 inclusive, 2124, 2127 to 2130 inclusive, 2133, 2143, 2205, 2220, 2222, 2360, 2368a, 2368b, 2369, 2267, 2268, 2270, 2271, 2273, 2279, 2296, 2298.

[49] Government Exhibits Nos. 49a id, 163, 326 id, 395, 448, 453, 454, 455, 456, 456a id, 456b id, 461, 547, 575, 764 id,

this case, fully supports its main contentions that General Electric conspired to, and did restrain trade and competition in and unlawfully monopolized the incandescent electric lamp industry in the United States.

All of the defendants moved at the end of the Government's case to dismiss the action and renewed these motions at the end of the presentation of their defenses. In view of the findings and conclusions hereinbefore discussed, the motions are denied.

## General Conclusion

The record of General Electric's industrial achievement has been impressive. Its predecessors pioneered the lamp industry and it organized through the years an establishment that stands as a model of industrial efficiency. It early established the policy of making the best lamps as inexpensively as possible and to this end developed a lamp research, engineering, and production system which established it in the first position of industrial leadership in the incandescent electric lamp field not only in the United States but in the world. By means of extensive research initiated by such scientists as Steinmetz, Whitney, Langmuir and Coolidge, mechanical and technological advances were accomplished (Ex. GE-235) which made possible a progressive price reduction policy (Ex. GE-239). Therefore, it was able in the twenty year period between 1922 and 1942 to reduce the prices of large lamps, 78.6%; miniature lamps, 70.3% with an average for both types of 77.2% (Ex. GE-239). It can take just pride in the more graphic statistic that the price of a 60 watt bulb was 45 cents in 1922 and 10 cents in 1942. By the efficiency which it employed in its business, the use of research to improve its lamps, the development of new lamps and new uses for old lamps to increase the market, there was established a firm foundation for leadership.

On the other hand there can be no doubt that it paced its industrial achievements with efforts to insulate itself from competition. It developed a tremendous patent framework and sought to stretch the monopoly acquired by patents far beyond the intendment of those grants. It constructed a great network of agreements and licenses, national and international in scope, which had the effect of locking the door of the United States to any challenge to its supremacy in the incandescent electric lamp industry arising from business enterprise indigenous to this country or put forth by foreign manufacturers. Its domestic licenses gave fiat to a few licensees whose growth was carefully limited to fixed percentages of its own production and expansion so that over the years its share of the business was not materially diminished and its dominant proportion was never exposed to any hazard in that direction.

Admiration for the business acumen of General Electric, however, cannot avoid adherence to the philosophy of political economics enunciated in the anti-trust laws of the United States, for as the Supreme Court stated:

" * * * our economy is built largely upon competition in quality and prices. Associated Press v. United States, 326 U.S. 1, 12-14, 65 S.Ct. 1416, 1420-1422, 89 L.Ed. 2013. Validation by Congress of agreements to exclude competition is unusual. Monopoly is a protean threat to fair prices. It is a tantalizing objective to any business compelled to meet the efforts of competitors to supply the market. * * * Whatever may be the evil social effect of cutthroat competition on producers and consumers through the lowering of labor standards and the quality of the produce and the obliteration of the marginal to the benefit of the surviving and low-cost producers, the advantages of competition in opening rewards to management, in encouraging initiative, in giving labor in each industry an opportunity to choose employment conditions and consumers a selection of product and price, have been considered to overbalance the disadvantages. The strength of size alone, the disappearance of small business are ever present dangers in competition. Despite possible advantages to a

---

780, 789, 821, 825, 836, 854, 893, 894, 917 (footnote only), 996 id, 997 id, 998 id, 1022, 1039 id to 1072 id, inclusive, 1079 id, 1080 id, 1085, 1090, 1387, 1881 id, 1882 id, 1883 id, 1900, 2185 id, 2186 id, 2216.

stable economy from efficient cartels with firm or fixed prices for products, it is crystal clear from the legislative history and accepted judicial interpretations of the Sherman Act that competition on prices is the rule of congressional purpose and that where exceptions are made, Congress should make them." United States v. Line Material Co., 333 U.S. 287, 309, 310, 68 S.Ct. 550, at page 561.

General Electric, as has been indicated herein, must be held to have violated § 1 and § 2 of the Sherman Anti-Trust Act. International General Electric, Philips, Sylvania, Tungsol, Consolidated and Chicago Miniature are likewise so held. Corning and Westinghouse are bound by their consent decrees.

Concededly many of the practices which are adjudged in this opinion to be violative of the law by force of the consent decrees, lapse of time, and other circumstances, have been discontinued. Ordinarily the issues involving them might have been rendered moot, but under the stipulated conditions governing this case, the hiatus of time involved and changed conditions are to be disregarded and continuity is to be given to the case as if it were tried in regular order.

A motion should be made by the Government for a day when the form of the findings of fact, conclusions of law and the decree may be considered in accordance with the findings and conclusions set forth in this opinion.